ORAL ARGUMENT NOT YET SCHEDULED
No. 26-1037 (and consolidated cases)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN PUBLIC HEALTH ASSOCIATION, ET AL.,

*Petitioners,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

On Petition for Review of a Final Rule of the Environmental Protection Agency
(No. EPA-91FR7686)

**BRIEF OF THE ALLIANCE FOR AUTOMOTIVE INNOVATION
AS *AMICUS CURIAE* IN OPPOSITION TO THE YOUTH PETITIONERS'
MOTION TO STAY**

Rachel Levick, D.C. Bar No. 1024969
Aly Cox, D.C. Bar No. 1780473*
Laura Stanley, D.C. Bar No. 90008623
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Tel.: 202-887-3574
rlevick@gibsondunn.com
acox@gibsondunn.com
lstanley@gibsondunn.com

*Application for Admission Pending*

*Counsel for* Amicus Curiae *Alliance for Automotive Innovation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 15(c)(6) and 26.1, the Alliance for Automotive Innovation certifies that it is a not-for-profit trade association of motor vehicle manufacturers, original equipment suppliers, and technology and other automotive-related companies. The Alliance for Automotive Innovation operates for the purpose of promoting the general commercial, professional, legislative, and other common interests of its members. The Alliance for Automotive Innovation does not have any outstanding shares or debt securities in the hands of the public, nor does it have a parent company. No publicly held company has a 10% or greater ownership interest in the Alliance for Automotive Innovation.

**CERTIFICATE REGARDING SEPARATE *AMICUS* BRIEF**

Pursuant to D.C. Circuit Rule 29(d), the Alliance for Automotive Innovation certifies that a separate amicus brief is necessary to provide its unique perspective in the above-captioned consolidated proceedings concerning petitions for review of the final rule published by the U.S. Environmental Protection Agency ("EPA") entitled *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7,686 (Feb. 18, 2026) ("Final Rule"). Auto Innovators seeks to provide information with respect to the Youth Petitioners' Motion to Stay the Final Rule during the pendency of their challenge to the Final Rule. Auto Innovators also submits that the information presented herein similarly relates to the ultimate issue of the remedy in the event this Court grants any petition for review challenging the Final Rule. Members of *amicus curiae* are subject to the Final Rule under review and would be impacted by any relief granted on the Youth Petitioners' Motion to Stay and on any relief granted by this Court on the petitions for review of the Final Rule. A*micus curiae* is particularly well-suited to provide the Court with important context on these issues and the potential impacts to the directly regulated industry.

## CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1)(A), Auto Innovators submits this certificate of persons who are currently parties, intervenors, or amici:

### A.    Parties

- Petitioners in No. 26-1037: American Public Health Association; Alliance of Nurses for Healthy Environments; American Lung Association; Center for Biological Diversity; Center for Community Action and Environmental Justice; Clean Air Council; Clean Wisconsin; Conservation Law Foundation; Environmental Defense Fund; Environmental Law & Policy Center; Friends of the Earth; Natural Resources Defense Council, Inc.; Physicians for Social Responsibility; Public Citizen; Rio Grande International Study Center; Sierra Club; Union of Concerned Scientists.

- Petitioners in No. 26-1038: Elena Venner; Ariela Lara; Emma Weibel; Katherine McIntosh; Lienna Lentfer; Maya Williams; Taylin Nishida; C.E., a minor, by and through her guardian B.K.; E.S., a minor, by and through his guardian K.S.; J.K., a minor, by and through his guardian L.K.; J.G., a minor, by and through her guardian T.L.; L.R.F., a minor, by and through her guardian A.F.; L.D. and R.D., minors, by and through their guardian S.D.; M.B., a minor, by and through her guardian G.M.; M.D., a minor, by and through her guardian S.A.; N.N., a minor, by and through his guardian K.S.N.; N.G., a minor, by and through her guardian E.G. ("Youth Petitioners").

- Petitioner in No. 26-1039: Business Climate Initiative Action d/b/a Zero Emission Transportation Association.

- Petitioners in No. 26-1043: Metropolitan Congregations United for St. Louis and Missouri Coalition for the Environment.

- Petitioner in No. 26-1051: Service Employees International Union.

- Petitioners in No. 26-1061: Commonwealths of Massachusetts and Virginia; Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; States of Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon,

iii

Rhode Island, Vermont, Washington, Wisconsin; District of Columbia; United States Virgin Islands; Cities of Albuquerque, New Mexico; Boston, Massachusetts; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Los Angeles, California; and New York, New York; Counties of Harris, Texas; Martin Luther King, Jr., Washington; and Santa Clara, California; and Cities and Counties of Denver, Colorado, and San Francisco, California (State and Local Government Petitioners).

- Petitioners in No. 26-1083: Alaska Institute for Justice, Chesapeake Bay Foundation, Chinik Eskimo Community, Native Village of Kwinhagak, Native Village of Nunapitchuk, Northeast Organic Farming Association of New York, WE ACT, West Virginia Highlands Conservancy, Wyoming Outdoor Council, Hoosier Environmental Council, Illinois Environmental Council, Iowa Environmental Council, Minnesota Environmental Partnership, Ohio Environmental Council, and Food & Water Watch.

- Petitioner in No. 26-1090: Bay Area Air Quality Management District.

- Respondents in these consolidated cases: The EPA and EPA Administrator Lee M. Zeldin, in his official capacity.

- Intervenors at the time of this filing in these consolidated cases: State of West Virginia; Commonwealth of Kentucky; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Iowa; State of Kansas; State of Louisiana; State of Missouri; State of Mississippi; State of Montana; State of Nebraska; State of North Dakota; State of Ohio; State of Oklahoma; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; State of Wyoming; Domestic Energy Producers Alliance; Western States Trucking Association, Inc.; Construction Industry Air Quality Coalition, Inc.; Liberty Packing Company, LLC.; Nuckles Oil Company, Inc.; Truck and Engine Manufacturers Association; National Federation of Independent Business; American Free Enterprise Chamber of Commerce; Illinois Corn Growers Association; Iowa Corn Growers Association; Kentucky Corn Growers Association; Missouri Corn Growers Association; North Dakota Corn Growers Associations; Tennessee Corn Growers Association; NACCO Natural Resources Corporation; CO2 Coalition; American Petroleum Institute; American Fuel & Petrochemical Manufacturers; Energy Marketers of America.

- <u>Amici Curiae at the time of this filing in these consolidated cases</u>: Government Accountability & Oversight and Government Oversight & Education, d/b/a Protect the Public's Trust; and Senators Ted Cruz and Cynthia M. Lummis.

## B. Rulings

The final agency action under review is the EPA final rule entitled *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, <u>91 Fed. Reg. 7,686</u> (Feb. 18, 2026).

## C. Related Cases

This case has not previously been before this Court or any other court.

The EPA rule challenged by Petitioners in this case repeals EPA rules setting greenhouse gas ("GHG") emissions standards for vehicles and engines that were challenged by petitioners in three cases currently pending in this Court:

- *Nebraska v. EPA*, No. 24-1129 (D.C. Cir.) (challenging Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles—Phase 3, <u>89 Fed. Reg. 29,440</u> (Apr. 22, 2024));

- *Kentucky v. EPA*, No. 24-1087 (D.C. Cir.) (challenging Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, <u>89 Fed. Reg. 27,842</u> (Apr. 18, 2024)); and

- *Texas v. EPA*, No. 22-1031 (D.C. Cir.) (challenging Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, <u>86 Fed. Reg. 74,434</u>, 74,503 (Dec. 30, 2021)).

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE REGARDING SEPARATE *AMICUS* BRIEF ................................. ii

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES .................... iii

TABLE OF CONTENTS ...................................................................................... vi

TABLE OF AUTHORITIES ................................................................................ vii

GLOSSARY OF ABBREVIATIONS .................................................................... x

STATEMENT OF IDENTITY, INTEREST, AUTHORITY, AUTHORSHIP, AND FINANCIAL CONTRIBUTION ............................... 1

I.    INTRODUCTION ..................................................................................... 4

II.   BACKGROUND ....................................................................................... 5

    A.    The Final Rule ............................................................................. 5

    B.    GHG Standards Repealed by the Final Rule ....................................... 5

    C.    Certification, Fleet Mix, and Lead Time .............................................. 9

III.  ARGUMENT ........................................................................................... 10

    A.    The Multi-Pollutant Rule's GHG Standards Are Not Achievable ....................................................................................... 11

    B.    Reinstating the Infeasible Multi-Pollutant Rule GHG Standards Would Substantially Harm Automakers and Is Contrary to the Public Interest .............................................................. 22

    C.    Staying the Final Rule Would Not "Maintain the Status Quo" For Automakers ............................................................................. 27

IV.   CONCLUSION ......................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Center for Biological Diversity v. Regan*, 691 F. Supp. 3d 1
(D.D.C. 2023) .........................................................................................28

*Citizens for Resp. & Ethics in Washington v. Federal Election
Comm'n*, 904 F.3d 1014 (D.C. Cir. 2018) ..........................................10

*Cooper-Standard Auto. Inc. v. Daikin Am., Inc.*, 568 F. Supp. 3d 846
(E.D. Mich. 2021) ..................................................................................26

*Kalshiex LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024)............................10

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ...............................................10

*Nken v. Holder*, 556 U.S. 418 (2009)........................................................10

*Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*, 2025 WL
2996157 (D.D.C. Oct. 24, 2025) ............................................... 22, 26

*State v. Dep't of Transp.*, 2026 WL 183584
(W.D. Wash. Jan. 23, 2026) .................................................................18

*Tower Auto. Operations USA I, LLC v. Vari-Form Mfg. Inc.*, 2024 WL
641020 (E.D. Mich. Feb. 15, 2024)......................................................26

## Statutes & Regulations

42 U.S.C. § 7524.......................................................................................24

42 U.S.C. § 7525................................................................................... 9, 25

Congressional Review Act, H.J. Res. 88 (119th Congress)................ 8, 17

The One Big Beautiful Bill Act, H.R. 1, 119th Congress (2025)....... 8, 16

40 C.F.R. § 19.4 ........................................................................................24

40 C.F.R. § 85.2302 ....................................................................................9

40 C.F.R. § 85.2304 ...............................................................................................9

40 C.F.R. § 86.1848-10 .........................................................................................9

40 C.F.R. § 86.1865-12 ................................................................................. 10, 24

U.S. EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards: Final Rule*, 86 Fed. Reg. 74,434 (Dec. 30, 2021) .............................................................................6

U.S. EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024)............................................................... 5, 12, 15, 17

U.S. EPA, *Proposed Rule: Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards,* 90 Fed. Reg. 36,288 (Aug. 1, 2025) ............................................................................28

U.S. EPA, *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7,686 (Feb. 18, 2026) ...........................................1, 5

U.S. EPA, *Revision of Tier 4 Criteria Pollutant Standards, Part 1: Amendments to Phase-In Schedule for Light-Duty and Medium-Duty Vehicles*, 91 Fed. Reg. 28,463 (May 18, 2026)....................... 10, 19, 23, 25

**Other Authorities**

Accounting Standards Update: Environmental Credits and Environmental Credit Obligations (Topic 818), No. 2026-02 (May 19, 2026), Financial Account Standards Board ........................................24

Alliance for Automotive Innovation, *Alliance for Automotive Innovation Reports New U.S. Electric Vehicle Data* (March 25, 2026) ................................................................................. 15, 18

Alliance for Automotive Innovation*, Comments on Proposed Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, EPA-HQ-OAR-2025-0194................................................ 7, 14, 21

Alliance for Automotive Innovation, *Get Connected, Electric Vehicle Quarterly Report, Fourth Quarter, 2025* (March 25, 2026)................................14

Bui, A., Pierce, L., Slowik, P., & Searle, S., *How the Inflation Reduction Act is driving U.S. job growth across the electric vehicle industry*, International Council on Clean Transportation (Apr. 2025) ................................................................................................19

Energy Innovation Policy and Technology LLC, *Impacts of the One Big Beautiful Bill on U.S. energy costs, jobs, health and emissions* (Jun. 2025) ................................................................................................18

John Bozzella, *EPA's Final EV Plan: The Ragged Edge of Achievable?*, Alliance for Automotive Innovation (Mar. 20, 2024)...................11

Massachusetts Department of Energy & Environmental Affairs, *Enforcement Discretion for Advanced Clean Cars II Requirements* (May 23, 2025)................................................................................................17

New York State Department of Environmental Conservation, *New York Enforcement Discretion for Passenger Cars and Light-Duty Trucks under the Advanced Clean Cars II Regulation* (May 2025)...................17

S&P Global Mobility, *Model Years 2012 to 2024 Baseline Study* (Jan. 20, 2025, version 1.2)................................................................7

U.S. EPA, *Explore the Automotive Trends Data* (Mar. 27, 2025)....................... 8, 20

U.S. EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis,* EPA-420-R-24-004 (Mar. 2024) ........................................ 7, 16

U.S. EPA, *Optimization Model for reducing Emissions of Greenhouse Gases from Automobiles*, OMEGA 2.5.0 Downloadable Materials, Light-duty central case (March 2024) ..............................................................13

U.S. EPA, *The 2024 EPA Automotive Trends Report*, EPA-420-R-022 (Nov. 2024) ........................................................................ 6, 9, 15, 20, 21

## GLOSSARY OF ABBREVIATIONS

BEV                              Battery Electric Vehicle

CAA                              Clean Air Act

EPA                              Environmental Protection Agency

EV                               Electric Vehicle

GHG                              Greenhouse Gas

ICE                              Internal Combustion Engine

IRA                              Inflation Reduction Act

MY                               Model Year

OBBBA                            The One Big Beautiful Bill Act

PHEV                             Plug-In Hybrid Electric Vehicles

## STATEMENT OF IDENTITY, INTEREST, AUTHORITY, AUTHORSHIP, AND FINANCIAL CONTRIBUTION

The Alliance for Automotive Innovation ("Auto Innovators") is the singular, authoritative, and respected voice of the automotive industry. Its members include the U.S. operations of automakers, equipment manufacturers, and auto-related technology and aftermarket-part suppliers that represent providers of approximately 95% of new cars and light trucks sold in the U.S. Auto Innovators' membership spans the full scope of the auto industry, including companies of all sizes in the automotive and downstream consumer- and commercial-product supply chain. The auto industry is critical to the nation's transportation infrastructure, supports over ten million American jobs, and constitutes as much as 5% of the national economy.

The primary interest Auto Innovators seeks to address in this *amicus* brief is the implications and effects of granting the Youth Petitioners' Motion to Stay the Final Rule (the "Motion to Stay", Dkt. No. 2174285). Auto Innovators has an interest in this litigation because its members are directly impacted by the final rule published by the EPA, entitled *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7,686 (Feb. 18, 2026) ("Final Rule"), and would similarly be directly impacted by this Court granting any relief staying, suspending, or vacating the Final Rule. Auto Innovators seeks to file an *amicus curiae* brief in this challenge

1

in opposition to the Motion to Stay to provide the unique perspective of the light-duty automotive industry and explain to the Court the impact of a stay on that industry, its members, and U.S. consumers. No other party to this case has provided, or is appropriately situated to provide, the insights, facts, and data in this brief. This brief will assist this Court in evaluating the balance of equities, which Auto Innovators submits weigh against staying the Final Rule.

Auto Innovators' *amicus* brief should not be viewed as in tension with its members' support of and commitments to the reduction of vehicle emissions. Automakers have continued to develop and market expanded portfolios of electric vehicles ("EVs", including battery electric vehicles ("BEVs") and plug-in hybrid electric vehicles ("PHEVs"))—one prong in their strategies to reduce new vehicle greenhouse gas emissions. But automakers have recently been faced with rapidly changing emissions standards. Denying the Motion to Stay the Final Rule would provide both stability and certainty while this litigation is pending. Staying the Final Rule would create an unworkable regulatory environment, significantly harming the automotive industry and its consumers.

Auto Innovators has sought leave to file this brief pursuant to a contemporaneously filed unopposed Motion for Leave to File as *Amicus Curiae*. No counsel for a party authored Auto Innovators' brief in whole or in part; no party or party's counsel contributed money to fund preparing or submitting the brief; and no

2

person other than the *amicus curiae*, its members, or its counsel contributed money

to fund preparing or submitting the brief.

## I.    INTRODUCTION

Auto Innovators' member companies are subject to and directly impacted by motor vehicle standards, certification requirements, and compliance obligations promulgated, rescinded, and revised by EPA.  The years-long design, development, and production cadence inherent to automotive manufacturing necessitates investments in technology and production capacity years in advance.  As such, Auto Innovators has long promoted a stable regulatory environment coordinated across the whole of government and reasonable, achievable standards that preserve consumer choice, support innovation, and continue to reduce vehicle emissions.  But increasingly, automakers and suppliers in the U.S. have been forced to navigate rapid and dramatic swings in vehicle emissions policy from one administration to the next. These regulatory changes put billions of dollars of capital investment at risk.

The Final Rule altered the regulatory landscape by repealing unachievable federal greenhouse gas emissions standards established in prior EPA rulemakings. The manufacturers who are members of Auto Innovators benefit from the stability that the Final Rule provides.  Conversely, members of Auto Innovators would be significantly and adversely impacted by this Court staying the Final Rule.

The Motion to Stay does not address the substantial and wide-reaching costs to auto manufacturers and to the public of staying the Final Rule, and thus fails to contend with the true balance of equities.  This amicus brief does.  In light of the

4

substantial costs to industry and to the public associated with granting the Youth Petitioners' requested relief, as well as the other stay factors, this Court should deny the Motion to Stay.

## II.    BACKGROUND

### A.    The Final Rule

In the Final Rule, EPA rescinded its 2009 Greenhouse Gas ("GHG") endangerment finding ("Endangerment Finding"), determining that Section 202(a)(1) of the Clean Air Act ("CAA") does not authorize the EPA to resolve questions of global climate change and regulate GHG emissions from new motor vehicles and engines.  Final Rule, 91 Fed. Reg. at 7,688.  The Final Rule also independently rescinded federal motor vehicle GHG standards, certification, and compliance rules, effective April 20, 2026. *Id.*

### B.    GHG Standards Repealed by the Final Rule

The "Multi-Pollutant Rule," the most stringent of the GHG standards rescinded by the Final Rule, was promulgated by the EPA in 2024.  It set increasingly demanding light- and medium-duty vehicle GHG standards for model years ("MYs") 2027-2032.[1]  The Multi-Pollutant Rule contained the strictest GHG

---

[1] U.S. EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024) (hereinafter "Multi-Pollutant Rule").  Automakers were already facing challenging GHG emissions levels for MYs 2023-2026 before the even more stringent emissions standards in the Multi-Pollutant Rule, as EPA increased the stringency of MY 2023-

emissions standards ever imposed on the light-duty and medium-duty vehicle sectors.

While automakers have continued to develop and market expanded portfolios of EVs—one of several prongs in their strategies to reduce new vehicle GHG emissions[2]—the stringency of the Multi-Pollutant Rule standards created significant compliance challenges for many automakers. In part, those challenges arose because the degree of electrification required by the Multi-Pollutant Rule was too much, too fast. And recent policy changes and market trends have only exacerbated these challenges. It is now infeasible for the industry at large to comply with these (currently repealed) standards.

In particular, Auto Innovators assesses that there is no internal combustion engine ("ICE")-based pathway to meet the MY 2027-2032 standards. In MY 2026, Auto Innovators is not aware of any non-electrified vehicles that meet the MY 2027 footprint-based GHG targets, even assuming maximum use of credit flexibilities including direct and indirect credits for air conditioning technologies and off-cycle

---

2026 light-duty vehicle greenhouse gas standards in an earlier 2021 rulemaking. *See* U.S. EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards: Final Rule*, 86 Fed. Reg. 74,434 (Dec. 30, 2021).

[2] In MY 2023, the average new light-duty vehicle emitted 17% lower tailpipe GHG emissions per mile than it did in MY 2012. U.S. EPA, *The 2024 EPA Automotive Trends Report*, EPA-420-R-022 (Nov. 2024) at 99.

technology credits.[3]  In the early years of the program, if reinstated, there would not be sufficient time to deploy the level of strong hybridization necessary to meet the standards without significant increases in EV market share.  In the later years of the program, the only vehicles likely to comply with the standards are EVs, which would have to be used to balance out the emissions of remaining ICE vehicles.  Analysis from S&P Global found that by 2030, the only MY 2024 vehicles that could meet the future standards are EVs.[4]  Even conventional strong hybrid EVs would generally not meet the MY 2030 and later targets, requiring EVs to offset them for compliance.

Moreover, the Multi-Pollutant Rule's reliance on EVs was premised on assumptions regarding EV demand and adoption rates that have since become outdated and inaccurate.  The Multi-Pollutant Rule assumed rapid growth in the U.S. market for EVs, supported in part by significant government investments in the EV supply chain, charging infrastructure, and consumer incentives.  *See* U.S. EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty*

---

[3] Analysis performed by Auto Innovators based on data from S&P Global Mobility Vehicle Technical Intelligence Platform (VTIP) as of June 3, 2026.

[4] S&P Global Mobility, *Model Years 2012 to 2024 Baseline Study* (Jan. 20, 2025, version 1.2) at 87 (funded by Auto Innovators); *see* Alliance for Automotive Innovation*, Comments on Proposed Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, EPA-HQ-OAR-2025-0194, 15–16, Figure 5 (Sept. 22, 2025).

*and Medium-Duty Vehicles, Regulatory Impact Analysis,* EPA-420-R-24-004 (Mar. 2024). The standards were also premised on the continued enforcement of California's Zero Emission Vehicle ("ZEV") regulations established through its Advanced Clean Cars II ("ACC II") regulations. However, both these federal initiatives and State programs were subsequently dissolved. *See* The One Big Beautiful Bill Act ("OBBBA"), H.R. 1, 119th Congress (2025); Congressional Review Act, H.J. Res. 88 (119th Congress). These policy changes, as well as other drastic changes to the EV market, charging infrastructure, consumer demand, supply chains, and affordability eroded the foundation upon which the EPA built its Multi-Pollutant Rule. The 2027 and later standards are simply not achievable in light of these significant changes to conditions outside of the control of automakers.

Notably, although the Multi-Pollutant Rule allowed automakers to comply with GHG standards by using banked and/or purchased credits, the credit trading market shows significant strain and is unlikely to provide sufficient compliance pathways. In MY 2023, full-line automakers incurred nearly 50 million metric tons ("MMT") of deficits,[5] while only about 37 MMT of credits were generated by

---

[5] U.S. EPA, *Explore the Automotive Trends Data*, https://www.epa.gov/automotive-trends/explore-automotive-trends-data (Mar. 27, 2025). Sum of "Total Credits (Mg)" without BYD, BYD Motors, Coda, Fisker, Karma, Karma Automotive LLC, Lucid, Rivian, Rivian Automotive LLC, and Tesla. Calculations by Auto Innovators.

EV-only manufacturers.[6]  The aggregate bank of credits has dropped every year since 2014 and fell to a record low of approximately 123 MMT in 2023.[7]

### C.    Certification, Fleet Mix, and Lead Time

Automakers may not sell a new vehicle unless it is covered by an EPA "certificate of conformity" confirming compliance with applicable emissions standards; violations of those requirements can lead to denial, suspension, or revocation of the certificates needed for initial sale.  *See* 42 U.S.C. § 7525(b)(2). Under EPA's rules, a certificate must be issued and in effect before sale, and certificates cover only vehicles produced during the applicable model-year production period; a model year must include January 1 of the named year and the annual production period may begin as early as January 2 of the preceding calendar year.  *See* 40 C.F.R. §§ 86.1848-10, 85.2302, 85.2304.  Compliance with the annual, sales-weighted fleet-average greenhouse gas standard is a condition of that certificate, and if the condition is not met, affected vehicles are deemed "not covered by the certificate."  40 C.F.R. § 86.1848-10(c)(7).  Indeed, under the regulations in place prior to the rule that is the subject of the present challenge, EPA could seek to void certificates *ab initio* if a manufacturer failed to meet the corporate average

---

[6] *Id.* at Table I. Compliance Data: Manufacturer Credit Balances as of October 2024.  Calculations by Auto Innovators based on "Final 2023 Credit Balance."

[7] *The 2024 EPA Automotive Trends Report*, *supra*, at 147, Figure 5.15.

standard or obtain sufficient credits to satisfy its shortfall. 40 C.F.R. § 86.1865-12(k)(7) and (8)(i), prior to April 20, 2026.

As a practical matter, then, manufacturers must lock in model year designs and certification and fleet-mix decisions well in advance; indeed, some have already certified MY 2027 vehicles. *See* U.S. EPA, *Revision of Tier 4 Criteria Pollutant Standards, Part 1: Amendments to Phase-In Schedule for Light-Duty and Medium-Duty Vehicles*, 91 Fed. Reg. 28,463, 28,473 (May 18, 2026) (the "Tier 4 Delay Proposed Rule") ("[S]ome companies have certified Tier 4 vehicles for MY 2027.").

## III.   ARGUMENT

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must make the same showing as for a preliminary injunction. *Kalshiex LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024). Youth Petitioners must therefore (1) make a "strong showing that [they are] likely to succeed on the merits" of the appeal; (2) demonstrate that they will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties interested in the proceeding"; and (4) establish that "the public interest" favors a stay. *Id.*; *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Youth Petitioners do not account for the extraordinary harms a stay would impose on the regulated parties, claiming instead that "there is no possibility of substantial and imminent harm to the public or EPA if a stay is granted." Motion to Stay at 29. Auto Innovators seeks to provide this Court with information regarding the substantial injuries to automakers (and the resulting harms to consumer choice and the public interest) were the Court to stay the Final Rule pending appeal. Given these harms, the balance of equities does not support granting the requested stay.

## A.    The Multi-Pollutant Rule's GHG Standards Are Not Achievable.

At the time of enactment, the GHG standards in the Multi-Pollutant Rule were "on the ragged edge of achievable … if everything … [went] just right."[8] However, everything did not go "just right." As explained below, the Multi-Pollutant Rule effectively mandated that EVs constitute a majority of new vehicle sales by 2030, as EPA demonstrated no ICE-based compliance pathway. The assessments of the rule's feasibility depended on optimistic assumptions about EV demand, federal incentives, state ZEV programs, and charging infrastructure—assumptions that proved inaccurate as market conditions and policy shifted dramatically. The credit trading market, moreover, cannot indefinitely bridge the gap between these

---

[8] John Bozzella, *EPA's Final EV Plan: The Ragged Edge of Achievable?*, Alliance for Automotive Innovation (Mar. 20, 2024), https://www.autosinnovate.org/posts/blog/ragged-edge-of-achievable.

11

standards and real-world fleet performance.  In short, the Multi-Pollutant Rule standards were barely achievable when enacted and have since become entirely infeasible for the automotive industry as a whole.  Reinstating those standards by staying the effect of the Final Rule would have disastrous consequences for industry and consumers alike.

> **1.     The Multi-Pollutant Rule's Assumptions Regarding EV Demand Were Unrealized.**

The Multi-Pollutant Rule claimed to set performance-based GHG standards in a way that did not mandate the adoption or use of any specific technology to meet those demanding standards.  That logic is akin to imposing a requirement to travel from Los Angeles to Boston in 18 hours and claiming that compliance with that requirement would not require the use of any specific mode of travel, like flying.  There is simply no way to get from Los Angeles to Boston in 18 hours without traveling by air for a substantial part of the trip.

Likewise, every compliance pathway EPA modeled for the MY 2027-2032 standards required that EVs surpass 50% market share no later than 2030.[9]  EPA did not demonstrate an alternative ICE-based pathway for compliance.  Auto Innovators believes that no such pathway exists: in the early years of the program, there is insufficient time to deploy strong hybridization at the scale needed to meet the

---

[9] Multi-Pollutant Rule, <u>89 Fed. Reg. at 27,856</u>, Table 3.

standards without significant increases in EV market share; in the later years, the only vehicles likely to comply are EVs, which must offset the emissions of remaining ICE vehicles. As shown in Figure 1, the EV penetration rates for the three GHG compliance pathways presented in the Multi-Pollutant Rule diverge sharply from the actual EV market share in the first half of 2025 (represented by the black dotted line).



Figure 1: EPA-projected U.S. light-duty vehicle EV market share for compliance with MY 2023-2032 standards and calendar year 2025 EV market share through 1H 2025.[10]

---

[10] Model year 2023-2026 EPA projections calculated by Auto Innovators from U.S. EPA, *Optimization Model for reducing Emissions of Greenhouse Gases from Automobiles*, OMEGA 2.5.0 Downloadable Materials, Light-duty central case (March 2024) (zip), Light-duty lower BEV production sensitivity (March 2024) (zip), Light-duty no additional BEVs beyond no-action sensitivity (March 2024) (zip), https://www.epa.gov/regulations-emissions-vehicles-and-engines/optimizati on-model-reducing-emissions-greenhouse-gases (last accessed May 18, 2026). 1H, 2025 EV market share compiled by Alliance for Automotive Innovation with new

Meeting the Multi-Pollutant Rule's projections would thus have required the EV market share to roughly triple in the course of a year and continue to rise thereafter.[11]  Instead, nationwide market share of new EVs plateaued and then declined.  Despite consumers having more plug-in EV options than ever to choose from, EV market growth flattened from mid-2023 to mid-2025.  In the first half of 2025, EVs represented just 9.6 percent of all light vehicle sales, a decrease in market share of 0.1 percentage points from the first half of 2024.[12]  Then, EV sales dropped even further, with the end of 2025 seeing the lowest EV sales since the first quarter of 2022.[13]  In the fourth quarter of 2025, EV market share plummeted to just 6.5 percent, representing a year-over-year decline of 4.4 percentage points.[14]  Even

---

registrations for retail and fleet data provided by S&P Global Mobility covering January 1, 2024 – June 30, 2024 and January 1, 2025 – June 30, 2025.

[11] *See* Alliance for Automotive Innovation, *Comments on Proposed Rescission*, *supra*, at 13-14.

[12] Figures compiled by Alliance for Automotive Innovation with new registrations for retail and fleet data provided by S&P Global Mobility covering January 1, 2024 – June 30, 2024 and January 1, 2025 – June 30, 2025.  *See* Alliance for Automotive Innovation*, Comments on Proposed Rescission*, *supra*, at 14-15.

[13] Alliance for Automotive Innovation, *Alliance for Automotive Innovation Reports New U.S. Electric Vehicle Data* (March 25, 2026), https://www.autosinnovate.org/posts/press-release/2025-q4-get-connected-press-release.

[14] Alliance for Automotive Innovation, *Get Connected*, *Electric Vehicle Quarterly Report, Fourth Quarter, 2025* at 2 (March 25, 2026), https://www.autosinnovate.org/posts/papers-reports/Get%20Connected%20EV%20Quarterly%20Report%202025%20Q4.pdf.

before the rapid changes of policy discussed herein, low consumer EV adoption created a gap between EV market trends and regulatory requirements.[15]  Time and an evolving policy landscape continue to widen this gap.

### 2.  Policies Supporting the Multi-Pollutant Rule Have Been Eliminated.

Government policies underlying the Multi-Pollutant Rule drastically changed since the Rule was promulgated, further impacting EV market potential.  In the Multi-Pollutant Rule, EPA explicitly and repeatedly acknowledged that the feasibility of the GHG standards was directly tied to incentives—like tax credits—created by the Inflation Reduction Act of 2022 ("IRA") and the Infrastructure Investment and Jobs Act, otherwise known as the Bipartisan Infrastructure Law.  *See, e.g.*, Multi-Pollutant Rule, 89 Fed. Reg. at 27,851, 28,027.  Those incentives no

---

[15] As discussed herein, automakers were generating GHG deficits in MY 2023, indicative of the decline in EV market growth.  *See The 2024 EPA Automotive Trends Report*, *supra*, at Table 5-19.  Fifteen automakers (representing 90% of U.S. auto sales) generated annual GHG regulation deficits amounting to over 49 million Megagrams of carbon dioxide.  This level of GHG deficit exceeded the total credits earned by the EV-only manufacturers that model year by 33%, meaning that EV-only manufacturers no longer had capacity to sell credits to cover the deficit-generating companies' shortfalls.  The 49 million Megagram regulatory shortfall for MY 2023 was twice the cumulative shortfall of deficit-generating companies for the previous MY, 2022.

longer exist.    OBBBA revoked the programs that EPA deemed critical to compliance—a development the Multi-Pollutant Rule did not anticipate.[16]

Specifically, OBBBA eliminated the IRA's new consumer purchase incentive of up to $7,500 for new EVs and $4,000 for used EVs and incentives for installing charging infrastructure, and it substantially modified the advanced manufacturing tax credit for EV batteries of up to $45 per kilowatt-hour.  The Multi-Pollutant Rule assumed manufacturers would increasingly produce vehicles eligible for the $7,500 new EV credit.  However, this expectation did not account for the OBBBA's elimination of the purchase tax credit.  Nor did the Multi-Pollutant Rule account for new OBBBA eligibility constraints for the EV batteries tax credits—such as critical mineral and manufacturing content requirements—or the long lead times needed to build facilities and restructure supply chains.  High upfront cost is already one of the top reasons consumers cite in deciding to not purchase EVs, and changes made by OBBBA further decreased the affordability of EVs.

The elimination of the Multi-Pollutant Rule's foundations extends beyond federal incentives.  EPA also premised its standards on third-party projections of EV market share that included state-level EV mandates, such as California's ACC II

---

[16] *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis*, *supra*, at 4-28 (discussing "Federal Purchase Incentive").

16

regulation. ACC II required automakers to progressively increase sales of zero-emission vehicles over time, culminating in a 100% zero-emission vehicle sale requirement for all new light-duty vehicles sold in California by 2036. Multi-Pollutant Rule, 89 Fed. Reg. at 27,847. In EPA's view, third-party projections including California's regulation, and subsequent adoption by other states, "point[ed] to greatly increased penetration of electrification across the U.S. light-duty fleet in the coming years." *Id.* But these state policies, too, have been dismantled.[17] Congress invalidated EPA's Clean Air Act waiver for the California ACC II regulation through the Congressional Review Act, H.J. Res. 88 (119th Congress), eliminating the state-level mandates that underlay the projections that EPA relied upon to project the EV adoption rates necessary for compliance with the Multi-Pollutant Rule.

Compounding these policy reversals, the charging infrastructure required to support EPA's compliance pathways has failed to materialize. Adequate EV charging infrastructure is universally recognized as a prerequisite to the EV adoption volumes the Multi-Pollutant Rule demanded, yet despite efforts by automakers and

---

[17] To this end, adopting states issued enforcement discretion letters. *See, e.g.*, New York State Department of Environmental Conservation, *New York Enforcement Discretion for Passenger Cars and Light-Duty Trucks under the Advanced Clean Cars II Regulation* (May 2025); Massachusetts Department of Energy & Environmental Affairs, *Enforcement Discretion for Advanced Clean Cars II Requirements* (May 23, 2025).

infrastructure companies, deployment has fallen far short of what is needed. Infrastructure installation trends[18] and changes to governmental funding[19] have not resulted in the infrastructure necessary to support EPA's compliance pathways under the Multi-Pollutant Rule.

The scale of the downturn in the EV market is staggering. Various independent research groups projected EV market share drops of 20 to 45 percent below business-as-usual EV projections. Energy Innovation predicts that 2030 EV market share will drop from 55 percent to 31 percent (a 44 percent reduction) following elimination of the IRA incentives.[20] The International Council on Clean

---

[18] To further illustrate inadequacies of U.S. public charging infrastructure:

- 27% of counties had no access to public charging.
- 41% of counties had five or fewer charging ports.
- One-third of all charging is located in just 25 counties.
- 44% of counties had no DC fast charging available.
- 6% of counties had access to only one DC fast charger.

Alliance for Automotive Innovation, *New U.S. Electric Vehicle Data*, *supra*.

[19] *See State v. Dep't of Transp.*, 2026 WL 183584 (W.D. Wash. Jan. 23, 2026) (detailing the freezing of National Electric Vehicle Infrastructure ("NEVI") funding, changing administrative guidance and regulation, and vacatur of executive action since January 2025).

[20] Energy Innovation Policy and Technology LLC, *Impacts of the One Big Beautiful Bill on U.S. energy costs, jobs, health and emissions* (Jun. 2025), https://energyinnovation.org/wp-content/uploads/Impacts-Of-The-One-Big-Beautiful-Bill-On-U.S.-Energy-Costs-Jobs-Health-And-Emissions_FINAL.pdf.

Transportation similarly projects that 2030 EV market share will fall from 40 percent with the IRA to approximately 32 percent without it—a 20 percent decline.[21]

EPA itself concedes that there have been significant changes to the Agency's assumptions regarding EV sales in the Multi-Pollutant Rule.[22]  EPA now "projects that the share of new light-duty [battery EVs ("BEVs")] sold in the market will be significantly lower in MYs 2027 and 2028 than the Agency previously estimated in the [Multi-Pollutant Rule]."  Tier 4 Delay Proposed Rule, 91 Fed. Reg. at 28,467. The Agency acknowledges that "[m]anufacturers … will be faced with fewer BEV sales than previously expected and have a limited time to alter their product plans for MYs 2027 and 2028."  *Id.*  EPA now projects the overall BEV market share values will be eight percent in MY 2027 and 12 percent in MY 2028—a fraction of what the Multi-Pollutant Rule anticipated in justifying its stringent standards.  *Id.* at 28,470.  When the regulator itself has abandoned the factual premises of its own

---

[21] Bui, A., Pierce, L., Slowik, P., & Searle, S., *How the Inflation Reduction Act is driving U.S. job growth across the electric vehicle industry*, International Council on Clean Transportation (Apr. 2025), https://theicct.org/wp-content/uploads/2025/04/ID-344-%E2%80%93-IRA-jobs_report_final.pdf.

[22] On May 14, 2026, EPA announced a proposed rulemaking to delay the Tier 4 criteria emission standards in the Multi-Pollutant Rule for light- and medium-duty vehicles by two years until MY 2029.  *See generally* Tier 4 Delay Proposed Rule, 91 Fed. Reg. 28,463.  The proposed rule relates to criteria emissions and does not address GHG standards because EPA rescinded the GHG emissions standards in the Final Rule.  *Id.* at 28,475 (GHG standards are "outside the scope of this rule").

rule, those premises cannot be relied upon to justify a judicial stay that would reimpose the rule's mandates on the regulated industry.

### 3. The Credit Market Is Not a Path to Compliance.

Youth Petitioners contend that "[i]f the Endangerment Finding and GHG emission standards are reinstated immediately, it would still be possible for automakers that have canceled EV models to meet the MY 2027 standards by purchasing GHG emission credits from EV manufacturers."  Motion to Stay, Ex. 12 at 14 (Sperling Decl.).  This claim could not be further from the truth.

While the Multi-Pollutant Rule does allow automakers to meet GHG standards by using banked and/or purchased credits, the credit market is under considerable strain and is unlikely to offer a feasible path to long-term compliance. As described above, industry aggregate credit banks fell, nearing exhaustion, and demand was outpacing available credit banks.[23]

The credit market also favors EV-only manufacturers, who generate a substantial majority of the available credits, while imposing costs on ICE-producing manufacturers.  The imbalance is already apparent: in MY 2023, the first year of the previously revised more stringent GHG standards, 15 of 23 automakers generated

---

[23] *Explore the Automotive Trends Data*, *supra* n.5; *The 2024 EPA Automotive Trends Report*, *supra*, at 147, Figure 5.15.

deficits.[24]  Of the eight manufacturers that generated credits, four were EV-only and two were small-volume manufacturers subject to less stringent alternative standards.[25]  In other words, only two of the sixteen ICE-producing manufacturers subject to the primary standards produced compliant fleets solely through consumer demand and purchase of vehicles.  Full-line automakers have, in aggregate, incurred deficits in each model year since 2016.[26]

As the standards tighten and EV market adoption continues to lag behind the compliance pathways EPA modeled, the pool of available credits will shrink even as the demand for credits rises—making eventual shortfalls a near certainty and further amplifying the cost transfer from ICE manufacturers to EV-only OEMs.  These facts reinforce that purchased credits are not a durable compliance solution, as credit scarcity was already materializing under the 2023-2026 program.

*    *    *

In light of the widely recognized drop in EV sales and U.S. market conditions, there is no feasible pathway for automakers to meet the Multi-Pollutant Rule projections for light-duty vehicle EV market share in MYs 2027-2032.  High EV

---

[24] *The 2024 EPA Automotive Trends Report*, *supra*, at 130, Figure 5.11.

[25] *Id*.

[26] Alliance for Automotive Innovation, *Comments on Proposed Rescission*, *supra*, at 10-11.

adoption rates were critical to the compliance pathways EPA outlined for the Multi-Pollutant Rule, and the impossibility of achieving the EV market share projections underlying the Multi-Pollutant Rule now means that compliance with the GHG standards in the Multi-Pollutant Rule is also infeasible for the industry as a whole.

**B.    Reinstating the Infeasible Multi-Pollutant Rule GHG Standards Would Substantially Harm Automakers and Is Contrary to the Public Interest.**

Youth Petitioners argue that the "need for regulatory certainty" weighs in favor of a stay, and that "any costs to manufacturers" from staying the Final Rule would be "short term," Motion to Stay at 29-30, but these arguments are belied by the facts. Given the unachievable nature of the Multi-Pollutant Rule GHG standards, any reversion to or "snapping back" of these standards would significantly harm automakers and harm the public interest. If this Court were to grant a stay of the Final Rule and reinstate the GHG emissions standards, automakers would have no realistic compliance pathways, jeopardizing their MY 2027 and future fleets, putting significant capital investment at risk, and imposing significant costs. These harms, and the reverberations throughout the marketplace and inevitable harm to consumers, tip the scale of equities against Youth Petitioners' request. *See Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*, 2025 WL 2996157 (D.D.C. Oct. 24, 2025) (denying Plaintiffs' motion to stay where "halting construction" of the Empire Wind project would "cause a ripple effect … that w[ould] likely lead to Project

cancellation," "cause [Empire Wind] to both lose any benefit from the $3 billion it has already invested in the project and face $850 million in termination fees for violating deadlines in [its] contracts," and lead to "the loss of thousands of jobs").

The potential costs of reinstating these unachievable standards could total tens of billions for the automotive industry. As described above, there is no viable compliance pathway for the Multi-Pollutant Rule's GHG standards. Reinstatement would force automakers to take drastic actions—such as restricting sales or production of already designed and/or certified ICE vehicles or competing with one another to purchase scarce compliance credits from EV-only companies—which would not only be infeasible but also impose significant costs on the industry and the public.[27] Further, automakers would be forced to risk compliance deficits. Automakers could face EPA non-compliance enforcement actions in the face of infeasible standards, which could include claims for civil penalties of up to $59,114

---

[27] As the EPA recently recognized in its Tier 4 Delay Proposal, other theoretical compliance options to attempt to force consumers into buying EVs, such as by restricting ICE vehicle sales volumes, in the absence of demand are not feasible. *See* Tier 4 Delay Proposed Rule, 91 Fed. Reg. at 28,472. Not only would such attempts negatively impact the marketplace and constrain consumer choice, for example by making fewer vehicles available and/or resulting in a net reduction in vehicle sales, but they would also be unlikely to result in successful compliance. A forced reduction in new vehicle sales may result in a net emissions increase, rather than providing any relief to movants. For example, if automakers were forced to limit ICE sales, customers may need to retain older vehicles longer, delaying fleet turnover and keeping older, higher-polluting vehicles on the road for an extended period.

per vehicle, decertification of vehicles in commerce, or other remedies.[28]  Pursuant to a newly released Accounting Standards Update by the Financial Accounting Standards Board addressing environmental credits and environmental credit obligations,[29] if the Multi-Pollutant Rule was reinstated, automakers would have to accrue the "fair value" of penalty exposure for any anticipated noncompliance with those GHG standards.  This requirement would have a clear and substantial negative financial impact on industry.

And even if automakers could theoretically comply with the Multi-Pollutant Rule GHG standards—which they cannot—automakers have already invested heavily in vehicle designs and fleet mixes for vehicles currently on the road, as well as future MYs 2027 and 2028, in reliance on the Endangerment Finding rescission. Given the realities of product development, labor, manufacturing, supply chain, marketing, and other operations that require significant lead time, automakers cannot simply change the vehicles available in the current, in progress, and near-term future MYs.  A rapid swing in regulatory policy puts billions of dollars of capital investment at risk for vehicles already produced and designed under the status quo.

---

[28] 40 C.F.R. § 86.1865-12 (j)(7), (k)(8); 42 U.S.C. § 7524(a); 40 C.F.R. § 19.4.

[29] Accounting Standards Update: Environmental Credits and Environmental Credit Obligations (Topic 818), No. 2026-02 (May 19, 2026), Financial Accounting Standards Board, *available at* https://tinyurl.com/4yzhd6ad.

As explained, vehicles must go through a certification application process and cannot be sold without a valid "certificate of conformity." 42 U.S.C. § 7525(b)(2). Manufacturers lock in model-year designs well in advance, in part due to the need to obtain the requisite approvals from regulators. Certification timelines for MY 2027 are, at this point, effectively fixed and cannot feasibly be unwound. Some automakers have already certified MY 2027 vehicles, placed orders with suppliers, planned production schedules, and began accepting orders, making resurrection of canceled MY 2027 designs prohibitively expensive and impracticable. *See* Tier 4 Delay Proposed Rule, 91 Fed. Reg. at 28,473.

Automakers also make fleet-mix decisions well in advance of a given model year. EPA recently confirmed that manufacturers have "limited time to alter their product plans for MYs 2027 and 2028." Tier 4 Delay Proposed Rule, 91 Fed. Reg. at 28,467. Automakers have already made consequential MY 2027 and 2028 decisions in response to the lag in demand for EVs that cannot be easily reversed, including reducing EV investments, reviving ICE engines, pausing plant conversions, and halting specific EV lines. *See* Tier 4 Delay Proposed Rule, 91 Fed. Reg. at 28,471-72. The MY 2027 certification-ready ICE powertrains and plant schedules are in place and not practically reversible at this stage. These decisions are "time sensitive" and implicate significant capital "already invested" in MY 2027.

25

*Save Long Beach Island*, 2025 WL 2996157, at *6.  The significant disruptions to automakers weigh against a stay.

Youth Petitioners themselves acknowledge these realities.  *See* Motion to Stay at 25 ("The nature of auto manufacturing requires years of lead time to design and build new model year ('MY') vehicles."); *id.* at 26 (recognizing that, once fleet decisions are made and ICE vehicles are manufactured and placed into commerce, "there can be no do over and no redress").  However, the Motion to Stay does not go on to address the logical consequences of a stay of the Final Rule and the resulting harm to the automotive industry (and the public).  Ignoring those harms, which are exacerbated by the long lead time inherent in vehicle development and certification, the Motion to Stay includes the unsupported claim that "[a]ny costs to manufacturers 'would only be short-term.'"  *Id.* at 30.  For the many reasons discussed herein, this assertion is not credible.

What is more, these unavoidable disruptions to the automotive industry and its supply chain will certainly reach beyond manufacturers; they will also have significant impacts on the U.S. economy and consumers.  *See Cooper-Standard Auto. Inc. v. Daikin Am., Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021) ("The public interest also weighs in favor of the efficient administration of the automotive industry."); *Tower Auto. Operations USA I, LLC v. Vari-Form Mfg. Inc.*, 2024 WL 641020, at *9 (E.D. Mich. Feb. 15, 2024) ("[A] disruption to the automotive supply

26

chain will harm the public's interest."). Dealers will be impacted if vehicle fleets and/or individual vehicles become non-compliant due to regulatory whiplash, leading to decreases in vehicle supply and stock that dealers cannot sell. And ordinary American consumers will likely face obstacles to marketplace choice and product availability, order cancellations, and increased costs for vehicles, repair parts, and service. Because substantial harms to the automotive industry will have ripple effects throughout the U.S. economy, the public interest does not favor a stay of the Final Rule and the reinstatement of the Multi-Pollutant Rule during the pendency of this litigation.

### C.    Staying the Final Rule Would Not "Maintain the Status Quo" For Automakers.

Youth Petitioners argue that a stay would "maintain[] the status quo" during the pendency of litigation. Motion to Stay at 2. As it relates to the automakers, this contention is false. Because automakers have already made production plans for MY 2026 vehicles as well as fleet design, certification, production ordering and scheduling decisions for MY 2027 based on the Final Rule, staying the Final Rule would not "maintain the status quo" but rather reinstate unachievable GHG standards at enormous cost to automakers.

The "status quo" started to change nearly a year ago, became final months before Youth Petitioners sought a stay, and has already had effects on automakers that cannot be unwound. The EPA announced its proposal to rescind the GHG

Endangerment Finding on July 29, 2025, publishing the proposed rule on August 1, 2025. *See* U.S. EPA, *Proposed Rule: Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards,* 90 Fed. Reg. 36,288 (Aug. 1, 2025). The Final Rule was published on February 18, 2026, and became effective two months later on April 20, 2026. By the time Youth Petitioners filed their motion—a month after the Final Rule became effective—compliance with the Multi-Pollutant Rule had already become impossible, MY 2026 production ordering and assembly schedules were set, and many MY 2027 vehicles had already been certified under the Final Rule. "It is now too late to return to the state of affairs as they existed" before the Final Rule went into effect, and a stay cannot "turn the clock back" to the time before EPA announced the Final Rule and repealed the Multi-Pollutant Rule GHG standards. *See Ctr. for Biological Diversity v. Regan*, 691 F. Supp. 3d 1, 11 (D.D.C. 2023) (concluding that an injury was not redressable by a 30-day suspension of an EPA rule because of the changed state of affairs since the rule took effect).

Staying the effect of the Final Rule would not maintain the current status quo, but rather cause untenable standards to "snap back" into effect without sufficient lead time, creating immediate compliance costs and impossibilities for automakers. These harms to automakers (and the resultant harms to consumers and the economy) strongly counsel against granting the Youth Petitioners' Motion to Stay.

28

## IV.    CONCLUSION

For the foregoing reasons, in particular the harms to the regulated community and the public interest that would flow from staying the Final Rule, the Court should deny Youth Petitioners' Motion to Stay the Final Rule.

Date: June 29, 2026                    Respectfully submitted,

*/s/ Rachel Levick*

Rachel Levick, D.C. Bar No. 1024969
Aly Cox, D.C. Bar No. 1780473*
Laura Stanley, D.C. Bar No. 90008623
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Tel.: 202-887-3574
rlevick@gibsondunn.com
acox@gibsondunn.com
lstanley@gibsondunn.com

*Application for Admission Pending*

*Counsel for* Amicus Curiae *Alliance for Automotive Innovation*

29

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 6,295 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

Date: June 29, 2026

*/s/ Rachel Levick*
Rachel Levick

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2026, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the District

of Columbia Circuit through the CM/ECF system on all registered counsel.

*/s/ Rachel Levick*
Rachel Levick
