## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al., | Case No. 26-1037 |
| Petitioners, | MOTION TO INTERVENE AS RESPONDENT-INTERVENOR OR, IN THE ALTERNATIVE, FOR LEAVE TO PARTICIPATE AS AMICUS CURIAE. |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency, | |
| Respondents, | |
| JOHN WORTHINGTON, Intervenor Applicant, | |
| Respondent. | |

John Worthington respectfully moves this Court pursuant to Federal Rule of Appellate Procedure 15(d), Federal Rule of Appellate Procedure 27, and D.C. Circuit Rule 15 for leave to intervene in this proceeding as [Respondent-Intervenor], or in the alternative, for leave to participate as amicus curiae in support of Respondents]. In support of this motion, Movant states as follows:

1

1. **Identity and Interest of Movant**

Movant is John Worthington, an individual residing in Sequim, Washington, a coastal community, who is directly affected by EPA policies on greenhouse gas emissions and related regulations. Movant has a substantial interest in ensuring that EPA regulations under the Clean Air Act, and NEPA studies address pollution sources comprehensively and equitably, without disproportionately burdening domestic U.S. industry while exempting major international sources such as shipping emissions, which disproportionately effect Worthington in his coastal location. Worthington has direct geographic ties to harms.

2. **Grounds for Intervention**

This case challenges the EPA's rescission of the 2009 Endangerment Finding for greenhouse gases and related motor vehicle standards (91 Fed. Reg. 7686 (Feb. 18, 2026)). Movant seeks to intervene to argue that the EPA's historical and ongoing focus on domestic/local emissions—while ignoring or inadequately addressing transboundary and international shipping emissions—creates an unfair economic disadvantage for American industry and fails to comprehensively protect public health and welfare from shipping emissions beyond 12 miles from coastal areas. Movant's interests

will be impaired if the Court upholds or remands without addressing this regulatory asymmetry.

Worthington also respectfully argues the existing parties (Petitioners, who seek to reinstate broad domestic GHG regulations, and Respondents EPA) do not adequately represent Movant's perspective, which emphasizes global trade distortions and transboundary pollution ignored in local tools like ICLEI's ClearPath, Washington State Department of Ecology and EPA.

Worthington also alleges controversial federally funded international contractual obligations to serve international interests, further interfere with EPA clean air regulations. Intervention is timely, as this motion is filed shortly after the petition (filed February 18, 2026).

3. **NEPA Element in EPA Policy:**

Movant further argues that the EPA's implementation of the National Environmental Policy Act (NEPA) in emissions-related rulemakings inadequately addresses indirect and cumulative effects, such as how domestic regulations drive offshoring of manufacturing and farming industries. This leads to replacement of local production with imported goods transported via international shipping, which—due to exclusions in national GHG inventories (as shown below—increases unaccounted-for emissions without achieving net environmental benefits. NEPA requires

3

analysis of these reasonably foreseeable impacts (40 C.F.R. § 1508.1), yet EPA reviews overlook socioeconomic displacements that exacerbate reliance on shipping, perpetuating an uneven regulatory field.

4. **Standing**

Movant possesses specialized standing due to his coastal residence in Sequim, Washington, on the Strait of Juan de Fuca within the Puget Sound/Salish Sea airshed—a primary corridor for international shipping.

This geographic proximity establishes a concrete, particularized injury-in-fact from transboundary pollution (e.g., NOx, SOx, PM2.5, black carbon) carried by winds and currents from distant vessels, causing personal health risks, reduced coastal enjoyment, and community impacts. Unlike generalized grievances, these harms are directly tied to EPA's alleged NEPA failures in analyzing indirect effects (e.g., offshoring → increased unpriced shipping emissions affecting Movant's locale). Causation and redressability follow, as proper NEPA review could prompt balanced policies reducing such localized burdens. Worthington has direct geographic ties to harms.

Movant has Article III standing: (1) Injury-in-fact from economic and environmental harms caused by imbalanced regulations (e.g., higher costs for U.S. manufacturing due to strict domestic rules while imports via shipping face fewer constraints); (2) Causation traceable to EPA actions and

4

the challenged rescission; (3) Redressability through Court action that could require more holistic consideration of emissions sources.

Movant has Article III standing under NEPA: (1) Injury-in-fact: As a resident of Sequim, Washington—a coastal community on the Strait of Juan de Fuca/Puget Sound—Movant suffers concrete, particularized harms from transboundary air and marine pollution, including criteria pollutants (e.g., PM2.5, NOx) and greenhouse gas effects from international shipping emissions that reach the local airshed via jet stream wind patterns and ocean currents. These include risks to respiratory health, reduced enjoyment of the coastal environment, and community/economic impacts from imbalanced regulations favoring distant shipping over local production. (2) Causation: These injuries are fairly traceable to EPA's alleged NEPA deficiencies in analyzing indirect effects (e.g., offshoring-driven increases in international shipping emissions not adequately accounted for in domestic-focused reviews). (3) Redressability: A favorable decision remanding for comprehensive NEPA analysis would likely redress Movant's injuries by prompting EPA to address transboundary shipping impacts, potentially leading to more equitable regulations reducing localized harms.

5. **Alternative Request for Amicus Participation**

- Chart showing carbon dioxide emissions from international shipping worldwide (in million metric tons) from 1970 to 2021, sourced from Statista/appropriate authority.

**Carbon dioxide emissions from international shipping worldwide from 1970 to 2021**
*(in million metric tons)*



- U.S. EPA Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2022 (and every year before/after), Energy Chapter, footnote b on tables.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| International Bunker Fuels[b] | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| $N_2O$ | 61.2 | 67.9 | 43.2 | 41.6 | 37.1 | 39.2 | 41.9 |
| Stationary Combustion | 22.3 | 30.5 | 25.1 | 22.2 | 20.5 | 22.0 | 24.7 |
| Mobile Combustion | 38.4 | 37.0 | 17.7 | 19.1 | 16.1 | 16.8 | 16.7 |
| Incineration of Waste | 0.4 | 0.3 | 0.4 | 0.4 | 0.3 | 0.4 | 0.3 |
| Natural Gas Systems | + | + | + | + | + | + | 0.2 |
| Petroleum Systems | + | + | + | + | + | + | + |
| International Bunker Fuels[b] | 0.8 | 0.9 | 1.0 | 0.9 | 0.5 | 0.6 | 0.8 |
| Total | 5,381.0 | 6,349.5 | 5,570.0 | 5,422.4 | 4,862.6 | 5,173.3 | 5,199.8 |

+ Does not exceed 0.05 MMT $CO_2$ Eq.

[a] Emissions from biomass and biofuel consumption are not included specifically in summing energy sector totals. Net carbon fluxes from changes in biogenic carbon reservoirs are accounted for in the estimates for LULUCF.

[b] Emissions from international bunker fuels are not included in totals. These values are presented for informational purposes only, in line with the *2006 IPCC Guidelines* and Paris Agreement and UNFCCC reporting obligations.

Note: Totals may not sum due to independent rounding.

- Excerpts from NEPA Guidance and Studies on EPA Regulations' Impacts on Offshoring and Shipping. "Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water" (40 C.F.R. § 1508.1(g)(2)). This applies to offshoring-driven shipping increases.

> (2) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

- ICLEI Goal to fight protectionism, integrate all countries into a World Economy, and build capacity for developing Nations.

> "As one of the main actors in the creation of Local Agenda 21 mandate, ICLEI continues to play an active role in promoting and facilitating implementation of Local Agenda 21 at the local level, and in reporting on local progress and performance at the global level through the United Nations and other international forums."

2.10. Accordingly, the international community should:
a. Halt and reverse protectionism in order to bring about further liberalization and expansion of world trade, to the benefit of all countries, in particular the developing countries;
b. Provide for an equitable, secure, non-discriminatory and predictable international trading system;
**c. Facilitate, in a timely way, the integration of all countries into the world economy and the international trading system**
**SECTION IV**. MEANS OF IMPLEMENTATION
33. Financial resources and mechanisms 33.1 - 33.21
34. Transfer of environmentally sound technology, cooperation and capacity-building 34.1 - 34.29
35. Science for sustainable development 35.1 - 35.25
36. Promoting education, public awareness and training 36.1 - 36.27
37. National mechanisms and international cooperation for capacity-building in developing countries 37.1 - 37.13

- Agreements between state, local and tribal groups to build an international government consortium.

## Charter

The Charter serves as the primary statute of the association.

### Article 1. Name, Seat and Mandate

### Charter 1.1 - Name

ICLEI – Local Governments for Sustainability (hereafter referred to as the "Association") was established as an international local government association in the year 1990. From its founding until 31 December 2003, the Association bore the name "International Council for Local Environmental Initiatives (ICLEI)".

### Charter 1.2 - Seat

The Association's seat shall be the location of its international headquarters (World Secretariat).

### Charter 1.3 - Mission

The Association's Mission shall be to build and serve a worldwide movement of local governments to achieve tangible improvements in global sustainability with special focus on environmental conditions through cumulative local actions.

### Charter 1.4 - General Mandate

The Association shall build an active and committed municipal membership of local spheres of government (local and regional governments and authorities) as well as international, regional, national and sub-national local-government associations.

### Charter 1.5 - Work Mandate

To support its Members, the Association shall:

(a) mobilize and provide support to local-level initiatives that address specific priority problems of local and global significance;

(b) help develop and strengthen local capacity and expertise;

(c) support networking among and exchange of experiences between local governments, especially between developing and industrialized countries;

(d) work with groups of local governments and partner organizations in order to research, develop, pilot and implement local initiatives for sustainability;

(e) function as a clearinghouse for information, and as a training center, on local sustainable development and environmental policies and programs;

These exhibits illustrate that shipping emissions have risen dramatically alongside trade growth yet are ignored in domestic-focused EPA policies and local tools like ClearPath (which limit scope to jurisdictional boundaries and do not account for jet stream-transported emissions from distant

sources). America makes strict pollution rules for factories, farms, and trucks inside USA. This makes American stuff cost more money to make.

However, America puts *ZERO* extra fees or pollution rules on giant ships and planes that bring stuff from 6,000 miles away. Therefore, ships and planes can pollute as much as they want at almost no extra cost. The EPA failure to account for these facts has helped increase coastal pollution and has harmed Worthington disproportionately.

These Exhibits above show EPA has been and still is unable to stop international shipping emissions, because bunker fuel is exempt and because we are contractually obligated to continue the trend of increasing shipping emissions to "build capacity" for the World Economy. The facts are state, local and tribally run NGO Organizations operating as Economic Development Districts funded by the United States Department of Commerce, through the Economic Development Administration, have enabled the world economy to pollute for free. Only simultaneous impact and user fees on the nautical and air miles on international shipping will reduce the harms against Worthington, not environmental regulations alone. The current agency policy needs to be redone, not reinstated by this Court. It is also more than likely Congress may have to step in to craft legislation to fix the shipping issues because they may be out of the purview of EPA.

**WHEREFORE**, Movant respectfully requests that the Court: (1) Grant leave to intervene as [Petitioner/Respondent-Intervenor]; or (2) In the alternative, grant leave to participate as amicus curiae; and (3) Grant such other relief as the Court deems just and proper.

Dated: February 19, 2026

Respectfully submitted,

/s/ John Worthington
John Worthington
303 S. 5TH Ave. G-53
Sequim WA. 98382

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation because it contains 1, 286 words excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: February 19, 2026,

Respectfully submitted,

/s/ John Worthington
John Worthington
303 S. 5TH Ave. G-53
Sequim WA. 98382

## CERTIFICATE OF SERVICE

I certify that on February 19, 2026, I caused a copy of the foregoing to be filed and served by e-mail to counsel of record. Participants in the case who are registered CM/ECF users will also be served by the CM/ECF system.

Respectfully submitted, this 19th day of February 2026.

Respectfully submitted,

/s/ John Worthington
John Worthington
303 S. 5TH Ave. G-53
Sequim WA. 98382

JOHN WORTHINGTON
303 SOUTH 5TH AVE, G-53
SEQUIM WA. 98382



Clerks Office
U.S. Court of Appeals for the D.C. Circuit
333 Constitution Ave NW
Washington, DC 20001

2000132866 C0C3