CASE NOT YET SCHEDULED FOR ORAL ARGUMENT

IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al., | Case No. 26-1037 |
| Petitioners, | |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency, | |
| Respondents, | |
| DOMESTIC ENERGY PRODUCERS ALLIANCE, | |
| Proposed Intervenor. | |

## MOTION OF THE DOMESTIC ENERGY PRODUCERS ALLIANCE TO INTERVENE AS RESPONDENT

FRANK D. GARRISON
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
fgarrison@pacificlegal.org

TYLER S. FRY
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, Virginia 22201
Telephone: (281) 239-5373
tfry@pacificlegal.org

ONDRAY HARRIS
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20012
Telephone: (202) 331-2272
ondray.harris@cei.org

SORIYA CHHE
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20012
Telephone: (202) 331-2265
soriya.chhe@cei.org

MARIN MURDOCK
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20012
Telephone: (202) 331-2272
marin.murdock@cei.org

*Counsel for Proposed Defendant-Intervenor Domestic Energy Producers Alliance*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION.......................................................................... 1

IDENTITY OF PROPOSED INTERVENOR............................................2

BACKGROUND ............................................................................ 4

STANDARD FOR INTERVENTION.....................................................9

ARGUMENT FOR INTERVENTION.................................................. 11

I. DEPA Has Article III Standing to Intervene as Respondent, Even Though It Is Not Required Here............................................ 11

   A. DEPA Has Organizational Standing to Intervene...................... 12

      1. Injury in Fact ............................................................. 13

      2. Causation and Redressability ........................................ 15

   B. DEPA Has Associational Standing to Intervene........................ 15

      1. Members' Own Standing................................................ 16

      2. Germaneness.............................................................. 18

      3. No Individual Participation Is Required ............................ 19

II. DEPA Satisfies the D.C. Circuit's Requirements for Intervention................................................................. 20

   A. DEPA's Motion Is Timely ............................................... 20

   B. DEPA Has a Cognizable Interest in This Proceeding................ 21

   C. Disposition in Petitioners' Favor Would Practically Impair DEPA's Interests ........................................................... 22

   D. Existing Parties Do Not Adequately Represent DEPA's Interests.................................................................. 23

CONCLUSION ........................................................................... 26

CERTIFICATE OF COMPLIANCE ....................................................... 28

CERTIFICATE OF SERVICE .............................................................. 29

**ADDENDUM**

26.1 DISCLOSURE STATEMENT ..................................................... 1a

# TABLE OF AUTHORITIES

**Cases:**

*Am. Ass'n of Retired Persons v. U.S. Equal Emp. Opportunity Comm'n,*
226 F. Supp. 3d 7 (D.D.C. 2016) ....................................................... 19

*Am. Horse Prot. Ass'n, Inc. v. Veneman,*
200 F.R.D. 153 (D.D.C. 2001) ........................................................ 12

*Associated Dog Clubs of N.Y. State v. Vilsack,*
44 F. Supp. 3d 1 (D.D.C. 2014) ...................................................... 12

*Coal. for Responsible Regul., Inc. v. EPA,*
684 F.3d 102 (D.C. Cir. 2012) .......................................................... 4

*Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n,*
788 F.3d 312 (D.C. Cir. 2015) ............................................... 11–12, 15

*Dimond v. District of Columbia,*
792 F.2d 179 (D.C. Cir. 1986) ........................................................ 23

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ......................................................................... 7

*Foster v. Gueory,*
655 F.2d 1319 (D.C. Cir. 1981) ...................................................... 22

*Fund for Animals, Inc. v. Norton,*
322 F.3d 728 (D.C. Cir. 2003) .......................................... 10, 20–24, 26

*Gundy v. United States,*
588 U.S. 128 (2019) ....................................................................... 25

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) .................................................................. 13–14

*Humane Soc'y of the U.S. v. Hodel,*
840 F.2d 45 (D.C. Cir. 1988) .......................................................... 19

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) .................................................................. 15–16

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*In re Brewer,
  863 F.3d 861 (D.C. Cir. 2017) ...................................................... 10, 20

*Institutional S'holder Servs., Inc. v. Sec. & Exch. Comm'n,
  142 F.4th 757 (D.C. Cir. 2025) ................................................... 10, 16

Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,
  591 U.S. 657 (2020) .................................................................. 10–11

Lujan v. Defs. of Wildlife,
  504 U.S. 555 (1992) .................................................................. 16–17

Massachusetts v. EPA,
  549 U.S. 497 (2007) ........................................................................ 4

*Nat. Res. Def. Council v. Costle,
  561 F.2d 904 (D.C. Cir. 1977) ...................................................... 9, 24

Nat'l Taxpayers Union, Inc. v. United States,
  68 F.3d 1428 (D.C. Cir. 1995) .......................................................... 13

*Nat'l Treasury Emps. Union v. United States,
  101 F.3d 1423 (D.C. Cir. 1996) ....................................................... 13

Nat'l Wildlife Fed'n v. Hodel,
  839 F.2d 694 (D.C. Cir. 1988) .......................................................... 18

*Nuesse v. Camp,
  385 F.2d 694 (D.C. Cir. 1967) ...................................................... 9, 21

*Spann v. Colonial Vill., Inc.,
  899 F.2d 24 (D.C. Cir. 1990) ........................................................... 14

Synovus Fin. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.,
  952 F.2d 426 (D.C. Cir. 1991) ........................................................... 9

Town of Chester v. Laroe Ests., Inc.,
  581 U.S. 433 (2017) ....................................................................... 11

TransUnion LLC v. Ramirez,
  594 U.S. 413 (2021) .................................................................. 16–17

Trbovich v. United Mine Workers of Am.,
  404 U.S. 528 (1972) ....................................................................... 23

United States v. Am. Tel. & Tel. Co.,
  642 F.2d 1285 (D.C. Cir. 1980) ................................................... 20, 23

*United States v. City of Los Angeles,*
 288 F.3d 391 (9th Cir. 2002)......................................................................10

*West Virginia v. EPA,*
 597 U.S. 697 (2022)......................................................................................7

*Wilderness Soc'y v. U.S. Forest Serv.,*
 630 F.3d 1173 (9th Cir. 2011)................................................................9–10

**Statutes:**

42 U.S.C. § 7521(a)(1)....................................................................................5

**Other Authorities:**

74 Fed. Reg. 66,496 (Dec. 15, 2009) ............................................................4

75 Fed. Reg. 25,324 (May 7, 2010)...............................................................5

75 Fed. Reg. 31,514 (June 3, 2010) ..............................................................6

7A Wright, C. & Miller, A., Fed. Prac. & Proc.: Civil § 1909 (1972) ......23

Emission Standards for New, Reconstructed, and Modified
 Sources, 81 Fed. Reg. 35,824 (June 3, 2016) ...............................5–6, 16

Fed. R. App. P. 15(d) .........................................................................1, 9, 26

Rescission of the Greenhouse Gas Endangerment Finding and
 Motor Vehicle Greenhouse Gas Emission Standards Under the
 Clean Air Act, 91 Fed. Reg. 7686 (Feb. 18, 2026) .......................1, 7–8

Order, *Coal. for Responsible Regul., Inc. v. EPA*, No. 09-1322
 (D.C. Cir. May 5, 2010), Doc. 1243328 ..............................................21

The Standards of Performance for New, Reconstructed, and
 Modified Sources and Emissions Guidelines for Existing
 Sources: Oil and Natural Gas Sector Climate Review,
 89 Fed. Reg. 16,820 (Mar. 8, 2024)............................................ 6, 16–17

U.S. Environmental Protection Agency,
 Final Regulatory Impact Analysis (2023) .........................................18

**INTRODUCTION**

Domestic Energy Producers Alliance ("DEPA") moves to intervene, under Fed. R. App. P. 15(d), as a Respondent to defend the Environmental Protection Agency's (EPA) Repeal Rule rescinding the 2009 Greenhouse Gas Endangerment Finding. *See* Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act, 91 Fed. Reg. 7686 (Feb. 18, 2026) ("Repeal Rule").[1] DEPA's members are the domestic oil and natural gas producers who bore the direct compliance costs of the regulatory cascade, including the greenhouse gas emissions standards for new motor vehicles and engines, which the 2009 Endangerment Finding set in motion. If Petitioners prevail and the Endangerment Finding is reinstated, those costs will resume. DEPA's intervention is timely, its interest is direct and concrete, that interest will be impaired by an adverse ruling, and no existing party adequately represents it. Under the

---

[1] Four additional petitions for review of the Repeal Rule have been consolidated with this proceeding under Case No. 26-1037. *See Venner v. EPA*, No. 26-1038; *Bus. Climate Initiative Action v. EPA*, No. 26-1039; *Metro. Congregations United for St. Louis v. EPA*, No. 26-1043; *Serv. Emps. Int'l Union v. EPA*, No. 26-1051 (D.C. Cir.). DEPA's motion applies to all consolidated cases. *See* Orders filed Feb. 20, 2026, Feb. 23, 2026, Feb. 27, 2026, Mar. 13, 2026.

D.C. Circuit's liberal approach to intervention in administrative review proceedings, DEPA's motion should be granted.

Petitioners—a group of health, environmental, and advocacy organizations including the American Public Health Association, American Lung Association, Natural Resources Defense Council, Environmental Defense Fund, Sierra Club, Center for Biological Diversity, Conservation Law Foundation, Friends of the Earth, Physicians for Social Responsibility, and Public Citizen, among others— filed this petition for review on February 18, 2026, the same day the Repeal Rule was published. *Am. Pub. Health Ass'n v. EPA*, No. 26-1037 (D.C. Cir.). They seek vacatur of the Repeal Rule and reinstatement of the 2009 Endangerment Finding. *See* Pet. for Review, *Am. Pub. Health Ass'n v. EPA*, No. 26-1037 (D.C. Cir. Feb. 18, 2026), Doc. #2159562.

## IDENTITY OF PROPOSED DEFENDANT-INTERVENOR

DEPA is a nonprofit 501(c)(6) membership organization incorporated in the State of Oklahoma and headquartered in Tulsa, Oklahoma. Simmons Decl. ¶¶ 4–5. DEPA represents various businesses and entrepreneurs in America's domestic energy market. Its membership includes 23 publicly traded corporations and over 100 nonpublic

companies, all engaged in domestic onshore oil and natural gas exploration and production, transportation, refining, and all service-related businesses. *Id.* ¶ 5. DEPA's membership ranges from large publicly traded operators to single-person small businesses that provide critical services in the domestic energy supply chain. *Id.* ¶¶ 6–7. DEPA's mission is to represent the interests of its members and to resist regulation that imposes unnecessary burdens or that otherwise threatens the vitality of the domestic energy industry. *Id.* ¶ 12.

DEPA's members are predominantly independent, nonintegrated operators who have borne the direct compliance costs of the federal regulatory burdens flowing from the 2009 Endangerment Finding—costs that the Repeal Rule has now largely removed. *Id.* ¶¶ 6, 13–14. The central legal question in this case is whether the 2009 Endangerment Finding—the predicate for that entire regulatory edifice—was ever within EPA's statutory authority. If Petitioners prevail and the finding is reinstated, the full weight of greenhouse gas regulation will immediately resume and DEPA's members will bear those costs directly. *Id.* ¶¶ 14–16.

## BACKGROUND

## The 2009 Endangerment Finding

In 2009, EPA issued its Endangerment Finding under Section 202(a) of the Clean Air Act, determining that six greenhouse gases—carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride—"may reasonably be anticipated to endanger public health or welfare." 74 Fed. Reg. 66,496, 66,505 (Dec. 15, 2009). The finding was prompted by the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), which held that greenhouse gases fall within the Clean Air Act's definition of "air pollutant" and directed EPA to evaluate whether they endanger public health or welfare.

That single finding became the legal predicate for a "cascading series of greenhouse gas-related rules and regulations" that fundamentally reshaped regulation of the domestic energy industry. *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 114 (D.C. Cir. 2012). These regulations imposed concrete compliance costs on DEPA's members, including expenditures for methane monitoring systems, leak detection and repair programs, emissions reporting infrastructure,

equipment modifications, and operational compliance programs required under EPA greenhouse-gas regulations. Under Section 202(a)(1), once the Administrator determines that emissions from new motor vehicles "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare," the statute imposes a mandatory duty to prescribe applicable standards. 42 U.S.C. § 7521(a)(1). The 2009 Endangerment Finding discharged that duty, and in doing so created the statutory predicate upon which EPA's entire greenhouse gas regulatory program for mobile and stationary sources was built. The cascade included, but was not limited to, the following rules that have directly burdened DEPA's members:

(a) Tailpipe emission standards for light-duty and heavy-duty vehicles under Clean Air Act Section 202, beginning with model year 2012. *See* 75 Fed. Reg. 25,324 (May 7, 2010). These standards increased the cost of fleet vehicles used extensively in oilfield operations;

(b) New Source Performance Standards for oil and natural gas facilities—the first direct federal methane and volatile organic compound standards on DEPA's members. *See* 81 Fed. Reg.

35,824 (June 3, 2016). This rule required extensive leak detection and repair ("LDAR") programs, equipment modifications, and ongoing monitoring obligations across DEPA's membership;

(c) The 2024 Methane Rule (NSPS OOOOb / EG OOOOc), which for the first time extended methane regulation to existing oil and gas sources nationwide. *See* 89 Fed. Reg. 16,820 (Mar. 8, 2024). This rule imposed comprehensive emissions monitoring, equipment upgrades, and state plan compliance requirements across DEPA's entire membership; and

(d) New Source Review and Prevention of Significant Deterioration permitting requirements for stationary sources emitting greenhouse gases above applicable thresholds, subjecting DEPA's members' facilities to preconstruction permitting and best available control technology requirements. *See* 75 Fed. Reg. 31,514 (June 3, 2010).

The aggregate economic impact on DEPA's members from regulations traceable to the Endangerment Finding is substantial. Simmons Decl. ¶ 14.

## The Changed Legal Landscape

Decisions handed down by the Supreme Court have changed the legal landscape governing EPA's regulatory authority since the 2009 Endangerment Finding was issued. In *West Virginia v. EPA*, 597 U.S. 697, 716 (2022), for example, the Supreme Court held that agencies must have clear congressional authorization before making decisions of "vast economic and political significance." These decisions provide important context for the Repeal Rule, which is the agency action DEPA seeks to defend.

Separately, EPA's decision to revisit the 2009 finding is permissible under ordinary APA principles. An agency may revise its prior policies so long as it provides a reasoned explanation for the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (recognizing that agencies may revise prior policies so long as they provide a reasoned explanation for the change). EPA has done so here on three independent grounds. *See* 91 Fed. Reg. at 7,688–89.

## EPA's 2026 Repeal Rule

On February 18, 2026, EPA published the Repeal Rule rescinding the 2009 the Endangerment Finding. 91 Fed. Reg. 7686. EPA concluded

on three independent grounds that it "lack[s] statutory authority to regulate in response to global climate change concerns." *Id.* at 7728. First, EPA concluded that the Clean Air Act (CAA) Section 202(a)(1)—enacted to address domestic air pollution through local and regional exposure—does not authorize regulation in response to global climate change: "[t]he appropriate policy response to global climate change concerns is a decision vested in Congress." *Id.* at 7688. Second, applying the major questions doctrine and the elimination of *Chevron* deference, EPA concluded that the Endangerment Finding's vast regulatory consequences required clear congressional authorization that the statute's text, structure, and history do not supply. *Id.* at 7689. Third, EPA found that even complete elimination of all U.S. vehicle GHG emissions would produce only de minimis effects on global temperature and sea level, rendering the regulatory program futile as a matter of law and policy. *Id.* at 7691.

Petitioners filed this petition for review on February 18, 2026. They seek vacatur of the Repeal Rule and reinstatement of the 2009 Endangerment Finding. *See* Pet. for Review, *Am. Pub. Health Ass'n v. EPA*, No. 26-1037 (D.C. Cir. Feb. 18, 2026), Doc. #2159562.

**STANDARD FOR INTERVENTION**

Fed. R. App. P. 15(d) provides that any person who desires to intervene in a proceeding for review of an administrative order may move to do so within 30 days after the petition for review is filed. The motion need only contain "a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d); *see also Synovus Fin. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 952 F.2d 426, 433 (D.C. Cir. 1991).

Because Rule 15(d) does not itself supply the substantive standard for intervention, this Court has developed its own doctrine governing the question—one that is relatively liberal, particularly in administrative review cases. *See Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 910–11 (D.C. Cir. 1977). The D.C. Circuit has long instructed that the relevant requirements should be construed "in favor of permitting intervention." *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967). This established approach reflects a strong history of permitting intervention. *See also Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) ("A liberal policy in favor of intervention serves both efficient resolution

of issues and broadened access to the courts." (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397–98 (9th Cir. 2002))).

In applying that doctrine, this Court evaluates (1) whether the motion is timely; (2) whether the applicant claims an interest sufficient to support intervention; (3) whether that interest may as a practical matter be impaired or impeded by disposition of the proceeding; and (4) whether existing parties adequately represent the applicant's interest. *See In re Brewer*, 863 F.3d 861, 872 (D.C. Cir. 2017); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003). Additionally, a party need not establish Article III standing when seeking the same relief as the federal government. *Institutional S'holder Servs., Inc. v. Sec. & Exch. Comm'n*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (quoting *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (explaining that the circuit court "erred by inquiring into [intervenors'] independent Article III standing" when they sought the same relief as the federal government, which "clearly had standing")). Because DEPA and EPA seek the same relief—affirmation of the Repeal Rule—DEPA does not need to independently demonstrate Article III standing. To the extent this Court still applies its prior precedents

requiring independent standing, however, DEPA independently satisfies that standard as well. *See Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015).

## ARGUMENT FOR INTERVENTION

### I. DEPA Has Article III Standing to Intervene as Respondent, Even Though It Is Not Required Here.

"For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Only "one party must demonstrate Article III standing for each claim for relief." *Little Sisters of the Poor Saints Peter & Paul Home*, 591 U.S. at 674 n.6. An intervenor need only "independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction." *Id.* (citing *Laroe Estates*, 581 U.S. at 439–40). Here, DEPA and the EPA seek the same relief— affirmation of the Repeal Rule. Thus, DEPA need not demonstrate Article III standing. Even so, to the extent that this Court requires proposed defendant-intervenors to establish Article III standing under its precedents, DEPA independently has Article III standing to intervene. *See Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 316.

"The standing inquiry for an intervening-defendant is the same as for a plaintiff: the intervenor must show injury in fact, causation, and redressability." *Id.*

> [W]hen a party seeks to intervene as a defendant to uphold what the government has done, it would have to establish that it will be injured in fact by the setting aside of the government's action it seeks to defend, that this injury will have been caused by that invalidation, and the injury would be prevented if the government action is upheld.

*Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 156 (D.D.C. 2001); *see also Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 316–17 (The Court has "generally found a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit."). DEPA readily satisfies this standard, both as an organization and on behalf of its members.

**A. DEPA Has Organizational Standing to Intervene**

"An organization may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Associated Dog Clubs of N.Y. State v. Vilsack*, 44 F. Supp. 3d 1, 4 (D.D.C. 2014) (internal quotations omitted). To establish organizational standing, DEPA must

demonstrate a concrete and demonstrable injury to its activities and not merely a setback to its "abstract social interests." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

### 1. Injury in Fact

DEPA suffers a concrete organizational injury in two independent respects. First, reinstatement of the Endangerment Finding directly frustrates DEPA's core mission of protecting its members from unnecessary regulatory burdens. "A direct conflict between the defendant's conduct and the organization's *mission*" supports organizational standing, though it is necessary but not alone sufficient. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

Second, DEPA has suffered and will continue to suffer a concrete drain on its resources. DEPA publishes newsletters and maintains ongoing educational programs to help its members navigate EPA's regulatory landscape—resources that expanded substantially during the period of active GHG regulation following the 2009 Endangerment Finding. Simmons Decl. ¶ 12. These programs served to track

regulations, administrative actions, and judicial activities and discusses and analyzes their impact on DEPA members.

The Repeal Rule allowed DEPA to begin scaling back the resources devoted to these compliance-guidance activities. Reinstatement would force DEPA to reconstitute them. "[A]n organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (citing *Havens Realty*, 455 U.S. at 379). If the Repeal Rule were to be overturned, DEPA would again have to dedicate resources to continue to guide its members on how to stay in compliance with the EPA's ongoing targeted emission standards under its prior rules. Thus, DEPA, as an institution, satisfies this Court's standard for establishing Article III standing in its own right because it will suffer concrete and demonstrable injuries should the Repeal Rule be overturned.

### 2. Causation and Redressability

Causation and redressability follow directly. *See Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 316 ("[I]f [a proposed defendant-intervenor] can prove injury, then it can establish causation and redressability."). If this Court vacates the Repeal Rule and reinstates the 2009 Endangerment Finding, the regulatory cascade triggered by that finding will resume, reimposing compliance costs and regulatory obligations on DEPA and its members. Conversely, a judgment upholding the Repeal Rule will prevent those regulatory burdens from returning. DEPA's injuries are therefore directly traceable to the rule at issue to this lawsuit and redressable through a judgment in favor of Defendants. Accordingly, the organizational applicants have standing to intervene.

### B. DEPA Has Associational Standing to Intervene

As to associational standing, an organization may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the

lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). All three elements are met.

### 1. Members' Own Standing

DEPA's members have standing in their own right. "To qualify as an injury-in-fact, a harm must be 'concrete and particularized' and 'actual or imminent.'" *Institutional S'holder Servs.*, 142 F.4th at 764–65 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "'[M]onetary harms' are paradigmatic concrete Article III injuries." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). All of DEPA's members are engaged in domestic onshore oil and natural gas exploration and production, transportation, refining, and all service-related businesses. Simmons Decl. ¶ 5. The 2009 Endangerment Findings resulted in a cascade of burdensome regulations on DEPA members such as the enactment of Emission Standards for New, Reconstructed, and Modified Sources, 81 Fed. Reg. 35,824 (June 3, 2016), which required DEPA's members to invest in monitoring, leak detection, and control technologies. Simmons Decl. ¶ 13. The 2024 amendments to those rules, The Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural

Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024), dramatically expanded methane regulation to cover existing oil and gas sources nationwide for the first time, requiring leak detection and repair ("LDAR") programs, equipment upgrades, and state plan compliance regimes across DEPA's entire membership. *Id.*

DEPA satisfies the first prong of the *Hunt* test because its members are directly regulated entities that have borne substantial compliance costs caused by regulatory programs traceable to the Endangerment Finding. Courts have long recognized that regulatory compliance costs constitute classic economic injuries sufficient to establish Article III standing. *See Lujan*, 504 U.S. at 560; *TransUnion*, 594 U.S. at 425.

DEPA's members have incurred significant expenditures to comply with methane monitoring requirements, leak detection and repair programs, greenhouse-gas emissions reporting mandates, equipment upgrades, and fleet-vehicle compliance obligations imposed under EPA regulations traceable to the Endangerment Finding. Simmons Decl. ¶¶ 12–17. According to EPA's 2023 Final Regulatory Impact Analysis (FRIA), the methane performance standards would subject 80,206 oil and gas facilities, components, and operations to new or more stringent

regulation by 2024 and 2,321,290 by 2038.[2] The FRIA further estimates that the net compliance costs for the affected industries from 2024 to 2038 may total up to $19 billion.[3] DEPA members are amongst the groups that form the basis of the EPA's FRIA analysis. Each category constitutes a concrete economic injury sufficient for Article III purposes meeting the first prong of establishing associational standing. *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988).

### 2. Germaneness

As to germaneness, DEPA's mission is to represent its member's interests in resisting regulations that impose unnecessary burdens or that otherwise threaten the vitality of the domestic energy industry.

---

[2] U.S. Environmental Protection Agency, Final Regulatory Impact Analysis (2023) at 2-46 to 2-48, Table 2-6 Projection of Incrementally Impacted Affected Facilities under the Final NSPS OOOOb and EG OOOOc, 2024 to 2038 (Production Sources), Table 2-7 Projection of Incrementally Impacted Affected Facilities under the Final NSPS OOOOb and EG OOOOc, 2024 to 2038 (Non-Production Fugitive/Leaks and Pneumatics Sources), Table 2-8 Projection of Incrementally Impacted Affected Facilities under the Final NSPS OOOOb and EG OOOOc, 2024 to 2038 (Non-Production Compressor Sources). 2024 and 2038 values calculated by totaling all values across row 2024 and 2038 for all three tables, respectively.

[3] *Id.* at 2-63, Table 2-13 Discounted Projected Costs under the Final NSPS OOOOb and EG OOOOc Option, 2024–2038 (millions 2019$) at 2 percent.

Simmons Decl. ¶ 12. The test for germaneness "require[s] only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988). DEPA's members are brought together by their shared interests to resist unnecessary regulatory burdens on the domestic energy industry. Defending the Repeal Rule— which eliminates fifteen years of compliance obligations traceable to the Endangerment Finding—is squarely germane to that purpose.

### 3. No Individual Participation Is Required

DEPA satisfies the last *Hunt* prong because this case concerns the validity of the EPA's Repeal Rule and turns entirely on whether the agency complied with its statutory authority under the Clean Air Act. The relief DEPA seeks is validation of the Repeal Rule. Neither the claims nor the relief require the participation of DEPA members as this case presents purely legal questions of statutory interpretation and constitutional law on a closed administrative record; there is no discovery and no member-specific facts to be developed, making individual member participation unnecessary. *See Am. Ass'n of Retired Persons v. U.S. Equal Emp. Opportunity Comm'n*, 226 F. Supp. 3d 7, 20 (D.D.C. 2016)

(individual participation not required where only injunctive relief sought).

## II. DEPA Satisfies the D.C. Circuit's Requirements for Intervention.

The D.C. Circuit looks to four factors, when determining whether a party may intervene: (1) whether the motion is timely; (2) whether the applicant claims an interest sufficient to support intervention; (3) whether that interest may as a practical matter be impaired or impeded by disposition of the proceeding; and (4) whether existing parties adequately represent the applicant's interest. *See In re Brewer*, 863 F.3d at 872; *Fund for Animals*, 322 F.3d at 731. DEPA satisfies all of the requisite standards for intervention.

### A. DEPA's Motion Is Timely

DEPA files this motion within 30 days of the first petition for review, as Rule 15(d) requires. No party has filed anything beyond standard procedural submissions, and DEPA's participation will cause no delay and no prejudice to any party. Timeliness is not in question. *See United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1295 (D.C. Cir. 1980) (timeliness assessed by time elapsed, purpose of intervention, need to preserve rights, and probability of prejudice).

## B. DEPA Has a Cognizable Interest in This Proceeding

The interest inquiry in D.C. Circuit practice "is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse*, 385 F.2d at 700. The inquiry is flexible: demonstrating Article III standing is itself sufficient to establish the requisite interest. *Fund for Animals*, 322 F.3d at 735.

Although DEPA has demonstrated its standing under Article III above, DEPA's interest is also both legally cognizable and directly implicated by the outcome of this case. The Repeal Rule eliminates the legal predicate for fifteen years of compliance obligations—methane monitoring, GHG reporting, LDAR programs, and equipment controls— that DEPA's members are preparing to wind down in reliance on the rule. If the Endangerment Finding is reinstated, those obligations immediately resume. Simmons Decl. ¶¶ 15–17. This Court has allowed industry intervenors with comparable economic stakes to participate in administrative proceedings involving the Clean Air Act. *See, e.g.*, Order, *Coal. for Responsible Regul., Inc. v. EPA*, No. 09-1322 (D.C. Cir. May 5, 2010), Doc. 1243328.

## C. Disposition in Petitioners' Favor Would Practically Impair DEPA's Interests

The impairment inquiry requires only that the applicant's ability to protect its interests "may," as a practical matter, be impaired by the outcome. The D.C. Circuit applies this standard flexibly, looking to the "practical consequences" of denying intervention. *Fund for Animals*, 322 F.3d at 735. The standard can be satisfied even by a "possibility" of impairment. *Foster v. Gueory*, 655 F.2d 1319, 1325 (D.C. Cir. 1981).

Here, if this Court vacates the Repeal Rule and reinstates the 2009 Endangerment Finding, DEPA's members will immediately face reimposition of methane emission standards, GHG reporting requirements, and a host of downstream regulatory obligations. Simmons Decl. ¶¶ 17–19. Beyond direct compliance costs, reinstatement would trigger a renewed wave of climate-related regulatory risk disclosures, investor demands, and institutional divestment pressures targeting the domestic onshore oil and gas sector. *Id.* ¶ 20. The damage to DEPA's members during any secondary litigation to vindicate their interests would be "substantial and likely irreparable." *Fund for Animals*, 322 F.3d at 735.

**D. Existing Parties Do Not Adequately Represent DEPA's Interests**

The adequacy-of-representation inquiry is "not onerous." *Fund for Animals*, 322 F.3d at 735 (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986)). An applicant need show only that representation "may be" inadequate, and the burden is "minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). An intervenor "ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee." *Am. Tel. & Tel. Co.*, 642 F.2d at 1293 (quoting 7A C. Wright & A. Miller, Fed. Prac. & Proc.: Civil § 1909, at 524 (1972)). DEPA meets this minimal threshold for three independent reasons.

First, EPA cannot adequately represent DEPA's specific interests. This Court has "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736 & n.9. A government agency "would be shirking its duty were it to advance" the "narrower interest" of a regulated industry group "at the expense of its representation of the general public interest." *Id.* at 737 (quoting *Dimond*, 792 F.2d at 192–93). EPA must weigh public health, environmental, and broad policy considerations that

go far beyond DEPA's members' direct economic stake. This divergence between DEPA's focused economic interest in domestic energy production and EPA's broad mandate is alone sufficient to establish inadequacy of representation. *See Costle*, 561 F.2d at 912.

Second, EPA may compromise, settle, or shift its litigation posture in ways adverse to DEPA's interests. The government's litigation strategy is subject to political and institutional pressures that do not constrain DEPA. Were EPA to concede certain issues, decline to raise available defenses, or negotiate a resolution that imperfectly preserves the Repeal Rule, DEPA's members would be left without adequate representation. *See Fund for Animals*, 322 F.3d at 736–37 (government's interests might diverge from those of would-be intervenors "during the course of litigation").

Third, DEPA will advance statutory and constitutional arguments that the Federal Government is unlikely to press. DEPA will argue that Section 202(a) of the Clean Air Act, as applied to greenhouse gas emissions, in certain respects as a proxy for addressing global climate change, constitutes an unconstitutional delegation of legislative power in violation of Article I. While the Government will likely focus on APA

arbitrary-and-capricious review and the major questions doctrine as a statutory matter, DEPA will argue that Congress failed to supply any intelligible principle governing EPA's discretion when confronting a global phenomenon such as climate change, rendering Section 202(a)'s application to greenhouse gases constitutionally invalid. Several Justices have signaled renewed willingness to reinvigorate this constitutional doctrine. *See, e.g.*, *Gundy v. United States*, 588 U.S. 128, 149–50 (2019) (Gorsuch, J., dissenting).

Finally, DEPA will also argue that greenhouse gas emissions do not contribute to air pollution that endangers public health and welfare. Specifically, DEPA will argue the inappropriateness of the EPA's use of volume thresholds in a contribution analysis and fleet averaging under new motor vehicle regulations. DEPA will explain how the EPA improperly usurped the National Highway Traffic Safety Administration's (NHTSA) fuel economy role under the Energy Policy and Conservation Act (EPCA), when it adopted vehicle greenhouse gas emissions standards flowing from the endangerment finding. DEPA will also argue that the 2009 endangerment finding was arbitrary and capricious because it failed to consider adaptation and relied upon

25

unreasonable emission scenarios and a technical support document that did not comply with the Information Quality Act.

DEPA's distinct legal theories provide independent grounds for the Repeal Rule's validity that only DEPA will advance. Divergence in legal theory independently establishes inadequacy of representation. *Cf. Fund for Animals*, 322 F.3d at 736–37.

## CONCLUSION

Pursuant to Fed. R. App. P. 15(d), and consistent with this Court's liberal approach to intervention in administrative review proceedings, DEPA respectfully asks the Court to grant its motion to intervene as Respondent.

DATED: March 19, 2026.    Respectfully submitted,

s/ Frank D. Garrison
FRANK D. GARRISON
Email: fgarrison@pacificlegal.org
*Counsel of Record*
TYLER S. FRY
Email: tfry@pacificlegal.org
*Pending Admission*

Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881

s/ Ondray T. Harris
ONDRAY T. HARRIS
E-mail: ondray.harris@cei.org

SORIYA R. CHHE
E-mail: soriya.chhe@cei.org

MARIN MURDOCK
E-mail: marin.murdock@cei.org
Competitive Enterprise Institute
1310 L Street NW, 7th FL
Washington, D.C. 20005
Telephone: (202) 331-1010

***Attorneys for Proposed Defendant-Intervenor Domestic Energy Producers Alliance (DEPA)***

# CERTIFICATE OF COMPLIANCE

I hereby certify on this 19th day of March 2026, that the foregoing Motion complies with the word limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,723 words, excluding parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (6) because this document has been prepared in 14-point Century Schoolbook font, a proportionally spaced typeface, using Microsoft Word.

/s/ Frank D. Garrison
FRANK D. GARRISON

## CERTIFICATE OF SERVICE

I hereby certify on this 19th day of March 2026, that the foregoing Motion has been filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit, using the CM/ECF System. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system, save for Mr. Worthington, who will be served by email per his request in ECF No. 2162370.

/s/ Frank D. Garrison
FRANK D. GARRISON

# ADDENDUM

# 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Counsel for Proposed Defendant-Intervenor Domestic Energy Producers Alliance (DEPA) certify that DEPA is a nonprofit 501(c)(6) membership organization incorporated in the State of Oklahoma and headquartered in Tulsa, Oklahoma. Counsel further certify that DEPA has no parent company, and no publicly held company has a 10% or greater ownership interest in it.