Docusign Envelope ID: 69E35AD1-483A-430E-BB55-D20ED67A71D3

IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al., | Case No. 26-1037 |
| Petitioners, | |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency, | |
| Respondents, | |
| DOMESTIC ENERGY PRODUCERS ALLIANCE, | |
| Proposed Intervenor. | |

**DECLARATION OF JERRY SIMMONS**

_____

FRANK GARRISON
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
fgarrison@pacificlegal.org

TYLER S. FRY
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, Virginia 22201
Telephone: (281) 239-5373
tfry@pacificlegal.org

Docusign Envelope ID: 69E35AD1-483A-430E-BB55-D20ED67A71D3

ONDRAY HARRIS
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20012
Telephone: (202) 331-2272
ondray.harris@cei.org

SORIYA CHHE
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20012
Telephone: (202) 331-2265
soriya.chhe@cei.org

MARIN MURDOCH
Competitive Enterprise Institute
1310 L Street NW, 7th Floor
Washington, D.C. 20012
Telephone: (202) 331-2272
marin.murdoch@cei.org

*Counsel for Petitioners*

Docusign Envelope ID: 69E35AD1-483A-430E-BB55-D20ED67A71D3

I, JERRY R. SIMMONS, declare that:

1)     I submit this Declaration in support of the Domestic Energy Producers Alliance's ("DEPA") Motion to Intervene in the above-captioned case (Lawsuit).

2)     I have personal knowledge of the facts stated in this Declaration, and if called as a witness, I could and would testify to these facts under oath.

3)     I am the President and Chief Executive Officer of the Domestic Energy Producers Alliance ("DEPA").

4)     DEPA is a nonprofit 501(c)(6) membership organization incorporated in the State of Oklahoma and headquartered in Tulsa.

5)     DEPA represents various businesses and entrepreneurs in America's domestic energy market. DEPA's membership includes 23 publicly traded corporations and over 100 nonpublic companies, all of whom are engaged in domestic onshore oil and natural gas exploration and production, transportation, refining, and all service-related businesses.

6)     DEPA's membership ranges from larger, more established companies down to truly small businesses. For example, on the smallest

1

scale, we have some member companies that have just one person operating a single truck, hauling materials, and laying piping, and performing other construction activities for oil and gas wells. These smaller operations provide critical services to larger firms in the domestic energy sector, all of which are dependent on each other.

7) Several DEPA member companies operate oil and natural gas production facilities directly subject to EPA methane and greenhouse-gas regulations promulgated pursuant to the 2009 Endangerment Finding. Compliance with those regulations has required members to invest significant capital in emissions monitoring equipment, leak-detection programs, reporting systems, and related compliance personnel.

8) For example, DEPA members operating in states such as Oklahoma, Texas, North Dakota, and New Mexico have been required to implement leak detection and repair programs, upgrade equipment, and modify operational practices in order to comply with federal methane standards applicable to new and existing oil and gas sources.

9) Additionally, DEPA's membership entails entrepreneurs in the domestic energy industry and 39 associations representing the energy industry in various states from California to West Virginia.

10) DEPA's members include companies that are directly regulated by these rules as well as smaller service providers that support regulated operators and whose businesses are affected by the regulatory compliance demands imposed throughout the domestic energy supply chain.

11) DEPA members pay annual dues. Dues paying members enjoy certain benefits, including the prerogative to vote on DEPA's officers, Executive Committee, and Board of Directors, which govern DEPA. 75% of DEPA members are operators of small oil refineries.

12) DEPA's mission is to represent the interests of our members and to resist regulation that imposes unnecessary burdens or that otherwise threatens the vitality of the domestic energy industry. For example, DEPA publishes monthly newsletters and maintains ongoing educational programs to help its members navigate EPA's regulatory landscape — resources that expanded substantially during the period of active GHG regulation following the 2009 Endangerment Finding.

13) Accordingly, DEPA is seeking to intervene as a defendant intervenor in the pending litigation challenging the Environmental Protection Agency's repeal of its 2009 Endangerment Finding. See

3

"Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," 91 Fed. Reg. No. 32 (Feb. 18, 2026) ("Repeal Rule"). The 2009 Endangerment Finding had declared that six greenhouse gases, including carbon dioxide, endanger public health and welfare, and that finding has served for over fifteen years as the legal foundation upon which EPA built an ever-expanding regulatory edifice targeting the domestic oil and gas industry.

14) DEPA and its members view the Repeal Rule as a vital and overdue course correction that will relieve the domestic energy industry of a crushing and legally unauthorized regulatory burden. The 2009 Endangerment Finding served as the predicate for a cascade of greenhouse gas regulations that imposed enormous costs on our members, restricted their operations, and threatened the long-term viability of traditional energy sources that our members produce.

15) DEPA's members face the very real prospect that a court could vacate or stay the Repeal Rule and reinstate the Endangerment Finding, which would immediately reimpose the full weight of GHG regulations from which the Repeal Rule has provided relief.

4

Docusign Envelope ID: 69E35AD1-483A-430E-BB55-D20ED67A71D3

16) Over the course of fifteen years, the 2009 Endangerment Finding served as the direct legal predicate for a cascade of increasingly burdensome regulations that have injured DEPA's members. These regulations include, among others:

a) The Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324 (May 7, 2010), which imposed mandatory GHG emission standards on new motor vehicles and engines beginning with model year 2012, directly increasing the cost of fleet vehicles used extensively by DEPA's members in oilfield operations;

b) The Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources, 81 Fed. Reg. 35,824 (June 3, 2016), which imposed the first federal methane and volatile organic compound (VOC) emission standards directly on the oil and gas sector and required DEPA's members to invest in monitoring, leak detection, and control technologies;

5

Docusign Envelope ID: 69E35AD1-483A-430E-BB55-D20ED67A71D3

c) The Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review 89 Fed. Reg. 16,820 (Mar. 8, 2024), which dramatically expanded methane regulation to cover existing oil and gas sources nationwide for the first time, requiring extensive emissions monitoring, leak detection and repair ("LDAR") programs, equipment upgrades, and state plan compliance regimes across DEPA's entire membership;

d) New Source Review and Prevention of Significant Deterioration permitting requirements for stationary sources emitting greenhouse gases above applicable thresholds, subjecting DEPA's members' facilities to preconstruction permitting and best available control technology requirements. See 75 Fed. Reg. 31,514 (June 3, 2010).

17) The cumulative regulatory burden imposed on DEPA's members through methane rules predicated on the 2009 Endangerment

Finding has been substantial. DEPA members have conducted numerous studies, Regulatory Impact Analyses (RIAs), cost-benefit assessments, and other examinations of the economic impacts of U.S. GHG regulations on the domestic onshore oil and gas sector.

18) DEPA's members already endure significant regulatory burdens flowing from the prior administration's interpretation of the Clean Air Act and its use of the Endangerment Finding to justify sweeping rulemakings. The Endangerment Finding undergirded GHG emission standards for vehicles, methane emission rules for the oil and gas sector, and a host of other regulations that have raised the cost of doing business for domestic energy producers year after year.

19) The regulations predicated on the Endangerment Finding have imposed a new compliance regime that required DEPA's members to devote substantial time, resources, and capital to emissions monitoring, reporting, and reduction programs. These expenditures diverted investment away from exploration and production activities that are core to the domestic energy mission that DEPA represents.

20) Should the Repeal Rule be vacated and the Endangerment Finding reinstated, DEPA's members would face immediate and severe

7

harm: millions of dollars in investments and renewed regulatory obligations.

21)    Regulations premised on the Endangerment Finding also rippled down through the supply chain that supports DEPA's members. DEPA's small and independent members reasonably fear that if the Endangerment Finding is reinstated, larger publicly traded operators will once again impose GHG-related compliance demands, effectively extending the regulatory burden to companies not directly subject to EPA's rules.

22)    Likewise, DEPA's members that access public capital markets have faced pressure rooted in GHG regulatory risk generated by the Endangerment Finding. If the Repeal Rule is overturned and the Endangerment Finding restored, DEPA's members anticipate a renewed wave of climate-related regulatory risk disclosures, investor demands, and institutional divestments that target the domestic onshore oil and natural gas sector.

23)    For these reasons, DEPA's membership has a profound and direct interest in the outcome of this litigation. DEPA's publicly traded members stand to suffer those burdens most immediately if the Repeal

Rule is vacated, but DEPA's small and independent members will feel the effects as well, through the reimposition of a regulatory environment that has disadvantaged domestic onshore producers.

24) Ultimately, the litigation now pending before this Court has enormous consequences for DEPA's membership. The Repeal Rule removes a decades-long legal threat to the domestic oil and gas industry, and the members DEPA represents have an immediate and substantial interest in ensuring that it is upheld. DEPA's intervention as a defendant is therefore both warranted and necessary to ensure the Court has the benefit of the perspective of the industry most directly affected by the outcome of this case.

25) The Association moves to intervene to protect these interests.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed in _____Tulsa_____, _____Oklahoma_____, on

3/17/2026
_____.

DocuSigned by:

*Jerry R. Simmons*

8C63C16B2DCB41E...

Jerry Simmons

**CERTIFICATE OF SERVICE**

I hereby certify on this 19th day of March, 2026, that the foregoing Declaration has been filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit, using the CM/ECF System. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system, save for Mr. Worthington, who will be served by email per his request in ECF No. 2162370.

/s/ Frank D. Garrison
FRANK D. GARRISON