**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 26-1037

(Consolidated with 26-1038, 26-1039, 26-1043 and 26-1051)

AMERICAN PUBLIC HEALTH ASSOCIATION; ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS; AMERICAN LUNG ASSOCIATION; CENTER FOR BIOLOGICAL DIVERSITY; CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE; CLEAN AIR COUNCIL; CLEAN WISCONSIN; CONSERVATION LAW FOUNDATION; ENVIRONMENTAL DEFENSE FUND; ENVIRONMENTAL LAW & POLICY CENTER; FRIENDS OF THE EARTH; NATURAL RESOURCES DEFENSE COUNCIL, INC.; PHYSICIANS FOR SOCIAL RESPONSIBILITY; PUBLIC CITIZEN; RIO GRANDE INTERNATIONAL STUDY CENTER; SIERRA CLUB; UNION OF CONCERNED SCIENTISTS,

*Petitioners,*

*(For Continuation of Caption See Inside Cover)*

*On Appeal from the Environmental Protection Agency in No. EPA-91FR7686.*

## BRIEF OF GOVERNMENT ACCOUNTABILITY & OVERSIGHT AND GOVERNMENT OVERSIGHT & EDUCATION, D/B/A PROTECT THE PUBLIC'S TRUST AS *AMICI CURIAE* IN SUPPORT OF RESPONDENTS

MATTHEW D. HARDIN
DC. Bar No. 1032711
101 Rainbow Drive #11506
Livingston, Texas 77399
(202) 802-1948
matt@matthewhardin.com

CHRISTOPHER C. HORNER
D.C. Bar No. 440107
1725 I Street NW
Suite 300, PMB #2094
Washington, DC 20006
(202) 262-4458
chris@chornerlaw.com

*Counsel for Amicus Curiae*

March 19, 2026

 (800) 4-APPEAL • (391504)

*v.*

ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

———————————————

JOHN WORTHINGTON; STATE OF WEST VIRGINIA; COMMONWEALTH OF KENTUCKY; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IDAHO; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MISSOURI; STATE OF MISSISSIPPI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF UTAH; STATE OF WYOMING,

*Movant-Intervenors for Respondent.*

**Certificate of Parties, Rulings, and Related Cases**

Pursuant to D.C. Circuit Rule 27(a)(4) and 28(a)(1)(A), I certify that the parties to this case are set forth below.

Petitioners: American Public Health Association, Alliance of Nurses for Healthy Environments, American Lung Association, Center for Biological Diversity, Center for Community Action and Environmental Justice, Clean Air Council, Clean Wisconsin, Conservation Law Foundation, Environmental Defense Fund, Environmental Law & Policy Center, Friends of the Earth, Natural Resources Defense Council, Inc., Physicians for Social Responsibility, Public Citizen, Rio Grande International Study Center, Sierra Club, Union of Concerned Scientists.

Respondents: United States Environmental Protection Agency ("EPA") and Lee M. Zeldin, in his official capacity as Administrator of the EPA.

Intervenors: John Worthington, West Virginia, Kentucky, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Missouri, Mississippi, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Wyoming.

Amici Curiae: John Worthington has sought *amicus curiae* status at the time of this filing.

There are four related cases:

i

1. *Elena Venner, et al v. EPA, et al.* (Case No. 26-1038).  That case was consolidated with this action on February 20, 2026.

2. *Business Climate Initiative, et al. v. EPA, et al.* (Case No. 26-1039).  That case was consolidated with this action on February 23, 2026.

3. *Metropolitan Congregations United for St. Louis, et al. v. EPA, et al.* (Case No. 26-1043). That was consolidated with this action on February 27, 2026.

4. *Service Employees International Union, et al. v. EPA et al.* (Case No. 26-1051). That matter was consolidated with this action on March 13, 2026.

Rulings: This case is an original action in this Court and does not challenge any Ruling of the District Court.

## Corporate Disclosure Statement

Pursuant to Circuit Rule 26.1:

Government Accountability & Oversight hereby certifies that it is a nonprofit, nonstock corporation incorporated under the laws of Wyoming. As such, Government Accountability & Oversight has no parent company or subsidiaries, and no entity owns any part of its stock. Nor does Government Accountability & Oversight own any shares of the stock of any other entity.

ii

Government Oversight & Education d/b/a Protect the Public's Trust hereby certifies that it is a nonprofit, nonstock corporation incorporated under the laws of Delaware. As such, Protect the Public's Trust has no parent company or subsidiaries, and no entity owns any part of its stock. Nor does Protect the Public's Trust own any shares of the stock of any other entity.

# TABLE OF CONTENTS

**Page**

Certificate of Parties, Rulings, and Related Cases ....................................................i

Corporate Disclosure Statement ................................................................... ii

TABLE OF AUTHORITIES ..................................................................v

Statement of Identity, Interest in the Case, and Statement of Authority to File.................................................................................................1

Statement of Authorship and Financial Contributions ...............................................3

I.      INTRODUCTION .................................................................3

II.     ARGUMENT...................................................................10

      A.     The Rule Was Unlawfully Predetermined and the Product of Unalterably Closed Minds ....................................................10

            1.     The Unalterably Closed Mind Standard ..................................10

            2.     The Birth of the Endangerment Finding ..................................14

      B.     The Rule is Unlawful as it is and Inherently Necessitates Regulation Beyond the Agency's Authority ......................................22

III.    CONCLUSION...................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Association of Nat'l Advertisers, Inc. v. FTC,*
  627 F.2d 1151 (D.C. Cir. 1979) ..................................................................11

*Consumers Union of U.S., Inc. v. FTC,*
  801 F.2d 417 (D.C. Cir. 1986) ....................................................................11

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ......................................................................................6

*Massachusetts v. EPA,*
  49 U.S. 497, 127 S Ct. 1438 (2007)................................................ 7, 12, 17, 26

*Michigan v. EPA,*
  576 U.S. 743 (2015)......................................................... 6, 7, 9, 25, 26

*Motor Vehicle Mfrs. Assn. of United States, Inc. v.*
  *State Farm Mut. Automobile Ins. Co.,*
  463 U.S. 29 (1983)......................................................................................25

*Nat'l Lifeline Ass'n v. FCC,*
  921 F.3d 1102 (D.C. Cir. 2019).....................................................................10

*Telecomms. Research & Action Ctr. v. FCC,*
  242 U.S. App. D.C. 222, 750 F.2d 70 (1984)................................................7, 28

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.,*
  484 U.S. 365 (1988)....................................................................................26

*Utility Air Regulatory Group v. EPA,*
  573 U.S. 302 (2014).................................................................................6, 26

*West Virginia v. EPA,*
  597 U.S. 697 (2022).......................................................................................6

*Weyerhaeuser Co. v. Costle,*
  590 F.2d 1011 (D.C. Cir. 1978 .....................................................................27

*Whitman v. American Trucking Assns., Inc.,*
  531 U.S. 457 (2001)....................................................................................26

**Statutes & Other Authorities:**

28 U.S.C. § 2347(b)(3)................................................................................7, 28

91 Fed. Reg. 7686 (Feb. 12, 2026) .........................................................................3

"2025 Long-Term Reliability Assessment, January 2026,"
North American Electric Reliability Corp., Jan. 23, 2026....................................9

Ciais, P., C. Sabine, G. Bala, L. Bopp, V. Brovkin, et al. (2013): Carbon and Other
Biogeochemical Cycles. In: Climate Change 2013: The Physical Science Basis.
Contribution of Working Group I to the Fifth Assessment Report of the
Intergovernmental Panel on Climate Change [Stocker, T.F., D. Qin, G.-K.
Plattner, M. Tignor, et al. (eds.)]. Cambridge University Press, Cambridge,
United Kingdom and New York, NY, USA .......................................................24

Circuit Rule 19(b) ...................................................................................................2

Clean Air Act § 202(a)......................................................................................23, 25

Clean Air Act § 202(a)(1) .....................................................................................26

*Competitive Enterprise Institute v. EPA* (DDC), Case No. 1:12-cv-01617
(JEB)(see, e.g., Neela Banerjee, *EPA administrator's email account raises
concern*, *Los Angeles Times*, Nov. 12, 2012.........................................................15

Energy Institute (2024) Statistical Review of World Energy.................................25

EPA (2024) Fast Facts:
U.S. Transportation Sector Greenhouse Gas Emissions 1990-2022 ...................24

*EPA's Interpretation of Regulations that Determine Pollutants Covered
By Federal Prevention of Significant Deterioration (PSD) Permit Program* .....15

Feb. 8, 2009 Memo Subject: Re: EPA Activities Relevant to Power Plants,
To: Lisa Jackson From: Lisa Heinzerling...........................................................14

Feb. 16, 2009 email from Heinzerling to Jackson, Allyn Brooks-LaSure,
Subject: Good news re: Johnson memo........................................................ 15, 16

Feb. 16, 2009 Heinzerling correspondence ...........................................................16

Feb. 22, 2009 email from Heinzerling to Jackson, Subject: Endangerment ..........17

Federal Rule of Appellate Procedure 29(a) ..............................................................1

Ian Talley, *EPA Set to Move Toward Carbon-Dioxide Regulation: Climate Czar Says Agency Will Determine That Greenhouse Gas Endangers Public, Propose New Emissions Rules*, Wall Street Journal .............17

Jean Chemnick and Mike Lee, "What the EPA's New Plans for Regulating Power Plants Mean for Carbon," *Scientific American*, March 11, 2023 ...............6

June 8, 2009 Memorandum to Administrator Jackson from David McIntosh, RE: "Tuesday 12:00 Meeting with Democratic Senators about Climate Policy," released by EPA in response to FOIA request 2026-EPA-00237_1434262 .......22

Lomborg, Bjorn (2016) "Impact of Current Climate Proposals" Global Policy 7(1) ..................................................................................................25

Mar. 6, 2009 email from McIntosh to Jackson, Subject: CB .................................18

Mar. 12, 2009 email from Al McGartland to Alan Carlin, cc: Steve Newbold, John Davidson and Chris Dockins ....................................21

Mar. 14, 2009 email from Heinzerling to Jackson, cc: McIntosh, Subject: Re: Fw: memo to President.......................................................................................18

Mar. 15, 2009 email from Heinzerling to Jackson, cc: McIntosh, Subject: Re: Fw: memo to President.......................................................................................19

Mar. 16, 2009 email from Carlin to Newbold, cc: McGartland, Davidson and Dockins, Subject: Fw: Comments on the Endangerment TSD....................21

Mar. 17, 2009 email from McGartland to Carlin, cc: Davidson, Newbold, Subject: Re: endangerment comments?? ...........................................................21

March --, 2009 Decision Memo, From Lisa P. Jackson, Subject: Potential Presidential Announcement of EPA's "Endangerment Finding" on Greenhouse Gases ...................................................................................................20

Robert Peltier, *Politics vs. Science at EPA: The Carlin Matter Revisited*, MasterResource.org, August 6, 2009,................................................................21

Robin Bravender, *EPA policy chief steps down*, Nov. 4, 2010, Politico .................12

Senate Environment and Public Works Comm., Minority Report, *A Call for Sunshine: EPA's FOIA and Federal Records Failures Uncovered*, (Sept. 9, 2013) ...............................................................................15

Sept. 3, 2025 letter, House Committee and Government Reform
   to Ms. Marcia McNutt, President, National Academy of Sciences...................5-6

Wigley, T.M.L. (1998). "The Kyoto Protocol: $CO_2$, $CH_4$
   and climate implications." Geophysical Research Letters 25(13).......................25

Pursuant to Federal Rule of Appellate Procedure 29(a), Government Accountability & Oversight (Amicus, or "GAO") and Government Oversight and Education (d/b/a Protect the Public's Trust ("PPT")) submit this brief in support of the Respondents the Environmental Protection Agency ("the Agency") and Lee Zeldin in the above-captioned case.

**Statement of Identity, Interest in the Case, and Statement of Authority to File**

GAO is a nonprofit incorporated in Wyoming which conducts research into government policy by seeking access to public records under the federal Freedom of Information Act and state equivalent laws and uses the information it obtains to educate decisionmakers be they the public, regulators, policymakers, or the courts. GAO has no direct interest, financial or otherwise, in the outcome of the case, aside from its interest in good governance, specifically transparent governance conducted with the support of an educated populace.

Government Oversight & Education d/b/a Protect the Public's Trust (PPT) is a nonprofit incorporated in Delaware dedicated to promoting ethics in government and restoring the public's trust in government officials. PPT conducts research on a variety of societal and economic topics including government transparency, ethics in public service and related fields, filing requests under federal and state open records laws, analyzing information obtained from such requests, and engaging in

watchdog activities regarding potential violations of ethics laws and scientific integrity standards. PPT has no direct interest, financial or otherwise, in the outcome of this case, aside from its interest in transparency, good governance, and adherence to scientific integrity standards.

*Amici* lack a direct interest in this case, but have intimate and firsthand knowledge of public records which illustrate why the Rule at issue here, rescinding the Respondent Agency's underlying 2009 Endangerment Finding ("EF"), should be allowed. These records show that the Endangerment Finding was predetermined and was the product of unalterably closed minds of senior political appointees and a sham purported notice-and-comment process under the Administrative Procedure Act (APA). No other party has yet raised the issues set forth in this brief, and the brief will therefore assist the Court in determining these issues.

*Amici* have sought leave to file this brief pursuant to a contemporaneously filed Motion for Leave to File as *Amici Curiae*. Circuit Rule 19(b). As of this filing, *Amici* have heard from only certain of the parties' counsel as to their consent for this brief: the Government consents to the filing of this brief. No other party has responded substantively.

**Statement of Authorship and Financial Contributions**

No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *Amici Curiae* or their counsel made a monetary contribution to the brief's preparation or submission.

## I. INTRODUCTION

Not less than 17 major activist groups have sued in this Court to challenge a final regulation of the Environmental Protection Agency ("EPA" or "the Agency"). The regulation in question is the "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," published at 91 Fed. Reg. 7686 (Feb. 12, 2026) ("the Rule"). The Rule rescinds the 2009 Endangerment Finding and Motor Vehicle Greenhouse Gas Vehicle Standards because the Endangerment Finding, on which the Standards are based, is unlawfully outside the scope of the Respondent Agency's statutory authority. *Amici* agree with the Agency that it exceeded its authority and possess information recently publicly released by the Agency which supports this position, specifically that the finding was not properly arrived upon as the best reading of the Clean Air Act but was instead something that political appointees came into their Agency positions fully intent on executing, a "decision ready to go" to them and, in

3

their minds, a "basic fact" and "nothing more than science and common sense." This predetermination, as confirmed in records only recently released by the Agency, is additional evidence that rescission is necessary.

The critical take-away from this documentary record is that the Agency *did not consider whether* the Clean Air Act authorized its desired action, let alone evaluate the issue with the required open mind which would have permitted some other outcome. Instead, the relevant political appointees assumed their Agency positions already bearing the unalterable conviction in a "basic fact" and "common sense" that they *should* and therefore *would* declare endangerment.

Agency emails dated as early as two-and-a-half weeks after the January 21, 2009 inauguration of President Barack Obama, and two memoranda dated soon thereafter, document that the political appointees who orchestrated the April 2009 formal proposal of and December 2009 final rule finalizing the EF entered their Agency positions with a predetermined conclusion that the Agency would declare that greenhouse gases endanger public health or welfare. These new officials asserted in early correspondence that endangerment was nothing less than a "basic fact" and "nothing more than science and common sense." Discussions at the Agency did not involve a rigorous assessment of whether a finding of endangerment should be made, but instead focused merely on scripting the *timing* of going through

4

various individual motions required to impose a significant notice-and-comment rulemaking, and how to pull that off on a very near-term timetable these appointees had concluded should be dictated by political anniversaries and a scheduled international conference.[1]

EPA then truncated a sham internal and inter-agency review process and similarly engineered a notice-and-comment public participation process effectively rendered meaningless because the Agency was not genuinely open to rational consideration of arguments and evidence that would undercut its predetermined outcome. These Agency records now in the public domain confirm there was no realistic chance the EPA's process would achieve any other outcome.

The 2009 Endangerment Finding precipitated numerous Agency regulations, whether purportedly made necessary due to the Finding or simply grounded therein, all of which aim to determine how Americans get their energy and what they can drive. [2]

---

[1] Concerns were not exclusively limited to optics. Senior Agency officials behind the Finding also struggled with the risk that their desire to include the President of the United States in an event proposing the Finding could upset "the timing and perhaps content of the finding itself"—which Finding the then-Administrator wrote in a Memorandum to the President, knowingly, was "something that, I will be so bold to say, is a near-certainty." See, *infra*. at 22.

[2] *See, e.g.,* Sept. 3, 2025 letter, House Committee and Government Reform to Ms. Marcia McNutt, President, National Academy of Sciences, https://oversight.house.gov/wp-content/uploads/2025/09/National-Academies-of-

The courts have subsequently struck down EPA's grandiose claims of vast regulatory powers to make such determinations, specifically overturning at least one regulation triggered by the EF because that rule, like the Finding itself, sought to dictate how Americans get their energy.[3] The Agency now properly seeks to rescind the Endangerment Finding and another rule grounded therein.

---

Sciences-President-McNutt-re-Endangerment-Finding-Letter-09032025.pdf. Several rules flowing from the EF were imposed as a "suite of standards" all designed to force the premature retirement of coal and gas-fired electricity generation, as admitted to by then-Agency Administrator Michael Regan in 2022, affirming the EF is driving unlawful agency adventurism and claims of authority far beyond that which Congress actually delegated. See, e.g., Jean Chemnick and Mike Lee, "What the EPA's New Plans for Regulating Power Plants Mean for Carbon," *Scientific American*, March 11, 2023, https://www.scientificamerican.com/article/what-the-epas-new-plans-for-regulating-power-plants-mean-for-carbon/ ("The industry gets to take a look at this suite of rules all at once and say, 'Is it worth doubling down on investments in this current facility or operation, or should we look at the cost and say no, it's time to pivot and invest in a clean energy future?" Regan told reporters after his keynote address. "If some of these facilities decide that it's not worth investing in [control technologies] and you get an expedited retirement, that's the best tool for reducing greenhouse gas emissions," he added.").

[3] *West Virginia v. EPA*, 597 U.S. 697 (2022). A decade of U.S. Supreme Court jurisprudence, including also *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), *Michigan v. EPA*, 576 U.S. 743 (2015), and *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) clarified the scope of the EPA's authority, admonish against regulating in complete disregard of cost (particularly *Cf.* benefit), affirm that deciding how Americans get their electricity (i.e., seeking to force "generation shifting") is not within EPA's mission, and/or restate the basic principle that major policy determinations are the prerogative of Congress and not administrative agencies.

The Agency's unlawful predetermination giving rise to the Endangerment Finding leads to the inescapable conclusion that this Court should permit that finding to be rescinded; barring that, at minimum it is appropriate to assign this case to a Special Master for discovery into the Agency's state of mind and the propriety of the Endangerment Finding which the Agency hereby seeks to rescind. *Telecomms. Research & Action Ctr. v. FCC*, 242 U.S. App. D.C. 222, 750 F.2d 70, 78 (1984) ("if an agency record is insufficient, the Court of Appeals may either remand the record to the agency for further development or appoint a special master under 28 U.S.C. § 2347(b)(3).").

To read the Clean Air Act as authorizing or even requiring futile regulatory gestures reflects "a profound misreading of the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007)." Rule, 91 Fed. Reg. 7689 (Feb. 18, 2026). Rescinding the Endangerment Finding is also warranted because reading the Clean Air Act to require or even permit all-pain-no-gain policies—of which the Endangerment Finding is the epitome—is impermissible under *Michigan v. EPA*, 576 U.S. 743 (2015).

Referring to U.S. greenhouse gas ("GHG") emissions as "endangering" human health, public welfare and/or the environment is inaccurate. Referring to any individual or collective U.S. reductions as "combating climate change" or "taking

action on climate," while colloquially popular, is also factually inaccurate, reflecting among other deficiencies a profound misunderstanding of the global scale of the issue and relative volumes of greenhouse gases involved. As such, notwithstanding the ideological fervor driving the machinations described and documented herein, U.S. policy actions triggered by and necessarily flowing from the Endangerment Finding are expected to have *undetectably* minimal, if any, direct impact on the global climate. In contrast to the case of local air contaminants like particulates and ozone, even the most aggressive regulatory actions on GHG emissions from U.S. mobile and/or stationary sources cannot be expected to remediate alleged climate dangers to the U.S. public on any measurable scale. Any effects—which again are not expected to be detectable—will emerge only with long delays (if at all), even if one accepts the assumptions of most general circulation models.

The EPA's previous failure beginning with the EF to acknowledge the lack of measurable impact on global climate trends, regardless of what regulatory approach it might take as to GHGs, has created farcical applications of the Clean Air Act (and other statutory regimes). In short, the argument goes:

1. The evidence shows we must do something

2. This is something.

3. Therefore, we must do this.

Such reasoning is prohibited by *Michigan v. EPA*. The Endangerment Finding and what it inherently, necessarily set in motion has led to profound regulatory and other economic costs, distortions and dislocation of resources for no material impact on the claimed risk.

There is no projected detectable climate impact (let alone credible claim to any benefit) from "climate" policies (i.e., GHG regulation)(*infra*). In this respect, imposing no policies at all and imposing policies in the name of climate both constitute "doing nothing" to "combat climate change." However, imposing the Endangerment Finding and related policies is far worse than not doing so given the tremendous economic, social and national security costs of the Agency's heretofore unlawful exercises in gesture-policymaking, including but not limited to the electricity reliability crisis we are now being warned about by reliability organizations such as the non-profit North American Electric Reliability Corp.[4] Regardless, the Supreme Court has subsequently affirmed that all pain, no gain regulation is legally unjustifiable under *Michigan v. EPA*.

---

[4] Most recently, "2025 Long-Term Reliability Assessment, January 2026," North American Electric Reliability Corp.,  Jan. 23, 2026, https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf.

This Court should uphold the Rule rescinding the underlying Endangerment Finding, or order discovery into the documentary evidence that the Agency's Finding rescinded by the Rule in this case was predetermined.

## II.    ARGUMENT

### A.    The Rule Was Unlawfully Predetermined and the Product of Unalterably Closed Minds.

#### 1.    The Unalterably Closed Mind Standard

The Due Process Clause to the U.S. Constitution, the Administrative Procedure Act (APA), and this Court's precedent require that decisionmakers meaningfully consider the evidence and arguments presented during a proceeding. All statutes assume it. This is the hallmark of due process and a fair and open process. Officials who proceed with predetermination, not genuinely open to reconsideration of facts and policy, run afoul of both the APA and the Constitution.

Although the presumption of regularity generally protects agency decisionmakers unless there is strong evidence of bad faith or improper behavior, the agency must at a minimum take an honest look at available data rather than rubber-stamping a rule. *Nat'l Lifeline Ass'n v. FCC,* 921 F.3d 1102, 1111 (D.C. Cir. 2019) (stating that the bare minimum is that an agency must examine relevant data and articulate a satisfactory explanation for its actions, accounting for reliance

10

interests). This Court has held that decisionmakers violate the Due Process Clause when they act with an "unalterably closed mind" and are "unwilling or unable" to rationally consider arguments contrary to their pre-existing position. *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1170, 1174 (D.C. Cir. 1979). Courts may set aside agency decisions made with an "unalterably closed mind" just as they may if the agency relies on improper considerations.

The "unalterably closed mind" test balances the need for impartiality with the recognition that agency officials often have policy views or preconceptions due to their roles in implementing statutory programs. Satisfying this test requires that the official's view could not be changed by the rulemaking proceedings that were to follow. *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 427 (D.C. Cir. 1986). An unalterably closed mind is demonstrated, the presumption of administrative regularity is rebutted, and a judicial remedy is warranted when there is a "clear and convincing showing" that an agency's unwillingness or inability to fairly consider views on matters critical to the disposition of a proceeding other than their pre-existing policy views, beliefs, and political agendas. *Association of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979). Prior advocacy, pre-existing policy views, beliefs, and political agendas held by decisionmakers are not in themselves inherently disqualifying under this Court's precedent. However, the

11

records described herein, recently made publicly available, further establish in a clear and convincing way that the Agency's former zeal to impose precisely the same standard that key political appointees had fought for as private advocates was never set aside to consider other viewpoints, [5] and guided a predetermined outcome.

In the instant matter, Agency records show that although its officials publicly insisted they had not decided to make a finding of "endangerment," this was untrue. Recently released records conclusively rule out the prospect that the newly-installed Agency employees debated whether to reach a finding of Endangerment prior to its April 2009 proposal. Instead, the questions that run through all of these records are

---

[5] The process was led by "the lead author of the briefs of Massachusetts and other petitioners in *Massachusetts v. EPA*," Lisa Heinzerling. https://archive.epa.gov/publicinvolvement/web/html/epaappointmentactivities.html . Ms. Heinzerling, who had for years insisted that GHGs endanger public health and welfare, served on the EPA transition team. Lisa Heinzerling, https://www.law.georgetown.edu/faculty/lisa-heinzerling/ (last visited March 19, 2026). She then was brought into EPA on Day 1 of the Obama Administration in 2009 to serve as Associate Administrator for the Office of Policy, Economics, and Innovation, or "policy chief," which position did not require Senate confirmation. Ms. Heinzerling immediately set to work guiding the new administration's work on this matter for the first approximately seven months as "Administrator Jackson's chief advisor on climate matters." Robin Bravender, *EPA policy chief steps down*, Nov. 4, 2010, Politico, https://www.politico.com/story/2010/11/epa-policy-chief-steps-down-044708 (last visited March 17, 2026). *See also* Feb. 10, 2009 email from Lisa Heinzerling to Eric Wachter, et al., available at: https://govoversight.org/wp-content/uploads/2026/03/2.10.09-Heinzerling-reinforcements-email-email.pdf (last visited March 19, 2026).

political timing and optics, including how quickly the Agency could publish the Finding given the requirement of an interagency review process (which other political appointees promised to pre-arrange and expedite to conclude in weeks rather than months so as to satisfy the desire to publish the Endangerment Finding by one of two politically symbolic target dates in April). One email even reveals the Agency's reluctance to involve White House staff for fear of disrupting not just "the timing [but] perhaps content of the finding itself." (*infra*) Career staff raising concerns about this were silenced and sidelined. (*infra*)

These records not only strongly suggest these appointees behind the Endangerment Finding were incapable of considering the issue with an open mind, but they also leave no question that the purported deliberation, reviews and notice-and-comment processes through which EPA originally adopted the Endangerment Finding were shams. The outcome was predetermined. The notice-and-comment process was not going to influence the final decision, and indeed the process did not involve fairly assessing comment.

The documentary record provides overwhelming evidence that the Agency did not fairly consider whether to implement the Endangerment Finding, and is sufficient to overcome a presumption of good faith, or regularity. This Court should therefore allow the Agency's recission to stand.

## 2.    The Birth of the Endangerment Finding

On January 21, 2009, the Obama administration officially assumed office at noon. Approximately two weeks after the inauguration, on February 8, 2009, Lisa Heinzerling (the new Climate Policy Counsel at EPA) sent Administrator Lisa Jackson a "power plant memo" stating, in pertinent part (**emphasis** added):

> "To: Lisa Jackson
> From: Lisa Heinzerling
> Date: February 8, 2009
> Re: EPA Activities Relevant to Power Plants
>
> Our "power plants" conference call with Carol Browner and her team is scheduled for tomorrow morning at 10:00. In preparation for that call, I have put together the following description of recent and near-term EPA activities related to power plants: …
>
> Endangerment: **We expect to be able to issue a proposed finding of endangerment for greenhouse gases within the next 100 days. Within the same document, we expect to find that certain major categories of greenhouse gases - in particular, motor vehicles - cause or contribute to air pollution (GHG emissions) which endangers public health and welfare**. An endangerment finding combined with a causal finding will trigger regulatory obligations under the Clean Air Act."[6]

Approximately three weeks into the administration and the day before a scheduled meeting with the Sierra Club and other environmentalist organizations,

---

[6] Feb. 8, 2009 Memo Subject: Re: EPA Activities Relevant to Power Plants, To: Lisa Jackson From: Lisa Heinzerling. https://govoversight.org/wp-content/uploads/2026/03/2.08.09-2026-EPA-00184-Heinzerling-power-plants-memo.pdf

on February 16, 2009, Heinzerling writes to Administrator Jackson—the latter using, as with all of the correspondence cited herein, an email account bearing a false identity of "Richard Windsor"[7]—with what the email subject line calls "Good news re: Johnson memo:"[8]

> "The Sierra Club and other petitioners who have challenged the Johnson memo on PSD will NOT be asking the court to stay the memo tomorrow. So we should all be celebrating together tomorrow, and the Green Group meeting should be cause for a group hug. Have a good night."[9]

---

[7] *Competitive Enterprise Institute v. EPA* (DDC), Case No. 1:12-cv-01617 (JEB)(see, e.g., Neela Banerjee, *EPA administrator's email account raises concern*, *Los Angeles Times*, Nov. 12, 2012, https://www.latimes.com/world/la-xpm-2012-nov-20-la-na-epa-emails-20121121-story.html). The volume of more than 100,000 records involved led the court to reviewing a randomly selected (by EPA) index of responsive records. The Agency has long publicly admitted that Jackson is the author/recipient of emails on that address. See, e.g., Senate Environment and Public Works Comm., Minority Report, *A Call for Sunshine: EPA's FOIA and Federal Records Failures Uncovered*, (Sept. 9, 2013) at 9, https://www.epw.senate.gov/public/_cache/files/5/0/5091690a-1c27-4e07-98aa-e4074a117dab/BF9D594B66EBA773D15F23EC2FEC547786CB6ADB4C2DD1862C0C90B6D44D8B5A.callforsunshineinepasfoiaandfederalrecordsfailuresuncovered.pdf.

[8] On December 18, 2008, then-EPA Administrator Stephen Johnson issued an 18-page memorandum titled *EPA's Interpretation of Regulations that Determine Pollutants Covered By Federal Prevention of Significant Deterioration (PSD) Permit Program*, detailing EPA's position on regulating carbon dioxide ($CO_2$) emissions under the PSD permitting program. The memo states that EPA does not consider a pollutant to be "subject to regulation." https://www.epa.gov/sites/default/files/2015-07/documents/co2_psd.pdf

[9] Feb. 16, 2009 email from Heinzerling to Jackson, Allyn Brooks-LaSure, Subject: Good news re: Johnson memo. https://govoversight.org/wp-content/uploads/2026/03/Feb.-16-2009-email-from-Heinzerling-to-Jackson-Allyn-Brooks-LaSure-Subject-Good-news-re-Johnson-memo.pdf

Jackson responded that same evening, exclaiming "Wow. How did you pull THAT off?"[10] This and other emails confirm that the Agency informed environmentalist pressure groups, through the Sierra Club, that it would reconsider the Johnson memo and indeed file a motion before this Court the next day "granting [Sierra's] motion for reconsideration of the memo," and "asking it to stay the effectiveness of the Johnson memo,"[11] persuading the groups to not force the issue via litigation by assuring them that an Endangerment Finding was in-process.

On February 22, 2009, a mere four weeks into office, Ms. Heinzerling again referenced the matter of *timing* or *when* the Agency would issue the finding of "endangerment," the near-term fact of which is already assumed in contemporary correspondence. Her email to Ms. Jackson stated in pertinent part:

> "What date should we shoot for for our own proposed endangerment finding? A number of press outlets have surmised, based on your excellent NYT interview [published February 18, 2009], that the finding will be issued April 2, the Mass v EPA anniversary. You have also saif [*sic*] the first day of Earth

---

[10] Feb. 16, 2009 email from Jackson to Heinzerling, Subject Re: Good news re: Johnson memo. https://govoversight.org/wp-content/uploads/2026/03/Feb.-16-2009-email-from-Heinzerling-to-Jackson-Allyn-Brooks-LaSure-Subject-Good-news-re-Johnson-memo.pdf

[11] See Feb. 16, 2009 Heinzerling correspondence at https://govoversight.org/wp-content/uploads/2026/03/2.16.09-Heinzerling-memo-re-Johnson-memo-explaining-why-Sierra-Club-dropped-challenge.pdf and https://govoversight.org/wp-content/uploads/2026/03/2.16.09-Heinzerling-explanation-behind-why-Sierra-Club-dropped-Johnson-memo-challenge-WOW-3.pdf.

Week would be good. Which do you prefer? Dina Kruger says her team can do April 2 IF the OMB review process goes quickly."[12]

Jackson responds in pertinent part, "2) I would like to shoot for an April 16th event at EPA that features POTUS."[13] At that same time, a White House official let slip this predetermination, which was reported the next day in a Dow Jones news story quoting White House advisor and former EPA chief Carol Browner admitting that the decision had already been made to make the endangerment finding. Administrator Jackson forwarded that story by email, Subject: CB, to Associate Administrator for Congressional Affairs David McIntosh who responded, *in toto*, "I went less far than this, and unlike her, I did not make the statement publicly.

---

[12] Feb. 22, 2009 email from Heinzerling to Jackson, Subject: Endangerment. https://govoversight.org/wp-content/uploads/2026/03/2.22.09-Jackson-Heinzerling-emails-2025-EPA-07150-Records.pdf

[13] *Id*. Ian Talley, *EPA Set to Move Toward Carbon-Dioxide Regulation: Climate Czar Says Agency Will Determine That Greenhouse Gas Endangers Public, Propose New Emissions Rules*, Wall Street Journal, https://www.wsj.com/articles/SB123531391527642021?gaa_at=eafs&gaa_n=AW EtsqfD3VWTUCBjiE4lspWQIaviiltuyQIkL0SihxvxFclpjkctvaef7zea&gaa_ts=69b 9b4ac&gaa_sig=dNa252XJ3G6hm-rOC9TYjZzq8wFNuAbC4pSPgK8ac1nK4W3JZjVzSMLuwS9Eb1oh5dPEHRM-tF2Gl-kuvE6MmA%3D%3D (Feb. 23, 2009).

17

And unlike her, I was responding to a direct question from a Member of Congress. I've prepared Allyn" [Brooks-LaSure, EPA spokesman].[14]

There is no evidence that at any time was it an open question whether the Endangerment Finding would be issued. The only question was whether it should be released on one of two arbitrarily selected dates.

On March 14, 2009, less than two months into the administration, Heinzerling emailed Jackson and Associate Administrator McIntosh about a memorandum she drafted for Jackson to send to the President, in pertinent part (**emphasis** added), "**We have a politically fraught but scientifically and legally straightforward decision ready to go: that is, that greenhouse gases endanger public health and welfare and that mobile sources contribute to the pollution that is dangerous**."[15]

On March 15, 2009, Heinzerling emailed Jackson, indicating these officials' own predetermination and concern that it might not survive if others in the administration were given the chance to intervene, stating, in pertinent part:

---

[14] Mar. 6, 2009 email from McIntosh to Jackson, Subject: CB. https://govoversight.org/wp-content/uploads/2026/03/3.06.09-McIntosh-concerns-Browner-admitted-EF-coming-2016-EPA-00145-Records.pdf

[15] Mar. 14, 2009 email from Heinzerling to Jackson, cc: McIntosh, Subject: Re: Fw: memo to President. https://govoversight.org/wp-content/uploads/2026/03/3.13.09-thru-3.15.09-corresp-and-POTUS-decision-memo-2025-EPA-07149-Records.pdf, p. 7 of 19.

18

"I've worried that perhaps if we 'lose' on the [POTUS] memo, we lose not only on the possibility of a Presidential announcement but also, because of the way the memo is written, on the timing and perhaps content of the finding itself."[16]

This memo as edited includes the following pertinent points (**emphasis** added, truncated for space considerations):

MEMORANDUM FOR THE PRESIDENT
FROM: LISA P. JACKSON
SUBJECT: POTENTIAL PRESIDENTIAL ANNOUNCEMENT OF EPA'S "ENDANGERMENT FINDING" ON GREENHOUSE GASES

I am writing to ask you to give your most serious consideration to the idea of personally announcing the Environmental Protection Agency's impending determination that greenhouse gases endanger public health and welfare. Climate change is the most pressing environmental issue of our time, and the "endangerment finding" soon to be issued by EPA will be the United States Government's first official recognition of this threat. I would urge that this announcement be the major Presidential event of this year's Earth Week. …

A draft endangerment finding will be sent to OMB [Office of Management and Budget] for interagency review on March 20. **OMB has indicated that they will endeavor to complete the process of interagency review in three weeks, so that the endangerment finding would be ready to be issued in mid-April**….

Analysis and Policy Considerations

You have made climate policy a central part of your domestic and international agenda. The premise of this policy is that greenhouse gases do indeed threaten human well-being. Yet the United States Government has never officially and formally proclaimed **this basic fact**... I believe that when the Government does

---

[16] Mar. 15, 2009 email from Heinzerling to Jackson, cc: McIntosh, Subject: Re: Fw: memo to President. Available at same link as *Id*., at p. 12 of 19.

so, through the endangerment finding EPA soon will make, you should be the one to deliver this long-awaited message.

If Earth Day passed without a finding, the domestic and foreign criticism would begin immediately and mount steadily. **When, eventually, your Administration made the finding – something that, I will be so bold to say, is a near-certainty** ….[T]he beauty of making the endangerment finding during Earth Week is that it would elate the Left without offering targets of opportunity to the Right. After all, **the finding is comprised of nothing more than science and common sense**."[17]

On March 12, 2009, EPA National Center for Environmental Economics (NCEE) director Al McGartland ordered senior scientist Dr. Alan Carlin, whose complaints about a hurried and non-rigorous review process and lack of supporting data were soon made public,[18] to not have any "direct communication with anyone

---

[17] March --, 2009 Decision Memo, From Lisa P. Jackson, Subject: Potential Presidential Announcement of EPA's "Endangerment Finding" on Greenhouse Gases. Available at same link as *Id*., at pp. 16 through 19 (date missing in original).

[18] In March 2009, Dr. Alan Carlin authored a 98-page study which severely criticized the scientific basis for the Agency's handling of this matter. This story became public when the Competitive Enterprise Institute (CEI) released a series of emails to Dr. Carlin from NCEE director Al McGartland, stating that Carlin's study would not be disclosed and that he was to stop working on global warming issues because criticizing EPA's position would only cause trouble. *See, e.g*., https://cei.org/blog/epa-considers-closing-ncee-dr-alan-carlins-unit/. See also, *e.g*., "In their recent draft of an endangerment-finding technical support document (TSD), scientists at the U.S. Environmental Protection Agency (EPA) conclude that carbon dioxide emissions are a public health hazard and should be regulated under the Clean Air Act. Federal law requires that regulations be based on scientific information that is "accurate, clear, complete, and unbiased"; the most recent available; and collected by the "best available methods." The EPA's TSD on carbon emissions violates all of these requirements. Staff researcher Dr. Alan Carlin, given just a few days to

outside of NCEE on endangerment."[19] On March 16, 2009, Dr. Carlin again pressed

for a more thorough consideration, contradicting what the administration has

decided to do.[20] The next day, March 17, 2009, McGartland emailed Carlin, stating

that he did not forward Carlin's input and, *inter alia*, "The administrator and the

administration has decided to move forward on endangerment, and your comments

do not help the legal or policy case for this decision."[21]

A truism, as scripted in a June 8, 2009 memorandum for Administrator

Jackson to caution Democratic Senators in an upcoming meeting, is that, "if EPA

---

review the draft TSD, took EPA to the woodshed because the report offered little more than a bibliography of out-of-date reports and research rather than a rigorous scientific inquiry into the subject. The Carlin report's preface clearly shows that the EPA abdicated its position of scientific authority on the subject." Robert Peltier, *Politics vs. Science at EPA: The Carlin Matter Revisited*, MasterResource.org, August 6, 2009, https://www.masterresource.org/epa-endangerment-finding/politics-vs-science-at-epa-the-carlin-matter-revisited/.

[19] Mar. 12, 2009 email from Al McGartland to Alan Carlin, cc: Steve Newbold, John Davidson and Chris Dockins. https://govoversight.org/wp-content/uploads/2026/03/3.12.09-McGartland-order-to-Carlin-2026-EPA-00335.pdf

[20] Mar. 16, 2009 email from Carlin to Newbold, cc: McGartland, Davidson and Dockins, Subject: Fw: Comments on the Endangerment TSD. https://govoversight.org/wp-content/uploads/2026/03/Mar.-16-2009-email-from-Carlin-to-Steve-Newbold-cc-McGartland-Davidson-and-Dockins-Subject-Fw-Comments-on-the-Endangerment-TSD.pdf

[21] Mar. 17, 2009 email from McGartland to Carlin, cc: Davidson, Newbold, Subject: Re: endangerment comments?? https://govoversight.org/wp-content/uploads/2026/03/Mar.-17-2009-email-from-McGartland-to-Carlin-cc-John-Davidson-Newbold-Subject-Re-endangerment-comments-Q-marks.pdf

were ever to give the impression that its ongoing greenhouse-gas regulatory activity were motivated by anything other than a desire to apply today's best science to today's statutory law, then it would de-legitimize EPA's actions in the eyes of many stakeholders and members of the public."[22] The then-Administrator was privately cautioning colleagues not to say things that the Agency also could not say publicly, which is that the endangerment finding was predetermined, but the appearance of a proper APA process must be maintained. The records show that was the case, and is indeed delegitimizing.

The Rule currently before this Court properly rescinds this unlawful predetermination.

### B.    The Rule is Unlawful as it is and Inherently Necessitates Regulation Beyond the Agency's Authority

EPA "climate" policies do not promise to impact the climate. U.S. policy actions are expected to have undetectably small direct impacts on the global climate. In contrast with conventional air pollution control of the sort contemplated when the Clean Air Act was amended with the sections at issue here, the local effect of even

---

[22] June 8, 2009 Memorandum to Administrator Jackson from David McIntosh, RE: "Tuesday 12:00 Meeting with Democratic Senators about Climate Policy," released by EPA in response to FOIA request 2026-EPA-00237_1434262. https://govoversight.org/wp-content/uploads/2026/01/2026-EPA-00237-Records.pdf

drastic local actions will have *possible* but undetectable local effects, decades hence.

Similarly, referring to U.S. emissions as "endangering" human health, public welfare

and/or the environment is inaccurate, as is referring to any individual or collective

U.S. reductions as "combating climate change" or "taking action on climate." As

several distinguished researchers have recently publicized, this rhetoric deployed to

promote this regulatory agenda reflects a profound misunderstanding of the scale of

the issue.

Consider a recent case study of U.S. motor vehicle emissions, recently

compiled by five independent experts on this background and climate policies, from

multiple disciplines.[23]

> "The scale problem can be illustrated with reference to U.S. motor vehicles. The EPA's 2009 Endangerment Finding focused on $CO_2$ emissions from cars and light-duty trucks in the U.S. because Section 202(a) of Clean Air Act mandates the EPA to set emissions standards for motor vehicles if pollutants are found to endanger public health or welfare. The 2009 Endangerment Finding therefore obligated the EPA to regulate emissions from new motor vehicles, ostensibly to reduce or eliminate climate-related harms to the U.S. public. Two questions that naturally arise are: (1) How large a reduction in $CO_2$ emissions would result from such regulation? and (2) What would be the climate impact of such regulation?
>
> The first question can be addressed by comparing U.S. vehicle-based $CO_2$ emissions to the global total. The second question can be addressed by

---

[23] Analysis and source documents are available at
https://www.energy.gov/sites/default/files/2025-
07/DOE_Critical_Review_of_Impacts_of_GHG_Emissions_on_the_US_Climate_July_2025.pdf
(last visited March 18, 2026).

using the fact that the reduction in global warming would be, according to the models relied upon by the EPA, proportional to the reduction in global emissions, keeping in mind that the change in the CO2 content of the atmosphere in any given year is the result of total global CO2 emissions, not just U.S. emissions.

In 2022, the emissions from U.S. cars and light duty trucks totaled 1.05 billion metric tons of carbon dioxide (GtCO2, EPA 2024). Meanwhile global CO2 emissions from energy use totaled 34.6 GtCO2 (Energy Institute 2024). Hence U.S. cars and light trucks account for only 3.0 percent of global energy-related CO2 emissions. …[W]e can say as an approximation that even eliminating *all* U.S. vehicle-based emissions would retard the accumulation of CO2 in the atmosphere by a year or two over a century. It would also reduce the overall warming trend by at most about 3 percent. For the period 1979-2023, which has the most extensive global coverage of a variety of weather data types, warming trends are determined to a precision of about ±15 percent, so the impact of reducing the rate of global warming by eliminating U.S. vehicle CO2 emissions would be far below the limits of measurability. Given that global- average temperature is the most direct climate change metric, impacts on any secondary climate metrics (e.g. severe weather, floods, drought, etc.) from reducing U.S. vehicle CO2 emissions would be even less measurable.

Consequently, in contrast to the case of local air contaminants like particulates and ozone, even the most aggressive regulatory actions on GHG emissions from U.S. vehicles cannot be expected to remediate alleged climate dangers to the U.S. public on any measurable scale."[24]

---

[24] *Id.* At 129-30. These authors cite to Ciais, P., C. Sabine, G. Bala, L. Bopp, V. Brovkin,et al. (2013): Carbon and Other Biogeochemical Cycles. In: Climate Change 2013: The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change [Stocker, T.F., D. Qin, G.-K. Plattner, M. Tignor, et al. (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

EPA (2024) Fast Facts: U.S. Transportation Sector Greenhouse Gas Emissions 1990-2022. Available online at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101AKR0.pdf.

The Supreme Court explained in *Michigan v. EPA* that "agency action is lawful only if it rests 'on a consideration of the relevant factors,'" 576 U.S. at 750, quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983), including "at least some attention to cost." *Michigan* at 752. *Michigan* requires the Agency to engage in "reasoned decisionmaking" which includes the consideration of all relevant factors which includes, *inter alia*, considering costs at the outset of the regulatory process, i.e., in deciding whether to regulate. The above therefore should have been taken into account when the 2009 Endangerment Finding intentionally triggered a duty to regulate by invoking CAA section 202(a) authority. It was not. Keeping the Endangerment Finding intact requires reading the Clean Air Act in a way that inherently, inescapably violates *Michigan*.

*Michigan* addressed regulation of air pollution from stationary sources where "regulation is appropriate and necessary," under a provision of the Clean Air Act

---

Energy Institute (2024) Statistical Review of World Energy. Available online at https://www.energyinst.org/statistical-review.

Lomborg, Bjorn (2016) "Impact of Current Climate Proposals" Global Policy 7(1) 109—118. Available at http://onlinelibrary.wiley.com/doi/10.1111/1758-5899.12295/full.

Wigley, T.M.L. (1998). "The Kyoto Protocol: CO2, CH4 and climate implications." Geophysical Research Letters 25(13), 2285-2288.

that does *not* expressly cite to consideration of costs, unlike Section 202(a), the mobile source provision specifically addressed in the Agency's reconsideration.[25] As such, from *Michigan* we know that in imposing CAA regulation (whether of mobile or stationary sources), it is not only not rational but is legally "(in)appropriate" to impose billions of dollars in economic costs in return for no impact on the nominal target of a regulation. Under *Michigan*, *Whitman v. American Trucking Assns*., Inc., 531 U. S. 457 (2001) provides no safe harbor for "climate" regulations carrying great cost and little to no demonstrable climate impact (let alone benefit), which regulation relies upon and indeed began with the 2009 Endangerment Finding. That Finding itself intentionally triggered all manner of costly regulations in the name of "climate" that do not offer detectable climate impacts (let alone benefit). EPA acted improperly in making its Endangerment Finding analysis.[26] It is inconceivable that a regulation with no anticipated appreciable or even detectable

---

[25] *Massachusetts v. EPA*, 549 U.S. 497, 127 S Ct. 1438 (2007) must be read together with *Michigan,* and the language of CAA section 202(a)(1) [NB: and other CAA authorities] must be read in context to "produc[e] a substantive effect that is compatible with the rest of the law." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014), *citing United Sav. Ass'n of Tex.* v. *Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371 (1988)).

[26] This is also true of all subsequent standards prescribed as a result or in reliance on the EF, which regulations find no safe harbor under *Whitman*.

impact on its nominal target, let alone benefit, survives the Clean Air Act's standard affirmed in *Michigan*. Costly gestures via regulation are not lawful.

## III.    CONCLUSION

For these reasons stated above, *Amici* wish to provide this Court with the extensive documentary trail supporting the argument that the Rule is warranted in rescinding the underlying Endangerment Finding which was imposed in violation of the proper and ordinary regulatory process, in violation of the public's right to Due Process and of the Administrative Procedure Act. The Agency proceeded with a predetermined outcome as the result of unalterably closed minds. Records recently released under the Freedom of Information Act support this conclusion. This Court has long recognized that predetermination of an Agency's approach runs contrary to the notion that an agency should only exercise its considerable rule-making authority with "a degree of public awareness, understanding, and participation commensurate with the complexity and intrusiveness of the resulting regulations." *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028 (D.C. Cir. 1978).

Accordingly, this Court should consider and take judicial notice of the records cited above, and the Agency's Rule rescinding the 2009 Endangerment Finding should stand because it properly rescinds a fatally flawed rulemaking that never should have proceeded in the first instance. Alternately, at minimum a Special

Master is warranted pursuant to *Telecomms. Research & Action Ctr.*, 750 F.2d at 78 and 28 U.S.C. § 2347(b)(3), to oversee discovery to discern the extent of the predetermination and the implications of the underlying rule on the Rule rescinding the Endangerment Finding.

Respectfully submitted this the 19th day of March, 2026,

/s/ Matthew D. Hardin
Matthew D. Hardin
DC. Bar No. 1032711
101 Rainbow Drive # 11506
Livingston, TX 77399
Phone (202) 802-1948
Email: Matt@MatthewHardin.com

/s/ Christopher C. Horner
Christopher C. Horner
D.C. Bar #440107
1725 I Street NW, Suite 300
PMB #2094
Washington, DC 20006
(202) 262-4458
Chris@chornerlaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies, in accordance with Federal Rule of Appellate Procedure 32(g)(1), that the following brief contains 6,372 words, as counted by counsel's word processing system (Microsoft Word), and thus complies with the 6,500 word limit. See Fed. R. App. P. 32 (a) (7) and 29 (a)(5). Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using size 14 Times New Roman font.

Dated: March 19, 2026

/s/ Matthew D. Hardin
Matthew D. Hardin