<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al.,<br><br>     *Petitioners,*<br><br>  v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. Environmental Protection Agency,<br><br>     *Respondents.* | No. 26-1037 (consolidated with Nos. 26-1038, 26-1039, 26-1043, 26-1051, 26-1061) |

**MOTION TO INTERVENE AS RESPONDENTS OF
NATIONAL FEDERATION OF INDEPENDENT BUSINESS,
AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE,
AND THE ILLINOIS, IOWA, KENTUCKY, MISSOURI,
NORTH DAKOTA, AND TENNESSEE
CORN GROWERS ASSOCIATIONS**

Michael Buschbacher
 *Counsel of Record*
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
 Suite 900
Washington, D.C. 20006
Tel.: (202) 955-0620

## MOTION TO INTERVENE AS RESPONDENTS

On February 18, 2026, the U.S. Environmental Protection Agency (EPA) published a Final Rule entitled, *Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act*, 91 Fed. Reg. 7,686. This rule rescinds EPA's *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66,496 (Dec. 15, 2009), and repeals all standards for greenhouse gas emissions from light-duty, medium-duty, and heavy-duty motor vehicles and engines for model years 2012 and beyond. Multiple groups have filed petitions for review of the Final Rule.

Movants National Federation of Independent Business (NFIB), and American Free Enterprise Chamber of Commerce (AmFree), and the Illinois, Iowa, Kentucky, Missouri, North Dakota, and Tennessee Corn Growers Associations (collectively, Corn Growers) are associations representing American individuals and businesses harmed by the greenhouse gas standards that the Final Rule repeals. NFIB is the Nation's leading small business association and works to promote and protect its members' ability to own, operate, and earn success in their businesses. This

1

includes fighting against federal and state policies that increase regulatory barriers and increase its members' costs of doing business. *See* Ex. A, Declaration of Elizabeth Milito (Milito Decl.) ¶ 4. AmFree is a membership association that represents entrepreneurs and companies across all sectors and states who are vitally interested in maintaining the free, fair, and open markets that are foundational to the American economy. AmFree serves its members by fighting against burdensome regulations and counterproductive policies that increase costs and harm its members' businesses. *See* Ex. B, Declaration of Gentry Collins (Collins Decl.) ¶ 4. The Corn Growers represent farmers throughout their states who grow and sell corn crops. A primary use of this corn is as a feedstock for ethanol, the second largest component of automobile gasoline. *See* Ex. C, Declaration of Rodney Weinzierl (Weinzierl Decl.) ¶¶ 2, 4, 6; Ex. D, Declaration of Adam Andrews (Andrews Decl.) ¶¶ 2, 4, 6; Ex. E, Declaration of Bradley Schad (Schad Decl.) ¶¶ 2, 4, 6; Ex. F, Declaration of Amy McNeil (McNeil Decl.) ¶¶ 2, 4, 6; Ex. J, Declaration of Brenda K. Elmer ¶¶ 2, 4, 6 (Elmer Decl.); Ex. K, Declaration of Kevin Studer ¶¶ 2, 4, 6 (Studer Decl.).

2

Movants' members rely on motor vehicles of all classes, or the fuels and industries that power those vehicles, in operating their businesses. Some members use vehicles to move products or people; others sell or lease vehicles; and others are in the automobile fuel supply chain or provide services to the fuel industry. Movants' members benefit from EPA's Final Rule, which repeals onerous greenhouse gas emissions standards that drove up vehicle costs, limited vehicle choice, and depressed demand for automobile fuel.

Movants therefore seek to intervene as Respondents to defend that repeal against legal challenge. Petitioners in Case Nos. 26-1037 and 26-1051 take no position. Petitioners in 26-1061 were unable to provide a position before filing. The remaining Petitioners did not respond. Respondents EPA and EPA Administrator Lee Zeldin reserve their position until they have reviewed the motion.

## BACKGROUND

### I.    The Greenhouse Gas Standards

Title II of the Clean Air Act provides a comprehensive scheme for regulating emissions from new motor vehicles that may harm the public. Section 202(a) directs the EPA Administrator to

3

> by regulation prescribe (and from time to time re-
> vise) … standards applicable to the emission of any
> air pollutant from any class or classes of new mo-
> tor vehicles or new motor vehicle engines, which in
> his judgment cause, or contribute to, air pollution
> which may reasonably be anticipated to endanger
> public health or welfare.

42 U.S.C. § 7521(a)(1). The determination that emissions cause or con-

tribute to dangerous air pollution has been referred to as an "endanger-

ment finding." Standards prescribed under Section 202(a) "shall be ap-

plicable to such vehicles and engines for their useful life," *id.*, and may

not take effect until "after such period as the Administrator finds neces-

sary to permit the development and application of the requisite technol-

ogy, giving appropriate consideration to the cost of compliance within

such period," *id.* § 7521(a)(2).

EPA did not regulate motor vehicle greenhouse gas emissions until

2010. Following the Supreme Court's decision in *Massachusetts v. EPA*,

549 U.S. 497 (2007), EPA first issued an endangerment finding under

Section 202(a) for "well-mixed greenhouse gases"—*i.e.*, carbon dioxide,

4

methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. 74 Fed. Reg. 66,496.

EPA then promulgated its initial light-duty vehicle greenhouse gas emission standards in a joint rulemaking with the National Highway Traffic Safety Administration (NHTSA), which sets corporate average fuel economy standards under the Energy Policy and Conservation Act. *See* 49 U.S.C. § 32901 *et seq.* As the agencies explained, carbon dioxide emissions—EPA's central focus in the greenhouse gas standards—are "essentially constant per gallon combusted of a given type of fuel," so carbon dioxide standards and fuel economy standards are two sides of the same coin. 75 Fed. Reg. 25,324, 25,327 (May 7, 2010); *see Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) (per curiam) ("[A]ny rule that limits tailpipe [greenhouse gas] emissions is effectively identical to a rule that limits fuel consumption.").

After that initial rulemaking, EPA continued to jointly promulgate its Title II greenhouse gas standards for cars and light trucks with NHTSA. *See* 85 Fed. Reg. 24,174 (Apr. 30, 2020); 77 Fed. Reg. 62,624 (Oct. 15, 2012). Because Congress prohibited NHTSA from considering the fuel economy of electric vehicles in setting fuel economy standards,

5

*see* 49 U.S.C. §§ 32901(a)(1), (8), 32902(h)(1), (2), the agencies' jointly promulgated standards could not be so stringent that they effectively required automakers to include electric vehicles in their fleets.

EPA and NHTSA also jointly promulgated greenhouse gas and fuel consumption standards for medium- and heavy-duty vehicles, beginning in 2011. *See* 76 Fed. Reg. 57,106 (Sept. 15, 2011); 81 Fed. Reg. 73,478 (Oct. 25, 2016). Like the standards for light-duty vehicles, the standards for heavy-duty vehicles could be met without electric vehicles. *See* 76 Fed. Reg. at 57,133; 81 Fed. Reg. at 73,500, 73,639, 73,704.

## II.    The Electric-Vehicle Mandates

In his first year in office, President Biden announced his Administration's "goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles, including battery electric, plug-in hybrid electric, or fuel cell electric vehicles." Exec. Order No. 14,037, 86 Fed. Reg. 43,583, 43,583 (Aug. 10, 2021). To that end, during the Biden Administration, EPA began issuing standards without NHTSA. That culminated in EPA's electric-vehicle mandates—the most expensive rules in American history.

In the so-called "multi-pollutant" rule, EPA set greenhouse gas standards for light- and medium-duty vehicles. 89 Fed. Reg. 27,842 (Apr. 18, 2024). EPA acknowledged that its standards would likely drive automakers to "deploy an increasing number" of electric vehicles. *Id.* at 27,898. By model year 2032, EPA projected that the standards would result in approximately two-thirds of all new passenger cars and light trucks being electric. *Id.* at 28,057. For medium-duty vehicles, EPA predicted an astonishing increase in electric vehicles—jumping to a 43% market share by model year 2032. *Id.* at 28,060. As automakers have explained, these standards are impracticable: demand for electric vehicles is nowhere near the Biden EPA's wildly optimistic expectations. *See* Comment Submitted by the Alliance of Automotive Innovation 13–22 (Sept. 22, 2025), *available via* https://www.regulations.gov/comment/EPA-HQ-OAR-2025-0194-7547.

Around the same time, EPA also promulgated its first-ever solo greenhouse gas standards for heavy-duty vehicles. Those standards were "more stringent than" prior standards and were projected to rapidly increase the production of electric heavy-duty vehicles to 45% of new vehicles by model year 2032, up from near zero. 89 Fed. Reg. 29,440, 29,443,

7

29,567–68 (Apr. 22, 2024). As truck manufacturers have explained, this mandate is also wildly impracticable given low demand for electric trucks. Comment submitted by Truck and Engine Manufacturers Association 17–29 (Sept. 22, 2025), *available via* https://www.regulations.gov/comment/EPA-HQ-OAR-2025-0194-0888.

## III.   The Final Rule

In the Final Rule, EPA repeals all of the greenhouse gas standards for motor vehicles for model years 2012 and beyond, citing several independent bases. First, EPA concludes that it lacks authority to regulate greenhouse gases as "air pollution" under the best reading of Section 202(a) because greenhouse gases "do not endanger public health or welfare through local or regional exposure" and lack a sufficiently close causal connection to the alleged harms. 91 Fed. Reg. at 7,714. Second, EPA concludes that regardless, regulating greenhouse gases raises questions of major economic and political significance by, among other things, compelling increased electrification of the U.S. motor vehicle fleet, and EPA lacks clear authority to mandate such a shift. *Id.* at 7,723–26. Third, EPA concludes that, in any event, the effect of U.S. motor vehicle emissions on any harms from climate change is *de minimis* because even elim-

8

inating *all* greenhouse gases from U.S. motor vehicles (an economic impossibility) would have no meaningful effect on global-mean surface temperatures or sea-level rise, let alone other possible downstream effects. *Id.* at 7,729–34.

## LEGAL STANDARD

Intervention here is governed by Federal Rule of Appellate Procedure 15(d), which requires the movant to file a motion for leave to intervene within 30 days after the petition for review was filed.[1] The motion "must contain a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d). "Because the Federal Rules of Appellate Procedure" are "silent on the subject" of the grounds for intervention, this Court "appl[ies] the intervention standards of Civil Rule 24." *United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426, 432 (D.C. Cir. 2022).

Under Civil Rule 24(a), a movant is entitled to intervention as of right if (1) the motion is "timely," (2) the movant has an "interest relating

---

[1] Rule 15(d)'s intervention procedures apply "[u]nless a statute provides another method." Fed. R. App. P. 15(d). Because the statute that Petitioners seek review under does not provide another method for intervention, *see* 42 U.S.C. § 7607(b), Rule 15(d) applies here.

9

to the property or transaction that is the subject of the action," (3) the interest "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," and (4) the existing parties do not "adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Additionally, this Court has held that "where a party tries to intervene as another defendant," it must "demonstrate Article III standing." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015). Doing so necessarily satisfies the "legally protected interest" requirement of Rule 24(a). *Id.* at 320; *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003).[2]

Under Civil Rule 24(b), a movant may be granted permissive intervention if (1) the motion is "timely," (2) the movant has "a claim or defense that shares with the main action a common question of law or fact," and (3) intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1), (3).

---

[2] This Court has recognized that its precedent requiring putative intervenors to show Article III standing even when seeking the same relief as existing parties "is in tension" with *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020), which held that such showing is not required. *See Inst. S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025).

10

## ARGUMENT

Movants meet the criteria for intervention as of right and have Article III standing. In any event, Movants also meet the criteria for permissive intervention.

### I.    Movants May Intervene as of Right

### A.    The Motion Is Timely

Movants seek to intervene in Case No. 26-1037 and the consolidated cases. The earliest petition for review was filed on February 18, 2026. Therefore, this motion for leave was filed within the 30-day period specified by Appellate Rule 15(d). Fed. R. App. P. 15(d).[3]

### B.    Movants Have Article III Standing and an Interest in the Final Rule

Movants seek to vindicate the interests of their members who will be harmed if the Final Rule is not affirmed by this Court.

NFIB represents small and independent businesses in Washington, D.C., and all fifty states. NFIB's membership includes hundreds of thousands of businesses spanning all industries and operations, from sole pro-

---

[3] Circuit Rule 15(b) states that a motion to intervene "will be deemed a motion to intervene in all cases before this court involving the same agency action or order, including later filed cases, unless the moving party specifically states otherwise …." D.C. Cir. R. 15(b).

11

prietorships to firms with hundreds of employees. NFIB's members rely on vehicles of all types—from passenger cars to heavy-duty trucks—to operate their businesses. The cost of purchasing and operating vehicles is one of the most significant expenses NFIB members face. Milito Decl. ¶¶ 8–14.

For example, NFIB member Herbi-Systems is a lawn and landscaping company that maintains thousands of acres of parks, athletic fields, and other grounds for clients in Memphis, Tennessee, and the surrounding area. Herbi-Systems is completely reliant on small and medium trucks to transport its skilled technicians, equipment, and supplies to service properties, and so it owns and operates a fleet of more than 60 gasoline- and diesel-powered trucks. The costs of purchasing and maintaining these trucks is a significant business expense. Moreover, Herbi-Systems has concluded that electric trucks aren't a commercially feasible option, in part because of the lack of charging infrastructure in the rural areas that it serves. Herbi-Systems therefore intends to continue using gasoline- and diesel-powered trucks for the foreseeable future. Ex. G, Declaration of Kenny Crenshaw (Crenshaw Decl.) ¶¶ 2, 4–5, 8–10.

12

NFIB member Go Wireline, an oil and gas services company that provides wireline services in North Dakota, South Dakota, Montana, Wyoming, Utah, Nebraska and Colorado, is in similar circumstances. Go Wireline's services typically involve using a truck with a long electric cable to hoist a variety of different tool sets into deep wellbores, and so the company's fleet of approximately 160 gasoline- and diesel-powered trucks are integral to its operations—and a core operating expense. Go Wireline has concluded that, for the foreseeable future, electric trucks aren't a feasible option to support the long distances, heavy payloads, and varied demands that their services require. Standards that increase the cost of gasoline- and diesel-powered vehicles therefore harm Go Wireline's bottom line. Moreover, because more than 99% of Go Wireline's revenue is derived from the oil and gas industries, standards that decrease demand for petroleum-derived products—like gasoline and diesel—also decrease demand for Go Wireline's services. Ex. H, Declaration of Lucas Gjovig (Gjovig Decl.) ¶¶ 2–4, 7–8.

AmFree represents businesses across all sectors and states who believe that free, fair, and open markets are critical to the prosperity of their business and the Nation. AmFree's members include companies

13

that own, operate, lease, or sell vehicles of all classes. These members have largely concluded that electric vehicles are not commercially feasible for their businesses, and so they intend to continue purchasing internal-combustion vehicles. Collins Decl. ¶¶ 8–11. For example, AmFree member Meiborg Companies is a family-owned trucking company in Illinois that operates a fleet of more than 200 internal-combustion heavy-duty Class 8 tractors. Meiborg Companies intends to purchase internal-combustion vehicles, rather than electric trucks, because of electric trucks' higher up-front costs, limited range, uncertain maintenance costs, and the limited availability of charging infrastructure. Ex. I, Declaration of Zach Meiborg (Meiborg Decl.) ¶¶ 2–4, 8–11.

If the Final Rule is not affirmed, NFIB's and AmFree's members will have to pay more for the internal-combustion vehicles they need to operate their businesses. The repealed greenhouse gas standards mandate electrification across all vehicle classes, which drives up prices since electric vehicles cost more to produce and manufacturers increase prices of internal-combustion vehicles to cross-subsidize electric-vehicle sales. EPA estimates that through 2055, its repeal reduces per vehicle costs by

14

$1,550 to $2,420 in 2024 dollars, depending on discount rate and other factors. 91 Fed. Reg. at 7,756 tbls. 15 & 16.

Movants also represent individuals and businesses that are part of the automobile fuel supply chain who are harmed if the Final Rule is not affirmed. For example, AmFree's members include producers of ethanol, a renewable fuel that is blended into nearly every gallon of gasoline sold in the United States. The Corn Growers represent farmers across the country whose corn crops are used as a feedstock for ethanol. Because more stringent greenhouse gas standards mean increased fuel economy, the repealed standards would significantly decrease demand for gasoline. EPA projected that through 2025, the light-duty vehicle standards, alone, would reduce retail gasoline consumption by 780 billion gallons. 89 Fed. Reg. at 28,141. If the Final Rule is not affirmed, then AmFree's and the Corn Growers' members face reduced demand for their products, harming their economic interests. Collins Decl. ¶¶ 12–14; Weinzierl Decl. ¶¶ 2, 4, 6, 9–12; Andrews Decl. ¶¶ 2, 4, 6, 9–12; Schad Decl. ¶¶ 2, 4, 6, 9–12; McNeil Decl. ¶¶ 2, 4, 6, 9–12; Elmer Decl. ¶¶ 2, 4, 6, 9–12; Studer Decl. ¶¶ 2, 4, 6, 9–12.

15

These concrete pocketbook harms are sufficient to establish standing under Article III and an interest under Civil Rule 24(a). "Economic harm to a business clearly constitutes an injury-in-fact. And the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). If the Final Rule is not affirmed, Movants' members will undoubtedly face at least a dollar in increased vehicle costs and decreased product and services sales from the greenhouse gas standards the Final Rule repeals. Movants' members "benefit from" the Final Rule and "would suffer concrete injury if the court grants the relief the petitioners seek." *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998). That satisfies both standing and intervention. *See id.*; *Fund for Animals*, 322 F.3d at 735 ("[o]ur conclusion that [movant] has constitutional standing is alone sufficient to establish that [movant] has" a sufficient interest under Civil Rule 24(a)).

AmFree's fuel-producer members and the Corn Growers' members have standing, and an interest sufficient for intervention as of right, for the separate and additional reason that they are the object of the standards the Final Rule repeals. Where a regulation "impedes Company A

16

from using Company B's product … both Company A and Company B are an object of the action" and "there is ordinarily little question that [both] have standing." *Energy Future Coal. v. EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (quotation marks omitted). Fuel producers and those in the automobile fuel supply chain are targets of the repealed greenhouse gas emissions standards because the standards "explicitly seek to restrict the use of gasoline and other liquid fuels in automobiles." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114–15 (2025). In any event, the repealed standards "force automakers to produce a fleet of vehicles that, as a whole, uses significantly less gasoline and other liquid fuels" which will "cause downstream or upstream economic injuries to others in the chain" including to "producers of gasoline and other liquid fuels." *Id.* at 117 (quotation marks omitted). So, there is no question those members have standing.

Because Movants' members have Article III standing, Movants have associational standing to intervene on behalf of their members. An organization has associational standing "when: (1) at least one of its members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and

17

(3) 'neither the claim asserted nor the relief requested requires the participation of individual members.'" *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)).

As explained above, multiple members have Article III standing to challenge the Final Rule in its own right; intervention is germane to Movants' purposes to promote and protect their members' ability to successfully operate their businesses free from burdensome and counterproductive regulations; and Movants are not asserting any claim or seeking any relief requiring individual member participation. *See generally* Milito Decl.; Collins Decl.; Weinzierl Decl.; Andrews Decl.; Schad Decl.; McNeil Decl.; Elmer Decl.; Studer Decl.

## C.   The Disposition of This Case Could Impair Movants' Interests

Movants meet the third factor for intervention as of right under Civil Rule 24(a), where courts look to "the 'practical consequences' of denying intervention, even where the possibility of future challenge to the regulation remain[s] available." *Fund for Animals*, 322 F.3d at 735 (alteration in original) (citation omitted). Typically, this factor is satisfied upon demonstrating Article III standing. *Cf. Roeder v. Islamic Republic*

18

*of Iran*, 333 F.3d 228, 233–34 (D.C. Cir. 2003) ("any person who satisfies Rule 24(a) will also meet Article III's standing requirement"). This factor is also satisfied where the litigation's disposition will lead to a "loss of revenues," *Fund for Animals*, 322 F.3d at 735, or "make the task of reestablishing the status quo more difficult and burdensome," including through unfavorable judicial precedent. *Crossroads Grassroots*, 788 F.3d at 320 (cleaned up).

Movants easily satisfy this factor. As explained above, Movants have standing. They will also lose revenue if the Final Rule is not affirmed, through increased motor vehicle costs and decreased product and services sales that result from reinstated greenhouse gas standards. Moreover, an adverse ruling here would make it more difficult for Movants to prevail in a later proceeding. This Court is likely to resolve legal issues that would bear on any subsequent challenge to federal greenhouse gas standards, and that "ruling would have persuasive weight with a new court." *Id*. Movants should be granted intervention to protect their members' interests in operating their businesses free of costly and burdensome greenhouse gas standards, which may otherwise be hindered without their participation here.

19

### D. EPA May Not Adequately Represent Movants' Interests

EPA is unlikely to adequately represent Movants' interests. Civil Rule 24(a) allows for intervention as of right "unless existing parties adequately represent" the movant's "interest." Fed. R. Civ. P. 24(a)(2). Movants' burden to show inadequacy "is not onerous," as they "need only show that representation of [their] interest 'may be' inadequate, not that representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)); *see also United States v. AT&T Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980) ("This court has held that the burden is on those opposing intervention to show that representation for the absentee will be adequate.").

Movants' particular business interests "plainly are not adequately represented by" EPA. *Fund for Animals*, 322 F.3d at 736. EPA "is charged by law with representing the public interest of [American] citizens," writ large, while Movants' seek "to protect a more narrow and 'parochial' financial interest not shared by" all Americans. *Id.* at 737 (quoting *Dimond*, 792 F.2d at 192–93). Movants' application "thus falls squarely within the relatively large class of cases in this circuit recognizing the

20

inadequacy of governmental representation of the interests of private parties." *Dimond*, 792 F.2d at 192.

Moreover, because divergent interests may give rise to divergent litigation choices, this Court "look[s] skeptically on government entities serving as adequate advocates for private parties." *Crossroads Grass-roots*, 788 F.3d at 312. That skepticism is fully warranted here. EPA's interest is in defending the Final Rule *in toto*, including the rescission of the 2009 endangerment finding that was a basis for repealing the greenhouse gas standards. Movants' interests are "more narrow and focus[ed]" on the standards, themselves, which are the source of their members' harm. *NRDC v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977). At least one difference in EPA's and Movants' views of those standards is already apparent. AmFree and several Corn Growers argued that the greenhouse gas standards were unlawful for the additional reason that the Clean Air Act does not authorize EPA to set standards that apply to a fleet, on average, rather than to individual vehicles. *See* Comment Submitted by AmFree et al. 13–15 (Sept. 22, 2025), *available via* https://www.regulations.gov/comment/EPA-HQ-OAR-2025-0194-1498. EPA declined to adopt that argument, *see* EPA Response to Comments 221–22 (Feb. 18,

21

2026), *available via* https://www.regulations.gov/document/EPA-HQ-OAR-2025-0194-31089, and has elsewhere defended averaging, *see, e.g.*, EPA Br. at 51–60, *Kentucky v. EPA*, No. 24-1087 (D.C. Cir. Nov. 26, 2024), Doc. 2086969.

These diverging interests may lead EPA and Movants to press different arguments or pursue different strategies. At a minimum, Movants may "make a more vigorous presentation" of arguments that support repeal of the standards, regardless of whether the endangerment finding survives. *Costle*, 561 F.2d at 912 (citation omitted). These diverging interests easily satisfy "the minimal burden of showing inadequacy of representation." *Crossroads Grassroots*, 788 F.3d at 321.

## II.    Movants Also Satisfy Permissive Intervention

In the alternative, Movants meet all three requirements for permissive intervention. First, as discussed above, Movants' motion is timely under Appellate Rule 15(d). *See* Part. I.A, *supra.* Second, Movants share a common defense with EPA in that all seek to defend part or all of the challenged Final Rule.[4] Third, intervention at this juncture will not un-

---

[4] It may be an "open question" whether a permissive intervenor must demonstrate Article III standing. *Mayor & City Council of Baltimore v.*

*(footnote continued on next page)*

duly delay the proceedings as the Rule 15(d) deadline has not passed and there is no briefing schedule yet, and Movants cannot conceive of any unfair prejudice to the parties that would result from their participation.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant their motion for leave to intervene in support of EPA in Case No. 26-1037 and consolidated cases.

---

*Bureau of Alcohol, Tobacco, Firearms & Explosives*, 738 F. Supp. 3d 1, 12 (D.D.C. 2024). Nonetheless, as discussed above, Movants have demonstrated that they have Article III standing to challenge the Final Rule. *See* Part I.B, *supra*.

23

Dated: March 20, 2026

Respectfully submitted,

<u>*/s/ Michael Buschbacher*</u>
Michael Buschbacher
  *Counsel of Record*
James R. Conde
Laura B. Ruppalt
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
  Suite 900
Washington, DC 20006
202-955-0620
mbuschbacher@boydengray.com
jconde@boydengray.com
lruppalt@boydengray.com

*Counsel for National Federation of Independent Business, American Free Enterprise Chamber of Commerce, and the Illinois, Iowa, Kentucky, Missouri, North Dakota, and Tennessee Corn Growers Associations*

24

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1. The motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,361 words, excluding the exempted portions.

2. This motion complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) as it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Michael Buschbacher*
Michael Buschbacher

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of March, 2026, I electronically

filed the foregoing document with the Clerk of this Court by using the

CM/ECF system, which will serve all parties automatically.

*/s/ Michael Buschbacher*
Michael Buschbacher