<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al., <br> *Petitioners*, <br><br> v. <br><br> UNITED STATES ENVIRONMEN-TAL PROTECTION AGENCY, et al., <br> *Respondents*. | No. 26-1037 <br><br> *Consolidated with Nos. 26-1038, 26-1039, 26-1043, 26-1051, 26-1061* |

**NACCO NATURAL RESOURCES CORPORATION'S
<u>MOTION FOR LEAVE TO INTERVENE AS RESPONDENT</u>**

Pursuant to Federal Rules of Appellate Procedure 15(d) and 27 and Circuit Rules 15(b)(1) and 27, NACCO Natural Resources Corporation (NACCO) moves for leave to intervene as a respondent in the above-captioned cases. On February 18, 2026, petitioners filed a petition for review challenging a rule issued by the Environmental Protection Agency (EPA or Agency) titled "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," 91 Fed. Reg. 7686 (Feb. 18, 2026) (Rescission Rule). In compliance with Federal Rule of Appellate Procedure 15(d), NACCO is filing this motion within 30 days after the filing of the petition for review. Under Circuit Rule 15(b), this motion constitutes a request to intervene in all petitions for review of the Rescission Rule.

1

## BACKGROUND

Formerly known as The North American Coal Corporation, NACCO is an American mining and natural resource company with surface coal mines in Mississippi and North Dakota that supply approximately 25 million tons of coal per year to power plants in those states. Declaration of Christopher D. Friez (Friez Decl.) ¶ 3. NACCO's operations often involve a "mine-mouth" setup, meaning the mine is located with or adjacent to the power plant it serves. *Id.* ¶ 4. Because NACCO mines primarily supply a single nearby power plant, regulatory burdens on those plants bear directly on NACCO's mining operations. *Id.* ¶¶ 5–7. If a regulation forces a power plant affiliated with a NACCO mine to scale back its electricity generation or shut its doors, the market for coal from that mine will shrink, if not vanish. *Id.* Such rules thus decrease the demand for NACCO's coal and can even cause NACCO to significantly downsize or close its mines at the loss of millions of dollars in investments. *Id.*

EPA's regulation of power plants therefore has long had a significant impact on NACCO's mining operations. *Id.* To protect those interests, NACCO has often participated in litigation over EPA's regulations that affect power plants. *See, e.g.*, *NACCO v. EPA*, No. 24-1153 (D.C. Cir. May 22, 2024); *North Am. Coal Corp. v. EPA*, No. 19-1179 (D.C. Cir. Sep. 5, 2019).

Central to that regulatory edifice is the Agency's 2009 "endangerment finding"—its determination that carbon dioxide, along with several other greenhouse gases, are air pollutants that endanger public health and welfare by causing global climate change. 74 Fed. Reg. 66496 (Dec. 15, 2009). While EPA issued its endangerment finding in evaluating potential emission standards for motor vehicles, that finding "launched the Agency into a course of regulation that fundamentally reshaped many aspects of the Nation's economic and social life." 91 Fed. Reg. at 7688. Notably, in 2015, EPA used that "earlier finding" as the predicate for its attempt to regulate carbon dioxide emissions "from power plants" in what it dubbed "the Clean Power Plan." *West Virginia v. EPA*, 597 U.S. 697, 711-12 (2022).

EPA emission regulations premised on the endangerment finding therefore impose burdens on NACCO. Its vehicle emission standards increase the costs of maintaining and operating NACCO's fleet of vehicles. Friez Decl. ¶¶ 8, 15–16. And its power-plant emission standards burden NACCO's customers, which directly harms NACCO's mines that supply them. *Id.* ¶¶ 4–7, 16–28. Specifically, these standards have made the power plants' operations more expensive, thereby reducing the amount of electricity they generate and the amount of coal they demand from NACCO's mines. *Id.*

Indeed, domestic coal production has fallen by more than half in the nearly two decades since the endangerment finding, driven in part by "increasingly stringent environmental regulations" such as the Agency's. U.S. Energy Admin., *U.S. Production Of All Types Of Coal Has Declined Over The Past Two Decades*, (Apr. 8, 2025), https://perma.cc/RQQ5-NAVW. For example, American Electric Power—"one of the nation's largest electricity producers"—has "retired, converted to natural gas, or sold" a substantial portion of its coal fleet "[s]ince 2011," citing, among other things, "the costs to comply with environmental regulations." American Electric Power, *EEI Investor ESG Report* 4-6 (2024), https://perma.cc/G6NW-NMSR.

In 2025, EPA proposed to rescind its endangerment finding and the related greenhouse gas emission standards for new motor vehicles. 90 Fed. Reg. 36288 (Aug. 1, 2025). NACCO submitted a comment in support of the Agency's proposal. Letter from R. McGrew to Administrator Zeldin (Sept. 22, 2025), https://perma.cc/M5QU-EUB2. On February 18, 2026, EPA published the final Rescission Rule, which rescinded the Agency's endangerment finding and the related vehicle emission standards. 91 Fed. Reg. at 7688. Petitioners initiated this challenge the same day.

## ARGUMENT

To "intervene in a proceeding" initiated by a petition for review of an agency action, an entity need only submit an intervention motion "within 30 days after the petition for review is filed" containing "a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d); *see Synovus Fin. Corp. v. Bd. of Governors*, 952 F.2d 426, 433 (D.C. Cir. 1991) ("Rule 15(d) simply requires the intervenor to file a motion setting forth its interest and the grounds on which intervention is sought").

While Rule 15(d) contains no other requirements, the "policies underlying intervention" expressed in Federal Rule of Civil Procedure 24 may sometimes inform appellate intervention motions in petition-for-review proceedings. *UAW v. Scofield*, 382 U.S. 205, 217 n.10 (1965); *see Sierra Club, Inc. v. EPA.*, 358 F.3d 516, 517-18 (7th Cir. 2004) ("Rule 15(d) does not provide standards for intervention, so appellate courts have turned to the rules governing intervention in the district courts under Fed. R. Civ. P. 24."). To the extent that framework applies here, NACCO "would be entitled to intervene" under Rule 24's requirements for both intervention as of right and permissive intervention. *Scofield*, 382 U.S. at 217 n.10 (applying both).

## I. NACCO meets Rule 24's requirements for intervention as of right.

To satisfy Rule 24(a)(2)'s requirements for intervention as of right, "'(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests.'" *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008); *see* Fed. R. Civ. P. 24(a)(2). NACCO meets all four criteria.

### A. NACCO's motion is timely.

NACCO easily clears the first hurdle. NACCO filed its motion within Rule 15(d)'s 30-day window, so there can be no question that the motion is timely. *See Alabama Power Co. v. ICC*, 852 F.2d 1361, 1367 (D.C. Cir. 1988).

### B. NACCO has a legally protected interest in this case.

Turning to the second requirement, NACCO need only show that "it has standing" to "demonstrate the existence of a legally protected interest for purposes of Rule 24(a)." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998); *see Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 320 (D.C. Cir. 2015) ("the standards for constitutional standing and the second factor of the test for intervention as of right are the same"). NACCO checks each box of the Article III inquiry: injury in fact, causation, and redressability.

To be clear, nothing in Article III *itself* requires NACCO to establish standing to intervene as a respondent in this litigation. Both NACCO and EPA aim to preserve the Rescission Rule, and "intervenors that seek the same relief sought by at least one existing party need not" show "constitutional standing." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (citing *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020)).

More fundamentally, while those who seek "to initiate or continue proceedings in federal court must demonstrate … standing to obtain the relief requested," Article III "does not restrict the opposing party's ability to object to relief being sought at its expense." *Bond v. United States*, 564 U.S. 211, 217 (2011); *see Seila Law LLC v. CFPB*, 591 U.S. 197, 210-11 (2020) (explaining that even if petitioner lacked "Article III standing" below, that would "not cast any doubt on the jurisdiction of the District Court because petitioner is *the defendant*"). That is all NACCO seeks to do here.[*]

---

[*] This Court has nevertheless rejected the argument that "*defendant*-intervenors … are not obliged to demonstrate Article III standing" without grappling with these Supreme Court precedents. *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013). NACCO respectfully submits that this Circuit precedent is incorrect and preserves the argument for further review.

In all events, NACCO satisfies the requirements for standing. In general, a prospective intervenor has standing to defend an agency action when it "benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads*, 788 F.3d at 317. The loss of that benefit is an "injury in fact," that harm is "directly traceable" to the legal "challenge," and the movant "can prevent the injury by defeating" the challenge. *Id.* at 316. That is the situation here.

*First*, the vehicle standards eliminated by the Rescission Rule raise the costs of maintaining and replacing NACCO's fleet of light-duty trucks used in its mining operations. Friez Decl. ¶¶ 8, 15-16. Those standards—along with other requirements predicated on the endangerment finding—have also increased NACCO's compliance costs in connection with federal mining lease applications. *Id.* ¶¶ 9-12. If petitioners prevail in their challenge to the Rescission Rule, those burdensome vehicle emission standards will spring back to life to the detriment of NACCO's pocketbook. *Id.* ¶ 16; *see Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"). NACCO can prevent that financial injury by ensuring petitioners do not succeed in this case.

*Second*, the endangerment finding is the cornerstone of power-plant regulations that reduce demand for NACCO's coal. Friez Decl. ¶¶ 16-28. Indeed, this Court held that EPA rightly relied "on the 2009 Endangerment Finding" made in connection with "automobiles' greenhouse gas emissions" to show "the need for regulation of another source of the same pollutant—fossil-fuel-fired power plants." *American Lung Ass'n v. EPA*, 985 F.3d 914, 976 & n.16 (D.C. Cir. 2021), *rev'd and remanded on other grounds by West Virginia*, 597 U.S. 697. Eliminating the rescission of that finding thus threatens NACCO.

This Court routinely finds standing in such circumstances. For example, in *Military Toxics Project v. EPA*, 146 F.3d 948 (D.C. Cir. 1998), it held that an association had standing to intervene to defend an EPA rule that determined most military munitions used at firing ranges do not qualify as "solid waste" subject to stringent federal regulation. *Id.* at 954. As the Court explained, because the association's "members produce military munitions," they "benefit from the EPA's … interpretation" and would "suffer concrete injury if the court grants the relief the petitioners seek." *Id.* So too here: NACCO enjoys a benefit from EPA's conclusion that particular objects "do not fall within" its regulatory authority. *Id.* at 957. The only difference is that the relevant objects are particular emissions rather than particular munitions.

9

To be sure, NACCO supplies coal-fired power plants rather than operates them, but that is of no constitutional significance. To the contrary, movants have standing to intervene as defendants "to uphold agency action affecting them indirectly." *Crossroads*, 788 F.3d at 318.

In *Fund for Animals, Inc. v. Norton*, 322 F.3d 728 (D.C. Cir. 2003), for instance, this Court held that an agency of Mongolia had standing to intervene in defense of a U.S. Fish and Wildlife Service (FWS) regulation that declined to designate a wild sheep species (the argali) as endangered in Mongolia and other countries. *Id.* at 733-34. Even though Mongolia was "not itself the object of the challenged agency action," it still faced a "concrete and imminent injury" from the pending challenge. *Id.* If the plaintiffs were successful in forcing FWS to classify the argali as endangered, "American hunters" would be prohibited from "bringing their trophies" of the sheep home, and "some hunters" would therefore "not travel to Mongolia to hunt the argali." *Id.* at 733. That "threatened loss of tourist dollars, and the consequent reduction in funding for Mongolia's conservation program," gave the Mongolian agency standing to defend the refusal of FWS to make an argali endangerment finding. *Id.* While this case involves emissions rather than sheep, the analysis remains the same.

Indeed, the Article III inquiry here is just the flipside of the one in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025). There, the Supreme Court held that fuel producers had standing to challenge EPA's approval of California regulations requiring automakers to manufacture fewer gasoline-powered cars. *Id.* at 104-05. Applying "commonsense economic realities," the Court explained that "invalidating California's regulations would likely mean more gasoline-powered automobiles, which would in turn likely mean more sales of gasoline" by the fuel producers. *Id.* at 116-17. While this case involves a *deregulatory* action by the Agency, the economic realities do not change. *See id.* at 116 (explaining that "'regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain'"). Not only will upholding the Rescission Rule remedy NACCO's direct injuries, but it will also likely extend the operational lives of the power plants served by NACCO and increase both their electricity generation and demand for NACCO's coal. Invalidating that Rescission Rule will likely have the opposite effect. *See* Friez Decl. ¶¶ 15-16. NACCO therefore has both "constitutional standing" and "'an interest relating to the property or transaction which is the subject of the action.'" *Fund for Animals*, 322 F.3d at 735.

### C.    This action may harm NACCO's ability to protect its interests.

For the same reasons, the outcome of this case "may as a practical matter impair or impede" NACCO's "ability to protect its interest." Fed. R. Civ. P. 24(a)(2). Right now, the Rescission Rule furthers NACCO's interests, and "the task of reestablishing" that "status quo" if petitioners prevail here "will be difficult and burdensome." *Fund for Animals*, 322 F.3d at 735.

### D.    The parties do not adequately represent NACCO's interests.

Finally, "no party to the action can adequately represent" NACCO's interest. *Crossroads*, 788 F.3d at 320. NACCO's task here is "not onerous"—it "need only show that representation of [its] interest 'may be' inadequate, not that representation will in fact be inadequate." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). This is a "minimal burden," and "a movant 'ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation.'" *Crossroads*, 788 F.3d at 321.

NACCO easily hurdles that low bar. Petitioners are threatening NACCO's interests, and EPA may not adequately represent them. In general, this Court looks "skeptically on government entities serving as adequate advocates for private parties," even when "their interests were aligned in defending the legality" of an agency action. *Crossroads*, 788 F.3d at 321.

There is no reason to chart a different course here. While NACCO and EPA currently "agree" that the Rescission Rule is "lawful," it is "not hard to imagine how [their] interests … might diverge during the course of litigation." *Fund for Animals*, 322 F.3d at 736. EPA, after all, is "'charged by law with representing the public interest of [U.S.] citizens,'" whereas NACCO seeks to protect "'a more narrow … financial interest not shared by'" the public at large. *Id.* at 737 (citation omitted). Thus, if anything, NACCO's industry-specific concerns—and its "experience and expertise" in that area—mean its participation is only "likely to serve as a vigorous and helpful supplement to EPA's defense." *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977).

Moreover, as a company that regularly *sues* the Agency, NACCO may "disagree about the extent" of EPA's "regulatory power" more broadly. *Crossroads*, 788 F.3d at 321; *see supra* at 2. Especially given the Agency's history of flipflopping in this area, NACCO should not be forced "to rely on a doubtful friend to represent its interests." *Crossroads*, 788 F.3d at 321; *see West Virginia*, 597 U.S. at 710-18 (discussing EPA's shifts in position in its regulation of carbon dioxide emissions from power plants).

## II.   NACCO meets Rule 24's requirements for permissive intervention.

NACCO also satisfies Rule 24(b)'s requirements for permissive intervention. The company seeks to defend the legality of the Rescission Rule and therefore has a "defense that shares with the main action a common question of law." Fed. R. Civ. P. 24(b)(1); *see supra* at 7. NACCO also filed its motion within 30 days after petitioners commenced this case and before any merits briefing occurred, so its motion is "timely" and its intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1), (3); *see supra* at 6. No more is required. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1234-36 (D.C. Cir. 2004) (en banc).

## CONCLUSION

This Court should grant NACCO's motion to intervene as a respondent.

Dated:  March 20, 2026

Jeffery D. Ubersax
KUSHNER & HAMED CO., LPA
1375 East Ninth Street
Suite 1390
Cleveland, OH 44114
(216) 696-6700
jdubersax@kushnerhamed.com

Respectfully submitted,

*/s/ Brinton Lucas*
Brinton Lucas
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3686
blucas@jonesday.com

S. Matthew Krsacok
JONES DAY
150 W. Jefferson, Suite 2100
Detroit, MI 48226
(313) 230-7923
mkrsacok@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts exempted under Federal Rule of Appellate Procedure 27(d)(2)(B), it contains 2889 words.

I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Expd BT font.

Dated:  March 20, 2026

*/s/ Brinton Lucas*
Brinton Lucas
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
blucas@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

16

## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al.,<br><br>*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMEN-TAL PROTECTION AGENCY, et al.,<br><br>*Respondents*. | No. 26-1037<br><br>*Consolidated with Nos. 26-1038, 26-1039, 26-1043, 26-1051, 26-1061* |

## CERTIFICATE AS TO PARTIES AND AMICI

Pursuant to Circuit Rules 27(a)(4) and 28(a)(1)(A), NACCO Natural Resources Corporation (NACCO) hereby states as follows:

The petitioners in this matter are the American Public Health Association; Alliance of Nurses for Healthy Environments, American Lung Association, Center for Biological Diversity; Center for Community Action and Environmental Justice; Clean Air Council; Clean Wisconsin; Conservation Law Foundation; Environmental Defense Fund; Environmental Law and Policy Center; Friends of the Earth; Natural Resources Defense Council, Inc.; Physicians for Social Responsibility; Public Citizen; Rio Grande International Study Center; Sierra Club; Union of Concerned Scientists; Business Climate Initiative Action d/b/a the Zero Emission Transportation Association; Elena

17

Venner; Ariela Lara; Emma Weibel; Katherine Mcintosh; Linnea Lentfer; Maya Williams; Taylin Nishida; C.E., a minor, by and through her guardian B.K.; E.S., a minor, by and through his guardian K.S.; J.K., a minor, by and through his guardian L.K.; J.G., a minor, by and through her guardian T.L.; L.R.F., a minor, by and through her guardian A.F.; L.D. and R.D., minors, by and through their guardian S.D.; M.B., a minor, by and through her guardian G.M.; M.D, a minor, by and through her guardian S.A.; N.N., a minor, by and through his guardian K.S.N.; N.G., a minor, by and through her guardian E.G.; Metropolitan Congregations United for St. Louis; Missouri Coalition for the Environment; Service Employees International Union; the Commonwealths of Massachusetts and Virginia; Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin; the District of Columbia; the United States Virgin Islands; the Cities of Albuquerque, New Mexico; Boston, Massachusetts; Chicago, Illinois; Cleveland, Ohio; Columbus, Ohio; Los Angeles, California; and New York, New York; the Counties of Harris,

Texas; Martin Luther King, Jr., Washington; and Santa Clara, California; and the Cities and Counties of Denver, Colorado, and San Francisco, California.

The Respondents are the U.S. Environmental Protection Agency (EPA) and EPA Administrator Lee M. Zeldin.

John Worthington, Western States Trucking Association, Construction Industry Air Quality Coalition, Inc., Liberty Packing Company, LLC, Nuckles Oil Company d/b/a Merit Oil Company, Domestic Energy Producers Alliance, the Truck and Engine Manufacturers Association, and the States of West Virginia, Kentucky, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming have moved for leave to intervene as respondents.

Government Accountability & Oversight and Government Oversight & Education d/b/a Protect the Public's Trust have filed a motion seeking to participate as *amicus curiae* in support of respondents.

Dated:  March 20, 2026

/s/ *Brinton Lucas*
Brinton Lucas
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
blucas@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

20

**ORAL ARGUMENT NOT YET SCHEDULED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| AMERICAN PUBLIC HEALTH ASSOCIATION, et al.,<br><br>    *Petitioners,*<br><br>      v.<br><br>UNITED STATES ENVIRONMEN-TAL PROTECTION AGENCY, et al.,<br><br>    *Respondents.* | No. 26-1037<br><br><br>*Consolidated with Nos. 26-1038, 26-1039, 26-1043, 26-1051, 26-1061* |

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 12(f), 15(c)(6), and 26.1, NACCO Natural Resources Corporation (NACCO) submits the following corporate disclosure statement:

1.    NACCO is a wholly owned subsidiary of NACCO Industries, Inc.

2.    NACCO is not publicly held, but NACCO Industries, Inc., its parent, is a publicly traded corporation that owns more than 10% of the stock of NACCO.

3.    No other publicly held corporation owns more than 10% of the stock of NACCO.

4.   The general nature and purpose of NACCO, insofar as relevant to this litigation, is the mining and delivery of lignite coal as fuel for power generation and the provision of mining services to natural resources companies.

Dated:  March 20, 2026

*/s/ Brinton Lucas*
Brinton Lucas
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
blucas@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2026, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, and service will be accomplished on all registered counsel by the appellate CM/ECF system.

*/s/ Brinton Lucas*
Brinton Lucas
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3686
blucas@jonesday.com

*Counsel for NACCO Natural Resources Corporation*

# DECLARATION OF CHRISTOPHER D. FRIEZ

I, Christopher D. Friez, declare as follows:

1. My name is Christopher D. Friez, and I am the Vice President-Land, Associate General Counsel and Assistant Secretary of NACCO Natural Resources Corporation (NACCO), formerly known as The North American Coal Corporation.

2. I am providing this declaration in support of NACCO's motion to intervene as respondent to defend a final rule promulgated by the Environmental Protection Agency (EPA) titled "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," 91 Fed. Reg. 7686 (Feb. 18, 2026) (Rescission Rule). This declaration is based on my personal knowledge of the facts and analysis conducted by my staff and me.

3. NACCO is an American mining and natural resource company with corporate headquarters in Plano, Texas. Through its subsidiary North American Coal, LLC, NACCO mines and markets lignite coal primarily as fuel for power generation and provides selected value-added mining services for other natural resources companies. NACCO operates surface lignite coal mines in North Dakota and Mississippi that supply approximately 25 million tons of coal per year, on a long-term contractual basis, to power plants in those states. In addition to providing a reliable power source, NACCO facilities employ more than 1,500 highly paid personnel in the mining sector.

1

USCA Case #26-1037    Document #2164792    Filed: 03/20/2026    Page 25 of 36

4. NACCO's operations primarily involve a mine-mouth setup, meaning the mine is located with or immediately adjacent to the power plant it serves. This arrangement reflects the physical characteristics of lignite coal, which has a higher moisture content and lower heat content than other types of coal and therefore cannot be transported long distances in a cost-effective manner. Most NACCO mines supply a single nearby power plant, and there are no reasonably viable alternative markets for lignite coal if the power plant a mine serves were to close.

5. Because NACCO mines primarily supply a single nearby power plant, regulatory burdens on those plants necessarily affect NACCO's mining operations. If a regulation forces a power plant affiliated with a NACCO mine to reduce its electricity generation or close, the market for coal from that mine will shrink, if not disappear. That in turn will decrease, or completely eliminate, the demand for coal from the mine, causing financial harm to NACCO. Regulatory burdens on these power plants could even cause NACCO to significantly downsize or close its mines, thereby suffering the loss of millions of dollars in investments.

6. EPA's regulation of coal-fired power plants affiliated with NACCO's mines therefore has long had a significant impact on NACCO's mining operations. Central to that regulatory system was EPA's 2009 endangerment finding—its determination that greenhouse gases endanger public health and welfare by causing global climate change, 74 Fed. Reg. 66496 (Dec. 15, 2009), which EPA used as the

2

predicate for a series of emissions regulations targeting coal-fired power plants. Each EPA power-plant regulation premised on the endangerment finding has placed regulatory burdens on NACCO's power-plant customers, with direct consequences to the NACCO mines supplying them. The endangerment finding has made the operation of coal-fired power plants more expensive, thereby reducing the amount of electricity they generate and the amount of coal they demand. Ever since EPA adopted the endangerment finding in 2009 as a predicate for regulating greenhouse gas emissions, NACCO's power-plant customers have reduced their demand for coal from NACCO's mines. The endangerment finding has therefore harmed NACCO's business.

7. For example, EPA's final rule titled "New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units; Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule," 89 Fed. Reg. 39798 (May 9, 2024) (the 2024 Rule), derived in substantial part from the 2009 endangerment finding, *id.* at 39807, 39825 n.182. That 2024 Rule threatened to force the closure or fuel-switching of multiple coal-fired power plants served by NACCO mines, which would in turn require NACCO to significantly downsize or close those mines, resulting in the loss of hundreds of millions of dollars in investments and thousands of jobs.

8.     The endangerment finding also has harmed NACCO by serving as the basis for emission regulations for motor vehicles. For example, NACCO owns a fleet of around 450 light-duty trucks for use in its operations. NACCO regularly replaces those vehicles, acquiring approximately 40–45 new ones every year. EPA's vehicle emission standards predicated on the endangerment finding—which require the design and installation of new, costly technologies—have raised the average cost of acquiring new trucks and the cost of maintaining them on an ongoing basis. The Rescission Rule's elimination of those vehicle emission standards should reduce those fiscal burdens.

9.     EPA's endangerment finding has also increased NACCO's compliance costs. For example, NACCO's wholly-owned subsidiary the Falkirk Mining Company (Falkirk) holds federal coal leases administered by the Bureau of Land Management (BLM). Federal coal lease applications require environmental review under federal statutes and regulations. Following EPA's adoption of the endangerment finding, BLM required Falkirk to analyze greenhouse gas emissions as part of that review, including emissions not only from the combustion of coal that Falkirk delivers to the adjacent power plant, but also from "vehicles and equipment" used in the mining of the coal as well as "employee commutes" to and from the mine. BLM, *Falkirk Mining Company Proposed Federal Coal Lease-by-Application, Serial*

*Number NDM 111489*, at 33–41 (Aug. 2025), https://perma.cc/HQ8R-2FMG (Falkirk Environmental Assessment).

10.    BLM's *Specialist Report on Greenhouse Gas Emissions and Climate Trends*—which was "incorporated by reference as an integral part of" the environmental assessment for Falkirk's lease application, Falkirk Environmental Assessment 33—traces the greenhouse gas analysis requirements to EPA's endangerment finding, noting that "[i]n April 2009, the EPA issued its endangerment finding," which initiated federal regulation of greenhouse gas emissions and the associated review obligations that BLM applied to Falkirk's application. BLM, *2023 BLM Specialist Report on Annual Greenhouse Gas Emissions and Climate Trends*, at 2.7 (Aug. 22, 2024), https://perma.cc/5K2T-8WLK.

11.    To satisfy those requirements, Falkirk retained SWCA Environmental Consultants to prepare the required documentation for Falkirk's federal coal lease application. Falkirk paid approximately $212,000 for that work, roughly half of which—approximately $106,000—was attributable to the greenhouse gas air analysis that BLM required as a result of the endangerment finding. Absent that requirement, the required documentation would have cost approximately half that amount.

12.    The leasing process for this application was also prolonged by the greenhouse gas analysis. Falkirk first submitted its emergency lease application in October 2019, but the environmental assessment was not finalized until August

5

2025—a period of nearly six years. The environmental assessment itself acknowledged that "over the last five years the federal leasing application process faced numerous delays." Falkirk Environmental Assessment 5. Those delays forced Falkirk to continuously revise its mine plans to work around the federal coal tracts, mine outside of its normal sequence, and apply for associated permit adjustments, all at significant cost in staff time and resources.

13.    On August 1, 2025, EPA proposed to rescind its endangerment finding and related motor vehicle emission standards. 90 Fed. Reg. 36288 (Aug. 1, 2025). NACCO submitted a comment in support of EPA's proposal. *See* Letter from R. McGrew to Administrator Zeldin (Sept. 22, 2025), https://perma.cc/M5QU-EUB2.

14.    On February 18, 2026, EPA issued the Rescission Rule, which rescinded the endangerment finding and thereby removed the regulatory foundation underlying the 2024 Rule and other regulations burdening NACCO and its power-plant customers. That deregulatory action will benefit NACCO by substantially reducing or eliminating federal regulatory burdens on NACCO and its power-plant customers that would otherwise force those plants to curtail operations or close, which in turn would force NACCO's mines to produce less coal, downsize, or close.

15.    Instead, the Rescission Rule will likely reduce NACCO's future vehicle costs and compliance costs. It also will likely increase the operating lives of the power plants served by NACCO and increase electricity generation by NACCO's

customers, which in turn would increase demand for coal from NACCO's mines. By removing significant future compliance costs, owners of the power plants served by NACCO also are more likely to invest in maintenance and upgrades to increase the run time and longevity of their power plants.

16.    Petitioners' challenge to the Rescission Rule threatens to deprive NACCO of the benefits it has obtained from the Rescission Rule. If the Rescission Rule is set aside, EPA's emission standards for motor vehicles would go back into effect and likely increase the cost of maintaining and replacing NACCO's fleet of light-duty trucks. Regulatory compliance costs predicated on the endangerment finding—such as the ones associated with federal coal lease applications discussed above—would also resurface. The foundation for EPA's greenhouse-gas emission regulations on coal-fired power plants would also be restored, and the regulatory burdens on those plants—and on NACCO's affiliated mines—likely would be reimposed. That would cause NACCO to suffer significant economic injuries: reduction in revenues, forced mine closures or downsizing, loss of hundreds of millions of dollars in investments, stranded assets, lost payroll, and the elimination of thousands of jobs.

17.    **Coyote Creek Mine:** For example, NACCO, through its wholly-owned subsidiary Coyote Creek Mining Company, LLC (CCMC), developed the Coyote Creek Mine in Mercer County, North Dakota, about 70 miles northwest of Bismarck

at a cost of approximately $100 million. The Coyote Creek Mine began making lignite deliveries to Coyote Station, a 427-megawatt power plant, in 2016. The Coyote Creek Mine's sole purpose is to supply Coyote Station. To develop the Coyote Creek Mine and fulfill its contractual obligations to Coyote Station, CCMC permitted an area large enough to supply coal for the full 25-year life of the contract—*i.e.*, until 2041. CCMC spent over $6 million to permit the acreage needed. CCMC also incurred approximately $30 million in mine development costs and approximately $80 million in equipment costs for mine startup and amortization, all of which are being amortized over the life of the mine.

18.    Coyote Station has faced regulatory burdens due to EPA's endangerment finding. For example, Otter Tail Power Company, which co-owns and operates Coyote Station, opposed the 2024 Rule, which is premised on the endangerment finding, noting that it would "increase[] the significant capital investments required by generators, thus either forcing them into early retirement or significantly curtailing the amount of hours a unit may run." Otter Tail Power Company Comments on Docket ID No. EPA-HQ-OAR-2023-0072, https://perma.cc/KP98-R35U.

19.    If Coyote Station is unable to operate due to EPA emission regulations on coal-fired power plants, the Coyote Creek Mine would have no viable market for its coal and would be forced to close early. An early closure of the mine would result in the loss of millions of dollars in development costs and stranded investments. It

8

also would likely cause a loss of substantial portion of equipment costs because full amortization cannot be realized and the equipment would likely have a very low resale value. And it would cause the Coyote Creek Mine's 90-person mine workforce to be laid off and CCMC to go out of business.

20.    **Falkirk Mine:** NACCO, through its wholly-owned subsidiary Falkirk, also operates the Falkirk Mine near Underwood, North Dakota, about 50 miles north of Bismarck. The Falkirk Mine annually produces between 7 million and 9 million tons of lignite for Coal Creek Station, a two-unit 1100-megawatt power plant owned by Rainbow Energy Center. NACCO and its customer at the Falkirk Mine have invested hundreds of millions of dollars in the development and operation of the mine.

21.    On average, Falkirk Mine has delivered less coal tonnage annually since 2009 than its average deliveries for the years 2005-2009. In my view, that drop in coal demand is attributable at least in part to the endangerment finding and the threat of onerous emission regulations on Coal Creek Station.

22.    If Coal Creek Station is required to close due to the imposition of onerous emission regulations on power plants, the adjacent Falkirk Mine would also be forced to close, resulting in a layoff of the mine's entire staff and workforce. For the approximately 400-plus employees who would lose their jobs, the impact on their lives and their families' lives would be severe. A mine closure would also have a substantial impact across several counties and cities in North Dakota. Falkirk pays a

9

coal severance tax of 37.5 cents on each ton of lignite mined. Under North Dakota law, a portion of that revenue funds a Constitutional Trust Fund administered by the Board of University and School Lands, while the remainder is shared among coal-producing counties and further distributed among county general funds, cities, and school districts. The loss of those revenues would impact education, law enforcement, and social services throughout the State of North Dakota.

23. **<u>Coteau Freedom Mine</u>:** NACCO, through its wholly-owned subsidiary The Coteau Properties Company, also operates the Freedom Mine near Beulah, North Dakota, about 75 miles northwest of Bismarck. The Freedom Mine annually produces between 12 million and 14 million tons of lignite for Antelope Valley Station (AVS), a two-unit 900-megawatt power plant, Leland Olds Station (LOS), a 660-megawatt power plant, and Dakota Gasification Company (DGC), a Synfuels plant, all owned by Basin Electric Power Cooperative (Basin Electric). NACCO and Basin Electric have invested hundreds of millions of dollars in the development and operation of the Freedom Mine.

24. On average, Freedom Mine has delivered less coal tonnage annually since 2009 than its average deliveries for the years 2005-2009. In my view, that drop in coal demand is attributable at least in part to the endangerment finding and the threat of onerous emission regulations on Freedom Mine's customers.

25.     Basin Electric, which operates AVS, LOS, and DGC, has faced regulatory burdens due to EPA's endangerment finding. For example, Basin Electric announced that the 2024 Rule, which is premised on the endangerment finding, posed "a threat to the affordable and reliable electric generation" by its members. *See* Press Release, *EPA Regulations Pose Threat to Basin Electric and Its Members*, Basin Electric (May 1, 2024), https://perma.cc/T77J-DBN9.

26.     A closure or curtailment of AVS or LOS due to the imposition of onerous emission regulations would also be harmful to the Freedom Mine, NACCO, and the surrounding community. The Freedom Mine alone employs over 400 people, and the combined facilities of AVS, LOS, and DGC support approximately 600 more jobs. These facilities are the backbone of economic activity for a 100-mile radius of central North Dakota, including the neighboring towns of Beulah and Hazen. Without the employment provided by these facilities, those towns would nearly vanish, along with any economic activity in the region. NACCO itself currently has approximately $130 million worth of property, plant, and equipment at the Freedom Mine, which would require accelerated depreciation if the mine were closed early. Moreover, if an early closure of the mine occurred, approximately $70 million in lease depreciation would be largely unrealized, approximately $37 million in warehouse inventory would have little to no value, and an annual payroll of over $60 million would be lost.

27.    **Red Hills Mine:** NACCO has owned and operated the Red Hills Mine near Ackerman, Mississippi, since 2002. On an annual basis, the Red Hills Mine produces approximately 2.4 million to 2.8 million tons of lignite, which is used as a fuel supply at the adjacent Red Hills Generating Facility, a 440-megawatt power plant that provides electricity to the Tennessee Valley Authority. NACCO provides lignite to the Red Hills Generating Facility pursuant to a supply agreement that runs through 2032, with two 10-year extension options that, if exercised, would extend the agreement to 2052. Based on NACCO's geological data, there are sufficient proven lignite reserves in the vicinity of the Red Hills Mine to support mining until at least 2052.

28.    Following EPA's adoption of the endangerment finding in 2009, the Tennessee Valley Authority (TVA), which operates the Red Hills Generating Facility, announced in 2021 that it "plans to potentially retire [its] entire coal fleet by 2035," citing "environmental regulations" as one of the "main drivers" for that decision. Press Release, *The Future of Coal at TVA*, TVA (June 22, 2021), https://perma.cc/7SL2-XCJP. After EPA proposed rescinding its endangerment finding in 2025, TVA announced that it planned to keep open two of its coal-fired power plants previously scheduled to retire by 2027 and 2028, citing a "significant change in the regulatory outlook" as a reason for its shift in plans. Dianna DiGangi,

12

USCA Case #26-1037    Document #2164792    Filed: 03/20/2026    Page 36 of 36

*TVA Board, Remade by Trump, Votes To Keep Coal Plants Open*, Utility Dive (Feb. 12, 2026), https://perma.cc/8MA8-FEJF.

29.    NACCO has invested over $100 million in mine assets and currently has assets valued at over $50 million at the Red Hills Mine that would be lost as stranded investments if emissions regulations on power plants predicated on the endangerment finding force that mine to close. The Red Hills Mine employs over 150 people and the Red Hills Generating Facility employs over 80 people. Those facilities are the main employers in rural Choctaw County, Mississippi. The nearby town of Ackerman, Mississippi would be severely harmed by such a closure and the county-wide average wage would drop significantly.

I, Christopher D. Friez, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

_____

Christopher D. Friez
NACCO Natural Resources Corporation

Dated:  March 20, 2026

13