**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AMERICAN PUBLIC HEALTH
ASSOCIATION, et al.,

      *Petitioners*,

      v.

ENVIRONMENTAL PROTECTION
AGENCY, et al.,

      *Respondents*.

No. 26-1037

**<u>UNOPPOSED MOTION OF AMERICAN PETROLEUM INSTITUTE
FOR LEAVE TO INTERVENE</u>**

Pursuant to Federal Rule of Appellate Procedure 15(d), the American Petroleum Institute ("API") respectfully moves for leave to intervene as a respondent in the above-captioned case. On February 18, 2026, a group of special interest groups filed a petition for review challenging a rule issued by the Environmental Protection Agency ("EPA") titled "Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act," published at 91 Fed. Reg. 7686 (Feb. 18, 2026). API seeks to defend portions of that rule to protect the interests of its various members who are affected by it. Specifically, API seeks to defend EPA's conclusion that EPA issued its 2024 motor vehicle emission standards without clear statutory authority.

This motion is timely because it is being filed within the time required by Federal Rule of Appellate Procedure 15(d).  API has contacted all parties in Case No. 26-1037 regarding this motion.  Petitioners have informed counsel that they take no position on the motion.  Respondents have likewise informed API that they take no position on the motion and will not file a response.

## BACKGROUND

### I.    Statutory Background

Title II of the Clean Air Act sets forth a comprehensive scheme for regulating motor-vehicle emissions.  At the center of the scheme is Section 202, which directs the EPA Administrator to:

> prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42 U.S.C. §7521(a)(1).  "Such standards shall be applicable to such vehicles and engines for their useful life."  *Id.*  The standards may not take effect until "after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."  *Id.* §7521(a)(2).

To determine compliance with these standards, EPA "shall test, or require to be tested in such manner as [it] deems appropriate, any new motor vehicle or new

(Page 2 of Total)

motor vehicle engine submitted by a manufacturer." *Id.* §7525(a)(1). "If such vehicle or engine" submitted by the manufacturer complies with the standards, EPA "shall issue a certificate of conformity," *id.*, which the manufacturer must "permanently affix[] to such vehicle or engine," *id.* §7541(c)(3)(C).

In addition to this testing, EPA may test or require that the manufacturer test "new motor vehicles" to determine if such vehicles "do in fact conform with the regulations." *Id.* §7525(b)(1). If EPA determines that "such vehicle or engine" is not in compliance, EPA "may suspend or revoke" a certificate of conformity. *Id.* §7525(b)(2)(A)(ii).

Manufacturers "shall warrant" that "each new motor vehicle and new motor vehicle engine" is "designed, built, and equipped so as to conform at the time of sale with applicable regulations under" Section 202. *Id.* §7541(a)(1). Title II gives EPA several remedies when vehicles fail to conform. One is to seek civil penalties from automakers for each individual vehicle they distribute, sell, or offer in commerce without an effective certificate of conformity. *Id.* §§7522(a)(1), 7524(a)-(b). In addition, where "a substantial number of any class or category of vehicles or engines" fail to conform, EPA must "require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given." *Id.* §7541(c)(1).

3

## II.      Regulatory Background

### A. Pre-2009 Interpretation of Section 202

Until 2009, EPA believed that it lacked authority under Section 202 to regulate motor vehicle greenhouse-gas emissions. *See* 68 Fed. Reg. 52,922 (Sept. 8, 2003). As the agency explained, Congress was "well aware of … global climate change" when it comprehensively revised the Clean Air Act in the 1990s, yet it expressly rejected a proposal that would have required EPA "to set $CO_2$ emission standards for motor vehicles." *Id.* at 52,926. The agency concluded that Section 202 gave it no power to regulate motor vehicle emissions that "may contribute to global climate change." *Id.* EPA, in other words, thought that when Congress enacted Section 202, it did not intend to "delegate a policy decision of such … magnitude" as whether to combat global climate change through motor vehicle emissions controls. *Id.* at 52,925.

### B. EPA's 2009 Greenhouse-Gas Endangerment Finding and Its Forced Electrification of the Nation's Vehicle Fleet

The EPA changed course following the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, 528 (2007), which held that Section 202(a)(1) of the Clean Air Act "authorizes EPA to regulate greenhouse gas emissions from new motor vehicles in the event that it forms a 'judgment' that such emissions contribute to climate change." After that decision, EPA issued an endangerment finding under Section 202(a) for "well-mixed greenhouse gases"—*i.e.*, carbon dioxide, methane,

4

nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. 74 Fed. Reg. 66,496 (Dec. 15, 2009) (the "2009 Endangerment Finding"). The agency found that "elevated concentrations" of these greenhouse gases—which it designated as a "single air pollutant," *id.* at 66,536-37—could be expected to endanger public health and welfare because these gases were the "drivers" of global climate change. *Id.* at 66,517.

From there, EPA concluded that domestic emissions from new motor vehicles "cause or contribute" to air pollution under Section 202 because emissions are "a proxy for contributions to atmospheric concentrations" of the targeted greenhouse gases. *Id.* at 66,538. Under EPA's view at the time, all emissions by any and all kinds of motor vehicles and conventional engines contributed to air pollution and worsened global climate change. The agency recognized that such regulation of low-level emissions would have likely been inappropriate to address "a more typical local or regional air pollution problem," but it thought it necessary to significantly expand Section 202's "cause or contribute" standard because of the "unique, global aspects of the climate change problem." *Id.* at 66,538; *see also id.* at 66,543 (insisting that "contributors must do their part even if their contributions to the global [climate change] problem, measured in terms of percentage, are smaller than typically encountered when tackling solely regional or local environmental issues"). It also considered the term "contribute" to be ambiguous, which (EPA thought) left it with

5

ample discretion under the now-defunct *Chevron* doctrine to "fill the statutory gap in reasonable fashion." *Id*. at 66,542.

The 2009 Endangerment Finding then became the predicate for EPA's and the National Highway Traffic Safety Administration's ("NHTSA") joint regulation of motor vehicle greenhouse-gas emissions.[1] *See, e.g.*, 85 Fed. Reg. 24,174 (Apr. 30, 2020) (setting carbon dioxide emission standards for passenger cars and light trucks); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (setting greenhouse-gas emission standards for medium and heavy vehicles).

Recently, however, EPA abandoned joint rulemaking with NHTSA—which allowed the agency to circumvent Congress' directive to NHTSA to not consider electric vehicles in setting fuel-economy standards. 49 U.S.C. §32902(h)(1), (2). In August 2021, EPA sought to impose increasingly stringent greenhouse-gas emission standards to meet an Executive Order issued by President Biden mandating "that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles, including battery electric, plug-in hybrid electric, or fuel cell electric vehicles." Exec. Order No. 14,037, 86 Fed. Reg. 43,583, 43,583 (Aug. 5, 2021).

---

[1] NHTSA sets corporate average fuel-economy standards, not emission limits, but the agencies promulgated their rules jointly until 2021 because carbon-dioxide emission standards and fuel-economy standards are two sides of the same coin. *See Delta Const. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) ("[A]ny rule that limits tailpipe [greenhouse-gas] emissions is effectively identical to a rule that limits fuel consumption.").

6

And in November 2022, the Secretary of Energy pledged that 100 percent of all new medium- and heavy-duty vehicles sold in 2040 will be zero-emission vehicles. *See* Memorandum of Understanding on Zero-Emission Medium and Heavy-Duty Vehicles (Nov. 15, 2022), perma.cc/HY7D-CACL.

EPA accordingly set emission standards at record lows, while at the same time counting electric vehicles towards compliance and treating them as zero-emission vehicles even when they run on electricity generated by carbon-emitting sources, and despite the higher carbon intensity in manufacturing electric vehicles. *See* 89 Fed. Reg. 27,842, 27,858 (Apr. 18, 2024) ("We project that … pollutant emissions from [electricity generation] will increase as a result of the increased demand for electricity associated with the final rule ….").  The agency admitted that its standards were "the most stringent" it had ever set, 86 Fed. Reg. at 74,435, and would require elimination of conventional engines and petroleum use over time, *see, e.g.*, 89 Fed. Reg. at 27,898 (new rules will drive automakers to "deploy an increasing number" of electric vehicles); 89 Fed. Reg. 29,440, 29,443, 29,567-68 (Apr. 22, 2024) (imposing emission standards on heavy-duty vehicles that are "more stringent than" any before).  Indeed, the very purpose of EPA's new emission standards was to force the electrification of the Nation's vehicle fleet, *see* 89 Fed. Reg. at 28,057-58; 89 Fed. Reg. at 29,567-68, and reduce gasoline consumption in the United States by 915 billion gallons through 2055, *see* 89 Fed. Reg. at 28,092 (projecting light-duty

rule would reduce consumption by "780 billion gallons through 2055"); 89 Fed. Reg. at 29,735 (projecting heavy-duty rule would "result in a reduction of 135 billion gallons of diesel and gasoline consumption" through 2055); *see also* 89 Fed. Reg. at 27,861 (projecting EPA's light-duty rule will reduce consumer spending on fuel by "$57 billion" through 2055); *id.* at 27,900 (rule will "reduce the demand for gasoline and diesel for light-duty and medium-duty vehicles domestically and affect the petroleum refining industry").  Because those new standards risked injury to API members, API challenged the standards in cases currently before this Court.  *See API v. EPA*, No. 24-1208 (D.C. Cir.); *API v. EPA*, No. 24-1196 (D.C. Cir.).

### C. The Rule at Issue

In January 2025, President Trump issued several Executive Orders revoking President Biden's Executive Order that had directed EPA and NHTSA to reconsider emissions and fuel economy standards finalized in prior years.  *See, e.g.*, Exec. Order No. 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025).  In doing so, President Trump announced the new administration's support for domestic production, processing, and distribution of oil, natural gas, biofuels, and other reliable energy supplies, and its intent to "eliminate the electric vehicle (EV) mandate" and to "ground[]" all future regulatory requirements "in clearly applicable law."  Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025).

In accordance with that directive, EPA issued its latest rule on February 18, 2026. In that rule (which petitioners challenge here), EPA rescinded the 2009 Endangerment Finding, as well as all greenhouse-gas emission standards for model years 2012 to 2027 and beyond. 91 Fed. Reg. 7,686 (Feb. 18, 2026). Returning to its pre-2009 position, EPA concluded that Section 202 does not authorize it to "prescribe standards for [greenhouse-gas] emissions based on global climate change concerns." *Id.* at 7,710. Instead, the agency interpreted the provision to empower it to regulate emissions that endanger public health and welfare "through local or regional exposure." *Id.* at 7,711. Among other things, EPA concluded that the regulation of domestic new vehicle and engine emissions for the purpose of combatting global climate change was a major question requiring clear congressional authorization, which was lacking. *Id.* at 7,723-26. As the agency pointed out, ameliorating the effects of global climate change by (as EPA tried to do) "mandating a shift from gasoline- and diesel-fueled vehicles to EVs" is a policy decision with "consequential tradeoffs" which Congress would have kept for itself. *Id.* at 7,724.

By rescinding these greenhouse-gas emission standards, EPA gave automakers "flexibility" to "produce a range of technologies, including gasoline, diesel, alternative fuels, and plug-in electric vehicles." *Id.* at 7,738. EPA found that recission of these standards would encourage consumers to opt for "safer and lower

emitting vehicles" that would have been too cost prohibitive under the 2024 motor vehicle emission standards. *Id.* at 7,737. EPA, however, did not revise or alter emission limits for "criteria pollutants" and "hazardous air pollutants." *Id.*

On the same day EPA issued its rule, petitioners filed their petition for review. API now moves to intervene.

## ARGUMENT

Federal Rule of Appellate Procedure 15(d) provides that a motion for leave to intervene "must be filed within 30 days after the petition for review is filed and must contain a concise statement of the interest of the moving party and the grounds for intervention." Fed. R. App. P. 15(d). Because Rule 15(d) does not specify clear standards for intervention, courts review motions to intervene under Rule 15(d) by referring to Federal Rule of Civil Procedure 24, which governs intervention in the district court. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Scofield*, 382 U.S. 205, 217 n.10 (1965). Under Rule 24(a), a movant is entitled to intervention as of right if the movant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). And under Rule 24(b), a court "may permit anyone to intervene" who "has a claim or defense that shares with the main action a common

10

question of law or fact." *Id.* 24(b). API qualifies for intervention here under either standard.

## I. API Has A Clear Interest In This Litigation.

As an initial matter, API has a clear interest in this litigation. *See* Fed. R. App. P. 15(d) (motion to intervene must contain "a concise statement of the interest of the moving party"). As described in more detail in the accompanying declaration, API is a national trade association that represents all segments of America's oil and natural gas industry, which supports more than 11 million jobs in the United States. *See* Hupman Decl. ¶2. API's nearly 600 members "produce, process, and distribute most of the Nation's energy." *Id.* API accordingly represents companies "throughout the entire supply chain of the oil and natural gas industry" that have an interest in EPA's repeal of the motor vehicle greenhouse-gas emission standards and in protecting the interests of consumers who value a wider range of choices than were available under the repealed standards. *Id.* ¶¶2, 4-13. And API has already demonstrated that interest in its pending challenges to the 2024 motor vehicle emission standards, which the government has sought to hold in abeyance pending the outcome of challenges like petitioners' here. *See API v. EPA*, No. 24-1208 (D.C. Cir.); *API v. EPA*, No. 24-1196 (D.C. Cir.).

Here, API seeks to defend a portion of the agency's position, and it therefore need not establish Article III standing to intervene. *See Little Sisters of the Poor*

*Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020); *see also Melone v. Coit*, 100 F.4th 21, 28-29 (1st Cir. 2024) (applying Rule 24). Specifically, API seeks to defend EPA's repeal of its 2024 motor vehicle emission standards. In particular, API seeks to defend EPA's finding that its prior adoption of tailpipe emission standards designed to force a transition to electric vehicles for the stated purpose of combatting global climate change was a major question lacking clear congressional authorization. But even if Article III standing were required, API has associational standing to intervene on behalf of its members because "(a) its members would otherwise have standing to [intervene] in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the [position] asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Merit Constr. All. v. City of Quincy*, 759 F.3d 122, 126-27 (1st Cir. 2014).

API includes members who are affected by the portion of EPA's rule that repeals the unlawful 2024 motor vehicle emission standards and ensures EPA will not unlawfully set emission standards that force electrification of the Nation's vehicle fleet. API is therefore harmed by petitioners' challenge to the rule. *See, e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113-14 (2025) (recognizing harm to energy producers from agency action that would cause a "decrease in purchases

12

of gasoline and other liquid fuels"); *see also Mil. Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (recognizing that companies that "benefit from" an agency rule "have standing to intervene" to defend that rule). Protecting those member interests in favorable regulatory findings is germane to API's purpose. Hupman Decl. ¶2; *see Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (describing "undemanding" germaneness requirement as satisfied by "mere pertinence between litigation subject and organizational purpose"). And neither the position asserted nor the relief requested requires the participation of individual members, which is why courts have routinely permitted API to intervene in similar proceedings challenging agency action. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015); *ConocoPhillips Co. v. EPA*, 612 F.3d 822 (5th Cir. 2010); *NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988).

## II.    API Should Be Permitted To Intervene.

### A.    API Should Be Granted Intervention as of Right.

A movant is entitled to intervene as of right if it demonstrates "(1) the timeliness of [its] motion; (2) a concrete interest in the pending action; (3) 'a realistic threat' that resolution of the pending action will hinder [its] ability to effectuate that interest; and (4) the absence of adequate representation by any existing party." *T-*

13

*Mobile Ne. LLC v. Town of Barnstable*, 969 F.3d 33, 39 (1st Cir. 2020) (applying Rule 24(a)).  API satisfies each of those requirements here.

First, API's motion to intervene is timely, as it was filed within the time required by Rule 15(d).  Under Rule 15(d), a motion to intervene "must be filed within 30 days after the petition for review is filed."  Fed. R. App. P. 15(d).  The petition for review here was filed on February 18, 2026, making motions to intervene due under Rule 15(d) and Rule 26(a) on Friday, March 20, 2026.  Moreover, because API has promptly moved to intervene at an early stage of the proceedings, allowing intervention will not disrupt or delay the proceedings or prejudice any parties.  *See, e.g.*, *Geiger v. Foley Hoag LLP Ret. Plan*, 521 F.3d 60, 64 (1st Cir. 2008) (finding motion to intervene timely under Rule 24(a) when "the case had not progressed beyond the initial stages when the motion was filed").

Second, API has a "concrete interest" in the litigation for the same reason described above:  because it seeks to defend a portion of a regulation that affects its members' interests.  *See, e.g.*, *Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1018-19 (D.C. Cir. 2003) (person who "has suffered a cognizable injury sufficient to establish Article III standing … also has the requisite interest under Rule 24(a)(2)");  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075-76 (D.C. Cir. 1998) (similar);  *Am. Horse Prot. Ass'n, Inc. v. Veneman*, 200 F.R.D. 153, 157 (D.D.C. 2001) ("[I]t is impossible to conjure a case in which an intervenor would have constitutional

14

standing to intervene but not have a sufficient 'interest in the litigation' to justify intervention under Fed. R. Civ. P. 24(a)(2)."); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1146 (D.C. Cir. 2009) ("by demonstrating Article III standing, the intervenors adduce a sufficient interest" under Rule 24); *Bost v. Illinois State Bd. of Elections*, 75 F.4th 682, 687 (7th Cir. 2023) (similar).

Third, there is a "realistic threat" that allowing this case to proceed without API's participation will hinder API's ability to protect its members' interests. *T-Mobile*, 969 F.3d at 39. To satisfy that element, a movant "need only show that if it cannot intervene, there is a possibility that its interest could be impaired or impeded." *Field v. Anadarko Petroleum Corp.*, 35 F.4th 1013, 1020 (5th Cir. 2022) (brackets omitted). API's interest in defending part of a regulation that affects its members could plainly be impaired or impeded if petitioners' challenge were to proceed without API's involvement.

Finally, the existing parties cannot adequately represent API's interests. The applicant's "burden of showing inadequate representation is 'minimal.'" *Mandan, Hidatsa & Arikara Nation v. United States Dep't of the Interior*, 66 F.4th 282, 285 (D.C. Cir. 2023) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). The D.C. Circuit has adopted a "presumption" of adequate representation when the movant seeks to intervene where the "state is already a party," and requires an affirmative showing that "its interest is in fact different from

15

that of the state." *Env't Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979).     API respectfully submits that this Court's rebuttable presumption of adequacy is incorrect and conflicts with the Supreme Court's clear instruction that the burden of showing inadequate representation should be "minimal," *Trbovich*, 404 U.S. at 538 n.10, and preserves that issue for further review if necessary.

But even applying that rebuttable presumption, the government would not adequately represent API's interests here, as API's and EPA's interests are not the same.     Whereas EPA seeks to defend its latest rule in full, API seeks to defend EPA's finding that EPA issued its 2024 motor vehicle emission standards without clear statutory authority, and API's reasoning in defense of that finding is not in lockstep with that of the government.     *See* 91 Fed. Reg. at 7,725.     Moreover, API is currently in litigation against the government in a pending challenge that involves some of the same or similar questions raised in this case.     *See, e.g.*, *In re NHTSA*, No. 24-7001 (6th Cir.).     The fact that API's position is not directly aligned with the government's position on the validity of the rule in this case, and that API is presently in the midst of related litigation *against* the government, is more than sufficient to provide a "strong affirmative showing" that the government would not adequately represent API's interests.     *See Victim Rights Ctr. v. Rosenfelt*, 988 F.3d 556, 561 (1st Cir. 2021).

16

### B.     API Should Be Granted Permissive Intervention.

Even if this Court is not convinced that API is entitled to intervention as of right, it should exercise its discretion to grant API permissive intervention.  Under Rule 24(b), a court "[o]n timely motion, … may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b).  That standard is not a restrictive one; it "provides basically that anyone may be permitted to intervene if his claim and the main action have a common question of law or fact," *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967), so long as intervention would not "unduly delay or prejudice the rights of the original parties," *Acree v. Republic of Iraq*, 370 F.3d 41, 49 (D.C. Cir. 2004), *abrogated on other grounds sub nom.*, *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009).  In applying that standard, courts "may consider 'almost any factor rationally relevant' in making [a] determination" on whether to grant permissive intervention. *Melone*, 100 F.4th at 28 (quoting *Daggett v. Comm'n on Gov. Ethics & Election Pracs.*, 172 F.3d 104, 113 (1st Cir. 1999)).

For all of the reasons already described, permissive intervention is warranted here.  API's motion is timely; allowing it to intervene would not prejudice the rights of the original parties or cause undue delay; API has a concrete interest in this litigation and seeks to address legal issues relevant to the petition; and allowing the litigation to proceed without API's participation threatens to impair API's and its

17

members' interests.  Even if this Court is not persuaded to grant API intervention as of right, it should exercise its discretion to grant API's unopposed motion to intervene on a permissive basis.

## CONCLUSION

For the foregoing reasons, this Court should grant API's unopposed motion for leave to intervene.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
DANIELLE SASSOON
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Movant-Intervenor American Petroleum Institute*

March 20, 2026

18

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), API certifies that it is a national trade association that represents all segments of America's natural gas and oil industry.  API's nearly 600 members produce, process, and distribute most of the Nation's energy, and participate in API Energy Excellence, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting.  API has no parent entity, and no publicly held corporation has a 10 percent or greater ownership stake in API.

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 4,048 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

March 20, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement