NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 26-1037
(consolidated with 26-1038, 26-1039, 26-1043, 26-1051, 26-1061)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN PUBLIC HEALTH ASSOCIATION, ET AL.,

*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

**BRIEF OF SENATORS TED CRUZ AND CYNTHIA LUMMIS AS
*AMICI CURIAE* IN SUPPORT OF RESPONDENTS**

On Review from the Environmental Protection
Agency (No. EPA-91FR7686)

Jason B. Torchinsky
Elizabeth Price Foley*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
jtorchinsky@holtzmanvogel.com

Daniel A. Bruce
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA
(540) 341-8808 (phone)
(540) 341-8809 (facsimile)

*\*Application for Admission Forthcoming*

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici* certify that they are not a corporation, association, joint venture, partnership, syndicate, or similar entity required to file a disclosure statement under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1.

/s/ *Jason B. Torchinsky*
JASON B. TORCHINSKY

## CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES

Pursuant to Circuit Rule 27(a)(4) and 28(a)(1)(A) *amici* certify the following:

**Parties**

The Petitioners in No. 26-1037 are American Public Health Association, Alliance for Nurses for Healthy Environments, American Lung Association, Center for Biological Diversity, Center for Community Action and Environmental Justice, Clean Air Council, Clean Wisconsin, Conservation Law Foundation, Environmental Defense Fund, Environmental Law & Policy Center, Friends of the Earth, Natural Resources Defense Council, Inc., Physicians for Social Responsibility, Public Citizen, Rio Grande International Study Center, Sierra Club, and Union of Concerned Scientists.

The Respondents in No. 26-1037 are the Environmental Protection Agency and Lee M. Zeldin, Administrator, U.S. Environmental Protection Agency.

Government Accountability & Oversight and Government Oversight & Education d/b/a Protect the Public's Trust have been granted leave to participate as *amici curiae*. An individual, John Worthington, has filed a motion for leave to participate as *amicus curiae*, as well as a motion to intervene. To *amici's* knowledge, the Court has not ruled on Mr. Worthington's motions.

A group of States has moved to intervene in support of Respondents. The State movant-intervenors include the States of West Virginia, Kentucky, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Missouri, Mississippi, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming.

Several organizations have also moved to intervene in support of Respondents. The organizational movant-intervenors include Domestic Energy Producers Alliance, Western States Trucking Association, Inc., Construction Industry Air Quality Coalition, Inc., Liberty Packing

Company, LLC, Nuckles Oil Company, Inc., Truck and Engine Manufacturers Association, National Federation of Independent Business, American Free Enterprise Chamber of Commerce, Illinois Corn Growers Association, Iowa Corn Growers Association, Kentucky Corn Growers Association, Missouri Corn Growers Association, North Dakota Corn Growers Associations, Tennessee Corn Growers Association, NACCO Natural Resources Corporation, CO2 Coalition, and American Petroleum Institute.

**Rulings**

This is an original action in this Court and does not challenge any ruling of a district court.

**Related Cases**

To *amici*'s knowledge, this case has been consolidated with all related cases. The consolidated cases include Nos. 26-1038, 26-1039, 26-1043, 26-1051, and 26-1061.

/s/ *Jason B. Torchinsky*
JASON B. TORCHINSKY

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ i

CERTIFICATE AS TO PARTIES, RULINGS, & RELATED CASES ...... i

TABLE OF CONTENTS ................................................................... iv

TABLE OF AUTHORITIES ................................................................ v

INTEREST OF *AMICI CURIAE* ......................................................... 1

ARGUMENT .................................................................................. 2

    I.    The Legislative Power Resides in Congress—Not Unelected Bureaucrats .......................................................... 2

    II.    The EPA's Invocation of the Major Questions Doctrine in Its Repeal of the 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards Preserves Congress's Lawmaking Authority ...................................................................... 7

    III.    The Major Questions Doctrine Preserves Congress's Role as Lawmaker and Appropriately Constrains Executive Power 11

CONCLUSION ............................................................................... 17

CERTIFICATE OF COMPLIANCE ..................................................... 18

CERTIFICATE OF SERVICE ............................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)...............................................................10, 15, 16

*Biden v. Nebraska,*
600 U.S. 477 (2023) ........................................... 10, 13, 15, 16

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ................................................................5, 6

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ...................................................................10

*Gonzales v. Oregon,*
546 U.S. 243 (2006) ...................................................................14

*Gundy v. United States,*
588 U.S. 128 (2019) ...................................................................12

*Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980) .................................................................. 8

*Learning Res., Inc. v. Trump,*
607 U.S. ___ (2026) .............................................................13, 15

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................................. 6

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) .................................................................. 2

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932) .................................................................. 5

*NFIB v. OSHA,*
595 U.S. 109 (2022)...................................................................14

*Seila Law LLC v. CFPB,*
591 U.S. 197 (2020) .................................................................. 6

*Solid Waste Agency v. U.S. Army Corps. of Eng'rs,*
531 U.S. 159 (2001) ...................................................................15

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2022)...................................................................10

*West Virginia v. EPA,*
597 U.S. 697 (2022)....................... 3, 4, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16

**Constitutional Provisions**

U.S. CONST. art. I, § 1................................................................2, 5
U.S. CONST. art. I, § 7 .............................................................. 3

**Regulations**

Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act, 91 Fed. Reg. 7686 (Feb. 18, 2026) ......................................... 7, 8, 9, 10, 11

**Other Authorities**

R. NATHAN, THE ADMINISTRATIVE PRESIDENCY (1983) ..........................5, 6
THE FEDERALIST (Clinton Rossiter ed., 1961) ......................................3, 4
THE FEDERALIST (J. Cooke ed. 1961) ...................................................... 6

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are Senators Ted Cruz and Cynthia Lummis, who represent the States of Texas and Wyoming, respectively, in the United States Senate. Senator Cruz serves as Chairman of the Subcommittee on Federal Courts, Oversight, Agency Action and Federal Rights for the Senate Committee on the Judiciary. Senator Lummis serves as Chairman of the Subcommittee on Clean Air, Climate, and Nuclear Innovation and Safety for the Senate Committee on Environment & Public Works. *Amici*'s respective interests overlap perfectly here.

Namely, both have a strong interest in judicial interpretations that preserve the legislative powers that Article I of the Constitution vests exclusively in Congress. *Amici* share an interest in ensuring that the judiciary serves as an appropriate check on the executive branch and vigilantly safeguards the Constitution's separation of powers. In addition, *amici* have an interest in ensuring that executive agencies— like the EPA—exercise only the authority Congress delegated to them, meaning that Congress retains all federal legislative power. When an

---

[1] No counsel for any party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person, other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

executive agency issues regulations with vast economic and political significance, the courts must invoke the major questions doctrine to protect the Constitution's separation of powers.

As members of the U.S. Senate, *amici* possess a unique interest in, and perspective on, the EPA's reliance on the major question doctrine to repeal its 2009 Endangerment Finding and corresponding regulations concerning greenhouse gas emissions standards for vehicles and engines. *Amici* respectfully submit this *amici curiae* brief pursuant to these interests and their unique perspective as U.S. Senators.

## ARGUMENT

### I. The Legislative Power Resides in Congress—Not Unelected Bureaucrats

Article 1, Section 1 of the Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States, which shall consist of a Senate and House of Representatives." The vesting of federal legislative power in Congress is "vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). As Justice Gorsuch has observed, "It is vital because the framers believed that a republic—a thing of the people—would be more likely to enact just laws than a regime

2

administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting THE FEDERALIST NO. 11, at 85 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). By vesting all lawmaking power in the people's elected representatives, the Framers "sought to ensure 'not only that all power would be derived from the people,' but also 'that those entrusted with it should be kept in dependence on the people.'" *Id.* at 738 (cleaned up) (quoting THE FEDERALIST NO. 37, at 227 (James Madison) (Clinton Rossiter ed., 1961)).

To be sure, this system makes lawmaking difficult. It requires majoritarian consensus and presidential approval for all laws, no matter how big or how small. U.S. Const. art. I, § 7. If the President vetoes a bill, a two-thirds legislative supermajority is required to override his veto. *Id.* In times of heightened political polarization—like shortly after the Founding and today—the Constitution's insistence on consensus can seem like an insurmountable hurdle to meaningful policy change. Given this frustration, it is perhaps inevitable that some would seek to circumvent the Constitution by attempting to enact significant policy

change through administrative regulations, which require no debate, no compromise, and no vote.

While some may view the messy, time-consuming, laborious process of legislating as a frustrating impediment to desired change, the Framers viewed it as an indispensable requirement for the preservation of individual liberty. "The framers believed that the power to make new laws regulating private conduct was a grave one that could, if not properly checked, pose a serious threat to individual liberty." *West Virginia*, 597 U.S. at 738 (Gorsuch, J., concurring) (citing THE FEDERALIST NO. 48, at 309–12 (James Madison) (Clinton Rossiter ed., 1961); *id.* No. 73, at 441–42 (Alexander Hamilton)).

The requirement for legislative debate and consensus "sought to ensure that any new laws would enjoy wide social acceptance, profit from input by an array of different perspectives during their consideration, and thanks to all this prove stable over time." *Id.* (citing THE FEDERALIST NO. 10, at 82–84 (James Madison) (Clinton Rossiter ed., 1961)). It also "sought to protect minorities by ensuring that their votes would often decide the fate of proposed legislation—allowing them to wield real power alongside the majority." *Id.* at 739 (citation omitted). And it left room for

States, not the federal government, to serve as "laborator[ies]" for "novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

Despite the Constitution's express command that "all legislative power" be vested in Congress, U.S. Const. art. I, § 1, administrative agencies are now "a central feature of modern American government." *City of Arlington v. FCC*, 569 U.S. 290, 313 (2013) (Roberts, C.J., dissenting). "The Framers could hardly have envisioned today's vast and varied federal bureaucracy and the authority administrative agencies now hold over our economic, social, and political activities." *Id.* (internal quotations omitted). With their "thousands of pages of regulations" that "pok[e] into every nook and cranny of daily life," federal agencies are too often the ones "doing the legislating." *See id.* at 315.

Even Presidents have recognized the dangers of runaway agencies. President Truman once quipped, "I thought I was the President, but when it comes to these bureaucrats, I can't do a damn thing." *Id.* at 313–14 (quoting R. NATHAN, THE ADMINISTRATIVE PRESIDENCY 2 (1983)). And "President Kennedy once told a constituent, 'I agree with you, but I don't

know if the government will.'" *Id.* (quoting R. NATHAN, THE ADMINISTRATIVE PRESIDENCY 1 (1983)). While the Supreme Court has recently made strides in restoring Presidents' control over such agencies, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024); *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the general insulation of the administrative state from electoral accountability highlights the dangers of "accumulat[ing] all powers, legislative, executive, and judiciary, in the same hands." *See City of Arlington*, 569 U.S. at 312 (Roberts, C.J., dissenting) (quoting THE FEDERALIST NO. 47, at 324 (James Madison) (J. Cooke ed., 1961)).

The vast growth of the modern administrative state—often referred to as the "fourth branch" of government—thus necessitates close judicial scrutiny to ensure that the Constitution's command that Congress possess "all" lawmaking power—and thus, individual liberty—is preserved. The major questions doctrine, which the EPA invoked here, is a critically important mechanism by which courts ensure that this aspect of horizontal separation of powers is preserved.

**II. The EPA's Invocation of the Major Questions Doctrine in Its Repeal of the 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards Preserves Congress's Lawmaking Authority**

This case represents the rare, but welcome, case in which an administrative agency admits its prior action exceeded its constitutional and statutory authority. In rescinding the 2009 Endangerment Finding and repealing Greenhouse Gas ("GHG") emission standards for motor vehicles, the EPA correctly concluded that the major questions doctrine independently barred the Agency from regulating GHG vehicle emissions to address global climate change under Clean Air Act section 202(a)(1). Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act, 91 Fed. Reg. 7686, 7723 (Feb. 18, 2026). The EPA determined that the 2009 Endangerment Finding and subsequent GHG standards constituted major questions given their profound impact on virtually every sector of the economy and American households. *Id.* at 7698, 7723.

That conclusion is undoubtedly correct. The Endangerment Finding and GHG standards were plain attempts by an administrative agency "to resolve a matter of great political significance or end an earnest and profound debate across the country." *See West Virginia*, 597 U.S. at 743

7

(Gorsuch, J., concurring) (citation omitted). The EPA found that the GHG emission standards sought to mandate a shift from gasoline- and diesel-fueled vehicles to electric vehicles—a fundamental transformation of the transportation sector that Congress did not authorize. 91 Fed. Reg. at 7723–24. The Supreme Court found that a similar effort by the EPA to "forc[e] a shift throughout the power grid" from coal to renewable energy sources implicated the major questions doctrine. *West Virginia*, 597 U.S. at 727–28. Both there and here, "[t]here is little reason to think Congress assigned" such an "'unprecedented power over American industry' . . . to the Agency." *Id.* at 728–29 (quoting *Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion)).

The EPA also pointed to congressional action and inaction as evidence that regulating GHG vehicle emissions constitutes a major question reserved for legislative resolution. Congress "considered and rejected multiple times" legislation that would have authorized or required the EPA to regulate GHG emissions from vehicles, including the American Clean Energy and Security Act of 2009, which passed the House by a narrow margin but never received a vote in the Senate. 91 Fed. Reg. at 7725. More recently, Congress disapproved through the

8

Congressional Review Act the EPA's waivers allowing California to enforce state GHG emission regulations, and the One Big Beautiful Bill Act of 2025 repealed several Inflation Reduction Act provisions related to GHG emissions and rescinded EPA appropriations for related funding programs. *Id.* at 7725–26. Further, the EPA observed that when Congress has chosen to address specific greenhouse gases, it has employed targeted, non-regulatory approaches—such as the American Innovation and Manufacturing Act's hydrofluorocarbon phaseout scheme, tax credits for carbon dioxide sequestration, and waste emission charges for methane. *Id.* at 7725.

The EPA concluded that these Congressional actions "further demonstrate the economic and political significance of the EPA's GHG emission regulations and reinforce the understanding that Congress intends to reserve such major questions of policy for itself." *Id.* at 7726 (citation omitted). That is correct. In *West Virginia*, the Court noted that "Congress . . . has consistently rejected proposals to amend the Clean Air Act to create" the program instituted by the EPA and "declined to enact similar measures." 597 U.S. at 731–32. There, as here, courts must look with skepticism on the EPA's "newly uncovered" powers that

"conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gas emissions 'had become well known, Congress considered and rejected' multiple times." *Id.* at 731 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000)).

The Endangerment Finding and GHG standards were also clear attempts by an administrative agency to exercise "'unheralded' regulatory power over 'a significant portion of the American economy.'" *Id.* at 722 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2022)). The EPA characterized the costs imposed by the GHG regulatory program as "immense" and in the "trillions of dollars," estimating that repeal will yield approximately $769 billion in cost savings. 91 Fed. Reg. at 7690, 7757. It also estimated that repeal could save American consumers as much as $2,420 per vehicle in cost reductions due to reductions in vehicle technology. *Id.* at 7755. Those costs greatly exceed the $50 million impact of the eviction moratorium that the Court found to be a major question in *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam), and are nearly double the $430 billion impact of the student loan forgiveness that likewise triggered the doctrine in *Biden v. Nebraska*, 600 U.S. 477, 494 (2023).

The EPA also found—to the extent it even matters to the major questions analysis—that the benefits of the GHG vehicle emission standards did not outweigh these substantial costs. EPA concluded that its disruptive, expensive GHG vehicle emission standards resulted in "an approximately 0.007 degree °C difference in GMST [global mean surface temperature] by 2050 . . . and an approximately 0.005 cm difference in GSLR [global mean sea level rise] by 2050 . . . ." 91 Fed. Reg. at 7691. These "impacts are *de minimis*" and illustrate the "futility of GHG emission standards under CAA section 202(a)(1)." *Id.*

## III. The Major Questions Doctrine Preserves Congress's Role as Lawmaker and Appropriately Constrains Executive Power

While the "major questions doctrine" label is recent, "it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 697 U.S. at 724. Simply stated, under the major questions doctrine, "administrative agencies must be able to point to 'clear congressional authorization' when they claim the power to make decisions of vast 'economic and political significance.'" *Id.* at 735 (Gorsuch, J., concurring).

11

The major questions doctrine thus plays a central role in preserving the separation of powers by ensuring that questions of economic and political significance are resolved by Congress, not administrative agencies. The Supreme Court has recognized that the major questions doctrine is grounded in the separation of powers: "[I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *Id.* at 723 (majority opinion) (citation omitted).

Several Justices have more clearly stated that the doctrine serves a critical, horizontal separation of powers function. For example, in *Gundy v. United States*, Justice Gorsuch, joined by Chief Justice Roberts and Justice Thomas, observed that "[a]lthough it is nominally a canon of statutory construction, we apply the major questions doctrine in service of the constitutional rule that Congress may not divest itself of its legislative power by transferring that power to an executive agency." 588 U.S. 128, 167 (2019) (Gorsuch, J., dissenting). In *West Virginia*, Justice Gorsuch, this time joined by Justice Alito, again reiterated that the

doctrine "operates to protect foundational constitutional guarantees." 597 U.S. at 735 (Gorsuch, J., concurring).

Justice Kavanaugh agrees that the major questions doctrine is "grounded in two overlapping and reinforcing presumptions: (i) a separation of powers-based presumption against the delegation of major lawmaking authority from Congress to the Executive Branch, and (ii) a presumption that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Learning Res., Inc. v. Trump*, 607 U.S. \_\_\_, \_\_\_ (2026) (Kavanaugh, J., dissenting) (citation omitted) (slip op. at 32). And even Justice Barrett, who does not view the major questions doctrine as a strong-form substantive canon of construction but as "emphasiz[ing] the importance of *context* when a court interprets a delegation to an administrative agency," *Nebraska*, 600 U.S. at 508 (Barrett, J., concurring), has emphasized that "[p]art of this context . . . is Article I of the Constitution." *Learning Res., Inc.*, 607 U.S. at \_\_\_ (Barrett, J., concurring) (slip op. at 2).

Major questions cases "have arisen from all corners of the administrative state." *West Virginia*, 597 U.S. at 721. As Justice Gorsuch has explained, these cases can be described using three categories. While

not exhaustive and sometimes overlapping, these categories demonstrate how the major questions doctrine serves its separation-of-powers-enhancing function.

First, the Supreme Court "has indicated that the doctrine applies when an agency claims to resolve a matter of great political significance or end an earnest and profound debate across the country." *Id.* at 743 (Gorsuch, J., concurring) (internal quotations and citation omitted). For example, the Court invoked the doctrine to strike down the Biden administration's COVID-19 vaccine mandate when Congress and state legislatures were engaged in robust debates over the propriety of vaccine mandates. *See NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). And the Court found the doctrine applied to an Attorney General regulation that would have banned most forms of physician-assisted suicide even as some states were debating whether to permit the practice. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006).

Second, the doctrine applies when an agency "seeks to regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (internal quotations and citation omitted). For

example, the Court applied the doctrine to invalidate the CDC's COVID-era eviction moratorium that would cost landlords approximately $50 billion. *See Ala. Ass'n of Realtors*, 594 U.S. at 764. So too in *Nebraska,* where the Court declined to read the statutory language, "waive or modify," as delegating to the Secretary of Education authority to cancel $430 billion in student loan debt. 600 U.S. at 494; *see also Learning Res., Inc.*, 607 U.S. at ___ (opinion of Roberts, C.J.) (slip op. at 11) (applying doctrine to executive action with trillions of dollars of economic impact).

Third, the doctrine may apply "when an agency seeks to intrude into an area that is the particular domain of state law." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (cleaned up). For example, the Court relied on the doctrine in refusing to interpret the phrase "navigable waters" to encompass an "abandoned sand and gravel pit" or simple "ponds and mudflats" because doing so "would result in a significant impingement of the States' traditional and primary power over land and water use." *Solid Waste Agency v. U.S. Army Corps. of Eng'rs*, 531 U.S. 159, 174 (2001).

In each of these cases, the Court held, in one form or another, that a "decision of such magnitude and consequence on a matter of earnest

15

and profound debate across the country must rest with Congress itself." *Nebraska*, 600 U.S. at 504 (cleaned up); *see also, e.g.*, *West Virginia*, 597 U.S. at 721 ("[C]ases in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." (cleaned up)); *Ala. Ass'n of Realtors*, 594 U.S. at 764 ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." (cleaned up)). This is because the major questions doctrine recognizes that Congress—and only Congress—possesses the power to legislate in our constitutional republic.

\*     \*     \*

Accordingly, as the EPA correctly determined, because the 2009 Endangerment Finding and corresponding GHG vehicle emission standards "claim[ed] the power to make decisions of vast 'economic and political significance,'" *see West Virginia*, 597 U.S. at 735 (Gorsuch, J., concurring), the major question doctrine applies, and the Agency must be able to point to clear Congressional authorization to justify the rule. Because the EPA correctly determined that no such authorization exists,

16

this Court must uphold the EPA's decision to rescind the rule to safeguard the Constitution's core guarantee of separation of powers.

## CONCLUSION

For the foregoing reasons, the Court should uphold the EPA's decision to rescind the 2009 Endangerment Finding and corresponding GHG vehicle emissions standards.

Dated: April 13, 2026

Respectfully submitted,

*/s/ Jason B. Torchinsky*
Jason B. Torchinsky
Elizabeth Price Foley\*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
jtorchinsky@holtzmanvogel.com

Daniel A. Bruce
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Highway
Haymarket, VA
(540) 341-8808 (phone)
(540) 341-8809 (facsimile)
*\*Application for Admission*
*Forthcoming*
*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume and word-count limits of Federal Rules of Appellate Procedure and Circuit Rules 29 and 32 and because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 3,196 words.

2.     This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Jason B. Torchinsky*
JASON B. TORCHINSKY

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 13th day of April, 2026, a true copy of the foregoing was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will serve all parties or their counsel.

/s/ Jason B. Torchinsky
JASON B. TORCHINSKY