ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ELENA VENNER, *et al.*,<br>　　　　　　　*Petitioners*,<br><br>v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>　　　　　　　*Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## PETITIONERS' REPLY IN SUPPORT OF MOTION TO STAY
## THE REPEAL RULE PENDING REVIEW

## TABLE OF CONTENTS

TABLE OF EXHIBITS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................1

I.      Petitioners Are Likely to Succeed on the Merits ............................1

    A.      Petitioners Have Standing ........................................................1

    B.      State-Derived Liberty Interest .................................................6

    C.      Religious Freedom Restoration Act .........................................8

    D.      Fifth Amendment Life and Liberty ........................................11

    E.      EPA Failed to Respond to Significant Comments ..................13

II.     Petitioners Face Irreparable Harm ................................................14

III.    The Equities Favor a Stay .............................................................16

CONCLUSION ..............................................................................................17

**TABLE OF EXHIBITS**

Exhibit 1    Supplemental Declaration of L.K. ("L.K. Suppl.")

Exhibit 2    EPA, *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles, Regulatory Impact Analysis* (Mar. 2024), EPA-HQ-OAR-2025-0194-0002, excerpt

Exhibit 3    Comment submitted by American Meteorological Society, EPA-HQ-OAR-2025-0194-1312 ("AMS Comment")

Exhibit 4    Comment submitted by Union of Concerned Scientists, EPA-HQ-OAR-2025-0194-23893 ("UCS Comment")

Exhibit 5    Attachments to Our Children's Trust, *Comment for Unlawful Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Emission Vehicle Standards Proposed Rule (Docket No. EPA-HQ-OAR-2025-0194)* (Sep. 22, 2025), EPA-HQ-OAR-2025-0194-7017 ("OCT Comment")

    Attachment 2 – Declaration of John Balmes, MD, *Lighthiser v. Trump*, No. 2:25-cv-00054 (D. Mont. June 13, 2025)

    Attachment 7 – Declaration of Craig McLean, *Lighthiser v. Trump*, No. 2:25-cv-00054 (D. Mont. June 13, 2025)

    Attachment 10 – Declaration of John Balbus, MD, *Lighthiser v. Trump*, No. 2:25-cv-00054 (D. Mont. June 13, 2025)

    Attachment 22 – Declaration of Gary A. Jonesi, *Lighthiser v. Trump*, No. 2:25-cv-00054 (D. Mont. June 13, 2025)

Exhibit 6    Supplemental Declaration of Dan Sperling, PhD, Founding Director and Professor Emeritus, Institute of Transportation Studies, University of California, Davis ("Sperling Suppl.")

## TABLE OF AUTHORITIES

**Cases**

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) ...................................................................14

*Americans for Safe Access v. Drug Enf't Admin.*,
706 F.3d 438 (D.C. Cir. 2013) .......................................................................2

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................4

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
683 F.3d 1144 (9th Cir. 2012) ........................................................................3

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ......................................................................................10

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ......................................................................................11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................2

*Coal. for Responsible Regul., Inc. v. EPA*,
684 F.3d 102 (D.C. Cir. 2012) ........................................................................5

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) ................................................................................2, 4, 6

*Dunn v. Blumstein*,
405 U.S. 330 (1972) ......................................................................................12

*Entergy Arkansas, LLC v. FERC*,
134 F.4th 576 (D.C. Cir. 2025) .......................................................................1

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ......................................................................................10

*Fontem US, LLC v. U.S. FDA*,
No. 22-1076, 2022 WL 2761393 (D.C. Cir. July 12, 2022)...........................15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................................................4

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975) ...............................................................15

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) .................................................................................11

*Gulf v. Burgum*,
    775 F. Supp. 3d 455 (D.D.C. 2025) ..........................................................2

*Helling v. McKinney*,
    509 U.S. 25 (1993) ....................................................................................4

*In re NTE Connecticut, LLC*,
    26 F.4th 980 (D.C. Cir. 2022) .................................................................14

*In re Polar Bear Endangered Species Act Listing & §4(d) Rule Litig.*,
    818 F. Supp. 2d 240 (D.D.C. 2011),
    *aff'd*, 720 F.3d 354 (D.C. Cir. 2013)......................................................17

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020).................................................................6

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008) ..................................................................9

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .......................................................4, 14, 16

*Lemon Bay Cove, LLC v. United States*,
    160 Fed. Cl. 593 (2022).........................................................................17

*Loe v. Jett*,
    796 F. Supp. 3d 541 (D. Minn. 2025) ...................................................11

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .................................................................................13

iv

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
   485 U.S. 439 (1988) ...................................................................10

*Mahmoud v. Taylor*,
   606 U.S. 522 (2025) ...................................................................9

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ...........................................................2, 13, 16

*Mirabelli v. Bonta*,
   607 U.S. 492 (2026) ..................................................................16

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ....................................................................4

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
   628 F.2d 604 (D.C. Cir. 1980) ...................................................4, 15

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ...............................................................11, 12

*Ohio v. EPA*,
   603 U.S. 279 (2024) ....................................................................9

*Powell v. Pennsylvania*,
   127 U.S. 678 (1888) ...................................................................12

*Priests For Life v. U.S. HHS*,
   772 F.3d 229 (D.C. Cir. 2014) ....................................................10

*Ramirez v. Collier*,
   595 U.S. 411 (2022) .................................................................9, 10

*Real Alternatives, Inc. v. Sec'y of HHS*,
   867 F.3d 338 (3d Cir. 2017) .......................................................10

*Richardson by Richardson v. Richardson-Merrell, Inc.*,
   857 F.2d 823 (D.C. Cir. 1988) .....................................................3

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ....................................................................4

v

*Trump v. CASA,*
   606 U.S. 831 (2025) ...............................................................................11

*United States v. Windsor,*
   570 U.S. 744 (2013) ..............................................................................7, 8

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ...............................................................................13

*Wolff v. McDonnell,*
   418 U.S. 539 (1974) .................................................................................7

*Yates v. Collier,*
   868 F.3d 354 (5th Cir. 2017).....................................................................4

*Zubik v. Burwell,*
   578 U.S. 403 (2016) ................................................................................10

## U.S. Constitutional Authorities

Declaration of Independence (U.S. 1776) ................................................16

## U.S. Statutes

42 U.S.C. § 2000bb-1 ..........................................................................10, 11

42 U.S.C. § 7401 ......................................................................................8

42 U.S.C. § 7607(d)(3)(C).......................................................................13

42 U.S.C. § 7607(d)(7)(B).........................................................................8

## Other Authorities

EPA, *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act,* Final Rule, 74 Fed. Reg. 66496 (Dec. 15, 2009) .......................................................................................5

**INTRODUCTION**

No party contests the key facts: the Repeal Rule will cause 8.81 *billion* metric tons (8.81 gigatons) of otherwise avoided greenhouse gas ("GHG") emissions and irretrievably locks in 942.2 million metric tons ("MMT") during the stay period.[1] Wilson ¶¶20, 15. Because Petitioners have standing, are likely to succeed on the merits, and will suffer irreparable harm to fundamental rights, the equities favor a stay.

**ARGUMENT**

**I.     Petitioners Are Likely to Succeed on the Merits**

**A.     Petitioners Have Standing**

Contrary to EPA's forfeiture argument, EPA Opp. 4-5, Petitioners presented arguments and evidence in a section titled "Standing." Mot. 6-7. EPA's citation makes clear there is no forfeiture here: "Forfeiture ordinarily applies whenever a party relies on an argument ***not raised in its opening brief***." *Entergy Arkansas, LLC v. FERC*, 134 F.4th 576, 580 (D.C. Cir. 2025) (emphasis added); *see also Gulf v.*

---

[1] Petitioners challenge EPA's decision to allow *these* emissions which worsen Petitioners' injuries—not past or other future emissions, and not climate change writ large. *Contra* EPA Opp. 8, 4, 7, 9. Petitioners' past harms typify the nature of the injuries the Repeal Rule worsens. Under Respondents' theory, because a child suffers asthma attacks from current levels of pollution, government decisions to expose her to increased pollution, causing increased asthma attacks, are not cognizable. "She already lost personal security to breathe; she can lose more" is not an adage the Constitution condones.

*Burgum*, 775 F. Supp. 3d 455, 468 n.7 (D.D.C. 2025); *Americans for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 445 (D.C. Cir. 2013) (procedural standing "apparent from the administrative record"); *see also infra* I.C. For the same reason, Petitioners' statutory arguments are not waived. Mot. 3, 24, 29; *contra* Priv. Opp. 13-14.[2]

Petitioners' injuries are actual, imminent, certainly impending, and traceable to the Repeal Rule. Their evidence is not "speculation," a "tangled web," nor is the impact "negligible." Petitioners and their experts account for each step in the causal chain—unlike *Clapper*, whose plaintiffs relied solely on personal "fear" of harm, uncorroborated by expert testimony. *Compare Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-13 (2013), *with* Mot. 25-26, 14-15, 17, 19-20, 9-10 (citing expert and EPA evidence); Wilson Decl.¶¶5-21 (942.2 MMT causes increase in local heat for Petitioners). EPA ignores Petitioners' expert's testimony that the Repeal Rule's emissions "will indisputably expose these youth petitioners to more heat than they are already experiencing[.]" Wilson ¶6; *see, e.g.*, J.K. ¶9, L.K. Suppl. ¶9 (Ex. 1) (extreme heat prevents walking to synagogue); Maya ¶3 (extreme heat triggers bronchospasms). Importantly, J.K.'s and Maya's cities are heating faster than the

---

[2] Petitioners rely on *Diamond*, not *Massachusetts*, for standing. *See* Mot. 6-7; *contra* EPA Opp. 6.

country, ensuring *outsized* harm to them from the Repeal Rule.[3] Running ¶17; Jacobson ¶9. "The more emissions allowed to enter the atmosphere by the Repeal Rule will worsen these health effects[.]" Wilson ¶21.

Although EPA tries to isolate the harms to climate change, Petitioners' experts and EPA confirm the Repeal Rule will also increase ground-level ozone where Elena, Maya, and E.S. live. Jacobson ¶9; Mot. 15, 26-27; Ex. 2; Elena and Maya have asthma. Pinsky ¶33. Because their cities are already over-polluted with ozone, their additional health harms from the Repeal Rule's increased ozone are certainly impending, which Respondents do not seriously contest.[4] Pinsky ¶¶32-34.

In short, increased air pollution and GHG emissions from the Repeal Rule *will* harm J.K., Elena, Maya, and E.S during the stay period. Petitioners' evidence far surpasses the required showing for standing. *See Diamond Alternative Energy, LLC*

---

[3] EPA quotes Dr. Running out of context to portray him as taking a position he does not—that vacating the Repeal Rule cannot benefit Petitioners *unless* all other GHG emissions are eliminated. EPA Opp. 10. Dr. Running's point is that "[a]llowing additional GHG emissions to enter the atmosphere from the Repeal Rule worsens the already dangerous planetary conditions that threaten Petitioners' lives." Running ¶7.

[4] Prof. Johnston's declaration should be disregarded because he is a law professor offering legal opinions on causation, and he has "no qualifications" in science. *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1153-54 (9th Cir. 2012). "[T]he examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." *Richardson by Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 831 n.55 (D.C. Cir. 1988).

*v. EPA*, 606 U.S. 100, 123, 114 (2025) (no redressability where relief "would actually have zero impact"; one theoretical dollar suffices).[5]

Even if Respondents were correct (they are not) that Petitioners face *only* an increased "risk of harm," *that* is sufficient for standing and a stay. EPA Opp. 5 (conceding Petitioners' experts show an increased risk); *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613 (D.C. Cir. 1980); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010). Standing to seek a stay "requires only a likelihood of irreparable injury[.]" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016). Courts "plainly recognize[] that a remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). By insisting otherwise, Respondents improperly "raise the standing hurdle higher than the necessary showing for success on the merits[.]" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

---

[5] This case presents no political question because the remedy sought—vacatur—requires no "judicial[] mold[ing]", and the facts provide the necessary standards for determining "the duty" and "its breach." *Baker v. Carr*, 369 U.S. 186, 198 (1962). Observant Jews must attend synagogue on Saturdays and can only walk there—facts unchanged for thousands of years. *Compare* L.K. ¶15, *with Rucho v. Common Cause*, 588 U.S. 684, 701 (2019) (political preferences change). Heat indices above 90ºF pose "serious risk of harm". *Yates v. Collier*, 868 F.3d 354, 360-61 (5th Cir. 2017); *contra* EPA Opp. 9 ("unconstitutionally hot"). No amount of particulate matter or ozone is safe to breathe. Pinsky ¶¶32, 38-39. And for Elena and Maya, who have underlying health conditions and whose air is already in nonattainment for these pollutants, *any* increase allowed by the Repeal Rule endangers health and life. Pinsky ¶¶18, 21, 29, 33.

4

Contrary to Respondents' factual-deference argument (Priv. Opp. 12; EPA Opp. 4-5, 8), Private-Intervenors' cited case gave "extreme" deference to EPA's 2009 Endangerment Finding because "[t]he body of scientific evidence marshaled by EPA in support of [it] is substantial." *Coal. for Responsible Regul., Inc. v. EPA*, 684 F.3d 102, 120 (D.C. Cir. 2012). By contrast, EPA's post-2025 "scientific analysis" supporting the repeal of the Endangerment Finding was discredited by the scientific community, and EPA's bait-and-switch conclusion that the Repeal Rule will have a *de minimis* impact on climate change—contrary to scientific evidence and EPA's past findings—is presently subject to a motion to complete the record in this Court. *See* Doc. 2174286; Running ¶¶52-55; Mot. Ex. 6 at 3-4; Ex. 3 (AMS Comment); Ex. 4 (UCS Comment). EPA itself acknowledged "EPA is not basing [the Repeal Rule] on uncertainty about the scientific basis for the Endangerment Finding", and EPA concluded GHG emissions from transportation are particularly dangerous for children like petitioners—indeed, that was a basis for the original Endangerment Finding. Mot. Ex. 5 at 310; 74 Fed. Reg. 66498, 66509, 66526, 66530-31; Ex. 5, Attachment 2. No credible scientist agrees with EPA's rewrite of facts and Respondents offer none. Mot. Ex. 6 at 4; Ex. 5, Attachments 7, 10, 22 (former officials' comments on administration's approach to climate science).

Contrary to Respondents' argument that agency rules that *remove* regulations can do no harm, "the fact that a regulation was designed to produce a particular effect

on the market ordinarily means that the likely result of vacating that regulation would be to reduce that effect on the market." *Diamond*, 606 U.S. at 117, 112. Nor is the causal chain broken by third-party conduct. Both sides' declarants agree the Repeal Rule, as designed, will reduce production and demand for electric vehicles ("EVs"), and that the expected result is more internal combustion engine ("ICE") vehicles on the road, emitting more GHGs and ambient air pollution. *See* Sperling ¶¶14-21, 35-36, 41-43, 48-49; Priv. Opp. 1 (repealed standards "would compel widespread electrification"), Ex. A Modlin ¶¶4-5, Ex. B Garrahan ¶¶15, 20; Doc. 2164781, Ex. G ¶¶5, 10 (repealed standards would "force" Memphis truck fleet (where Petitioner E.S. lives) to electrify). "To deny standing based on a theory that invalidating an important regulation would actually have zero impact on a dynamic and heavily regulated market requires a degree of economic and political clairvoyance that is difficult for a court to maintain." *Diamond*, 606 U.S. at 123.[6] Nor is standing reserved for regulated parties. *Id.* at 112. Petitioners have standing.

## B.    State-Derived Liberty Interest

If a state "create[s]" an interest and "recogniz[es] that its deprivation" is prohibited under state law, the Due Process Clause protects that interest. *Wolff v.*

---

[6] The out-of-circuit case Respondent States cite, *Juliana v. United States*, is easily distinguishable. States Opp. 8 (citing 947 F.3d 1159, 1164-65 (9th Cir. 2020)). The injury in *Juliana* was deemed not redressable for lack of judicial power to order a court-supervised remedial plan to remedy 50 years of mostly past conduct. The remedy here, vacatur, poses no such issue.

6

*McDonnell*, 418 U.S. 539, 557 (1974). No Respondent disputes that Petitioners N.N. and Taylin have "an expectation or interest created by" Hawai'i's constitutional-transportation-emissions settlement. Mot. 18 (citing cases). Nor do Respondents dispute the Repeal Rule hinders Hawai'i's compliance with the settlement. Mot. 20.

Instead, EPA argues that because Hawai'i remains legally obliged to meet the settlement's terms, the Repeal Rule does not infringe on N.N and Taylin's interest in the settlement. EPA Opp. 19. But that misses the point. In the settlement, the parties agreed HDOT needs "[a]vailability and delivery of new vehicles and technologies from private parties (such as medium- and heavy-duty electric vehicles)." N.N., Ex. A. Because the Repeal Rule "makes it harder for Hawaii to meet emission targets it had agreed to in the settlement" as EPA tacitly concedes, the Repeal Rule infringes N.N.'s and Taylin's state-protected interests. EPA Opp. 18-19; Mot. 26, 19 (citing evidence).

EPA's attempt to distinguish *United States v. Windsor* fails. 570 U.S. 744 (2013). There, the Defense of Marriage Act ("DOMA") did *not*, as EPA says, "displace[] state-conferred protection." EPA Opp. 19. DOMA "by its terms" applied only to federal agencies—not to states—just as the Repeal Rule does not disturb the legal force of Hawai'i's settlement. EPA Opp. 19; 570 U.S. at 752, 765. *Nevertheless*, DOMA violated the Fifth Amendment because DOMA "injure[s]

7

those whom the State . . . sought to protect," just like the Repeal Rule. 570 U.S. at 775; EPA Opp. 19.

Respondents' remaining arguments are doublespeak. Private-Intervenors say EPA—not Hawai'i—sets emission standards under the Clean Air Act ("CAA"), yet also, that EPA lacks authority under the CAA to set those standards. *Compare* Private Opp. 20, *with id.* 15. State-Intervenors say the CAA preempts Hawai'i's settlement to reduce emissions within Hawai'i, yet do not disagree that under the CAA, "air pollution control at its source is the primary responsibility of States[.]" 42 U.S.C. § 7401; Mot. 18; State Opp. 9. Respondents cannot have the law both ways. Petitioners are likely to succeed on their state-derived Fifth Amendment claim.

### C.    Religious Freedom Restoration Act

Petitioners have exhausted remedies for their RFRA claims because their comment raised religious-exercise concerns "with reasonable specificity." 42 U.S.C. § 7607(d)(7)(B). Petitioners' comment "advise[d]" EPA that the Repeal Rule "is violative of . . . the legal mandate . . . not [to] deprive children of their . . . religious traditions," including through "increased heat exposure," and provided the scientific basis for the violation. Mot. Ex. 6 at 1-3, 8. Petitioners' comment gave "notice of the challenge . . . and a chance to consider in substance, if not in form, the same

8

objection now raised in court"; that is enough. *Ohio v. EPA*, 603 U.S. 279, 296 (2024) (citation modified).

Respondents do not contest the sincerity of Petitioners' religious practices and beliefs, arguing instead the Repeal Rule's burden on J.K, E.S., M.D., and Elena is not "substantial" because it does not "coerce" them to do anything. But it does: the Repeal Rule coerces J.K. and E.S. not to walk to synagogue as their religion commands by making it physically too unsafe, more often, for them to walk there, and it coerces M.D. and Elena similarly. Mot. 9-12. Because the Repeal Rule puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs," "[a] substantial burden exists[.]" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008).[7] Preventing observant Jews from participating in required religious services qualifies as a substantial burden. *See Ramirez v. Collier*, 595 U.S. 411, 426 (2022).

The Repeal Rule also unlawfully restricts and impedes J.K. and E.S. from developing knowledge, values, and habits fundamental to their religion which they or their parents wish them to master. Mot. 10-11. The facts here are *more*—and more *directly*—coercive than in *Mahmoud v. Taylor*. *Compare* 606 U.S. 522, 533, 565 (2025) (finding reading LGBTQ-inclusive books poses "a very real threat of

---

[7] Unlike *Kaemmerling*'s plaintiff, Petitioners here "identify an[] exercise which is the subject of the burden to which [they] object[]." 553 F.3d at 679.

undermining the religious beliefs and practices that the parents wish to instill"), *with* L.K. ¶¶21-22, *and* E.S. ¶23.

Respondents are incorrect that "RFRA is violated only if the government regulates them." EPA Opp. 13-15; *see, e.g.*, *Ramirez*, 595 U.S. at 426 (plaintiff-adherent's exercise burdened by rule regulating pastor's actions); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 478 (2020) (protects against "indirect coercion"). The cases EPA cites are distinguishable or bad law. *Compare Real Alternatives, Inc. v. Sec'y of HHS*, 867 F.3d 338, 361 (3d Cir. 2017) (providing employees "a choice" they can refuse is not a substantial burden), *with* E.S. ¶22 ("I'm unable to go to synagogue"); *Priests For Life v. U.S. HHS*, 772 F.3d 229, 246 (D.C. Cir. 2014), *vacated sub nom. Zubik v. Burwell*, 578 U.S. 403, 408 (2016) (vacated to allow parties to "accommodate[] petitioners' religious exercise").

Respondents' reliance on *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)—a pre-RFRA case that interpreted the right narrowly—is misplaced because "RFRA was designed to provide very broad protection for religious liberty. By enacting RFRA, Congress went far beyond what this Court has held is constitutionally required." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). RFRA specifies "Government *shall not* substantially burden a person's exercise," except "only" if the government's action survives strict scrutiny. 42 U.S.C. § 2000bb-1 (emphasis added).

10

Because Petitioners have likely shown a substantial burden, the burden shifts to Respondents to satisfy strict scrutiny. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Because Respondents ***made no effort*** to meet their burden, Petitioners, as movants for a stay, "must be deemed likely to prevail" on the merits of their RFRA claim. *Id.*; Mot. 24.

RFRA authorizes any "appropriate relief against a government." 42 U.S.C. § 2000bb-1. Relief broader than an individual exception, such as vacatur, is appropriate when "there is no way 'to peel off just the portion of the nuisance that harmed the plaintiff,'" as here. *Trump v. CASA*, 606 U.S. 831, 852 (2025) (citation omitted); *see, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993); *Loe v. Jett*, 796 F. Supp. 3d 541, 583 (D. Minn. 2025). The remedy here—vacatur—is appropriate under RFRA. *Contra* EPA Opp. 9.

### D.    Fifth Amendment Life and Liberty

Petitioners allege the Repeal Rule violates two Fifth Amendment rights: Life, and Liberty interests in bodily integrity and personal security. Respondents rewrite Petitioners' motion by rebutting narrow straw-man rights that Petitioners have *not* invoked. *See* EPA Opp. 16-17; Priv. Opp. 19; States Opp. 7-9. Fundamental constitutional rights must be defined broadly where, as here, the right's "essential attributes" "ha[ve] been long protected." *Obergefell v. Hodges*, 576 U.S. 644, 665 (2015). For example, because the essential attributes of the (broad) "right to marry"

11

had long been protected, the Supreme Court did not narrowly construe the right as "same-sex marriage." *Id.* Here, because Life and Liberty regarding bodily integrity and personal security have long been protected, *see* Mot. 13-17, Respondents cannot narrow the rights to a "pollution-free environment." By opposing *only* narrowly-construed, unrecognized rights, Respondents tacitly acquiesce to Petitioners' prima facie showing of Life and Liberty violations. *See* Mot. 13-18.

Although Petitioners did not brief the state-created danger doctrine, *contra* EPA Opp. 17, EPA admits "the government could violate substantive due process if it affirmatively creates danger," and EPA is not wrong that children "in this country [are] in EPA's custody [over air quality] and thus the government would owe [them] some duty of safety." EPA Opp. 17-18; *see, e.g.*, Maya ¶7 (outdoor air "permeate[s]" Maya's home; "[t]here [is] nowhere safe for me to breathe."); C.E. ¶¶ 4, 7-10. The Repeal Rule exacerbates and makes more frequent Maya's and C.E.'s injuries, affirmatively creating additional danger. Wilson ¶6; Running ¶¶30-39; Pinsky ¶¶21, 43.

Because government has no discretion to violate fundamental rights, such violations receive strict scrutiny—not rational basis—even if the government action is "legislative". *Powell v. Pennsylvania*, 127 U.S. 678, 685 (1888); *Dunn v. Blumstein*, 405 U.S. 330, 338 (1972); *contra* States Opp. 10. Respondents waive

12

their opportunity to satisfy strict scrutiny. Petitioners are likely to prevail that the Repeal Rule is unconstitutional.

### E.    EPA Failed to Respond to Significant Comments

Petitioners did challenge a fundamental premise for the rule—the invasion of their life, liberty, and religious rights. Mot. Ex. 6. at 2, 5, 8. Respondents do not argue that EPA conducted a responsive analysis in its rulemaking to address "the major [constitutional] legal interpretations and policy considerations" affecting children's fundamental rights as required by 42 U.S.C. § 7607(d)(3)(C).

Even under rational-basis review, it is not rational for EPA to rely on its interpretation of the CAA the Supreme Court expressly "forecloses", especially post-*Loper Bright*. *Massachusetts v. EPA*, 549 U.S. 497, 528 (2007); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024); Mot. 24. The Major Question Doctrine does not save the Repeal Rule, *contra* Priv. Opp. 14-15, because *West Virginia v. EPA* never questioned EPA's authority to regulate greenhouse gas emissions of power plants, much less vehicles; it only prohibited the specific method EPA employed. 597 U.S. 697, 732 (2022).

The Court need not turn a blind eye to EPA's driving premise: Executive Order 14154 told EPA to eliminate all undue burdens on fossil fuels and to reconsider the Endangerment Finding because of that directive. EPA did so without

13

a sideways glance at the Constitution, Supreme Court *majority* opinions, credible science, or the Nation's children.

## II.    Petitioners Face Irreparable Harm

Violation of a constitutional right is a per se irreparable injury. Mot. 27 (citing cases). State Intervenors' contrary assertion is wrong, as their cited case illustrates. States Opp. 21. Petitioners allege injury *to their* vested constitutional rights, not injury *from* litigating before an officer whose appointment violated the Appointments Clause. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1333-34 (D.C. Cir. 2024).

The irreparable harm analysis encompasses not only harm *befalling* Petitioners during the stay period, but also harm "locked in" during that period that "could not later be clawed back." *In re NTE Connecticut, LLC*, 26 F.4th 980, 985, 991 (D.C. Cir. 2022). "Damocles's sword does not have to actually fall on all appellants before" a stay will issue. *Newby*, 838 F.3d at 8-9. Dr. Sperling concludes the Repeal Rule will irretrievably "lock in" 942.2 MMT, not the 111.2 MMT State Intervenors misleadingly quote. Sperling ¶49; *contra* States Opp. 16. Even if model year ("MY") 2027 is locked in, emissions from MY 2028-2029 and beyond remain fully at stake in this stay motion. Sperling ¶¶17-18; Sperling Suppl. ¶16 (Ex. 6); *accord* Priv. Opp. 11.

EPA agrees GHGs "persist in the atmosphere"; i.e., are irretrievable. EPA Opp. 9. Respondents argue without scientific or expert support that the Repeal Rule's increase in local hot weather is "negligible," but that is false. *See supra* I.A.; Mot. 14-15, 27; Mot. Ex. 6 at 2-3.[8]

*Farmworkers* is analogous. *Contra* States Opp. 20-21; *Nat'l Ass'n of Farmworkers Orgs.*, 628 F.2d at 606, 613-14. The Repeal Rule, like the *Farmworkers* waiver, withdraws the protection that the status quo ex ante afforded to children—here, authorizing Petitioners' exposure to increased ozone, heat, and wildfire smoke. *See supra* I.A.

Petitioners did not delay. Petitioners filed their appeal the day the Repeal Rule was published and requested a stay from EPA before moving this Court prior to the deadline for procedural motions. Petitioners worked diligently to prepare a fact-intensive motion supported by 18 expert and lay declarations. The time it took did not render the stay moot; Respondents' cited cases are thus distinguishable. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (procedural claim, and delay rendered preliminary injunction "all but futile"); *Fontem US, LLC v. U.S. FDA*, No. 22-1076, 2022 WL 2761393, at *1 (D.C. Cir. July 12, 2022) (did not "seek a stay from the agency"). Irreparable harm exists.

---

[8] Law professor Johnston's conflation of causation with detectability does not change this; it merely illustrates why lawyers should not pose as scientists. *Contra* Priv. Opp. 23.

15

### III.    The Equities Favor a Stay

Petitioners have shown "great harm that will befall them" from the emissions locked in "during merits litigation." *See supra* I.C., I.A., II; *contra* EPA Opp. 22.

State Intervenors agree *Mirabelli v. Bonta* says "children's safety is the overriding equity." 607 U.S. 492, 497 (2026); Mot. 29; State Opp. 24. Their purported distinction—"*Mirabelli* involved a specific injunction"—fails because the equivalent is true here, too. States Opp. 24.

EPA says a stay would irreparably injure the government by preventing it from "carrying out its responsibilities under 'statutes enacted by representatives,'" without citing any statutes. EPA Opp. 23. Government exists to protect liberty, not the other way around. Decl. of Indep. ("Governments are instituted among Men . . . to secure these rights"); *Newby*, 838 F.3d at 12; *Massachusetts*, 549 U.S. at 533 ("If EPA makes a finding of endangerment, the Clean Air Act requires the Agency to regulate emissions of [GHGs] from new motor vehicles.").

The parties agree that regulatory whiplash wreaks havoc on industry, but the whiplash comes not from a stay, but from the Repeal Rule eviscerating the regulatory paradigm that existed from 2009-2026 that automakers want intact. Mot. 1-4, 29-30; Sperling Suppl. ¶¶3-6.

Private Intervenors are incorrect that the repealed standards for trucks are now infeasible. *Contra* Priv. Opp. 24-25; Sperling Suppl. ¶¶7-16. Moreover, the repealed

standards gave automakers two ways to comply: "invest in EVs or pay EV manufacturers for emission credits[.]" Sperling ¶34. "Vehicle manufacturers universally expected the [Repeal] rule [ ] to be vigorously challenged in court and potentially stayed." Sperling ¶24. "Fully aware of that risk," automakers made "conscious, calculated choice[s]" to move away from compliance with the standards *even before repeal*, because "ICE vehicles earn companies more profits than EVs." *Id.* Any difficulty automakers would have now in meeting the repealed 2027 standards are self-inflicted. *See, e.g.*, *In re Polar Bear Endangered Species Act Listing & §4(d) Rule Litig.*, 818 F. Supp. 2d 240, 255 (D.D.C. 2011), *aff'd*, 720 F.3d 354 (D.C. Cir. 2013); *Lemon Bay Cove, LLC v. United States*, 160 Fed. Cl. 593, 613 (2022).

Private Intervenors offer no proof that a stay would require automakers to "destroy" physical capital or thousands of jobs. *Contra* Priv. Opp. 25-26. Conversely, Petitioners' experts documented the destruction of EV physical capital and jobs already underway due to the Repeal Rule. Mot. 30.

## CONCLUSION

Youth Petitioners deserve a stay to protect their fundamental rights.

DATED: July 16, 2026                    Respectfully submitted,


                                        */s/ Julia A. Olson*
                                        Julia A. Olson (D.C. Cir. Bar 54969)

17

Andrea Rodgers (D.C. Cir. Bar 66983)
Nathan Bellinger
Laura Mebert
OUR CHILDREN'S TRUST
1216 Lincoln Street
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org
laura_m@ourchildrenstrust.org

Daniel C. Snyder (D.C. Cir. Bar 66846)
Haley Nicholson (D.C. Cir. Bar 65084)
Public Justice
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Counsel for Petitioners*

18

## CERTIFICATE OF COMPLIANCE

I certify that this filing contains 3,996 words, excluding the parts exempted by Fed. R. App. P. 32(f). A timely motion to exceed length limit was filed on July 9, 2026, requesting to exceed the limit in Fed. R. App. P. 27(d)(2)(C) by 1,400 words. ECF 2182595. As the motion was not acted upon by the filing date, pursuant to Circuit Rule 27(g)(4), this overlength motion is being timely filed pending the Court's ruling on Petitioners' motion at ECF 2182595.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word with 14-point Times New Roman font.

/s/ *Julia A. Olson*
Julia A. Olson (D.C. Cir. Bar No. 54969)
OUR CHILDREN'S TRUST
1216 Lincoln Street
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org

*Counsel for Petitioners*

19

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on July 16, 2026, which will serve each party.

/s/ Julia A. Olson
Julia A. Olson (D.C. Cir. Bar No. 54969)
OUR CHILDREN'S TRUST
1216 Lincoln Street
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org

Counsel for Petitioners

20

# EXHIBIT 1

ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ELENA VENNER, *et al.*,
          *Petitioners*,

    v.

UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY, *et al.*,
          *Respondents*.

Case No. 26-1038
Lead Case No. 26-1037
(and consolidated cases)

**SUPPLEMENTAL DECLARATION OF L.K.
IN SUPPORT OF PETITIONERS' MOTION TO STAY
THE FINAL RULE PENDING REVIEW**

I, L.K., hereby declare and if called upon would testify as follows:

1.      I am the mother and guardian of Petitioner J.K. in the above-entitled action. I am making this supplemental declaration in support of the Motion to Stay the Repeal Rule. I have personal knowledge of the facts I state herein and if called to testify, I would and could testify competently thereto.

2.      I am over the age of 18, a citizen of the United States, and a resident of Westchester County, New York. I am using my initials to protect the identity of my minor child.

1

3.      I am submitting this declaration in response to statements in the Intervenor-Respondent States' brief that mischaracterize my son's increasing exposure to extreme heat, and how such increasing exposure to heat prevents him from walking to synagogue, as "generalized worries" that are not "certain to occur."

4.      In response, I wanted to provide a very specific example of how the increasing heat is already interfering with my son J.K.'s faith practices, as happened this past weekend.

5.      This past week we suffered a tremendous heatwave. On Wednesday, July 1, 2026, the temperature rose steadily to near 100ºF. It was similarly hot on Thursday and Friday. Due to the heat, we could not do much outside. As Friday drew closer, I began to wonder what *Shabbat* would bring regarding our walk to synagogue. By Thursday evening it became apparent that it would likely be too hot to go to synagogue on Saturday.

6.      Because we power down all electronics for *Shabbat* shortly before sundown each Friday, on Friday afternoons I check the weather forecast for *Shabbat*. This past Friday, July 3, 2026, I opened my phone's Weather app to check the forecast for Saturday—*Shabbat*—and it showed a high of 95ºF. Below is a screenshot of the forecast I saw. As I looked at the temperatures specifically for the time we would have to walk to synagogue and back, I knew we would not be able to go because it would be too hot.

2



7.

8.     Because we had already seen it would be too hot to go to synagogue on *Shabbat*, we spent the day indoors and barely went outdoors. We did not get to see anyone from our faith community, and we could not attend synagogue services. It undermined the practices and values my husband and I wish to instill in J.K. and our other children to inspire them to adhere to this tradition. It is challenging to convince our impressionable children of the beauty of our religion when they are forced to spend the entire *Shabbat* indoors and isolated until *Shabbat* concludes at sunset.

9.     My family is currently experiencing the effects of already-trapped heat. Additional trapped heat due to the Repeal Rule will mean more *Shabbatot* like this one: it will mean being able to attend fewer *Shabbat* services than we would have attended otherwise. For reasons explained in my previous declaration, the more days with extreme heat we have to endure, the more often our family, including J.K., will be prevented from attending synagogue on *Shabbat* as our faith commands, and the less able I am to nurture and protect my son's religious practices the way God's law dictates.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 8, 2026 in Westchester County, New York.

*L.K.*

L.K.

4

# EXHIBIT 2

# Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles

## Regulatory Impact Analysis

Assessment and Standards Division
Office of Transportation and Air Quality
U.S. Environmental Protection Agency

United States
Environmental Protection
Agency

EPA-420-R-24-004
March 2024



**Figure 7-9: Projected changes in 8-hour maximum average ozone concentrations in 2055 ozone season from "onroad-only" emissions changes.**

When only the onroad emissions impacts of the rule are considered, 8-hour maximum average ozone concentrations will decrease by an average of 0.09 ppb in 2055, with a maximum decrease of 0.70 ppb. The population-weighted average change in 8-hour maximum average ozone concentrations attributable to the onroad emissions reductions will be a decrease of 0.16 ppb in 2055.

### 7.4.2.3 Projected Ozone Design Value Impacts in 2055

This section summarizes the impacts of the final rule on projected ozone design value concentrations in 2055, based on our CMAQ modeling. Figure 7-10 presents the annual maximum 8-hour ozone design value concentrations in 2055. Not all counties have monitor data that meet the requirements to calculate a design value concentration; counties without a calculated design value are left white on the map.

# EXHIBIT 3

Adopted as an AMS Statement on 08/27/25 by the Executive Committee of the AMS Council

The Practice and Assessment of Science:
Five Foundational Flaws in the Department of Energy's 2025 Climate Report

Here we identify five foundational flaws in the Department of Energy's (DOE's) 2025 Climate Synthesis report[1]. Each of these flaws, alone, places the report at odds with scientific principles and practices. For the report to accurately characterize scientific understanding and to be useful as a basis for informed policy and decision making, the DOE must first rectify all five flaws and then conduct a comprehensive assessment of scientific evidence. Were DOE to do so, the result will almost certainly be conclusions that are broadly consistent with previous comprehensive scientific assessments of climate change, such as those from the National Academies of Sciences, Engineering, and Medicine (NASEM); American Association for the Advancement of Science (AAAS); Intergovernmental Panel on Climate Change (IPCC), American Meteorological Society (AMS), and a wide-range of other scientific organizations.

The Department of Energy's recent attempt to synthesize climate science has five foundational flaws as a scientific effort:

1) **Lack of breadth across scientific fields**. The science of climate change spans dozens of fields and sub-fields within the physical, natural, and social sciences relating to the Earth and environment. These include (but are not limited to): atmospheric physics; atmospheric chemistry; oceanography (physical, chemical, and biological); cryology; glaciology; biology; physiology; biogeography; biogeochemistry; health; and economics; among others. Each of these disciplines has hundreds of practicing scientists—tens of thousands of scientists overall. No group of five scientists can possess the disciplinary breadth encompassed by all who study climate change[2]. To be credible, scientific assessments must include authors who can characterize the full breadth of scientific evidence.

2) **Lack of depth within scientific fields and specific topics**. Comprehensive assessment of any specific scientific topic must account for the full range of scientifically defensible views among the relevant subject matter experts—those who are familiar with the evidence of that specific topic[3]. For virtually any specific

---

[1] This document emphasizes overarching flaws with the process used in the development of the DOE report. Point-by-point rebuttals of specific evidence and conclusions also have value but are beyond the scope of this document (and are available from and being prepared by other climate scientists).

[2] For illustration, the scientific assessments by the IPCC include three distinct working groups each of which has hundreds of scientists serving as contributing authors distributed among twelve or more chapters. Each chapter synthesizes the results from hundreds of scientific papers. Thousands of additional scientists provide independent reviews of each IPCC chapter. Assessments from the National Academies of Sciences involve similar numbers of experts for comparable scientific topics.

[3] For illustration, the chapter on Water Cycle Changes in the most recent IPCC synthesis (one of 47 chapters in the full assessment) included more than 60 authors: 3 coordinating lead authors, 12 lead

Adopted as an AMS Statement on 08/27/25 by the Executive Committee of the AMS Council

scientific field or topic within that field, five authors would be insufficient to capture the depth of knowledge and range of views, even if all were narrowly focused on that specific topic and independent of one another.

To be credible, scientific assessments must include authors who reflect the full range of defensible views among the subject matter experts within every specific area of science that is included in the assessment.

3) **The DOE Report is based on an unrepresentative group of subject matter experts**. The five DOE authors do not appear to be a random sample of climate scientists but a biased selection. They seem to have been chosen based on a shared disagreement with the larger community of subject matter experts.

Unusual perspectives and disagreement are important within the scientific process because they can generate alternative plausible explanations; identify needs for additional inquiry; or challenge the thinking of the larger community of subject matter experts. However, scientific assessments that emphasize unusual views are unrepresentative of the larger community of subject matter experts.

Valid assessments need to consider all evidence and all views and weigh them only on their merits. Scientific merit increases with independent replication, corroboration, and conclusions that withstand the scrutiny of those who know the subject. Scientific merit decreases with obvious flaws in logic or experimental design, biased selections of scientific evidence (i.e., cherry picking), or emphasis on weakly supported evidence.

Notably, the views put forth in the DOE report are not new. They have been thoroughly tested and considered by the larger community of scientists. Those views have been incorporated in previous comprehensive assessments—to the extent justified by their scientific merit. In contrast, robust conclusions of the larger scientific community that follow from comprehensive assessment of the evidence, are not represented in the DOE report. To be credible, scientific assessments must be representative of expert judgement that is based only on the scientific merit of the evidence.

4) **The DOE Report selectively emphasizes a small set of unrepresentative findings, particularly those that might appear beneficial on superficial examination. This "cherry picking" also downplays and excludes scientific findings that might be widely understood to be harmful**. For

---

authors, and 47 contributing authors. Two chapter scientists and two review editors also contributed to assessment of evidence.

Adopted as an AMS Statement on 08/27/25 by the Executive Committee of the AMS Council

example, the document focuses simplistically on one of the direct effects of carbon dioxide on photosynthesis and DOEs not consider other important aspects of biological responses to carbon dioxide[4] or the impact that warming is having on organisms and biological systems, which include altering: species locations; timing of key life events; and the provision of goods and services from natural and managed systems[5]. The report also downplays or ignores the impact of warming on the physical characteristics of the Earth (weather patterns; where land meets ocean; where ice and snow occur; the location, amount, and timing of water flows)[6]; and impacts of climate change on virtually every aspect of social and economic life, including: public health; agricultural productivity; transportation; energy supply and demand; and national security.[5]

Notably, the writing team of this report DOEs not appear to include any authors with subject matter expertise in biology (foundational flaw 1) and DOEs not seem to reflect the views of biologists with respect to the impacts of carbon dioxide and climate change (foundational flaw 2). Both flaws likely contribute to the report reaching conclusions so inconsistent with the conclusions of comprehensive assessments (see IPCC WG 2, for example).

5) **The DOE Report extrapolates from a limited subset of findings to reach conclusions that do not follow from comprehensive consideration of the scientific evidence.** The impacts of climate change will be vast and will touch virtually every aspect of our lives. Given the vastness of impacts, it is not surprising that a small fraction of impacts may be beneficial (or seem beneficial with cursory examination). However, it is misleading to extrapolate from a small and biased selection of potential impacts to suggest the outcomes for humanity will be positive.

Why are negative impacts from global-scale environmental disturbance vastly more likely? The changes in climate that people are causing are larger and faster than any humanity is known to have endured over the last 10,000 years[7]. Furthermore, physical, biological, economic, and social systems are tuned to climate and highly sensitive to climate change. A wide range of harmful impacts are already occurring and are expected to greatly outnumber and outweigh positive outcomes (as described above).

---

[4] A wide range of direct impacts of carbon dioxide on crops and natural biological systems have been identified, including ones that are disruptive and understood to be harmful: variable responses among species; decreases in plant nutritional quality; greater success of weedy species and pests; ocean acidification; and impacts that cascade throughout systems and food webs.
[5] IPCC WG2, AR6: https://www.ipcc.ch/report/ar6/wg2/
[6] IPCC WG1, AR6: https://www.ipcc.ch/report/ar6/wg1/
[7] D. Kaufman et al., *Sci. Data* **7**, 201 (2020). https://doi.org/10.1038/s41597-020-0530-7

Adopted as an AMS Statement on 08/27/25 by the Executive Committee of the AMS Council

> To be credible, scientific assessments cannot: extrapolate from a small and unrepresentative subset of potential outcomes; emphasize contentious or weakly supported scientific evidence; dismiss scientifically robust contradictory evidence; or ignore—in the case of climate change—the wide range of harmful impacts that are occurring and expected.

The five foundational flaws described here demonstrate that the report is inconsistent with the scientific principles and practices needed to accurately assess evidence. Furthermore, the total number of foundational flaws at least suggests that the underlying motivation of the report was not to comprehensively assess the science of climate change—wherever the evidence may lead—but to arrive at pre-drawn conclusions that are at odds with comprehensive assessments of scientific evidence. Therefore, its representation of scientific understanding and its conclusions are not scientifically defensible. As such, the report findings cannot be used as the basis for informed decisions about climate change, including with respect to emissions policy, adaptation, and investments in infrastructure.

Notably, the evidence relating to climate change has been comprehensively assessed hundreds of times by independent subject matter experts and scientific organizations that are motivated to be scientifically accurate (whose credibility increases with scientific accuracy or diminishes with scientific errors).[8]

Five conclusions are robust when accounting comprehensively for the scientific evidence. They have been consistently reaffirmed by independent subject matter experts and independent scientific institutions worldwide. Decades of intensive research on climate change demonstrate that:

1) **Climate is changing, and the rate and magnitude of change are unusual in human experience.**
2) **People are the primary cause of modern climate change, mostly through burning fossil fuels.**
3) **Climate change is harmful to humanity, and the threats to people and all life are increasing.**
4) **A wide range of response options is available that can reduce the dangers of climate change.**
5) **Those who study the scientific evidence overwhelmingly agree.**

---

[8] The NASEM, AAAS, and AMS all represent many fields of science and what they say about any one field reflects on their credibility in all other fields. Rigorous, robust, and accurate assessments of scientific evidence for one field (e.g., climate change) enhances credibility and standing. In contrast, scientific errors and inaccuracies in any one area diminish credibility and standing in all other areas of science.

# EXHIBIT 4

# Comments of the Union of Concerned Scientists Regarding the Proposed Repeal of Vehicle Greenhouse Gas Emissions Standards

## *Submitted to Docket # EPA-HQ-OAR-2025-0194*

### HIGHLIGHTS

*EPA asserted without evidence that greenhouse gas emissions standards would adversely impact air quality in its proposal. UCS analysis shows clearly that not only are greenhouse gas emissions standards protective of public health and welfare by reducing the impacts of global climate change, but the repeal of these standards will be detrimental to local air pollution by increasing emissions of particulate matter and smog-forming pollutants.*

Dr. Dave Cooke

September 2025



**CONTENTS**

**1   Introduction  3**

**2   Air Quality and Fleet Turnover Response to EPA Request for Comment C-13   5**

Modeling the light-duty vehicle fleet                                                                5

   **Table 1.** Monetized health-related harms from the proposed repeal of light-duty vehicle greenhouse gas standards, as modeled by EPA (2022$)                                                  10

Heavy-duty vehicles                                                                              11

   **Figure 4.** Comparison of the maximum rate of adoption for electric vehicles, by year   15

   **Table 3.** Share of heavy-duty vehicle miles traveled, by emissions tier            22

   **Table 4.** Percentage change in share of heavy-duty vehicle miles traveled, by emissions tier, in the compliance scenario compared to the market-based scenario          22

   **Table 5.** Gasoline and diesel consumption by heavy-duty vehicles, with and without greenhouse gas emissions standards                                                        23

   **Table 6.** Comparison of grid emissions factors (tons per TWh)                    25

   **Table 7.** Air pollution impacts from repealing heavy-duty vehicle greenhouse gas emissions standards, by source (tons)                                                        25

   **Table 8.** Monetized health impacts from repealing heavy-duty vehicle greenhouse gas emissions standards, by source (millions of 2022$)                                        26

**3   Regulatory Text Related to Other Emissions Regulations Response to EPA Request for Comment (C-3, C-16, C-19, C-20)     28**

Battery warranty and durability provisions                                                      29

Miscellaneous unrelated provisions deleted in the proposal                                      30

**4   EPA HDV Regulations and CAFE Response to EPA Request for Comment C-17 and C-18     31**

**5   Conclusions  36**

References                                                                                        37

# 1  Introduction

In its proposal, EPA has outlined four distinct rationales for eliminating vehicle greenhouse gas emissions standards:

1.  The agency concludes that the Clean Air Act does not provide the authority to regulate greenhouse gas emissions.[1]

2.  The agency concludes that even if the Clean Air Act did provide the authority, the scientific data does not support the conclusion that greenhouse gas emissions from vehicles cause or contribute to endangerment to public health and welfare.[2]

3.  The agency concludes that there is no "requisite technology" to control GHG emissions from light-, medium-, and heavy-duty vehicles.[3]

4.  The agency concludes that compliance with vehicle greenhouse gas emissions standards will have a negative impact on air quality due to fleet turnover.[4]

While all of these rationales are faulty, this comment responds solely to the question of fleet turnover and air quality impacts, which the agency has neglected to model and for which modeling clearly refutes the agency's assertions (C-13, C-21). Additionally, we respond to the agency's improper elimination of regulatory text related to criteria emissions controls (C-3, C-16, C-19, C-20) and fuel economy (C-17, C-18) under the guise of removing regulatory text related to greenhouse gas emissions.

For responses to the first two rationales on the agency's misguided proposal to repeal the endangerment finding, for which there is no justifiable scientific or legal basis, we would direct the agency to public comments submitted to this docket by the Center for Biological Diversity, *et al.*, addressing the numerous legal deficiencies in EPA's decisionmaking and interpretation of the Clean Air Act with respect to its proposed repeal of the Endangerment Finding;[5] to public comments submitted to this docket by the Union of Concerned Scientists regarding the repeal of the Endangerment Finding, emphasizing the scientific basis of the 2009

---

[1] *"We now believe that regulating GHG emissions based on global climate change concerns exceeds our statutory authority under CAA section 202(a)." 90 FR 36297.*

[2] *"There is insufficient reliable information to retain the conclusion that GHG emissions from new motor vehicles and engines in the United States cause or contribute to endangerment to public health and welfare in the form of global climate change." 90 FR 36310.*

[3] *"We are proposing that there is no 'requisite technology' for emission control for light- and medium-duty vehicles because reducing GHG emissions from such vehicles to zero would not measurably impact GHG concentrations in the atmosphere or the rate of global climate change. Relatedly, we are proposing that there is no "requisite technology" for emission control for heavy-duty vehicles and engines, even if considered in combination with light- and medium-duty vehicle standards." 90 FR 36311*

[4] *"EPA has serious concerns that its GHG standards may be harming air quality by raising prices and reducing fleet turnover." 90 FR 36313.*

[5] *Center for Biological Diversity, et al. 2025a. Joint legal comments on the proposed rulemaking entitled "Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards," 90 Fed. Reg. 36,288 (Aug. 1, 2025). Submitted to Docket # EPA-HQ-OAR-2025-0194, September 22, 2025.*

finding and the degree to which recent evidence further supports the original determination;[6] to public comments of the Union of Concerned Scientists responding to the scientific malpractice in DOE's report of its Climate Working Group (*A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate*) within docket DOE-HQ-2025-0207, which EPA illegally relies upon extensively for its scientific understanding of climate change;[7] and to the National Academies' recently released consensus study *Effects of Human-Caused Greenhouse Gas Emissions on U.S. Climate, Health, and Welfare*, which is directly responsive to EPA's claims on the scientific record.[8]

With respect to the specious argument made by EPA regarding the "requisite technology" to reduce greenhouse gas emissions from vehicles, we point EPA to docketed comments of the Center for Biological Diversity, *et al.*, addressing legal and technical deficiencies with EPA's proposed repeal of vehicle standards, particularly Sections VI.B and VII.C.2;[9] and the docketed comment of David Greene,[10] which rebuts the agency's fallacious rationale.

Below please find responses to the agency's erroneous claims about the relationship between fleet turnover and air quality and its improper deletion of regulatory text responsive to fuel economy and non-GHG emissions rules.

---

[6] *Cleetus, R., et al. 2025b. Comments on Proposed Rule for Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards. Submitted to Docket # EPA-HQ-OAR-2025-0194, September 22, 2025.*

[7] *Cleetus, R., et al. 2025a. Comments on the draft report produced by DOE's Climate Working Group (CWG), titled "A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate" (CWG Report). 90 FR 36150, August 1, 2025. Notice. Department of Energy. Submitted to Docket # DOE-HQ-2025-0207, September 2, 2025. Available at https://ucs-documents.s3.us-east-1.amazonaws.com/global-warming/comments-doe-climate-working-group-report.pdf.*

[8] *"In a Federal Register Notice published on August 1, 2025, EPA stated that the agency 'unreasonably analyzed the scientific record' in making the 2009 Endangerment Finding and that subsequent 'developments cast significant doubt on the reliability of the findings.' Such significant claims about the scientific record deserve careful review. The Federal Register Notice proposed repealing the Endangerment Finding and invited public comments. In response to EPA's request for public input, the National Academies of Sciences, Engineering, and Medicine undertook this independent assessment of the science underpinning the Endangerment Finding." From the Foreword of the report, https://doi.org/10.17226/29239.*

[9] *Center for Biological Diversity, et al. 2025b. Joint comments addressing the legal and technical deficiencies with EPA's proposed repeal of vehicle standards," 90 Fed. Reg. 36,288 (Aug. 1, 2025). Submitted to Docket # EPA-HQ-OAR-2025-0194, September 22, 2025.*

[10] *D.L. Greene. 2025. The EPA erred by omitting the value of greenhouse gas emissions reductions from its proposed rule's cost-benefit analysis. September 5, 2025. Document # EPA-HQ-OAR-2025-0194-0635.*

# 2  Air Quality and Fleet Turnover

## Response to EPA Request for Comment C-13

*We seek comment on the proposed bases for repeal presented in section V of this preamble, including on the economics of fleet turnover, the relative efficiency and emission reductions achieved by newer vehicles, and the potential costs to air quality of retaining standards that may slow fleet turnover as compared to the potential benefits of retaining GHG emission standards in response to global climate change concerns (C–13).*

The agency expresses concern that compliance with greenhouse gas emissions regulations will adversely impact air quality but does not support this with data, even though its own light-duty modeling tool already considers this exact question. The modeling submitted by the agency cited in the Draft RIA does not support the agency's assertion.

Even taking a conservative approach to the impact of compliance on sales, modeling results indicate clearly that emissions impacts related to the impact of increased costs on sales and fleet turnover, which could lead to increased vehicle travel from older models, are dwarfed by the emissions reductions associated with compliance with the greenhouse gas emissions rules.

## Modeling the light-duty vehicle fleet

### Technology deployment in the light-duty vehicle market

In the absence of vehicle standards, vehicle efficiency and emissions have largely remained flat (Figure 1). This was seen perhaps most notably in during the 1990s, when vehicle fuel economy actually got worse over time, the result of an industry push towards increased light truck share driven primarily by profit motivation and response to regulatory incentives.[11]

Many of the technologies deployed today to improve vehicle efficiency were developed during this period of efficiency stagnation and were simply not widely deployed. In the very first

---

[11] *Domestic manufacturers in particular had strong incentives to shift production to light trucks: "The less stringent CAFE standards for trucks did provide incentives for manufacturers to invest in minivans and SUVs and to promote them to consumers in place of large cars and station wagons, but other factors appear at least as important. Domestic manufacturers also found light-truck production to be very attractive because there was no foreign competition in the highest-volume truck categories. … With no Japanese competition for large pickup trucks and SUVs, U.S. manufacturers were able to price the vehicles at levels that generated handsome profits. The absence of a gas guzzler tax on trucks and the exemption from CAFE standards for trucks over 8,500 lb also provided incentives," at p. 18.* Transportation Research Board and National Research Council. 2002. Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards. *Washington, DC: The National Academies Press. https://doi.org/10.17226/10172. This reinforces the role manufacturers play in the product availability that inherently affects consumer choice.*

**Figure 1.** Historic vehicle fuel economy data



*Historically, vehicle efficiency has only increased in response to changes in fuel economy and greenhouse gas emissions standards.*

SOURCE: EPA Fuel Economy Trends

study by the National Academies on fuel economy technology in 1992, technologies like variable-valve timing, turbocharged engines, and continuously variable transmissions were already considered "proven" technologies,[12] yet had zero marketshare.[13] Today, the uptake of these technologies on gasoline-powered vehicles is 96, 41, and 27 percent, respectively.[14]

There is considerable evidence supporting market barriers limiting the uptake of energy efficiency technologies in the light-duty vehicle market, detailed extensively in EPA's regulatory impact analysis supporting the 2027-2032 LDV and MDV Multipollutant Standards.[15] These barriers include both demand-side impacts like consumers' discounting of fuel savings and supply-side constraints like "first-mover disadvantage" and financial constraints on investment in research and development.

---

[12] *Table 2-2, National Research Council. 1992.* Automotive Fuel Economy: How Far Can We Go?. *Washington, DC: The National Academies Press.* https://doi.org/10.17226/1806.
[13] *Ibid., Appendix C. The marketshare for turbocharged engines was not given, but the committee authoring the report noted that turbocharging was "Currently used primarily to enhance performance" (Table 2-2), and no measurable share of turbocharged gasoline engines appear in EPA data until 1996. See column "Turbocharged Engine of Gasoline ICE Vehicles" in "A. Detailed Real-World Fuel Economy, CO2 Emissions, and Vehicle Attribute and Technology Data," available at* https://www.epa.gov/automotive-trends/explore-automotive-trends-data. *EPA 2024a.*
[14] *EPA. 2024b. The 2024 EPA Automotive Trends Report: Greenhouse Gas Emissions, Fuel Economy, and Technology since 1975. EPA-420-R-24-022.* https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101CUU6.pdf.
[15] *Section 4.4, EPA. 2024c. Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis. EPA-420-R-24-004. (2027-2032 FRIA)*

As highlighted by EPA itself, "In the absence of standards, automakers have seemed willing to invest in small improvements upon existing technologies and more reluctant to invest in major innovations in the absence of standards."[16] This may be related to evidence that manufacturers undervalue consumers' willingness to pay for fuel efficiency improvements.[17]

### Impact of technology deployment on light-duty vehicle sales

EPA directly considers consumer choice via a logit model in the compliance modeling (via OMEGA) supporting its light-duty vehicle greenhouse gas standards.[18] This allows the agency to estimate consumer behavior in response to a vehicle fleet produced by manufacturers to comply with the standards, including price increases related to technology deployment.[19] One important feature of the logit model is it recognizes the diversity of consumer behavior.[20]

A key aspect of assessing the impact on sales in its OMEGA modeling, is the value placed on consumers' willingness to pay for fuel savings. EPA has assumed that consumers are willing to pay for 2.5 years of fuel savings,[21] a value consistent with manufacturers' assertions that consumers are willing to pay for only 1 to 4 years of fuel savings.[22] While there is a wide range of values for what consumers are willing to pay for various vehicle attributes, including improvements to fuel economy,[23] this assumption falls far below both the mean and median of the available literature.

EPA's assumption that consumers will only pay for 2.5 years of fuel savings is a conservative assumption that may underestimate the value consumers place on technology and, thus, may overestimate the negative impact on sales, since the impact on sales is related to the differential between vehicle price increase and valued fuel savings.

---

[16] *p. 4-58, 2027-2032 FRIA, citing Helfand, G, and R Dorsey-Palmateer. 2015. "The Energy Efficiency Gap in EPA's Benefit-Cost Analysis of Vehicle Greenhouse Gas Regulations: A Case Study." Journal of Benefit-Cost Analysis 6 (2): 432-454. https://doi.org/10.1017/bca.2015.13.*

[17] *"Based on these results, it appears possible that automakers operate under a different perception of consumer willingness to pay for additional fuel economy than how consumers actually behave." p. 4-60, 2027-2032 FRIA.*

[18] *"Consumer Module: This module projects a consumer response to the vehicle offerings generated by the producer module. ... [T]he purchase decisions of consumers are modeled in response to vehicle price and consumers' preconceptions of their own driving behavior and likely fuel and operating costs, in combination with the consumer's consideration of other vehicle attributes and individual preferences." p. 2-8, 2027-2032 FRIA. See also Section 4.1.2 for details.*

[19] *"Producer Module: This module generates potential decisions of the regulated entities (producers) in response to policy alternatives, while accounting for technology cost and availability, and constraints on vehicle production," p. 2-7, 2027-2032 FRIA.*

[20] *"Because consumers are diverse, consumers purchase comparable vehicles over a range of prices. The logit is specified to represent market penetration of lower and higher cost vehicle technologies. In other words, some consumers will purchase a lower-cost vehicle technology and others will purchase a higher-cost vehicle technology," p. 4-7, 2027-2032 FRIA.*

[21] *p. 4-62, 2027-2032 FRIA.*

[22] *"Manufacturers perceive that consumers require relatively short payback periods of 1 to 4 years for fuel economy improvements," p. 9-36. National Research Council. 2015. Cost, Effectiveness, and Deployment of Fuel Economy Technologies for Light-Duty Vehicles. Washington, DC: The National Academies Press. https://doi.org/10.17226/21744.*

[23] *Greene, et al. 2018. "Consumer willingness to pay for vehicle attributes: What do we know?" Transp. Res. Part A Policy Pract. 2018 Dec;118:258–279. doi: 10.1016/j.tra.2018.09.013.*

An additional conservative estimate stems from the agency's choice of price elasticity, which dictates the relationship between increases in price (or net price, in this case, since it includes fuel savings) and decreases in vehicle sales. EPA uses a value in its model of -0.4, which means that a 10-percent increase in vehicle price (after accounting for 2.5 years of fuel savings) would result in a 4-percent decrease in sales.

As EPA itself has pointed out, the value of -0.4 represents the largest magnitude in a detailed study of long-term elasticity related to policy changes and is thus a conservative estimate.[24] Literature values with greater magnitude emphasize short-run impacts and ignore the response of the used vehicle market to changes in price in the new vehicle market. Based on a comprehensive literature review and detailed modeling associated with different assumptions on short-term elasticity and interaction with the used vehicle market, it is most likely that the long-term price elasticity for light-duty vehicles is between -0.14 and -0.3.[25]

## Impact of technology deployment on light-duty fleet emissions

After calculating new vehicle sales, EPA's OMEGA model is designed to ensure that total LDV fleet mileage in a given year remains constant, fixing VMT to projections from the Energy Information Administration's *America's Energy Outlook.*[26] The net effect of this is that a decrease in vehicle sales results directly in increased miles traveled from the used vehicle fleet.[27]

Conservative estimates of both the long-term price elasticity and consumer valuation of fuel savings mean that EPA's OMEGA model likely overestimates the reductions in sales associated with compliance with greenhouse gas emissions standards for new LDVs. Since these reduced sales directly lead to increased miles traveled by older, more polluting vehicles, EPA's OMEGA model likely overestimates the impact of the standards on fleet turnover and thus overstates any pollution disbenefits associated with a reduction in fleet turnover resulting from the LDV GHG standards.

Nonetheless, it remains noteworthy that EPA's OMEGA model is designed to consider fleet turnover, even if its estimates likely overstate any effect of reduced fleet turnover, because this is precisely the concern raised by the agency itself in proposing to repeal the vehicle GHG standards.[28] If the agency was interested in better understanding the impacts of fleet turnover, it would only have needed only to examine its own modeling effort.

---

[24] *p. 4-62, 2027-2032 FRIA.*
[25] *Table 8-1 and the surrounding discussion on pp. 8-7—10 in EPA. 2021. Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Regulatory Impact Analysis. EPA-420-R-21-028. (2023-2026 FRIA).*
[26] *p. 4-64, 2027-2032 FRIA.*
[27] *"The net effect of the analysis approach is that the slight reduction in new vehicle sales tend to increase the portion of miles driven by older vehicles, and therefore tend to increase their overall impacts relative to a case where there is no change in new sales," pp. 1845-6 in EPA. 2024d. Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Response to Comments. EPA-420-R-24-005. (2027-2032 RTC)*
[28] *"We are proposing that GHG emission standards may harm, rather than advance, public welfare as defined in the CAA by reducing fleet turnover that improves air quality, safety, consumer choice, and economic opportunity." 90 FR 36311.*

*EPA modeling of air quality impacts related to the repeal of LDV GHG standards*

In support of its proposal, EPA including OMEGA modeling in an effort to estimate the costs and benefits of its rule.[29] Despite having run the model, which includes the effects of fleet turnover as noted above, the agency did not acknowledge anywhere in the proposal's regulatory impact analysis a discussion of the pollution impacts resulting from this modeling effort. The agency ignored these docketed results and failed to include the associated monetized public health impacts of those emissions as part of its cost-benefit analysis. [30]

**Figure 2.** Increases in air pollution resulting from the repeal of light-duty vehicle greenhouse gas emissions standards, as modeled by EPA in its proposal



*EPA's own modeling shows that a repeal of LDV GHG standards would significantly increase air pollution.*

SOURCE:  EPA-HQ-OAR-2025-0194-0038

---

[29] *Docketed at EPA-HQ-OAR-2025-0194-0038. Modeled emissions impacts for the LDV GHG repeal alone are found in \LMD\effects\omega_effects_ld.zip, at 20250703_083214_physical_effects_annual.csv.*
[30] *Summary figures of the increases in relevant emissions, including $NO_x$, $SO_x$, VOCs, and $PM_{2.5}$, were docketed by the agency in Section 8 of the report at EPA-HQ-OAR-2025-0194-0047. However, there is no discussion of these results in the proposal's RIA. For example, compare Table 8 at 89 FR 27860 to Tables A-1—2, A-4—6 in the proposal's RIA.*

**Not only has EPA not justified its concerns about fleet turnover with data, but it has ignored the results of its own modeling, from which can be drawn the exact opposite conclusion.**

We bring attention to the agency's own results in Figure 2, which shows a cumulative increase through 2055 of all criteria emissions despite the OMEGA model's inclusion of the very effect EPA claims is so detrimental to its mission. We have further monetized these impacts using the sector-specific benefit per ton estimates for reducing $PM_{2.5}$ and ozone,[31] summarized in Table 1.

**Table 1.** Monetized health-related harms from the proposed repeal of light-duty vehicle greenhouse gas standards, as modeled by EPA (2022$)

| Sector | 3% Discount Rate | | 7% Discount Rate | |
|---|---|---|---|---|
| | Ozone | $PM_{2.5}$ | Ozone | $PM_{2.5}$ |
| LDVs | $47.8 B | $30.8 B to $60.4 B | $21.8 B | $14.4 B to $28.5 B |
| EGUs | −$23.3 B | −$12.1 B to −$24.1 B | −$13.0 B | −$6.8 B to −$13.7 B |
| Refineries | $10.2 B | $17.4 B to $34.2 B | $4.8 B | $8.2 B to $16.2 B |
| **Total** | **$34.6 B** | **$36.0 B to $70.5 B** | **$13.6 B** | **$15.8 B to $30.9 B** |

*Quantifying the health-related harms related to the agency's own modeling in support of the proposal indicates up to $105.2 billion in untallied social costs at a 3 percent discount rate, and up to $44.6 billion at a 7 percent discount rate.*

*Updated modeling of air pollution related to the repeal of LDV GHG standards*

Recent modeling by the Environmental Defense Fund (EDF) using an updated version of the OMEGA model highlights additional considerations related to air pollution from the repeal.[32] For example, EPA's approach to refinery emissions significantly overstates the amount of refined fuel that would continue to be exported if the standards are repealed,[33] which has the effect of underestimating the refinery emissions under a repeal scenario. EPA has also not

---

[31] *Benefit-per-ton estimates come from EPA. 2024e. Sector-based PM2.5 and Ozone Benefit Per Ton Estimates (dataset). Archived at https://gaftp.epa.gov/benmap/BPTs/archives/. To inflate these values from 2016$ to 2022$ we have relied upon BEA Table 1.1.9, consistent with EPA's approach. Values were interpolated using a cumulative annual growth rate in intermittent years prior to 2040 and extrapolated for all years thereafter based on the rate of increase for 2035-2040.*

[32] *EDF, Technical Comments re Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, submitted to Docket # EPA-HQ-OAR-2025-0194 on September 22, 2025. (EDF Technical Comments).*

[33] *In the proposal's RIA, EPA notes the Alternative Transportation scenario in the AEO 2025, which considers a policy scenario where CA ACT and federal vehicle GHG standards are eliminated and IRA incentives reduced. EIA uses a macroeconomic model to estimate the impact of this repeal, consistent with EPA's proposal—the result is that the added supply requires close to a 1:1 increase in domestically refined product.*

updated its grid emissions to reflect an increasing share of fossil-based generation owing to the removal of significant incentives for cleaner electricity generation.

After updating the model to the latest data, again OMEGA modeling results show that the repeal of LDV GHG standards will result in substantial increases in pollution, despite the agency's claim to the contrary.

Given that its own peer-reviewed model, up to date with the latest assumptions, shows clearly that the agency's proposal will increase air pollution, at odds with its mandate under the Clean Air Act, EPA must withdraw its proposed recission of the LDV GHG standards.

## Heavy-duty vehicles

### Technology deployment in the heavy-duty vehicle market

Unlike the light-duty vehicle fleet, heavy-duty vehicle (HDV) sales are governed almost exclusively through an analysis of the total cost of ownership (TCO) of a vehicle by the purchaser—given that these vehicles are used in commercial activity, fleet operators will seek to optimize profit margins by reducing the total costs of operation, especially when it comes to fuel and maintenance costs.

Despite the importance of TCO to a purchaser, there are still a number of market barriers that may curtail uptake of even cost-effective technologies: for any technology, but particularly those new to the market, there may be considerable uncertainty around critical cost-related information such as the real-world fuel savings for a fleet's operations or the potential for increased maintenance, both on the new and used markets; there may be split incentives between the operator of the truck and the owner of a truck, such that, e.g., the operator may prioritize fuel savings but the owner prioritizes maintenance, leading to trade-offs in technology adoption; and uncertainty in fuel prices can result in substantial discounting of future gains, leading to risk averse purchasing behavior.[34]

Additionally, for a technology to be available for purchase, it must be available for sale on a truck. Manufacturers thus represent yet another layer of risk aversion to the market. The HDV market is much lower volume than the LDV market, so vehicle and engine platforms are generally updated much less frequently than their LD counterparts, and manufacturers are naturally constrained in the amount of research and development for any technology deployment.[35] For advanced technologies requiring wholesale changes to vehicle and/or engine platforms, this can be a powerful constraint limiting product availability.

For all these reasons, technology deployment in the heavy-duty market tends to, like many other markets,[36] follow an S-curve.[37] In the development of its HD TRUCS model for the HDV

---

[34] *These are just some of the market failures requiring government intervention. For a more expansive discussion, see Section 9.2 in EPA-420-R-11-901 (Phase 1 FRIA).*
[35] *See discussion at 80 FR 40236 (Phase 2 NPRM).*
[36] *Rogers, Everett M. 2003. Diffusion of Innovations. 5th edition. New York, NY: Free Press.*
[37] *pp. 2-18—19 at EPA and NHTSA 2016. Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles - Phase 2: Regulatory Impact Analysis. EPA-420-R-16-900 (Phase 2 FRIA).*

Phase 3 greenhouse gas (GHG) emissions rules, EPA used the relationship between TCO and technology deployment to estimate the market trends for electrification.[38]

## Modeling technology deployment in the heavy-duty vehicle market

### Appropriateness of the HD TRUCS model

In absence of regulation, technology availability and TCO will be the primary drivers of technology adoption across the fleet. This is the primary theory behind the approach taken by the agency in developing its HD TRUCS model, which applies BEV, PHEV, and FCEV technology to 101 different vehicle types based on the payback time for the technology, limited by a production cap.

While EPA has limited its approach to modeling only the uptake of electric vehicle technology, given sufficient time and resources, it would be possible to develop a model based on the same principles that looked at all available technologies. Such models already exist for LDVs,[39] but developing such a detailed model for HDVs would require equivalent diversity of fleet purchasers in order to avoid ubiquitous adoption of a single, economically optimal technology package.[40]

Unlike these more detailed vehicle-by-vehicle adoption models, HD TRUCS allows for the application of technology packages that are not economically efficient, capturing overall market behavior.[41] By broadening the HD TRUCS approach to include a range of diesel-powered technology packages as well, it may be possible to better estimate average market behavior, reflecting the greater diversity of technology options facing fleet purchasers in the real world.

### Technology packages available

Because of the Phase 2 GHG standards currently on the books, we assume that the diesel technologies identified in that rulemaking will all be available in the timeframe considered. Because the standards were set in three-year increments, which manufacturers are likely targeting (on average), for simplicity we have considered a range of conventional internal

---

[38] Section 2.7 in EPA-420-R-24-006 (Phase 3 FRIA).

[39] The Optimization Model for reducing Emissions of Greenhouse Gases (OMEGA) tool was developed for just such a purpose by EPA, with its most recent version used by the agency in setting GHG emissions standards for LDVs and MDVs for model years 2027-2032. The Department of Transportation's Volpe Center has developed its own compliance optimization model based on economic efficiency of vehicle technologies, the CAFE Compliance and Effects Modeling System (CCEMS), which was used by EPA in setting the MY2023-2026 LDV GHG regulations. These models apply technology based on cost-effectiveness, and the CCEMS model applies technologies that pay back within a given time window even in the absence of regulation, even if such behavior is not consistent with decades of manufacturer and consumer behavior.

[40] Because the model applies economically efficient technologies, in the absence of regulation there will be a single most fuel-efficient technology package for a given vehicle type and fleet characteristic. HD TRUCS captures some features that differentiate beyond duty cycle, such as annual vehicle miles traveled, but additional factors would likely need to be incorporated to yield a level of market variation seen in today's highly customizable HDV market.

[41] For example, CCEMS will only apply technologies that fall within the 100 percent section of the S-curve (i.e. have negative payback period), while the HD TRUCS model will apply technologies in a fractional way based on the length of payback period.

combustion engine technology packages to align with the baseline packages for the Phase 2 rule (MY2018) and the packages associated with the three successive regulatory steps (MY2021, MY2024, and MY2027). In addition to this, we have added two advanced packages, one associated with the best-performing MY2027 diesel package (MY2027 max),[42] and a strong hybrid package (SHEV), since this technology was excluded from adoption in the agency's package but identified in the Phase 3 rulemaking as a viable technology beyond the MY2027 Phase 2 packages.[43] Finally, we continue to allow adoption of battery-electric and fuel cell-electric vehicles consistent with the HD TRUCS model used in the HDV GHG Phase 3 rulemaking.

The costs of the technology packages considered come directly from the HDV GHG Phase 2 rulemaking, with the exception of strong hybrids, for which EPA explicitly updated its analysis of costs and effectiveness. All Phase 2 costs were converted to 2022$ from 2013$ using the same inflationary multiplier as the Phase 3 rule (1.2503). All technologies include the effects of learning using the learning curves defined by EPA.

In addition to the total costs (direct + indirect costs) associated with the technology, we consider increased costs associated with insurance, state taxes, and the federal excise tax, consistent with the HD TRUCS model. We do not make any assumptions on differences related to maintenance costs for diesel technologies.

## Modification of the HD TRUCS approach to diesel technologies

To model the rate of adoption of these technologies, we rely on the relationship between payback period and adoption rate generated by the TEMPO model, which is the same relationship underpinning the agency's HD TRUCS analysis.[44]

For the conventional diesel packages, we have not applied any sort of cap on adoption—these diesel technology packages do not have the same constraints related to battery production or lead time that the agency relied upon to rationalize a limit the adoption of EVs.[45] While battery material constraints are significantly reduced for hybrid technologies due to much smaller capacity, the low production numbers today suggest that there could be lead-time issues shifting to large production volumes, so for vocational vehicles we have applied a similar cap to that applied by the agencies for electric vehicles.[46] This represents a conservative assumption, as manufacturers already produce hybrids across all vocational vehicle classes.[47]

---

[42] *For tractors, this package is based on that identified by the agency in the Phase 2 rulemaking at EPA-HQ-OAR-2014-0827-2349, with appropriate limitations on day cab tractors (e.g., aerodynamics limited to Bin IV) and heavy-haul tractors (e.g., no 6x2 axles). For vocational vehicles, we extrapolate the non-engine technology adoption rates for MY2021-2027 through MY2032, as described in MFN et al. 2023 at pp. 68-69 (in this case, limited to diesel packages only). For all vehicles, GEM was used to model the effectiveness of the package, while costs were obtained through the agency's Phase 2 cost assessment.*

[43] *Section 2.11.1.4, Phase 3 FRIA.*

[44] *TEMPO curve in Figure 2-14, Phase 3 FRIA. Section 2.7.1 details the agency's approach to the model.*

[45] *Section 2.7.2, Phase 3 FRIA.*

[46] *Rather than the piecewise approach taken by the agency and limited to just the 2027-2032 timeframe, we have fit an S-curve to the Phase 3 cap and applied this across all model years. Since the agency was emulating an S-curve to begin with, this well mimics the cap used in Phase 3 while extending it through all model years.*

[47] *Section 1.4.5, Phase 3 FRIA. In its own feasibility analysis for Phase 3, EPA determined that penetration levels as high as 52 percent in 2027 would be feasible for hybrid technology (Table 2-144, Phase 3 FRIA).*

For tractors, we have excluded the availability of the strong hybrid package in the market-driven baseline and assume that manufacturers will only invest in this technology under the market-forcing conditions of greenhouse gas emissions regulations, since the technology has to date been limited to the DOE Super Truck demonstration project. This is consistent with the agency's approach to strong hybrids in the Phase 2 feasibility assessment but represents a conservative approach given its proven effectiveness and the agency's updated assessment of technology readiness in Phase 3.

We consider the packages in increasing complexity and cost but consider the application of the package relative to the aggregate of the market rather than individual packages in order to ensure that the total application does not exceed 100 percent of the market. This process is diagramed in Figure 3. In this way, the application of a package is reduced proportionally by the successive application of the next more complex package. The payback period is considered relative to the average technology packages already applied.

**Figure 3.** Illustration of procedure to apply technology packages based on relationship between application rate and payback period



$$marketshare_i = \prod_{j=0}^{n} x_j$$

e.g., $marketshare_{MY2018} = 25\% \times 80\% \times 70\% \times 90\% \times 95\% = 11.97\%$

*A diagram of how the package-based approach was applied to model diesel technology adoption in a modified version of HD TRUCS.*

For calculating the electric vehicle marketshare in our market-based scenario, two modifications were made. First, we have artificially capped the adoption of electric vehicles in a class by extending the S-curve of adoption by 5 years for much the same reason as we limited strong hybrids for tractors: legacy truck manufacturers have shown significant reticence to invest in battery-electric vehicles in the United States absent regulatory actions like the Advanced Clean Trucks rule, even as they may do so globally.[48] This represents a conservative,

---

[48] *For example, even as electric truck prices have fallen in Europe in response to battery price reductions, in the United States the prices have increased, stifling market adoption. See Xie, Y., and Minjares, R. 2025.*

ad hoc assumption that serves to likely underestimate the adoption of electrification in a free market, but it is one consistent with apparent supply-side restrictions currently imposed.

**Figure 4.** Comparison of the maximum rate of adoption for electric vehicles, by year



*While the sector is investing to meet greenhouse gas emissions standards, we have assumed an S-curve rate of maximum adoption of battery-electric vehicles consistent with EPA's maxima in the Phase 3 regulation. However, in the absence of such regulatory push, we have conservatively assumed a reduction in investment that will slow legacy manufacturers' deployment of electric trucks in the United States, which reduces the deployment of this cost-effective technology through market forces alone and results in increased compliance costs in our modeling runs.*

One final modification was made to HD TRUCS for the purpose of our analysis in both compliance and market-based scenarios: the only "zero-emission" trucks considered in our modeling were battery-electric trucks. To date, hydrogen deployment has been virtually non-existent in the United States, and Congressional and administrative action have eliminated incentives that were expected to grow the sector.[49] Additionally, there is significant uncertainty about the emissions profile of hydrogen given that essentially all of it is produced from fossil fuel today,[50] while most of the growth in global production is expected to be driven

*Battery Electric Commercial Vehicle Pricing in the United States. Working Paper of the International Council on Clean Transportation (ICCT), September 8, 2025. Available at https://theicct.org/publication/battery-electric-commercial-vehicle-pricing-in-the-us-sept25/.*
[49] *The administration's efforts to eliminate greenhouse gas reporting will make it even harder for some hydrogen facilities to qualify for the 45Q tax credit, which Congress set to expire in 2028 under the "One Big Beautiful Bill" Act, and the Department of Energy has proposed to eliminate 4 of the 7 regional clean hydrogen hubs funded under the Bipartisan Infrastructure Law. Rob Meyer, "The EPA's Backdoor Move to Hobble the Carbon Capture Industry," Heatmap News, Sept. 12, 2025, https://heatmap.news/energy/epa-greenhouse-gas-reporting-program-45q; Maeve Allsup, "These are the hydrogen hubs slated to lose their DOE funding," Latitude Media, April 4, 2025, https://www.latitudemedia.com/news/these-are-the-hydrogen-hubs-slated-to-lose-their-doe-funding/.*
[50] *"Today 95% of the hydrogen produced in the United States is made by natural gas reforming in large central plants." Department of Energy, n.d. "Hydrogen Resources." https://www.energy.gov/eere/fuelcells/hydrogen-resources.*

by lower-emission alternatives.[51] Additionally, the continued development of battery-electric options with larger batteries and longer range continue to support battery-electric deployment across all vehicle classes,[52] even if it may be a higher-cost alternative to a theoretical hydrogen-powered truck according to the agency's analysis, so this is yet another conservative first-cost assumption in our analysis.

## Technology adoption in the absence of greenhouse gas emissions standards

One further modification was made to HD TRUCS in order to reflect the latest fuel price information from the Energy Information Administration. To assess the baseline adoption in the absence of any vehicle greenhouse gas emissions standards we rely upon the Alternative Transportation case in *America's Energy Outlook (AEO) 2025*, which includes macroeconomic modeling of the United States energy and fuel sectors in the absence of greenhouse gas standards and with significantly reduced incentives for electrification. We use the same deflator used by EPA in its proposal to deflate these fuel prices to 2022$ for use in the modified HD TRUCS model. Electricity prices were also updated, consistent with the agency's approach.[53] It should be noted that for diesel and electricity there is not a significant difference in projected prices between the Reference and Alternative Transportation cases in AEO 2025, so the choice to reflect macroeconomic impacts on fuel prices based on the two different policy outcomes does not have a significant impact on the results. Because EIA does not project prices beyond 2050, it is assumed that prices will remain at 2050 levels in ensuing years.[54]

In designing the Phase 2 and Phase 3 regulations, EPA put a heavy emphasis on the importance of payback period for the regulatory standards as needing to be within an acceptable timeframe for heavy-duty trucks in order to ensure uptake.[55] Therefore, it should come as no surprise that our modeling of the market evolution of each regulatory class of vehicles closely matches the Phase 2 standards in 2027 (Figure 5). Over time, the cost-effectiveness of electric vehicles increases their marketshare in all classes (but especially LHDVs), significantly reducing the greenhouse gas emissions of the average vehicle. However, average certification values estimated for a market absent greenhouse gas standards fall well short of the Phase 3

---

[51] *International Energy Agency. 2025. Global Hydrogen Review 2025. https://www.iea.org/reports/global-hydrogen-review-2025/.*

[52] *"The new long-distance electric truck from Volvo has a range of up to 600 kilometers and its batteries can be charged in 40 minutes." https://www.volvotrucks.com/en-en/news-stories/press-releases/2025/may/600-km-range-and-superfast-charging-meet-volvo-s-new-electric1.html. Recent updates on Tesla Semi deployment in less-than-truckload and beverage delivery note the truck "generally matched the performance of its diesel counterparts." Jason Cannon, "ABF Freight: Tesla Semi 'generally matched' diesel trucks in 3-week pilot," Commercial Carrier Journal, July 9, 2025. https://www.ccjdigital.com/alternative-power/article/15750270/abf-freights-tesla-semi-pilot-reveals-impressive-efficiency-and-performance.*

[53] *EPA modifies a commercial rate by 52 cents/kWh for depot charging. For on-route charging, as with EPA we assume 19.6 cents/kWh in 2027 and adjust in other years relative to the price of electricity for transportation end-use.*

[54] *This simplification only affects the calculation of payback period, not any realized savings, which are not modeled beyond 2050.*

[55] *"An important metric to vehicle purchasers is the payback period that can be expected on any new purchase. In other words, there is greater willingness to pay for new technology if that new technology "pays back" within an acceptable period of time." 81 FR 73510. See also the class-specific discussion for tractors and vocational vehicles at 81 FR 73621-22 and 81 FR 73718-19, respectively.*

requirements, even extended out to the 2050 timeframe, for all but LHD vocational vehicles, which would achieve the Phase 3 standard in 2046 via market forces alone, according to our model. For reference, our market-based adoption of EVs is comparable to EPA's Reference case,[56] though because our diesel technology package is less efficient than the Phase 2 2027 standards, overall fuel use and tailpipe greenhouse gas emissions are higher than in EPA's Reference case.

**Figure 5.** Average greenhouse gas emissions from heavy-duty vehicles, by regulatory class.



*Even in the absence of further greenhouse gas emissions standards, our modeling shows the industry would be on track to meet the Phase 2 GHG targets for 2027. However, even with the continued increase in adoption of cost-effective electrification, no class of vehicles is expected to achieve a level of emissions reductions consistent with the Phase 3 standards by 2032 absent regulation, and only LHD vocational vehicles could do so before 2050.*

The technological evolution of the market in absence of regulation is shown in Figure 6. While diesel prices increase slightly over time, technology costs for the diesel packages do not change very much over time, so generally the payback period does not change rapidly over the years modeled—there is a modest shift of MHDVs adopting 2027 EPA packages compared to 2024 packages, for example, and an increasing share of tractors adopting the maximum conventional diesel package identified by the agencies, but these represent only modest reductions in emissions.

It is further worth noting the significant share of vehicles for which the baseline 2018 package remain cost-effective over time. While our modeling is not sophisticated enough to reproduce the full diversity of the heavy-duty vehicle fleet, these graphs do prove that even this relatively simple approach can capture a range of market behavior.

---

[56] *Compare Figure 6 to Table 4-8 in the Phase 3 FRIA.*

**Figure 6.** Marketshare modeled for different diesel technology packages over time based on market forces alone



*Given the range of duty cycles in every vehicle class, modeling shows the market adopting a range of diesel technologies through cost-effectiveness alone, including a host of applications for which the baseline efficiency would remain adequate. We see only small growth in hybridization over time, despite its effectiveness at cutting fuel use. Diesel marketshare is eroded over time as the cost-effectiveness of electric trucks take over, but only LHDVs are see a majority share by 2050.*

## Technology to comply with Phase 3 greenhouse gas emissions standards

As shown in Figure 5, the market alone is not likely to reduce greenhouse gas emissions to the level of the Phase 3 standards. Similar to the approach taken by EPA's OMEGA model for LDVs, we make the assumption that manufacturers will choose to comply with the regulatory requirements via the most cost-effective pathway available, with a couple caveats.

First, because BEVs are treated as 0 g/ton-mile vehicles, electrification is, in most cases, the most cost-effective compliance strategy. In this modeling exercise, however, we've not considered the adoption of BEVs as a compliance strategy until all diesel technologies are exhausted. This was done as a conservative approach to modeling the emissions impacts of compliance—1) this increases the overall costs of compliance, which will maximize the impacts compliance has on overall sales; and 2) an increasing share of BEVs will result in reduced tailpipe emissions, while selling increasingly efficient diesel-powered vehicles does not, since criteria emissions for heavy-duty vehicles are regulated at the engine level, and thus this will minimize the reduction in tailpipe emissions resulting from compliance with GHG standards. Additionally, we make a simplifying assumption that each regulatory class will

comply with the regulations (e.g., LHD-Urban will meet its standards), rather than take advantage of the credit compliance flexibilities available via the averaging, banking, and trading (ABT) provisions of the standards, again increasing cost.

These compliant technology deployments are shown in Figure 7. Because costs of the technologies decrease in time, particularly electrification, we see an interesting backsliding occur over time when standards remain fixed. The year-to-year variation seen around 2032 would likely be smoothed out in the real world, owing to the ABT flexibilities we have excluded from our modeling. However, the degree to which manufacturers take advantage of such additional compliance strategies would only serve to decrease compliance costs and thus reduce the effect we are interested in modeling.

**Figure 7.** Marketshare for different diesel technology packages over time while compliant with Phase 3 GHG standards



*In the first few years of compliance, we see a substantial shift to more and more efficient diesel technology packages, such that the fleet is largely dominated by hybrids and battery-electric vehicles. As electric truck deployment continues to become more cost-effective over time and their marketshare continues to grow, our model produces a backsliding on the remaining diesel vehicles as hybridization no longer becomes necessary to meet the stagnant 2032 standards.*

As can be seen in Figure 7, our modeling of compliance with the Phase 3 GHG standards largely becomes possible through a shifting share of the maximum level of diesel technology (hybridization) and an increase in electrification beyond what the market will naturally find cost-effective. These technology costs are summarized in Table 2. Our modeling does show backsliding on diesel technology, which is not a likely occurrence given fleet operators' focus

on TCO; however, this represents another conservative approach because it increases upstream emissions associated with these vehicles. The overall increase in prices beyond the market uptake is modest, but those costs will be borne by fleets and could influence purchasing decisions, as discussed below.

**Table 2**. Price increases related to compliance with Phase 3 HDV greenhouse gas emissions standards, relative to the market-based scenario

| Truck Class | Price Increase of Compliance | | | | | % Increase in Vehicle Price | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2030 | 2035 | 2040 | 2045 | 2050 | 2030 | 2035 | 2040 | 2045 | 2050 |
| **Tractor** | $3,849 | $8,085 | $7,837 | $7,726 | $ 7,563 | 2.8% | 5.9% | 5.7% | 5.6% | 5.5% |
| **HHD** | $3,119 | $5,356 | $4,728 | $3,859 | $ 3,219 | 2.2% | 3.8% | 3.4% | 2.7% | 2.3% |
| **MHD** | $6,194 | $6,724 | $5,770 | $5,289 | $ 4,820 | 7.7% | 8.4% | 7.2% | 6.6% | 6.0% |
| **LHD** | $5,891 | $6,136 | $5,159 | $4,688 | $4,417 | 8.6% | 9.0% | 7.6% | 6.9% | 6.5% |

*The cost of compliance with Phase 3 standards using a combination of diesel technologies and electrification leads to thousands of dollars in per-vehicle price increases. However, these increases are small relative to the price of the average heavy-duty vehicle.*

## Impact of vehicle price on heavy-duty fleet turnover

Because the price of the average vehicle will increase, it is probable that this would affect vehicle sales. However, the magnitude of this effect is not likely to depend on the change in price alone, since fleet operators will also consider the additional fuel savings resulting from the more efficient, albeit more expensive, technology package.

To illustrate this, we can look more closely at the TEMPO model of marketshare as a function of payback period. The payback period is defined as the point at which the fuel savings is equal to the difference in price (i.e., the number of years $y = \frac{p}{f}$, where $p$ is the price difference and $f$ is the annual fuel savings). The TEMPO curve looks essentially like a logistical function of the form $n = 1 - e^{\beta y} = 1 - e^{\beta p/f}$. Now we can estimate the change in price and improvement in fuel savings. In this case, the ratios of $\frac{\Delta p}{p}$ and $\frac{\Delta f}{f}$ are small, so we can estimate this using the Taylor expansion of our logistical function:

$$\Delta n = \left(1 - e^{\beta(p+\Delta p)/(f+\Delta f)}\right) - \left(1 - e^{\beta p/f}\right)$$

$$\Delta n \approx \left(1 - 1 - \frac{\beta(p + \Delta p)}{f + \Delta f} - \frac{\beta^2(p + \Delta p)^2}{2(f + \Delta f)^2} + \cdots\right) - \left(1 - 1 - \frac{\beta p}{f} - \frac{\beta^2 p^2}{2f^2} + \cdots\right)$$

Simplifying the denominators of the form $(1 + x)^{-n} \approx 1 - nx$ and keeping only first order terms yields:

$$\Delta n \approx \frac{\beta p \Delta f}{f^2} - \frac{\beta \Delta p}{f} - \frac{\beta^2 p \Delta p}{f^2} + \frac{\beta^2 p^2 \Delta f}{f^3} = \frac{\beta p}{f}\left(1 + \frac{\beta p}{f}\right)\left(\frac{\Delta f}{f} - \frac{\Delta p}{p}\right)$$

This makes clear that the change in sales is not proportional to price but to the proportion of fuel savings as compared to the relative proportion of price. In other words, in the heavy-duty sector the real-world impact of price increases will be offset in part by the fuel savings valued by fleet purchasers.

The implications of this are that the price elasticity for heavy-duty vehicles should be less than 1, likely substantially less. However, given the time constraints of this public comment period, we have not had time to analyze how the valued fuel savings would reduce price elasticity and have modeled the impacts of compliance costs on vehicle purchases using a price elasticity of 1, a conservative estimate that undoubtedly overestimates the reduction in new truck sales resulting from compliance costs.

## Modeling the emissions impacts of compliance using the EPA MOVES model

To estimate emissions from the heavy-duty vehicle fleet in the two scenarios, we have employed the EPA MOVES5 model. This model is up to date with the latest HDV regulations, including the 2027 engine regulations and the Phase 3 GHG regulations.

For our modeling, we have only examined a nationwide estimate of the pollution from heavy-duty trucks. To do so, we have adjusted the MOVES vehicle population to reflect the market-based and GHG compliance scenarios above, reallocating the shares of electric and internal combustion vehicles to be consistent with our compliance scenarios. The energy usage of internal combustion engine vehicles was scaled to reflect changes in efficiency relative to the MOVES5 default of Phase 2-2027 compliant trucks.

To capture any increase in usage of pre-2027 vehicles related to a decrease in sales, we deploy the same approach that EPA uses in its OMEGA model—new vehicle sales are reduced, and the associated VMT is reallocated proportionally among the remaining fleet.[57] For heavy-duty vehicles, this represents a conservative assumption—fleet operators are cost-sensitive, so the allocation of this additional VMT would likely be inversely proportional to the fuel costs of the truck, meaning that the newest vehicles in the fleet would see a greater increase than the older vehicles. However, small fleets do not have such flexibility, and those fleets are likely to be the most price sensitive, so we have chosen to simply allocate all VMT with a single scalar applied to the older fleet, proportional to VMT traveled in the market-based scenario, ensuring that total fleet travel is identical in both scenarios.

Older vehicles travel fewer miles, and the more that time passes, the fewer that remain on the road. This means that the dirtiest vehicles do not travel many miles per year in either scenario (Table 3). However, as a differential, this means that small reductions in new vehicle sales can lead to proportionally large changes in this very small quantity. This is summarized in Table 4, where we have divided the fleet up into three groups based on heavy-duty emissions tier.

Because the lions' share of VMT continues to come from new vehicles, and because these new vehicles contain a large share of battery-electric vehicles, tailpipe pollution increases in most years as the result of the proposed repeal of HDV GHG standards. However, it is important to consider upstream emissions associated with the refining of gasoline and diesel as well as the source of electricity powering the electrifying heavy-duty vehicle fleet in order to get a full

---

[57] *Section 4.4.2, 2027-2032 FRIA.*

picture of the impacts repealing these protective standards would have on air pollution and public health.

**Table 3.** Share of heavy-duty vehicle miles traveled, by emissions tier

| Year | LHD | | | MHD | | | HHD | | | Tractor | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2010 | 2010-2026 | 2027+ | Pre-2010 | 2010-2026 | 2027+ | Pre-2010 | 2010-2026 | 2027+ | Pre-2010 | 2010-2026 | 2027+ |
| 2030 | 3.4% | 59.9% | 36.7% | 8.5% | 61.9% | 29.5% | 9.0% | 64.3% | 26.7% | 3.9% | 61.1% | 35.0% |
| 2035 | 1.3% | 29.8% | 69.0% | 4.3% | 35.7% | 60.0% | 4.5% | 40.9% | 54.6% | 1.1% | 31.4% | 67.5% |
| 2040 | 0.5% | 12.7% | 86.8% | 2.1% | 18.5% | 79.4% | 2.1% | 24.0% | 73.9% | 0.2% | 13.7% | 86.1% |
| 2045 | 0.2% | 5.8% | 94.0% | 0.9% | 9.7% | 89.5% | 0.9% | 13.8% | 85.3% | 0.1% | 6.1% | 93.9% |
| 2050 | 0.0% | 2.5% | 97.5% | 0.0% | 5.0% | 95.0% | 0.0% | 7.8% | 92.2% | 0.0% | 2.3% | 97.7% |

*The dirtiest trucks on the road travel an ever-increasing share of miles over time.*

**Table 4.** Percentage change in share of heavy-duty vehicle miles traveled, by emissions tier, in the compliance scenario compared to the market-based scenario

| Year | LHD | | | MHD | | | HHD | | | Tractor | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2010 | 2010-2026 | 2027+ | Pre-2010 | 2010-2026 | 2027+ | Pre-2010 | 2010-2026 | 2027+ | Pre-2010 | 2010-2026 | 2027+ |
| 2030 | 1.3% | 1.1% | -1.9% | 2.3% | 3.2% | -7.4% | 0.4% | 0.6% | -1.6% | 0.5% | 0.9% | -1.6% |
| 2035 | 5.2% | 4.6% | -2.1% | 7.4% | 12.5% | -7.9% | 1.6% | 2.6% | -2.1% | 5.1% | 5.7% | -2.7% |
| 2040 | 14.8% | 12.5% | -1.9% | 17.8% | 30.0% | -7.5% | 5.4% | 6.9% | -2.4% | 27.5% | 22.8% | -3.7% |
| 2045 | 32.0% | 26.8% | -1.7% | 48.9% | 59.1% | -6.9% | 13.4% | 14.4% | -2.5% | 81.9% | 64.0% | -4.2% |
| 2050 | | 62.7% | -1.6% | | 119.1% | -6.3% | | 28.2% | -2.4% | | 187.5% | -4.4% |

*A small decrease in miles traveled from newer vehicles can result in a proportionally large increase in miles traveled from older vehicles. However, in terms of total miles traveled, the share of miles from older vehicles remains the same, even under reduced new vehicles sales. For example, the share of MHD VMT in 2050 traveled by 2010-2026 trucks more than doubles as the result of reduced vehicle sales, but this still represents a total share of just 11 percent of miles traveled.*

## Modeling refinery emissions in the absence of greenhouse gas emissions standards

As shown in Table 5, there would be a considerable increase in gasoline and diesel usage by heavy-duty vehicles if the proposed repeal of HDV GHG standards were finalized. However, an increase in the domestic use of refined products does not necessarily lead to a similar increase in refinery usage. For example, it could be that this newly supplied product would come from a reduction in exported final product, in which case there would be no increase in emissions. On the other hand, to the extent that this product requires additional refining use, those increased refinery emissions must be captured.

**Table 5.** Gasoline and diesel consumption by heavy-duty vehicles, with and without greenhouse gas emissions standards

| Year | Phase 3 Compliance | | Proposed Repeal | | Difference (Proposal) | |
|---|---|---|---|---|---|---|
| | Gasoline [B gal] | Diesel [B gal] | Gasoline [B gal] | Diesel [B gal] | Gasoline [B gal] | Diesel [B gal] |
| **2030** | 4.995 | 38.817 | 5.089 | 39.427 | +0.091 | +0.610 |
| **2035** | 4.836 | 32.791 | 5.276 | 36.591 | +0.439 | +3.800 |
| **2040** | 4.616 | 28.404 | 5.200 | 34.325 | +0.584 | +5.922 |
| **2045** | 4.520 | 26.159 | 5.057 | 32.635 | +0.537 | +6.476 |
| **2050** | 4.593 | 25.205 | 5.021 | 31.372 | +0.428 | +6.168 |

*Repealing HDV GHG standards would result in more than a 20 percent increase in gasoline and diesel usage from the HDV fleet by 2040 that would continue through at least 2050.*

Macroeconomic modeling of the energy sector can capture these nuances to consider the impacts of increased domestic consumption of gasoline and diesel on the global oil market. For example, the Energy Information Administration's Alternative Transportation scenario in AEO 2025 includes detailed modeling of the liquid fuels sector in a policy case with reduced IRA incentives, the elimination of California's Advanced Clean Trucks program, and the elimination of vehicle GHG standards—in other words, the Alternative Transportation is a virtual match for the proposed repeal.

The Alternative Transportation scenario shows significant increases in domestic production of oil and refining of fuel, both of which adversely affect public health. EDF used this modeling to assess the difference in upstream emissions as a result of the proposed repeal of vehicle GHG standards, finding significant increases in air pollutants and harm to public health.[58]

While we are not modeling the entire transportation sector, we can use the AEO 2025 modeling data to examine the increase in refinery utilization. This can then be used with the latest version of Argonne National Lab's GREET (2024Rev1) model to develop an emissions factor for the gasoline and diesel fuel in our scenario.

The EIA data shows clearly a significant increase in the share of domestic crude supplied to refineries in the Alternative Transportation case. Refinery emissions depend on the fuel source,[59] so a shift in the crude feedstock has an impact on the energy use and emissions from refineries. Domestic crude oil is generally a light crude, which means it has lower production emissions, which is borne out in the GREET data. We can use the relative change in sourced crude as a share of the difference in final product delivered to the transportation sector to estimate the overall emissions change for the final product. Then we can multiply these GREET-based factors for gasoline and diesel by the relative changes in fuel consumption in our heavy-duty modeling to estimate the refinery emissions associated with the additional fuel

---

[58] *EDF Technical Comments.*

[59] *For example, "light" crude is has fewer long-chain molecules and requires less energy for refineries to process into gasoline or diesel than "heavy" crude. "Sour" crude has significantly higher sulfur content, which has an impact on $SO_x$ emissions in particular, whereas "sweet" crude has lower sulfur content.*

used under the proposed repeal treating the relative change in domestic and imported feedstock (and the corresponding fuel) separately.

It is worth noting that we have limited our assessment of petroleum-related emissions to refineries, consistent with EPA. This means that there is no accounting for any of the domestic production emissions related to an increase in domestically sourced crude and, thus, and underestimate of the emissions impact of the repeal.

## Modeling grid emissions in the absence of greenhouse gas emissions standards

Congress recently passed the "One Big Beautiful Bill" Act (OBBBA), which repealed a number of incentives helping to accelerate cleaner electricity generation. As a result, EPA's previous upstream consideration of electric generating units (EGUs) likely overstates the share of clean electricity sources in the future.[60]

In order to better reflect the latest policy, we turn to a grid analysis conducted by Energy Innovation just prior to OBBBA's passage.[61] As detailed in the report, OBBBA is projected to curtail investments in solar, wind, and battery capacity by 110 GW, 210 GW, and 9 GW, respectively, by 2035.

Owing to time and availability of data, we are using average grid emissions rather than trying to estimate any increased deployment of generation specifically for the heavy-duty sector, as was done by EPA.[62] A comparison of our emissions factors and EPA's are shown in **Table 6**. Note that while $CO_2$ emissions are lower in the initial years, virtually all other emissions are higher, particularly in 2050.

According to our MOVES analysis, the repeal of HDV GHG standards will cut electricity usage by approximately 100 TWh annually in the 2040-2050 timeframe, leading to significant reductions in grid-related emissions.

---

[60] *"EGU emission factors decrease into the future, as higher-emitting power generation technologies like coal and natural gas combustion are phased out in favor of renewable sources. This is especially apparent in the emission factors of sulfur dioxide ($SO_2$), which decrease by more than 99% from 2035 to 2050 as coal is almost entirely phased out." p. 580, Phase 3 FRIA.*

[61] *Orvis, et al. 2025. Assessing Impacts of The House "One Big Beautiful Bill Act" On U.S. Energy Costs, Jobs, Health, Emissions. Available at https://energyinnovation.org/report/one-big-beautiful-bill-act/.*

[62] *For a discussion of the relative value of short- and long-run marginal emissions as compared to average emissions, see Gagnon, P. and Cole, W. 2022. "Planning for the evolution of the electric grid with a long-run marginal emission rate," iScience 25 (3), 103915 (2022). https://doi.org/10.1016/j.isci.2022.103915.*

**Table 6.** Comparison of grid emissions factors (tons per TWh)

| | EPA | | | | | UCS (from Energy Innovation) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | $CO_2$ | VOC | $NO_x$ | $PM_{2.5}$ | $SO_2$ | $CO_2$ | VOC | $NO_x$ | $PM_{2.5}$ | $SO_2$ |
| **2035** | 443,304 | 6.4 | 133.6 | 19.5 | 161.2 | 147,048 | 3.9 | 36.2 | 68.6 | 8.9 |
| **2040** | 78,249 | 1.2 | 18.4 | 3.9 | 13.5 | 115,412 | 3.2 | 30.5 | 57.7 | 7.3 |
| **2045** | 98,012 | 2.1 | 9.8 | 3.7 | 4.0 | 119,270 | 2.9 | 22.5 | 41.0 | 6.1 |
| **2050** | 81,195 | 1.1 | 8.7 | 2.9 | 0.4 | 108,137 | 2.6 | 20.4 | 37.3 | 5.4 |

*Owing to the detrimental impacts of the "One Big Beautiful Bill" Act, the grid under current policy is expected to be much dirtier in the future than when EPA conducted its original analysis. Additional differences likely result in EPA's consideration of marginal emissions, as opposed to average grid emissions.*

## Total emissions impacts in the absence of greenhouse gas emissions standards

Emissions and energy data from MOVES combined with the upstream emissions factors detailed above allow us to estimate the emissions impacts of the proposed repeal of HDV GHG standards while explicitly considering the impact compliance with those standards may have on fleet turnover. These emissions differences are summarized in Table 7.

**Table 7.** Air pollution impacts from repealing heavy-duty vehicle greenhouse gas emissions standards, by source (tons)

| | $NO_x$ | $PM_{2.5}$ | $SO_2$ | VOC |
|---|---|---|---|---|
| **Tailpipe emissions** | | | | |
| **2030** | -4,638 | -55 | 8 | -420 |
| **2035** | -3,538 | -32 | 125 | 1,036 |
| **2040** | 12,589 | 25 | 203 | 2,084 |
| **2045** | 22,700 | 52 | 219 | 1,489 |
| **2050** | 22,109 | 141 | 202 | -1,506 |
| **Refinery emissions** | | | | |
| **2030** | 1,324 | 100 | 217 | 941 |
| **2035** | 3,812 | 293 | 611 | 2,633 |
| **2040** | 3,966 | 311 | 618 | 2,726 |
| **2045** | 3,081 | 251 | 464 | 2,161 |
| **2050** | 2,534 | 214 | 371 | 1,801 |
| **Electric generating unit (EGU) emissions** | | | | |
| **2030** | -326 | -39 | -226 | -16 |
| **2035** | -3,950 | -514 | -2,045 | -222 |
| **2040** | -5,759 | -727 | -3,182 | -319 |
| **2045** | -4,617 | -683 | -943 | -323 |
| **2050** | -3,945 | -572 | -794 | -280 |

It is clear from the tailpipe emissions data that EPA's first premise regarding fleet turnover is misguided. While there are some small reductions initially for some pollutants, the fact is that HDV GHG standards encourage the adoption of clean, efficient vehicles, which ultimately will dwarf any short-term impact related to fleet turnover, even under our extremely conservative analysis.

## Total health impacts in the absence of greenhouse gas emissions standards

Because of limited time and resources, we were not able to attempt a detailed air quality or health impact analysis. However, we can utilize EPA's benefits-per-on estimates by sector to estimate the net monetized health impacts of the proposed repeal.[63] Importantly, these estimates reflect premature mortality from both ozone and particulate matter.

We analyzed the outcome of the repeal using MOVES for specific calendar years. To account for intervening years in order to calculate a total net present value, we use linear interpolation. Undiscounted values for the modeled years are presented for both a choice of discount rate for the health outcomes of 3 and 7 percent along with the total net present value.

**Table 8.** Monetized health impacts from repealing heavy-duty vehicle greenhouse gas emissions standards, by source (millions of 2022$)

Discount rate applied of 3%

|  | Ozone | PM$_{2.5}$ (Wu) | PM$_{2.5}$ (Pope) | Total |
|---|---|---|---|---|
| **2030** | -323 | 0 | 1 | -322 to -323 |
| **2035** | -614 | -23 | -42 | -657 to -637 |
| **2040** | 666 | 125 | 254 | 791 to 920 |
| **2045** | 1,949 | 497 | 976 | 2,446 to 2,925 |
| **2050** | 2,050 | 556 | 1,071 | 2,606 to 3,121 |
| **NPV** | 7,152 | 2,548 | 5,028 | 9,700 to 12,180 |

Discount rate applied of 7%

|  | Ozone | PM$_{2.5}$ (Wu) | PM$_{2.5}$ (Pope) | Total |
|---|---|---|---|---|
| **2030** | -290 | 0 | 1 | -289 to -290 |
| **2035** | -553 | -21 | -38 | -574 to -591 |
| **2040** | 592 | 113 | 230 | 705 to 822 |
| **2045** | 1,743 | 449 | 876 | 2,192 to 2,619 |
| **2050** | 1,834 | 505 | 961 | 2,338 to 2,794 |
| **NPV** | 2,230 | 1,068 | 2,104 | 3,298 to 4,334 |

---

[63] *See footnote 31.*

## Summary of modeling results

UCS developed a simple compliance model using the HD TRUCS framework developed by EPA to assess a market-based HDV fleet in the absence of GHG standards. This was then combined with the EPA MOVES model to examine the impact of compliance costs on fleet turnover.

At virtually every stage of the process, assumptions were chosen that would increase costs and/or decrease fleet turnover in an effort to see whether there was any validity to the agency's concerns around air quality impacts. These assumptions include: additional limitations on the availability of hybrid and battery-electric vehicle deployment in the absence of GHG emissions standards; excluding the availability of hydrogen fuel cell vehicles in all classes, even when they are a lower-cost technology alternative to BEVs; prioritizing diesel technology deployment, which limits tailpipe emissions improvements from new vehicles; setting a price elasticity of 1, despite clear evidence that fleet operators will always consider any additional fuel savings; allowing for backsliding in the compliance scenario on diesel technology, which is not likely to occur given fleet operators' focus on TCO; and proportionally assigning vehicle miles traveled proportional to travel rather than per-mile costs.

Despite all these conservative assumptions, our modeling shows that the repeal of HDV GHG emissions standards will result in between $9.7 and $12.2 billion in net present value costs (3 percent discount rate) in health impacts alone.

**EPA's concerns about fleet turnover must be wholeheartedly rejected.**

# 3   Regulatory Text Related to Other Emissions Regulations

## Response to EPA Request for Comment (C-3, C-16, C-19, C-20)

*The EPA is not proposing to reopen or substantively modify at this time any regulations necessary for criteria pollutant and air toxic measurement and standards, CAFE testing, and associated fuel economy labeling requirements. If there are any elements of our regulations, test procedures, or GHG emission models proposed for removal that should remain to support other programs outside of the EPA's GHG standards, we are seeking comment on what those elements are and why their preservation in the CFR is necessary (C–3).*

*We request comment on all proposed changes described in section VI of this preamble, including on any additional regulatory provisions for engines and vehicles that should be removed as part of repealing the GHG standards or should be retained to effectuate unrelated standards that we are not proposing to repeal or revise (C–16).*

*We request comment on all proposed changes described in preamble section VI, including suggestions to remove additional regulatory provisions for such engines and vehicles for purposes of GHG regulation or to retain provisions we propose to remove. Specifically, we request comment on the proposed regulatory changes for the light- and medium-duty vehicle programs under 40 CFR parts 85, 86, and 600, and whether additional changes should be considered for purposes of GHG regulation (C–19).*

*We request comment on all proposed changes described in preamble section VI, including suggestions to remove additional regulatory provisions for such engines and vehicles for purposes of GHG regulation or to retain provisions we propose to remove. Specifically, we request comment on the proposed regulatory changes for the heavy-duty engine and vehicle programs under 40 CFR parts 1036 and 1037 and whether we should consider additional changes for purposes of GHG regulation (C–20).*

In its zeal to eliminate regulatory text related to greenhouse gas emissions standards, EPA has (inadvertently?) deleted critical emissions-related text that ensures emissions controls are

functional over the vehicle lifetime as intended. The relevant sections of regulatory text are identified below, along with the rationale for their reinstatement.

## Battery warranty and durability provisions

*40 CFR § 85.2103 (d)(1)(v) and (d)(3)*  
*40 CFR § 86.1 (c)(2), (c)(3), and (f)(3)*  
*40 CFR § 86.1807-01 (a)(3)(iv)*  
*40 CFR § 86.1815-27*  
*40 CFR § 86.1839-01 (c)*  
*40 CFR § 86.1845-04 (g)*  

*40 CFR § 86.1861-17 (f)*  
*40 CFR § 1036.635 (a)(2)*  
*40 CFR § 1037.115 (f)*  
*40 CFR § 1037.205 (e)(1)*  
*40 CFR § 1037.205 (q)*  

The above sections of regulatory text all refer to provisions regarding battery warranty and durability. The agency has erred in removing these sections, as these provisions are not limited to greenhouse gas emissions. In fact, 40 CFR § 1037.120(c) makes clear that the emissions-related warranty should cover batteries.

This is described at length in the multipollutant rule in which these provisions were introduced for light- and medium-duty vehicles:

> "The battery durability and warranty requirements support BEV and PHEV battery durability and thus support achieving the GHG *and NMOG+NOX emissions* reductions projected for the final standards." (89 FR 27965) [*emph.* added]

BEVs and PHEVs are part of the vehicle set meeting NMOG+NO$_x$ standards, and ensuring that they are capable of reducing those emissions over the lifetime of use and that that lifetime of use is consistent with the credits received under the NMOG+NO$_x$ emissions standards is key to ensuring that the NMOG+NO$_x$ program results in the emissions reductions intended.

No explanation is given by the agency for the removal of these provisions. These provisions are not part of the GHG program, as was made clear over and over in the preamble to the 2027-2032 LDV and MDV rule.[64] They are needed for ensuring reductions in tailpipe emissions over

---

[64] *On severability: "For example, EPA is making changes to compliance testing (including requirements for fuels) and other certification procedures, as well as establishing battery durability and battery warranty provisions. Each of these issues has been considered and adopted independently of the level of the standards, and indeed of each other. Thus, EPA has independently considered and adopted each of these portions of the final rule (including but not limited to the standards for LD GHG, LD NMOG+NOX, LD PM, LD CO, LD HCHO, MD GHG, MD NMOG+NOX, MD PM, MD CO, MD HCHO; in-use standards for high-GCWR MDV; trading and A/C credits; compliance testing and certification procedures; battery durability; and battery warranty) and each is severable should there be judicial review." 89 FR 28144.*

the length of the vehicle's life.[65] They are explicitly applicable to the NMOG+$NO_x$ standards.[66] And they are legally required under the Clean Air Act.[67,68]

The elimination of current battery warranty and durability requirements falls outside the scope of the proposal amending its authority to regulate greenhouse gas emissions, and EPA must therefore not finalize any regulatory text eliminating battery warranty and durability requirements.

## Miscellaneous unrelated provisions deleted in the proposal

40 CFR § 1036.545 (a)(1) was proposed to be deleted in the proposal. However, this provision is explicitly related to $NO_x$ emissions testing during engine testing required under the HD CAFE program. This regulatory text should remain even if the agency finalizes the repeal of HDV GHG emissions standards.

---

[65] *The ability of a zero-emission vehicle to achieve the expected emission reductions during its lifetime depends in part on the ability of the battery to maintain sufficient driving range, capacity, power, and general operability for a period of use comparable to that of any other vehicle. Durable and reliable electrified vehicles are therefore critical to ensuring that projected emissions reductions are achieved by this program." 89 FR 27968.*

[66] *From 40 CFR § 86.1815-27, which the agency has proposed to eliminate: "The requirements of this section start to apply for vehicles above 6,000 pounds GVWR* **when they are first certified to Tier 4 NMOG+$NO_x$ bin standards** *under § 86.1811-27(b), not later than model year 2031." (**emph.** added) This makes clear this provision is related to Tier 4 (and therefore non-GHG) standards.*

[67] *Under CAA § 202(a)(1): "As required under CAA section 202(a)(1) ("Such standards shall be applicable to such vehicles and engines for their useful life"), EPA emissions standards are applicable for the full useful life of the vehicle. ... Today's final rule continues EPA's longstanding policy of ensuring durability for emissions control components and builds upon the existing durability requirements for batteries. Recognizing that PEVs, including both PHEVs and BEVs, are playing an increasing role in automakers' compliance strategies, and that emissions credit calculations are based on mileage over a vehicle's full useful life, EPA similarly has the authority to set requirements ensuring that manufacturers with PEVs in their fleet will continue to comply with relevant emissions standards over the course of those PEVs' useful lives." 89 FR 27967.*

[68] *Under CAA § 207: "For light-duty vehicles, CAA section 207(i)(1) specifies that the warranty period is 2 years or 24,000 miles of use (whichever first occurs), except for specified major emission control components (SMECC) described in 207(i)(2), for which the warranty period is 8 years or 80,000 miles of use (whichever first occurs). For all other vehicles, which would include mediumduty vehicles (MDVs), CAA 207(i)(1) specifies that the warranty period shall be the period established by the Administrator. For both light-duty and medium-duty vehicles, the Administrator is establishing a warranty period of 8 years and 80,000 miles. ... CAA section 207(i)(2) provides that the Administrator may so designate any other pollution control device or component, subject to the conditions that the device or component was not in general use on vehicles and engines manufactured prior to the model year 1990 and that the retail cost (exclusive of installation costs) of such device or component exceeds $200 (in 1989 dollars), adjusted for inflation or deflation as calculated by the Administrator at the time of such determination. Adjusted for inflation, the $200 retail cost threshold would be about $500 today. As BEVs and PHEVs and thus their high-voltage battery systems and associated powertrain components were not in general use prior to 1990, and their high-voltage battery systems and associated powertrain components exceed this cost threshold, the Administrator determines that these emission control devices meet the criteria for designation as specified major emission control components. Accordingly, the Administrator designates these components as specified major emission control components according to his authority under CAA section 207(i)(2)." 89 FR 27972-3.*

# 4  EPA HDV Regulations and CAFE

## Response to EPA Request for Comment C-17 and C-18

*NHTSA's medium- and heavy-duty fuel efficiency regulations in 49 CFR part 535 refer to several sections in the EPA's 40 CFR parts 1036 and 1037 that we are proposing to modify or remove. We request comment on whether any of these provisions should be retained for the final rule with a CFR notation throughout 40 CFR parts 1036 and 1037 explaining that these sections only apply to NHTSA's heavy-duty fuel efficiency program (C–17).*

*We request comment on the time required to transition from requiring manufacturers to supply relevant data to the EPA to requiring that they supply the data directly to NHTSA (C–18).*

EPA and NHTSA worked closely to design test procedures for compliance with HD GHG emissions and MD/HD CAFE standards.  As noted by EPA, many of the test procedures for the heavy-duty CAFE program directly refer to EPA's program. Should EPA make the disastrous decision to eliminate its HD GHG emissions standards, it is nonetheless straightforward to selectively eliminate references to GHG emissions in the relevant regulatory text to preserve the test procedures that apply to MD/HD CAFE. These test procedures were adopted via notice and comment aimed specifically at the HDV sector and have been in place in many cases for over a decade. Were the agency to simply strike these sections, NHTSA's MD/HD CAFE would cease to function and be thrown into chaos. Should NHTSA choose down the road to respond to any EPA action by eliminating references to those sections and adopting its own regulatory text, EPA could adopt such action, since these sections would be vestigial; however, the agency must not do so preemptively, or it would disrupt another agency's regulation and undermine a statute over which it has no authority.

While EPA highlights references to 40 CFR parts 1036 and 1037,[69] NHTSA's MD/HD CAFE regulations also refer to 40 CFR parts 85, 86, 1039, and 1068.[70] In many cases, NHTSA's regulations do not specify further the relevant CFR section with any detail, making it difficult to assess precisely which subsections of these parts are directly relevant to NHTSA's regulation. Additionally, NHTSA's regulations take for granted the existence of the EPA program, referring to it as "the corresponding EPA program" and noting overlapping regulatory applicability. If EPA were to outright delete its greenhouse gas emissions programs, this would only further sow confusion over to manufacturers' responsibilities under MD/HD CAFE.

---

[69] *90 FR 36324.*
[70] *For example, see 49 CFR § 535.3 (c) and (h).*

Given the intrinsic overlap between the two programs, the first-best solution, should EPA finalize its repeal of vehicle GHG emissions standards, would be for the agency to amend the relevant "Applicability" sections with a note along the lines of "To the extent that these sections refer to greenhouse gas emissions standards, such provisions are solely left for reference to the medium- and heavy-duty vehicle fuel efficiency program (49 CFR § 535). There are no applicable greenhouse gas emissions standards for vehicles under 40 CFR Part XXX." This would preserve any undocumented references between the two programs and provide clarity for manufacturers in any intervening period before EPA works with NHTSA to adjust the regulatory text of 49 CFR § 535 to eliminate any such overlap.

Because EPA has not in its proposal identified all of the linkages between the two programs, we have outlined as much as possible some specific sections that should remain, although it is likely that this list is incomplete as well given how tightly the two programs are tied together:

**40 CFR § 86.1801-12 (a)(3)(i) –** keep "The work factor for these vehicles may not be greater than the largest work factor that applies for vehicles in the test group that are at or below 14,000 pounds GVWR (see § 86.1819-14)"

**40 CFR § 86.1819-14(k)(5) –** this is referred to at 49 CFR § 535.3 (e)(2)(ii), and it is likely that the entirety of 40 CFR § 86.1818 and 40 CFR § 86.1819 should be preserved since this covers a range of applicability not directly called out in 49 CFR § 535.

**40 CFR § 1036.108 –** Referenced by NHTSA at 49 CFR § 535.6 (d)(2).

**40 CFR § 1036.230 –** Referenced by NHTSA at 49 CFR § 535.6 (d)(3)(i).

**40 CFR § 1036.235 –** Referenced by NHTSA at 49 CFR § 535.6 (d)(2)(ii), (d)(3)(iii).

**40 CFR § 1036.301 (b), (c), and (d) –** the GEM model is used for both HD CAFE and HD GHG compliance, and selective enforcement audits should remain valid for those inputs. It is not clear to me why EPA has proposed eliminating this regulatory text.

**Subpart F of 40 CFR § 1036 (1036.501-1036.580) –** NHTSA refers to these EPA engine sections as part of its own test procedures. These must remain in place until NHTSA eliminates said references or the fuel consumption standards for HD engines would lack any certification process.

**40 CFR § 1036.501 (h) –** EPA has erroneously proposed eliminating 1036.505, references to which are deleted here. GEM is core to compliance with both HD CAFE and HD GHG and is explicitly referred to at 49 CFR § 535.6 for measurement and calculation procedures.

**40 CFR § 1036.505 –** the GEM model is used for both HD CAFE and HD GHG compliance, and selective enforcement audits should remain valid for those inputs. It is not clear to me why EPA has proposed eliminating this regulatory text. Moreover, EPA is the agency better positioned to provide such audits, owing to the National Vehicle and Fuel

Emissions Laboratory in Ann Arbor, MI, which is equipped with appropriate test equipment to validate manufacturer data for both light- and heavy-duty vehicles.[71]

**40 CFR § 1036.535 –** the fuel-mapping procedure core to the GEM model is used for both HD CAFE and HD GHG compliance and should remain.

**40 CFR § 1036.540 –** the fuel-mapping procedure core to the GEM model is used for both HD CAFE and HD GHG compliance and should remain.

**40 CFR § 1036.545 –** the deletions in this section seem to misunderstand fundamental lab test procedures. For example, the deleted text of (a)(7) is likely the result of conflating "carbon balance" with "greenhouse gas emissions" when this is just a general practice for fuel economy testing writ large. Additionally, as with the above examples EPA is proposing to delete regulatory text (e.g., (g), (h), (n), (o) ) that fundamentally underpins compliance with the CAFE program because GEM and its inputs are core to that compliance. Some additional deletions refer to sections that we have already identified as being necessary to carry forward.

**40 CFR § 1036.730 –** Referenced by NHTSA at 49 CFR § 535.6 (d)(3)(i).

**40 CFR § 1036.815 –** The deleted sentence should instead be modified, since §§ 1036.535 and 1036.545 should be left in. A narrower alteration could be "Data that vehicle manufacturers need for demonstrating compliance with vehicle fuel efficiency standards, including fuel consumption data as described in §§ 1036.535 and 1036.545, also qualify as emission data for purposes of confidentiality determinations." This policy would be consistent with the treatment of other relevant manufacturer-submitted data.

**Appendix C to 40 CFR § 1036 –** This deletion again is the result of EPA's lack of recognition of how HD CAFE compliance is determined, which is through the GEM model. The default engine fuel maps help reduce the test burden on manufacturers and are key to modeling compliance of HD CAFE.

**40 CFR Part 1037 –** The list of sections of 40 CFR Part 1037 referenced by 49 CFR § 535.6 is quite lengthy, and EPA should not eliminate any such sections: 1037.150, 1037.230, 1037.231, 1037.232, 1037.301, all of Subpart F (1037.501-570), 1037.610, 1037.660. EPA's proposed elimination of Subparts D-F of 40 CFR Part 1037 makes little sense considering how severable they are from the GHG standards and how critical they are to the ability for NHTSA to administer compliance with its own program. These provisions represent standardized procedures that were developed with stakeholders and have been in place for many years with a certainty for manufacturers on how to comply with both the HD GHG and MD/HD CAFE programs.

**40 CFR § 1037.5 (d) –** MD/HD CAFE explicitly refers to exemptions in 40 CFR Part 1037, and it is likely that this exclusion is one with overlapping jurisdiction that is not otherwise specified in 49 CFR § 535.

---

[71] *https://www.epa.gov/vehicle-and-fuel-emissions-testing/technical-capabilities-national-vehicle-and-fuel-emissions*

**40 CFR § 1037.205 –** EPA has erroneously deleted the second sentence, ignoring that this emissions data is required for HD CAFE compliance and should still be required. Eliminating the current list of required data at (e) would also impede compliance with HD CAFE.

**40 CFR § 1037.230 –** The adjustments made by EPA to family definitions are not necessary and create confusion with ongoing certification with HD CAFE.

**Subparts G and H of 40 CFR § 1037 –** Flexibilities such as off-cycle credit programs that NHTSA relies upon for its own program cannot simply be deleted (e.g., 40 CFR § 1037.610 is referenced by 49 CFR § 535.7 (a)(1)(iv) ). Similarly, the ABT provisions of NHTSA's HD CAFE program refer to the same provisions established in Subpart H of 40 CFR § 1037 (e.g., 49 CFR § 535.7 (a)(2)(iv) refers directly to sections like 40 CFR § 1037.745 the agency is proposing to eliminate).

Many of the changes made above, particularly those with reference to GEM inputs and test procedures, seem to ignore EPA's historical role for CAFE, which has since the advent of the CAFE program been to determine the appropriate test procedures.[72] It is only natural for this role to translate into the heavy-duty sector, regardless of whether or not the agency maintains its HD GHG program. EPA staff developed the models underlying compliance with both programs[73] and has invested in the laboratory equipment to support these test procedures.[71] The fact that NHTSA's own regulatory text defers to the agency on test procedures throughout supports this shared understanding.[74]

For this reason, we do not think it necessary to delete 40 CFR § 1036.755—EPA would be playing the same role it already plays in the light-duty vehicle sector.

It is also notable that EPA is not in a position to delete reporting requirements because from the beginning NHTSA has tied compliance of its program to EPA's program.[75] EPA cannot by itself determine to sever that tie by eliminating the referential text—the proposed repeal is focused exclusively on greenhouse gas emissions, and not only would altering MD/HD CAFE regulations not be germane to the proposal, but EPA lacks the authority to do so.

---

[72] *P.L. 94-163, Dec. 22, 1975, 89 Stat. 907: "Fuel economy for any model type shall be measured, and average fuel economy of a manufacturer shall be calculated, in accordance with testing and calculation procedures established by the EPA Administrator, by rule. Procedures so established with respect to passenger automobiles (other than for purposes of section 506) shall be the procedures utilized by the EPA Administrator for model year 1975 (weighed 55 percent urban cycle, and 45 percent highway cycle), or procedures which yield comparable results. Procedures under this subsection, to the extent practicable, shall require that fuel economy tests be conducted in conjunction with emissions tests conducted under section 206 of the Clean Air Act. The EPA Administrator shall report any measurements of fuel economy and any calculations of average fuel economy to the Secretary."*

[73] *See e.g., EPA. 2011. Peer Review of the Greenhouse Gas Emissions Model (GEM) and EPA's Response to Comments. EPA-420-R-11-007.*

[74] *"EPA already oversees testing, collects and processes test data, and performs calculations to determine compliance with both CAFE and CAA standards for Light-Duty. For Heavy-Duty products that closely parallel lightduty pickups and vans, under a coordinated approach, the compliance mechanisms for both programs for NHTSA and EPA would be consistent and non-duplicative for GHG pollutant standards and fuel consumption requirements." 76 FR 57256.*

[75] *"NHTSA will assess compliance with its fuel consumption standards based on the results of the EPA GHG emissions compliance process for each engine family." 76 FR 57256*

For these reasons, the time required to transition from requiring manufacturers to supply relevant data to the EPA to requiring that they supply the data directly to NHTSA is not a question that is relevant to the current proposal—such action must be taken in the context of the MD/HD CAFE program and only by the Administrator with authority to do so.

# 5  Conclusions

Transportation is the largest source of greenhouse gas emissions in the United States.[76] The scientific evidence on the harms from greenhouse gas emissions to the public health and welfare of the people of the United States is quite clear.[77] The concerns raised by EPA are dubious, at best, as indicated by UCS's modeling and that of others showing the significant damage that would be enacted by the repeal of the endangerment finding and rescission of vehicle greenhouse gas emissions standards.

EPA must act in the best interest of the American people by withdrawing its proposal and focusing on protecting the public health and welfare, as the Agency is required to do under the Clean Air Act.

---

[76] *"The transportation sector was the largest emitter of CO2 in 2023, followed by electric power generation," p. ES-8. EPA. 2025. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2023. EPA-430-R-25-003. Available at https://library.edf.org/AssetLink/145ky510ew61fk1tq5c2klp5kq5yp33j.pdf*

[77] *"EPA's 2009 finding that the human-caused emissions of greenhouse gases threaten human health and welfare was accurate, has stood the test of time, and is now reinforced by even stronger evidence," p. 1. NASEM. 2025. Effects of Human-Caused Greenhouse Gas Emissions on U.S. Climate, Health, and Welfare. Washington, DC: The National Academies Press. https://doi.org/10.17226/29239.*

## Author

**Dr. Dave Cooke** is Senior Scientist in the UCS Clean Transportation Program.

## References

Allsup, M. 2025. "These are the hydrogen hubs slated to lose their DOE funding," Latitude Media, April 4, 2025, https://www.latitudemedia.com/news/these-are-the-hydrogen-hubs-slated-to-lose-their-doe-funding/.

Argonne National Lab. 2025. R&D GREET® Model: The Greenhouse gases, Regulated Emissions, and Energy use in Technologies Model. 2024Rev1 release, May 23, 2025. https://greet.anl.gov/

Bolon, K. 2025. Appendix A supporting materials for analysis using 2024 LMDV and HDP3 rule methodologies (data). July 21, 2025. Document # EPA-HQ-OAR-2025-0194-0038.

Brakora, J., and Cullen, A. 2016. Greenhouse Gas Emission Model (GEM) Simulation of the Best of 2027 Tractor-Trailers for Phase 2 Final Rule, August 9, 2016. Memo. Document # EPA-HQ-OAR-2014-0827-2349.

Cannon, J. 2025. "ABF Freight: Tesla Semi 'generally matched' diesel trucks in 3-week pilot," Commercial Carrier Journal, July 9, 2025. https://www.ccjdigital.com/alternative-power/article/15750270/abf-freights-tesla-semi-pilot-reveals-impressive-efficiency-and-performance.

Center for Biological Diversity, et al. 2025a. Joint legal comments on the proposed rulemaking entitled "Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards," 90 Fed. Reg. 36,288 (Aug. 1, 2025). Submitted to Docket # EPA-HQ-OAR-2025-0194, September 22, 2025.

Center for Biological Diversity, et al. 2025b. Joint comments addressing the legal and technical deficiencies with EPA's proposed repeal of vehicle standards," 90 Fed. Reg. 36,288 (Aug. 1, 2025). Submitted to Docket # EPA-HQ-OAR-2025-0194, September 22, 2025.

Cleetus, R., et al. 2025a. Comments on the draft report produced by DOE's Climate Working Group (CWG), titled "A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate" (CWG Report). 90 FR 36150, August 1, 2025. Notice. Department of Energy. Submitted to Docket # DOE-HQ-2025-0207, September 2, 2025. Available at https://ucs-documents.s3.us-east-1.amazonaws.com/global-warming/comments-doe-climate-working-group-report.pdf.

Cleetus, R., et al. 2025b. Comments on Proposed Rule for Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards. Submitted to Docket # EPA-HQ-OAR-2025-0194, September 22, 2025.

Department of Energy, n.d. "Hydrogen Resources." https://www.energy.gov/eere/fuelcells/hydrogen-resources.

Environmental Defense Fund (EDF). 2025. Technical Comments re Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards. Submitted to Docket # EPA-HQ-OAR-2025-0194 on September 22, 2025.

EPA. 2011a. Final Rulemaking to Establish Greenhouse Gas Emissions Standards and Fuel Efficiency Standards for Medium-and Heavy-Duty Engines and Vehicles: Regulatory Impact Analysis. EPA-420-R-11-901.

EPA. 2011b. Peer Review of the Greenhouse Gas Emissions Model (GEM) and EPA's Response to Comments. EPA-420-R-11-007.

EPA. 2021. Revised 2023 and Later Model Year Light-Duty Vehicle GHG Emissions Standards: Regulatory Impact Analysis. EPA-420-R-21-028.

EPA. 2024a. Appendix A. Detailed Real-World Fuel Economy, CO2 Emissions, and Vehicle Attribute and Technology Data (dataset). Available at https://www.epa.gov/automotive-trends/explore-automotive-trends-data.

EPA. 2024b. The 2024 EPA Automotive Trends Report: Greenhouse Gas Emissions, Fuel Economy, and Technology since 1975. EPA-420-R-24-022. Available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101CUU6.pdf.

EPA. 2024c. Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Regulatory Impact Analysis. EPA-420-R-24-004.

EPA. 2024d. Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles: Response to Comments. EPA-420-R-24-005.

EPA. 2024e. Sector-based PM2.5 and Ozone Benefit Per Ton Estimates (dataset). Archived at https://gaftp.epa.gov/benmap/BPTs/archives/.

EPA. 2024f. Motor Vehicle Emission Simulator: MOVES5 (Version 5.0.0) [Computer software]. https://www.epa.gov/moves.

EPA. 2025. Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2023. EPA-430-R-25-003. Available at https://library.edf.org/AssetLink/145ky510ew61fk1tq5c2klp5kq5yp33j.pdf

EPA. n.d. Technical Capabilities of the National Vehicle and Fuel Emissions Laboratory (NVFEL). https://www.epa.gov/vehicle-and-fuel-emissions-testing/technical-capabilities-national-vehicle-and-fuel-emissions

EPA and NHTSA. 2016. Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles - Phase 2: Regulatory Impact Analysis. EPA-420-R-16-900.

Gagnon, P. and Cole, W. 2022. "Planning for the evolution of the electric grid with a long-run marginal emission rate," iScience 25 (3), 103915 (2022). https://doi.org/10.1016/j.isci.2022.103915.

Greene, D.L. 2025. The EPA erred by omitting the value of greenhouse gas emissions reductions from its proposed rule's cost-benefit analysis. September 5, 2025. Document # EPA-HQ-OAR-2025-0194-0635.

Greene, D.L., et al. 2018. "Consumer willingness to pay for vehicle attributes: What do we know?" Transp. Res. Part A Policy Pract. 2018 Dec;118:258–279. doi: 10.1016/j.tra.2018.09.013.

Helfand, G, and R Dorsey-Palmateer. 2015. "The Energy Efficiency Gap in EPA's Benefit-Cost Analysis of Vehicle Greenhouse Gas Regulations: A Case Study." Journal of Benefit-Cost Analysis 6 (2): 432-454. https://doi.org/10.1017/bca.2015.13.

International Energy Agency. 2025. Global Hydrogen Review 2025. https://www.iea.org/reports/global-hydrogen-review-2025/.

Meyer, R. 2025. "The EPA's Backdoor Move to Hobble the Carbon Capture Industry," Heatmap News, Sept. 12, 2025, https://heatmap.news/energy/epa-greenhouse-gas-reporting-program-45q.

Moving Forward Network, et al. 2023. Comments Re: Phase 3 Greenhouse Gas Emissions Standards for Heavy-Duty Vehicles Docket No. EPA–HQ–OAR–2022–0985. Document # EPA-HQ-OAR-2022-0985-1631.

National Academies of Science, Engineering, and Medicine (NASEM). 2025. Effects of Human-Caused Greenhouse Gas Emissions on U.S. Climate, Health, and Welfare. Washington, DC: The National Academies Press. https://doi.org/10.17226/29239.

National Research Council. 1992. Automotive Fuel Economy: How Far Can We Go?. Washington, DC: The National Academies Press. https://doi.org/10.17226/1806.

National Research Council. 2015. Cost, Effectiveness, and Deployment of Fuel Economy Technologies for Light-Duty Vehicles. Washington, DC: The National Academies Press. https://doi.org/10.17226/21744.

Orvis, et al. 2025. Assessing Impacts of The House "One Big Beautiful Bill Act" On U.S. Energy Costs, Jobs, Health, Emissions. Available at https://energyinnovation.org/report/one-big-beautiful-bill-act/.

Rogers, E.M. 2003. Diffusion of Innovations. 5th edition. New York, NY: Free Press.

Transportation Research Board and National Research Council. 2002. Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards. Washington, DC: The National Academies Press. https://doi.org/10.17226/10172.

Volvo Trucks. 2025. 600 km range and superfast charging – meet Volvo's new electric truck. Press release, May 20, 2025. https://www.volvotrucks.com/en-en/news-stories/press-releases/2025/may/600-km-range-and-superfast-charging-meet-volvo-s-new-electric1.html.

Xie, Y., and Minjares, R. 2025. Battery Electric Commercial Vehicle Pricing in the United States. Working Paper of the International Council on Clean Transportation (ICCT), September 8, 2025. Available at https://theicct.org/publication/battery-electric-commercial-vehicle-pricing-in-the-us-sept25/

Union of
Concerned Scientists

*The Union of Concerned Scientists puts rigorous, independent science into action, developing solutions and advocating for a healthy, safe, and just future.*

© SEPTEMBER 2025    UNION OF CONCERNED SCIENTISTS

# EXHIBIT 5

# ATTACHMENT 2

Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| **EVA LIGHTHISER**; et al.<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>**DONALD J. TRUMP**, in his official capacity as President of the United States; et al.<br><br>　　　　　　Defendants. | Case No: CV-25-54-BU-DLC<br><br>**DECLARATION OF JOHN BALMES, MD, IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, John Balmes, hereby declare and if called upon would testify as follows:

1.  I am a Professor Emeritus of Environmental Health Sciences at the University of California, Berkeley School of Public Health, with a focus on the respiratory, cardiovascular, immune, and metabolic health effects of air pollution. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.  I am submitting this Declaration in support of Plaintiffs' Motion for Preliminary Injunction to prevent Defendants from implementing several sections of Executive Orders Nos. 14154, 14156, and 14261, which are designed to "unleash" fossil fuels, increase air pollution, and suppress public health and climate science research.

3.  In this declaration, I describe how the health of children and youth is currently being harmed by air pollution from fossil fuels and how those harms will get worse if Defendants are allowed to "unleash" more fossil fuels. I also describe how cuts in federal funding, particularly from the National Institutes of Health (NIH), National Science Foundation (NSF), and Environmental Protection Agency (EPA) will have immediate and long-lasting consequences for public health, and children in particular. My decades of research and public service have demonstrated that emissions of air pollutants and greenhouse gases (GHG) from fossil fuels

1

exacerbate respiratory and allergic diseases as well as increasing the risk of diabetes, obesity and high blood pressure, thereby endangering the lives of children and youth.

4.      In my opinion, urgent and substantial reductions in GHG emissions are necessary to prevent irreversible harm to the health and lives of children. Given the well-developed body of science documenting how pollution from fossil fuels impairs children's health, "unleashing" more fossil fuels is reckless, will harm these 22 youth Plaintiffs, and endangers their lives. Each additional ton of fossil fuel pollution Defendants "unleash" will further endanger Plaintiffs' lives. Because of the life-long consequences of childhood exposure to fossil fuel pollution, it is critical that Defendants' actions to "unleash" more harmful fossil fuels are stopped immediately.

**Background & Qualifications**

5.      I earned my Bachelor of Arts degree from the University of Illinois, Urbana, in 1972, and obtained my M.D. from Mt. Sinai School of Medicine, City University of New York, in 1976. I completed my residency in internal medicine at Mt. Sinai Hospital, followed by a fellowship in pulmonary and critical care medicine at Yale University.

6.      I served on the faculty of the University of California, San Francisco (UCSF) for more than three decades, attaining the position of Professor of Medicine and currently holding the title of Professor Emeritus. Concurrently, for more than two decades, I was a Professor of Environmental Health Sciences at the University

2

Case 2:25-cv-00054-DLC    Document 25-2    Filed 06/13/25    Page 4 of 78

of California, Berkeley School of Public Health and am currently holding the title of Professor Emeritus.

7. I directed the Northern California Center for Occupational and Environmental Health (COEH) from 2002-2021 and served as Director of the Human Exposure Laboratory at UCSF from 1990-2015. In these roles, I advanced research and education in occupational and environmental health and mentored numerous graduate students and health professionals.

8. Since 2008, I have served as the Physician Member of the California Air Resources Board, advising the state on health-based air quality standards and public health impacts of climate-related air pollution, including wildfire smoke.

9. My research has focused on the health effects of air pollution, with particular attention to vulnerable populations, including children. I have led or collaborated on NIH and EPA-funded studies examining the impacts of ozone, particulate matter, diesel exhaust, and wildfire smoke on lung function and inflammatory responses.

10. I have served on and chaired numerous committees for the American Thoracic Society (ATS), including the Environmental Health Policy Committee and multiple international and ad hoc task forces related to air pollution, climate change, and respiratory health.

Case 2:25-cv-00054-DLC    Document 25-2    Filed 06/13/25    Page 5 of 78

11.     My scientific contributions include over 300 peer-reviewed publications addressing occupational lung disease, air pollution exposure, asthma, COPD, and gene-environment interactions. I also contributed to defining the occupational contribution to the burden of airway disease in an official ATS statement.

12.     As an invited speaker, I have presented at leading international and national conferences on environmental and respiratory health, including the American Thoracic Society, World Allergy Organization, and the Pan-African Thoracic Society. I regularly lecture on climate change and its intersection with public health.

13.     I have testified before legislative bodies and advised the National Academies of Sciences, Engineering, and Medicine on topics including wildfire smoke, respiratory protection, and health effects of climate-driven environmental exposures.

14.     I have received numerous honors and awards, including the Distinguished Achievement Award and the John M. Peters Award in Appreciation of a Lifetime of Leadership, Research, and Devoted Service to the Pursuit of Respiratory Health from the American Thoracic Society, recognizing my lifetime contributions to respiratory health and environmental medicine.

15.     I have been retained as an expert in multiple public health and environmental health matters, offering my scientific and medical expertise on the adverse impacts of air pollution and climate change.

16.     Additional details on my education, research, and public service can be found in my curriculum vitae, a true and correct copy of which is attached as Exhibit A.

**Children, Including Plaintiffs, are Being Harmed by Fossil Fuel Burning Today**

17.     Fossil fuel burning from vehicles, power plants, and industrial sources, emits a complex mixture of air pollutants including nitrogen dioxide ($NO_2$), fine particulate matter ($PM_{2.5}$), black carbon, and ozone precursors. These pollutants disproportionately harm children. Fossil fuel-driven air pollution is a major contributor to adverse pediatric health outcomes, and reducing such emissions is critical to protecting children's health and development. Defendants' actions to "unleash" more fossil fuels and block the build out of clean energy alternatives will increase fossil fuel burning and cause more harm to Plaintiffs' health and lives.

18.     We know that preserving lung health during childhood is critical for chronic disease morbidity and mortality not just in childhood but over the child's entire life. Lower lung function in childhood has been linked to chronic respiratory disease in adulthood, including chronic obstructive pulmonary disease (COPD),

5

underscoring the long-term consequences of early-life exposure.[1] Children are particularly susceptible to air pollution as they have developing lungs, weigh less, and breathe faster than adults, resulting in a higher effective dose of air pollution. The risk begins prenatally, when maternal exposure to $PM_{2.5}$ increases risk for poorer lung function and development of asthma throughout childhood.[2] During childhood, when children exercise outdoors, they increase their respiratory rate and thus are exposed to outdoor air and the pollutants in larger quantities (more air per kg of body weight). This disproportionate exposure is harmful to the developing lungs and immune systems in children.[3]

---

[1] McGeachie MJ, Yates KP, Zhou X, et al. Patterns of growth and decline in lung function in persistent childhood asthma. N Engl J Med. 2016;374(19):1842-52; Kalhan R, Arynchyn A, Colangelo L, et al. Lung function in young adults predicts airflow obstruction 20 years later. Am J Med. 2010;123(5):468.e1-7.

[2] Usemann J, Mozun R, Kuehni CE, et al. Air pollution exposure during pregnancy and lung function in childhood: The LUIS study. Pediatr Pulmonol. 2024;59:3178-89; Leon Hsu HH, Mathilda Chiu YH, Coull BA, et al. Prenatal particulate air pollution and asthma onset in urban children. Identifying sensitive windows and sex differences. Am J Respir Crit Care Med. 2015 Nov 1;192(9):1052-9.

[3] Aithal SS, Sachdeva I, Kurmi OP. Air quality and respiratory health in children. Breathe. 2023 Jun 13;19(2):230040; Gasana J, Dillikar D, Mendy A, et al. Motor vehicle air pollution and asthma in children: a meta-analysis. Environ Res. 2012;117:36-45; Fleming S, Thompson M, Stevens R, et al. Normal ranges of heart rate and respiratory rate in children from birth to 18 years of age: a systematic review of observational studies. Lancet. 2011;377:1011-18; Bateson TF, Schwartz J. Children's response to air pollutants. J Toxicol Environ Health A. 2008;71(3):238-43; Bennett WD, Zeman KL, Jarabek AM. Nasal contribution to breathing and fine particle deposition in children versus adults. J Toxicol Environ Health A. 2008;71:227-37; Stoll BJ, Hansen NI, Bell EF, et al. Neonatal outcomes of extremely preterm infants from the NICHD Neonatal Research Network. Pediatrics. 2010;126(3):443-56; Fanaroff AA, Stoll BJ, Wright LL, et al. Trends in neonatal

6

19.     Living close to roads where fossil fuel burning vehicles travel is especially dangerous for children. This proximity is strongly associated with higher exposure to harmful air pollutants, such as $NO_2$ and $PM_{2.5}$, which are known to impair lung development during critical periods of growth. School buses powered by fossil fuels are also harmful for children and pollute the air they breathe. As the EPA has said: "Older, more polluting school buses can lead to significant health risks for students who typically ride these buses for one-half to two hours a day."[4] Near-roadway nitrogen oxides ($NO_x$), a major component of diesel and gasoline vehicle exhaust, are associated with reduced lung function, even in healthy children without asthma. Breathing traffic-related pollution is strongly associated with the development of childhood asthma.[5] Being exposed to higher fine particulate matter, or $PM_{2.5}$, increases the risk of developing asthma by age seven.[6] A comprehensive systematic review and meta-analysis by Khreis et al. (2017) found exposure to black

morbidity and mortality for very low birthweight infants. Am J Obstet Gynecol. 2007;196:147.e1–8.

[4] EPA, *Making School Buses Cleaner,* https://www.epa.gov/dera/making-school-buses-cleaner (last accessed June 6, 2025).

[5] Urman R., McConnell R, Islam T, et al. Associations of children's lung function with ambient air pollution: Joint effects of regional and near-roadway pollutants. Thorax. 2014;69(6):540-47.

[6] Carlsten C, Dybuncio A, Becker A, et al. Traffic-related air pollution and incident asthma in a high-risk birth cohort. Occup. Environ. Med. 2011;68(4):291-95.

carbon, $NO_2$, $PM_{2.5}$, and $PM_{10}$ was associated with increased childhood asthma risk.[7] All of this underscores why it is so important for schools to substitute electric buses for diesel buses, as J.M. is trying to do for her school, and why extending the use of diesel school buses will cause further harm to J.M. and other children.

20.    The known dangers of fossil fuel burning vehicles underscores the need to substitute electric vehicles for internal combustion vehicles, which the challenged Executive Orders intentionally obstruct. By keeping more internal combustion vehicles on the roads longer, Plaintiffs will be exposed to more harmful air pollution that would otherwise be lessened if the Trump administration was not obstructing the substitution of electric vehicles for fossil fuel-power vehicles.

21.    GHG emissions from burning fossil fuels also directly and indirectly increase other air pollutants such as ozone, which has been linked to higher incidence and exacerbations of chronic respiratory disease and sleep disordered breathing in children.[8] Children playing three or more sports in high-ozone communities have a

---

[7] Khreis K, Kelly C, Tate J, et al. Exposure to traffic-related air pollution and risk of development of childhood asthma: A systematic review and meta-analysis. Environ Int. 2017 Mar;100:1-31.

[8] Perera F, Nadeau K. Climate change, fossil-fuel pollution, and children's health. N Engl J Med. 2022;386:2303-14; Orru H, Ebi KL, Forsberg B. The interplay of climate change and air pollution on health. Curr Environ Health Rep. 2017;4:504-13; Manisalidis I, Stavropoulou E, Stavropoulos A, Bezirtzoglou E. Environmental and health impacts of air pollution: a review. Front Public Health. 2020;8:14; Tenero L, Piacentini G, Nosetti L, et al. Indoor/outdoor not-voluptuary-habit pollution and sleep-disordered breathing in children: a systematic review. Transl Pediatr. 2017;6:104-10.

3.3-fold increased risk of developing asthma compared to children playing no sports.[9] The takeaway isn't that children shouldn't play sports, but that all children should be able to play freely outside without compromising their health—by breathing clean, safe air. Children should not have to choose sports and playtime outside over the health of their lungs. Some of the Plaintiffs here, including Ula and I.H., play sports or train year-round in Montana, exposing their developing lungs to air pollution that harms their lungs. Many of the other Plaintiffs hike, bike, and otherwise recreate outdoors year-round, which has a similarly harmful effect to their lungs when done in polluted air.

22.     The lungs are not the only organ affected by air pollution from fossil fuels. Maternal (prenatal) exposure to particulate pollution has been associated with reduced memory and cognitive function in children.[10] Higher exposure to black carbon during infancy is associated with measurable decreases in cognitive function, including verbal and nonverbal intelligence and memory performance.[11] Exposure to a range of largely traffic-related pollutants during childhood have further been

---

[9] McConnell R, Berhane K, Gilliland F, et al. Asthma in exercising children exposed to ozone: A cohort study. Lancet. 2002 Feb 2;359(9304):386-91.

[10] Chiu YH, Hsu HH, Coull BA, et al. Prenatal particulate air pollution and neurodevelopment in urban children: examining sensitive windows and sex-specific associations. Environ Int. 2016;87:56-65.

[11] Suglia SF, Gryparis A, Wright RO, et al. Association of black carbon with cognition among children in a prospective birth cohort study. Am J Epidemiol. 2008;167(3):280-86.

linked to adverse neurodevelopmental and neurocognitive outcomes, including academic achievement, as children age.[12] These findings suggest that fossil fuel pollution can impair neurodevelopment in early life and underscore the life-long harms that result from childhood and prenatal exposure to air pollution from fossil fuels. Defendants' actions to "unleash" fossil fuels not only cause injuries to children today, but those injuries will be borne by today's children for the rest of their lives.

23.    Coal fired power plants release many harmful types of air pollutants, including fine particulate matter, sulfur dioxide, and nitrogen oxides like $NO_2$. The harms from these coal-burning emissions are well recognized, which is one reason $PM_{2.5}$, $SO_2$, and $NO_2$ are three of the six criteria air pollutants that are regulated under the Clean Air Act.

24.    In addition to the direct impacts on air pollution caused by burning coal for power production, coal dust resulting from the transport of coal by rail can significantly impact the health of children in communities where coal trains pass through. Coal dust from moving coal trains contains a variety of pollutants harmful to human health and the environment, including polycyclic aromatic hydrocarbons, trace metals, and emerging pollutants like polar aromatic compounds.[13] There is

---

[12] Clifford A, Lang L, Chen R, et al. Exposure to air pollution and cognitive functioning across the life course - A systematic literature review. Environ Res. 2016 May 1;147:383-98.

[13] Stout SA, Emsbo-Mattingly SD. Concentration and character of PAHs and other hydrocarbons in coals of varying rank–implications for environmental studies of

clear data that show exposure to coal dust impacts respiratory health. Studies have shown that living in proximity to trains transporting coal, which significantly increase levels of fine particulate matter air pollution, is associated with death and disease.[14] Coal dust exposure has also been shown to increase the risk of chronic obstructive airways disease.[15] The trains transporting the coal also generate significant air pollution, with an associated increase in the risk of asthma and other chronic lung diseases for children of nearby communities.[16] Livingston, Montana experiences regular coal train traffic, as does Missoula, Montana, with trains often stretching 1.5 miles long. Plaintiffs Eva, Ripley, J.M., Olivia, Lander, Grace, J.H., and I.H., live in these communities. Defendants' actions to "unleash" additional fossil fuels, including expanding coal mining in Montana, threatens to immediately expose these Plaintiffs to more coal dust and air pollution from trains, and would increase their susceptibility to death and disease.

---

soils and sediments containing particulate coal. Org Geochem. 2008 Jul 1;39(7):801-19.

[14] Ostro B, Fang Y, Sospedra MC, et al. Health impact assessment of $PM_{2.5}$ from uncovered coal trains in the San Francisco Bay Area: Implications for global exposures. Environ Res. 2024 Jul 1;252:118787.

[15] Petsonk EL, Rose C, Cohen R. Coal mine dust lung disease. New lessons from an old exposure. Am J Respir Crit Care Med. 2013 Jun 1;187(11):1178-85.

[16] Ostro B, Fang Y, Sospedra MC, et al. Health impact assessment of $PM_{2.5}$ from uncovered coal trains in the San Francisco Bay Area: Implications for global exposures. Environ Res. 2024 Jul 1;252:118787.

25.    Fossil fuel driven air pollution is directly impacting work to improve our nation's air quality – posing a significant threat to the economic stability of the United States not only by direct exposure to the workforce, but also via the ripple effects of child sick days on productivity and family economic burden. Ozone levels above American Thoracic Society recommendations are associated with an estimated 6,800,000 lost school days annually.[17] Plaintiffs J.K. and N.K. have missed school because they were ill due to wildfire smoke.

**Reducing Air Pollution Improves Public Health**

26.    Reductions in air pollution from fossil fuels are associated with better lung health among children, demonstrating that government actions to substitute clean renewable energy for harmful fossil fuel-energy improves children's health.[18] Notwithstanding this undeniable fact, the Trump administration has it backwards: it is blocking renewable energy in favor of more harmful fossil fuel development. Over a 13-year period in Southern California, communities with science-driven reductions

---

[17] Carbon monoxide in Texas, school absenteeism even below EPA standard in 2009: Currie J, Hanushek E, Kahn EM, et al. Does pollution increase school absences?. Rev Econ Stat. 2009 Nov 1;91(4):682-94. Available from: https://hanushek.stanford.edu/sites/default/files/publications/Currie%2BHanushek %20et%20al.%202009%20REStat%2091%284%29.pdf; Cromar K, Gladson L, Gohlke J, et al. Adverse health impacts of outdoor air pollution, including from wildland fires, in the United States: "Health of the Air," 2018-2020. Ann Am Thorac Soc. 2024;21(1):76-87.
[18] Gauderman WJ, Urman R, Avol E, et al. Association of improved air quality with lung development in children. N Engl J Med. 2015;372:905-13.

12

in $NO_2$ and PM levels saw better lung growth, providing strong evidence that reducing fossil fuel emissions leads to tangible pediatric health benefits. Reductions in air pollution have also been shown to lower lung disease incidence. Improvements in $NO_2$ and $PM_{2.5}$ levels between 1993 and 2014 were associated with decreased asthma incidence in children in California, and communities that experienced greater air quality improvements saw the greatest reductions in new asthma cases. Cleaner air is healthier air, and healthier air means healthier children.

27.    Productivity gains and cost savings can also be seen in relation to reductions in school absences, with a study in Utah estimating that reductions of $PM_{2.5}$ and ozone by 50% would save nearly half a million dollars per year in the Salt Lake City School District.[19] Further, adoption of clean air and fuel technologies on school buses in Seattle and Tacoma, Washington school districts reduced $PM_{2.5}$, improved lung function and lung growth, and reduced pulmonary inflammation and absenteeism among riders age 6-12. Extrapolated to the U.S. population, adoption of these practices with improvements in air quality were estimated to reduce school absences by 14 million per year.[20] This is why J.M.'s efforts to help get electric buses

---

[19] Mendoza DL, Pirozzi CS, Crosman ET, et al. Impact of low-level fine particulate matter and ozone exposure on absences in K-12 students and economic consequences. Environ Res Lett. 2020 Nov 18;15(11):114052.

[20] Adar SD, D'Souza J, Sheppard L, et al. Adopting clean fuels and technologies on school buses. Pollution and health impacts in children. Am J Respir Crit Care Med. 2015 Jun 15;191(12):1413-21.

13

Case 2:25-cv-00054-DLC    Document 25-2    Filed 06/13/25    Page 15 of 78

for her school are so important and why EPA should not be allowed to withhold funding for electric buses at J.M.'s school. When children are healthier and can go to school, they learn and achieve more, translating to societal benefits.

28.    The medical evidence is unambiguous—"unleashing" more fossil fuels will harm the health of children, including these 22 youth Plaintiffs, cause or exacerbate various diseases, and increase the risk of premature death. On the other hand, reducing fossil fuel pollution will result in healthier children with longer lifespans.

**Climate Change Increases Wildfire Driven Air Pollution**

29.    I will not describe here the numerous ways in which climate change harms the health and lives of children, as that is covered thoroughly by the declaration of Dr. Lori Byron. I have reviewed Dr. Byron's declaration and agree with her opinions, which are supported by the scientific literature and my own personal experience. Here I focus on the dangers to children's health from wildfire smoke, given my expertise on this topic.

30.    It is well documented that climate change is increasing the severity of wildfires and the duration of the wildfire season, which have reversed the improvements in air quality due to stricter emission standards and now contribute to

14

half the annual burden of $PM_{2.5}$ in the United States.[21] A recent study estimates that climate change contributed to 15,000 wildfire smoke deaths between 2006 and 2020, with an estimated cost of $11 billion per year.[22] That cost is likely an underestimate as it reflects mortality and does not include other economic burdens, such as lost work days or healthcare utilization. Notably, emissions from wildland fires alone are estimated to cause 692,000 lost school days annually. Multiple studies have shown that exposure to wildfire smoke worsens childhood asthma control and increases the risk of asthma flares.

31. All of the 22 Plaintiffs here are being harmed by wildfire smoke. For example, Plaintiffs J.K. and N.K. moved away from Montana to try to avoid wildfire smoke exposure. Avoiding harmful environmental exposures, such as air pollution, is critical to preserving lung health. This is even more important for people with chronic lung diseases. J.K. has pulmonary sequestration, an abnormality of the lung. Some children with pulmonary sequestration are at higher risk of complications, such as infections, and need to have surgery. N.K. has needed supplemental oxygen for respiratory illness, which is a sign of the lungs not being able to get enough oxygen, called acute hypoxemic respiratory failure. These brothers have had to miss

---

[21] Burke M, Childs ML, de la Cuesta B, et al. The contribution of wildfire to PM2.5 trends in the USA. Nature. 2023 Oct 26;622(7984):761-6.

[22] Law BE, Abatzoglou JT, Schwalm CR, et al. Anthropogenic climate change contributes to wildfire particulate matter and related mortality in the United States. Commun Earth Environ. 2025;6(1):336.

15

Case 2:25-cv-00054-DLC    Document 25-2    Filed 06/13/25    Page 17 of 78

school due to breathing in wildfire smoke. Studies have also shown that wildfire smoke exposure is associated with lower test scores.[23]

32.    Defendants' actions to "unleash" fossil fuels and block renewable energy will further increase the severity and duration of the wildfire season, resulting in more dangerous air pollution, that will further harm Plaintiffs' health and lives.

**Cuts in Federal Funding for Public Health Research Will Have Immediate and Long-lasting Consequences for Children's Health if Not Stopped Immediately**

33.    The termination of ongoing federal grants from NIH and NSF is wasteful and harms public health. Science helps us understand how air pollution harms children's health and how science-led reductions in air pollution levels improves our children's health. Our national air quality standards have reduced mortality across the U.S. These standards are built on decades of federally funded research describing how air pollution harms health, even at levels below the current EPA standards, suggesting that now is the time for increasing protection for children's health by reducing air pollution from fossil fuels, not "unleashing" fossil fuels, blocking clean renewable energy, and cutting public health research. As my record shows, my work, and the work of many others in this field, has contributed to our understanding of how air pollution harms our health, which benefits these

---

[23] Wen J, Burke M. Lower test scores from wildfire smoke exposure. Nat Sustain. 2022 Nov;5(11)947-55.

16

Plaintiffs and other children. Eliminating this ongoing research will hurt children's long-term health, including these Plaintiffs who are increasingly suffering from extreme wildfire smoke, something we are increasingly studying.

34.    My research has been personally affected by funding cuts from the Trump administration. Funding to support my research on the health impacts of air pollution and wildfires in children, adults, and pregnant people have been terminated. The following specific grants have been terminated by Defendants.

a. G2021-STAR-H1 (Thakur; Balmes, Co-investigator) U.S. EPA. Partnering for Resilient Opportunities to Eliminate Cumulative Toxic (PROTECT) Health Effects from Wildfire PM2.5 in Environmental Justice Communities.
b. G2021-STAR-H1 (Krieger; Balmes, Co-investigator) U.S. EPA. Contra Costa Climate Air Pollution, and Pregnancy Study (CC CAPS).
c. R01ES035504-01 (Thakur; Balmes, Co-investigator) NIH/NIEHS Driving Environmental Justice: Community Monitoring of Diesel Truck Emissions and Impacts on Asthma Morbidity in Immigrant Communities.
d. R01ES029995 (Co-PIs: Clark, Volckens – Colorado State; Balmes, Co-investigator) NIH/NIEHS Sustainable Household Energy Adoption in Rwanda [SHEAR]: Promoting Rural Health with Solar and Gas.

35.    The wide-spread cuts to EPA-funded research have resulted in termination of almost 800 projects across the United States directly targeting community level actions to reduce the impacts of climate change on health. While the EPA has, to date, declined to release a full list of defunded research, from what I've seen some of the grants being cut include projects to provide solar power to local school districts and interventions focused on climate change resilience of at-

17

risk communities, among others. The abrupt cuts to this research and these efforts to reduce pollution both harm the economics of local communities, and will have long lasting, cascading impacts on community and public health if not immediately halted.

36.    Over the past 50 years, the EPA has improved air quality across the country, improving the health of millions of Americans, lengthening life expectancy, and saving trillions of dollars in health and productivity benefits, though worsening fossil fuel pollution and climate change impacts threaten to negate many of these improvements. The firing of scientific experts within the federal government and the termination of NIH, NSF, EPA, and funding from other federal agencies, undermines the ability of federal government, in conjunction with the scientific community, to make evidence-based policies, inform the public on health risks related to fossil fuels and climate change, and breaks from long-established processes. For instance, the Clean Air Scientific Advisory Committee (CASAC), an independent scientific committee that advises the U.S. EPA on National Ambient Air Quality Standards (NAAQS), was fired. This reckless dismantling of federal agencies and federal funding for public health research and programs will have a grave human health and economic toll if not stopped immediately. Young people like these Plaintiffs will suffer the longest lasting harm from this dismantling

18

because of the length of time they will live with the consequences compared to adults.

**Conclusion**

37.    In my professional judgment, informed by over 45 years of experience in environmental medicine and supported by a large and consistent body of peer-reviewed evidence, "unleashing" more fossil fuel combustion represents a serious and preventable danger to the health of children, including the 22 Youth Plaintiffs here. Further, federal funding cuts to public health and climate research will have immediate and long-lasting consequences for current and future generations of children. Immediate relief is necessary to protect Plaintiffs' lives and the body of scientific evidence needed to protect them.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 10, 2025 at Berkeley, California.

John R. Balmes

_____

John Balmes, MD

19

# ATTACHMENT 7

Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **EVA LIGHTHISER**; et al.<br><br>       Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP**, in his official capacity as President of the United States; et al.<br><br>       Defendants. | Case No: CV-25-54-BU-DLC<br><br>**DECLARATION OF CRAIG McLEAN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I, Craig McLean, hereby declare and if called upon would testify as follows:

1.      I am now retired, after having served in the National Oceanic and Atmospheric Administration ("NOAA") for more than 41 years, attaining the rank of Captain in NOAA's uniformed Commissioned Corps and as a member of the Senior Executive Service. When I retired from NOAA, I served as NOAA Assistant Administrator for Research, acting NOAA Chief Scientist, and the U.S. head of delegation to the UN's Intergovernmental Oceanographic Commission, a position in which I served for eleven years. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.      I am submitting this Declaration in support of Plaintiffs' Motion for Preliminary Injunction, which is seeking to prevent Defendants from implementing several sections of Executive Orders Nos. 14154, 14156, and 14261, which are designed to "unleash" fossil fuels, block renewable energy, and suppress the development and publication of climate change science.

3.      I was commissioned as an Ensign in NOAA's Commissioned Corps in 1981 and enjoyed a seagoing, shoreside program leadership, and legal career until my Service retirement in 2006. Immediately thereafter I was hired into the Senior Executive Service as the Deputy Assistant Administrator for Research, and in 2015, was selected as the Assistant Administrator for Research until my retirement in

1

March of 2022. My career was founded in an ambition instilled in me since my childhood, of ocean science and public service.

4.     The position of Assistant Administrator for Research is one of the five subordinate agency heads leading the major operational components of NOAA under the immediate supervision of the NOAA Administrator. The Assistant Administrator for Research leads the NOAA Research enterprise consisting of ocean, weather, climate, and coastal research. This Line Office of NOAA is called Oceans and Atmospheric Research which serves and delivers scientific understanding and technical innovation to the operational Lines of NOAA: the National Weather Service, National Marine Fisheries Service, National Ocean Service, and the National Satellite Data and Information Service.

5.     I was responsible for an Annual Budget of approximately $600M of the public's money, to deliver results and expend it wisely on statutory missions. I was responsible for 2,200 personnel, scientists, engineers, technicians, administrative personnel, as assigned Commissioned Officers, federal employees, and academic scientists and contractors working on the NOAA mission.

6.     I supervised the work of ten laboratories, each of which was paired with a prestigious academic institution through NOAA's Cooperative Institute program, authorized by federal law.[1] This program pairs government science with universities

---

[1] 15 U.S.C. § 1540.

who compete for a five-year renewable financial assistance award to work on the NOAA mission alongside and inside of the NOAA laboratories, contributing to the NOAA missions of climate, weather, ocean, and coastal science. The universities associated in partnership with these laboratories include the University of Colorado, Princeton University, University of Oklahoma, University of Washington, University of Miami, University of Michigan, University of Maryland, Scripps Institution of Oceanography, the Woods Hole Oceanographic Institution, and others.

7.      I supervised the work of seven federal programs authorized in law: the NOAA Climate Program Office, Weather Program Office, National Sea Grant Program, Ocean Exploration and Research, Ocean Acidification Program, Technology Partnership Program, and the Cooperative Institute Program.

8.      I served for eleven years as the U.S. head of delegation to the UN Intergovernmental Oceanographic Commission where I was one of five principal architects of the UN Decade of Ocean Science, was a leader in expanding the effort to finally map the world's oceans, and to extend the tools for measuring the ocean and the effects of climate change.

9.      At the time of my retirement, I was recognized by the President for my contributions to scientific integrity, and by House and Senate statements in the Congressional Record citing my work in furthering ocean and atmospheric research and scientific integrity.

3

Case 2:25-cv-00054-DLC      Document 25-7      Filed 06/13/25      Page 5 of 27

10. I have nearly two decades of experience as a senior executive leader working in the Oceans and Atmospheric Research line of NOAA. I know the importance and the mechanics of the work defined by Congress and the reasons for it to be performed, the standards of excellence necessary to deliver the appropriate results, and the value that citizens including the Plaintiffs both deserve and derive from that science and information. I am submitting this declaration because I see the Executive Branch implementing the President's executive orders being challenged in this case to diminish, degrade, and dilute the funding and personnel of the agency, which is destroying the decades-long building of NOAA's climate science leadership recognized around the globe.

11. The nation elects policy choices every four years. Science informs policy choices, but science in and of itself is not policy. Congress established NOAA to make the United States a global leader in science, and the science does not change based on who is in the oval office. The current administration's fallacy of denying human caused climate change is not a scientific conclusion, and the Defendants' directives to dismantle climate change science and research as a means to "unleash" fossil fuels are damaging the health, environment, economic, and prosperous future of our nation and the Plaintiffs in this case.

4

Case 2:25-cv-00054-DLC    Document 25-7    Filed 06/13/25    Page 6 of 27

**NOAA's History and Importance to the Safety and Success of Americans**

12.    NOAA was formed in 1970 to organize all ocean relevant civilian agencies and missions in one place, and one of its principal missions was to understand the relationship between the ocean and the atmosphere. At the time, "climate" was understood mainly as an attribute of geography, not the interconnected and interdisciplinary discipline that we know it to be today. NOAA brought and recruited richly talented personnel who designed and acquired ships, aircraft, buoys, floats, sensors, satellites, radars, and networks. The more NOAA studied the linkage between oceans and atmosphere, the more the linkage became clear, yielding major discoveries such as the El Niño-Southern Oscillation ("ENSO"), which improved our understanding of surface ocean warming and cooling patterns that affect the cycle of rainfall and weather.

13.    Everything the world today understands to be scientifically accurate about the climate system, and how it is changing due to the burning of fossil fuels, has its roots in NOAA's leadership and work. For example, using ice cores and other geological records NOAA built models to show the Earth's climate history far back in time before human influence on the planet. That research showed that according to the rhythm of the Earth, we should be going into a period of cooling, and not the fossil-fueled warming we are experiencing today. NOAA developed the world's first true climate model. Although other countries now have climate models too, no other

5

Case 2:25-cv-00054-DLC    Document 25-7    Filed 06/13/25    Page 7 of 27

country comes close to the United States, and it's because no country has NOAA's tenure and depth of expertise due to the research it conducts and sponsors.

14.    NOAA's expertise is profound. Many principal scientists in climate modeling around the globe have passed through NOAA's Geophysical Fluid Dynamics Laboratory in Princeton, where one of the best, if not the best climate model in the world resides today. From NOAA's integrated building of tools and equipment, its measurements, its analysis and understanding of the measurements, its descriptive and predictive mathematical models, and the expert people continuously recruited and retained to work on NOAA's ocean, weather, coastal, and climate missions, this agency has defined the state of the science, globally.

15.    Other nations followed but have not led. Today NOAA provides the world with more than half of the global ocean measurements upon which all ocean and climate models are based. Other nations—as well as industries, such as insurance companies—base their work on NOAA's data and models. NOAA is the core of global climate science, and that science is crucial to protect the Plaintiffs and the American people from the ever-worsening climate change impacts plaguing this country, impacts that will be exacerbated by the fossil fuel "unleashing" of the Executive Orders.

6

**NOAA's Cessation and Deletion of Climate Change Data**

16.    The Defendants expressly view climate change science as a barrier to their desire to "unleash" fossil fuels because the science has been referenced by all three branches of government to support the regulation of the use of fossil fuels. The Defendants in this case are implementing their policy to "unleash" fossil fuels by suppressing and inhibiting climate change research, which is one of NOAA's primary areas of expertise given its tie to the agency's mission, in a variety of ways.

17.    Defendants are implementing the executive orders by causing the withdrawal and cessation of important data compilations, reports, and assessments that monitor and explain the changes in the Earth and to the environment as a consequence of human-caused climate change. Some of the ceased reports are required by law, but all are essential in fulfilling NOAA's mission and protecting the Plaintiffs.

18.    For example, in May 2025, NOAA retired the Billion-Dollar Weather and Climate Disaster database. This database indicates the impact, trend, and cost to the nation from climate-driven hazards on the infrastructure and lives of American citizens. Discontinuing this database is silencing the fire alarm for the nation and deleting an important metric of the true costs of climate change on Americans. There is no substitute for this database in the private sector, and its retirement will

7

undoubtedly weaken industry's, government's, and the Plaintiffs' ability to understand and limit the economic fallout from worsening climate disasters.

19.     NOAA also stopped updating and providing technical support for its database of Arctic sea ice and snow cover. This information about Arctic warming and land-based glacial ice melting is scientifically crucial. It is an input requirement for determining sea level rise, which is happening now and impacting several of the Plaintiffs in places like Florida and Hawai`i. Sea level rise is accelerating as the Arctic approaches a tipping point; and it informs the nature of how severely, how fast, and by when the rising sea level is projected to reach what level. The cost to the nation, and the world's coastal cities will be enormous and could be anticipated, and mitigated, with the more thorough knowledge provided by these measurements. Keeping this information updated and publicly available is also crucial because snowpack and cover constitute a seasonal reserve of melt water that nourish reservoirs of drinking water, and possibly lead to flooding episodes. NOAA is funded and required to do this work by Congress. By not updating and withdrawing these datasets, the public and Plaintiffs face increasing risk of harm because civil authorities lack crucial information to manage and plan for sea level rise, flooding, and constraints on drinking water sources accordingly.

20.     Defendants' cessation of work on the next National Climate Assessment—a report that is required by Statute and funded by an annual

Appropriation—is also damaging to the nation and the health and wellbeing of the Plaintiffs. Withdrawing this report flies in the face of the evident truths that NOAA climate change research confirms: the atmosphere is heating up when it should be Earth's normal behavior to be cooling. The information in this report, which is broken down by region, is relied on by society to make appropriate choices and to implement protective measures. Insurance companies, banking and finance, transportation, real estate, agriculture, fisheries, building and construction, and other industries all use this information to plan their expenditures, measure their risk, and determine their operating direction.

**The Defendants' Executive Orders Inhibit NOAA's Ability to Fulfill Its Mission**

21.    NOAA is a global powerhouse for climate science because of its scientists' deep well of experience. The average NOAA employee has decades of institutional knowledge from experience, knowledge that is not written down anywhere, not the subject of reports, and not contained in scientific papers. They are NOAA's mentor class, and they are one of NOAA's most valuable assets.

22.    Research at NOAA and NOAA's Cooperative Institutes is done in research and/or office facilities in physical buildings. If leases to these facilities are canceled and not replaced, research cannot take place or is made significantly more difficult.

23.     Defendants are implementing the executive orders by gutting NOAA's mentor class through extorting them to leave. On April 30, 2025, when 1,056 NOAA employees "accepted" offers of so-called Voluntary Early Retirement or Voluntary Separation Incentive Pay, they did so to evade the threat implicit in the offer: that if they continued coming to work, the uncertainty of being overtly fired would hang over their heads every day. By accepting, at least they could come out with something for their families. These 1,056 do not include the employees who took the Department of Government Efficiency's ("DOGE's") earlier "fork in the road,"[2] or the probationary employees who were fired.[3]

24.     Since January 20, 2025, NOAA has fired hundreds of probationary employees. Probationary employees have been on NOAA staff or in their current position fewer than two years. Yet they are usually not new to NOAA because NOAA recruits its staff from above-described Cooperative Institute partnerships. Cooperative Institutes make up half of the scientific personnel and intellect contributing to NOAA's research alongside NOAA scientific staff as integrated members of the same team. Consequently, many probationary employees with fewer than two years on NOAA staff have often been working on a NOAA mission for

---

[2] https://www.opm.gov/fork/original-email-to-employees/

[3] https://democrats-science.house.gov/news/press-releases/committee-leaders-demand-answers-after-noaa-complaints-reveal-firings-decisions-came-from-outside-of-noaa-leadership

over a decade. The firing of probationary employees further deepened NOAA's experience deficit and the understaffing of its missions.

25.    The firings and extorted departures of NOAA federal employees by the Defendants have caused the departure from NOAA of 27,000 years of cumulative experience from the work force. This deficit thwarts the ability of NOAA to fulfill the specific missions needed to be performed and to sustain the mission-critical work. Not only will the loss of these personnel through firings which some courts have found to be illegal and the extorted departures inhibit the ability of NOAA to continue its climate change science research efforts, it will ultimately harm the Plaintiffs by compromising the ability, quality, and scope of the work performed by the agency necessary to inform them and ensure their ability to have the best quality of life and an environment their government should be capable of providing.

26.    For example, NOAA's staff cuts will inevitably increase the risk of loss of life and property damage from storms that are becoming more frequent and severe due to climate change. When Hurricane Dorian struck in 2019, one way NOAA was able to accurately forecast that the storm would not hit Florida—and would spare Alabama—was because NOAA's National Weather Service ("NWS") staff were launching additional weather balloons across the country to measure the behavior of the atmosphere, information which is not detectable by satellite. Until 2025, NWS's weather balloon launches covered the nation.

11

27.    The Defendants' cuts to NOAA staff and facilities since January 20, 2025 have left NWS with insufficient meteorologists to launch weather balloons. This increases the mortal danger to Plaintiffs in places like Florida and Hawaiʻi because the 2025 hurricane season is already underway, and the staff cuts inhibit the NWS's capacity to accurately predict the paths of approaching cyclones on a sustainable basis.

28.    The Defendants' actions pose a particular danger to Plaintiffs in Hawaiʻi, California, and Florida because the reduced staff and experience of meteorologists and atmospheric scientists, the aircraft availability reduced by contract delays, stalled satellite software upgrades, are necessary but are now lacking to reliably forecast the intensity and path of extreme rain events, like the "rain bomb" that decimated Kalālapa's community in Kauaʻi or that Joseph experienced in La Jolla, California. Precision in such forecasts saves lives particularly when intense atmospheric rivers follow a fire, and landslides ensue.

29.    The Defendants' actions are also hampering hurricane preparedness in other ways because accurately predicting the path and intensity of hurricanes involves pilots flying research planes into the storms, mechanics and parts suppliers keeping the plane working, and scientific staff running the research and operational equipment in the back of the plane and on the ground, all of whom are being impacted by the aforementioned cuts.

30.    The Defendants' actions to "unleash" fossil fuels through cuts to NOAA personnel and facilities also diminishes NOAA's ability to assess climate risks to Plaintiffs. For example, NOAA-affiliated observatories, including the Mauna Loa Observatory, collect atmospheric samples to measure greenhouse gases. Having fewer people to collect the samples, or terminating leases for the building where the work takes place, inevitably slows or scales back their work. The observatories send the samples to a NOAA lab in Boulder, Colorado for analysis, but if it too is understaffed, its analysis gets backed up. Boulder's measurements are then sent to Cooperative Institute researchers at Princeton who develop or improve the climate models that allow scientists to know how bad climate change has gotten, how fast it is worsening, and who make that information understandable to the public, including plaintiffs. But 20% of the staff at Princeton's lab have been cut. Thus, at every step, understaffing and loss of facilities slows and weakens NOAA's ability to gather and communicate the science, which is vitally needed for the protection of American lives.

**NOAA's Cancellation of Contracts**

31.    Secretary of Commerce Howard Lutnick is implementing the President's executive orders—including the Unleashing American Energy executive

13

order, according to documents I have reviewed (see Exhibits A,[4] B,[5] and C[6])—by ordering NOAA to hold all contracts and grants above $100,000 in abeyance until the Secretary reviews them for compliance with executive orders, including those challenged herein.[7] This review includes grants and Cooperative Institute arrangements.

32.     This unimaginable directive is resulting in the delay and cancellation of scientific projects perceived as incompatible to the Unleashing American Energy executive order. For example, Secretary Lutnick canceled the contract to complete the Atlas 15 project beyond the already-completed pilot location of Montana. Atlas 15 updates rain-volume forecasts to account for climate change. The existing Atlas 14 forecasts are based only on historical rain patterns which are now obsolete. That cancelation has eliminated a tool for governments and civil engineers to protect Plaintiffs who live outside of Montana (who do not get the benefit of Atlas 15) from

---

[4] U.S. Department of Commerce, Senior Procurement Executive Memorandum 2025-01 (Revised 4/7/2005).

[5] Letter from Timothy Carrigan, Acting Director NOAA Grants Management Division, to Kelly M. Kallio, NOAA Award Number NA22OAR4310213 (May 5, 2023).

[6] Memorandum from Laura Grimm, NOAA Chief of Staff, to Timothy Carrigan, Acting Director NOAA Grants Management Division, NOAA Award Number NA22OAR4310213 (Apr. 25, 2025).

[7] https://www.scientificamerican.com/article/noaa-has-ground-to-a-halt-as-lutnick-has-left-contracts-unsigned

14

the effects of floods and droughts, and will damage the public's access to accurate information about weather patterns.

33.    Secretary Lutnick's directive is also asphyxiating the agency. It creates a bottleneck at the Secretary's desk and a backlog of unreviewed agreements, which pushes agreements right down to the wire, to the brink of expiration before they are ultimately renewed, reduced or canceled. This backlog has pushed at least six Cooperative Institute agreements to the eve of expiration. The delays and denials are costing the agency supplies, repairs, commercial contract provision of services to weather, ocean, and climate work. The agency runs on federal employees, academic grantees, and commercial services and this additional review for compliance with the executive orders is delaying work. Some grants are canceled outright upon review. For example, according to documents I reviewed, NOAA terminated a grant to assess wind energy infrastructure in rural communities because it is misaligned with the President's policy goal of achieving fossil fuel energy dominance. (*See* Exhibits B and C).

34.    This directive is also implementing the executive orders by causing attrition. Before 2025, the settled practice at NOAA was to encourage Cooperative Institutes to develop deep relationships with NOAA and rely on funding from NOAA through predictable scheduled of annual allotments under existing agreements. Researchers at the Cooperative Institutes built careers and lives with

15

confidence that the agreements would be continued because they were critical to achieving NOAA's mission. Secretary Lutnick's directive has removed that predictability. Even if the Secretary ultimately renews a contract, grant, or financial assistance award on the eve of its expiration, the Cooperative Institutes' researchers are starting to leave because year-to-year stability that is essential for building a life and a career as a research scientist, is gone. The attrition at NOAA's Cooperative Institutes is considerable. If Defendants continue their actions that lead to this attrition, the effect on NOAA's mission would be devastating; I fear that up to 50% of NOAA's staff would be gone.

35.    An exact accounting of the harm associated with how Defendants' directives are compromising NOAA's missions through their implementation of the executive orders is necessarily an underestimate because the full extent of the stifling of climate change research, forced staff reductions, grant and contract delays or arbitrary reductions, or the impact of 27,000 years of experience having left the agency is difficult to quantify. Losing NOAA's knowledge base jeopardizes NOAA's readiness and abilities which puts the Plaintiffs in harm's way.

**Conclusion**

36.    Defendants are locking NOAA out of the best science and are in the process of driving us back to the 1950's, when climate change was unknown and warming was out of mind. This is not an exaggeration because Defendants are

16

Case 2:25-cv-00054-DLC    Document 25-7    Filed 06/13/25    Page 18 of 27

stopping advances from *going forward*—which, by itself, would freeze us in the knowledge pre-January 20, 2025, but that is not the way our ocean and atmospheric systems function, especially in the era of fossil fuel-induced climate change. And Defendants are dragging NOAA *backward* by decimating the staff, destroying years' worth of institutional knowledge; by stopping certain data collection and reporting; and by removing the year-to-year financial predictability of the Cooperative Institutes at universities. Defendants' actions are bleeding NOAA into a slow death, and its mission-critical work that is needed to protect the lives, health and safety of the Plaintiffs, and future generations to come, are suffering. Every week the Defendants wage more harm on NOAA's ability to do its job. The scientific work and integrity of NOAA can be saved if the Defendants' implementation of the executive orders is stopped, but with every unit of time that passes, it grows harder and exposes the Plaintiffs to ever-worsening conditions.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 10, 2025 at Silver Spring, Maryland.

_____
Craig McLean

17

# ATTACHMENT 10

Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| **EVA LIGHTHISER**; et al. <br><br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP**, in his official capacity as President of the United States; et al. <br><br> Defendants. | Case No: CV-25-54-BU-DLC <br><br> **DECLARATION OF JOHN BALBUS, MD, MPH, IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Case 2:25-cv-00054-DLC    Document 25-10    Filed 06/13/25    Page 2 of 13

I, John Balbus, hereby declare and if called upon would testify as follows:

1.      I am the Principal of Climate Care Consulting, LLC and former HHS Deputy Assistant Secretary for Climate Change and Health Equity with over 30 years of experience working on the health implications of climate change and decarbonizing the health sector, and I have personal knowledge of the facts stated herein.

2.      I am submitting this Declaration, in my personal capacity as a fact witness, in support of Plaintiffs' Motion for Preliminary Injunction, which is seeking to prevent Defendants from enforcing and implementing several sections of Executive Orders Nos. 14154, 14156, and 14261, which are designed to "unleash" fossil fuels, block renewable energy, and suppress the development and publication of climate change science. I offer this testimony to provide the Court with real-world examples of how the Defendants' directives are being implemented in a way that harms the health and wellbeing of Americans, including the young Plaintiffs in this case.

3.      I have not been retained as an expert witness by any party or their counsel in connection with this case, and am not offering expert testimony to the Court. I am receiving no compensation in connection with this case or my declaration.

1

Case 2:25-cv-00054-DLC     Document 25-10     Filed 06/13/25     Page 3 of 13

4.      I am trained as a physician in both Internal and Occupational and Environmental Medicine. I received my A.B in Biochemistry from Harvard University, my MD from the University of Pennsylvania School of Medicine, and my Master's Degree in Public Health from Johns Hopkins School of Hygiene and Public Health. I have devoted my professional career to understanding and addressing the health implications of climate change. Most recently, I established and directed the U.S. Department of Health and Human Services (HHS) Office of Climate Change and Health Equity.  Prior to that, I spent twelve years as Senior Advisor for Public Health at the National Institute for Environmental Health Sciences, where I coordinated activities on global environmental health and climate change and represented the Institute, the NIH, and HHS on climate change and health issues. Before that I served as Associate Professor and founding Acting Chairman of the Department of Environmental and Occupational Health at the George Washington University School of Public Health and Health Services. I was elected to the National Academy of Medicine in 2021.

5.      I served in the U.S Air Force, separating with a rank of Major. While at HHS, I was selected for the Senior Executive Service, received the highest level of security clearance, and served as an advisor to the Assistant Secretary for Health and the Secretary of HHS on the intersection of climate change, health, and national security.

2

**The Defendants Actions Enhance the Health Risks Americans Face from Climate Change**

6.      I was asked to create and lead the HHS Office of Climate Change and Health Equity in May of 2021, with the primary mission of protecting the health of the American people, particularly those who are most vulnerable, from extremes of weather, severe storms, and other real-world manifestations of climate change. We recognized that fulfilling this critical mission of protecting people from harm had to involve ensuring that the health systems that care for them could continue to operate and provide services in the face of the increasing frequency and severity of extreme weather events and natural disasters. We therefore also focused our work on ensuring that health systems, especially those that cared for people at high risk, had access to reliable and lower cost energy supplies and measures to enhance their resilience.

7.      To fulfill our mission, our office worked strategically with agencies across the federal government to support health care providers and organizations in protecting the health of all people in the United States and in making their facilities more sustainable, resilient, efficient, and less costly to operate.  This involved unique collaborations with the Environmental Protection Agency and Department of Energy to help them tailor their energy and cost-saving programs for the health sector, developing a learning community of sustainability staff from all the federal health systems (Veterans Health Administration, Defense Health Agency, Indian Health Services, and Bureau of Prisons), and collaboration with the Department of

3

Homeland Security on community resilience. We convened all of the operating divisions of the Department of Health and Human Service and supported their efforts to enhance the resilience and sustainability of the nation's health systems. Finally, we also partnered with the White House to create a private sector community of practice through the White House/HHS Health Sector Climate Pledge ("Health Sector Climate Pledge"), which recruited around 143 organizations including 8 Fortune500 companies and representing 960 hospitals.

8. On January 22, 2025, I was placed on administrative leave (I subsequently retired in February 2025), and the Office of Climate Change and Health Equity was deleted from the HHS website, along with many of the tools and resources we created to protect the health of Americans. This included:

    a. Protecting Vulnerable Patient Populations from Climate Hazards: A Referral Guide for Health Professionals- A unique tool for health care providers who often recognize risk factors for harm from extreme weather events in their patients but don't know about resources available to protect them.

    b. Climate Resilience Plan Elements for Healthcare Organizations: A quick guide for Healthcare Organizations to develop enhanced resilience plans in conjunction with our Health Sector Climate Pledge.

4

Case 2:25-cv-00054-DLC    Document 25-10    Filed 06/13/25    Page 6 of 13

c. Inflation Reduction Act Quickfinder: A detailed analysis and guide to the provisions of the Inflation Reduction Act that were relevant to healthcare organizations.

d. Health Sector Resource Hub: A unique curated set of federal government opportunities and resources supporting healthcare organization sustainability, resilience and efficiency.

e. Climate Health Outlook and Portal: The Climate Health Outlook was a compilation of federal government seasonal forecasts for a range of climate and weather hazards, including heat, drought, hurricanes, wildfires, and pollen.  Appearing as a monthly newsletter through the Spring, Summer and Fall, the Outlook displayed those forecasts by county in the context of county profiles of at-risk populations and then provided specific resources and recommendations for health care providers to prevent illness and death from those climate and weather hazards.  The portal was an on-line interactive map that allowed users to look up their county and see the forecasts and vulnerable population profiles directly.

**The Defendants Actions Hinder the Ability of the Health Sector to Reduce Emissions and Ensure Continuity of Care**

9. The closure of the Office of Climate Change and Health Equity and loss of these resources, when combined with the closing down or firing of most of the

5

staff of multiple offices working on climate change across the federal government, directly limits the capacity of the nation's health systems to protect the health of people in the United States and to improve their efficiency and resilience. I have observed that the resources described above, as well as others created by the Office of Climate Change and Health Equity and other federal agencies, were uniquely valuable to both private and public sector healthcare organizations. The fact that they carried the authority and credibility of the federal government was a fundamental reason for their value and impact.

10.    I know that the health sector in the United States accounts for 8.5% of total U.S. GHG emissions.[1] This is more than the airline industry (less than 3%).[2] A substantial part of the emissions from the health sector arise because health care facilities have high energy demands. According to the US Department of Energy, hospitals are the third most energy intensive type of buildings, after food service and food sales. And historically, health care organizations have not implemented renewable energy and high efficiency measures to the same extent as other industries. The health care industry is also unique in that some of the waste products

---

[1] National Academy of Medicine. Key Actions to Reduce Greenhouse Gas Emissions by U.S. Hospitals and Health Systems. 2023 May 17. https://nam.edu/product/key-actions-to-reduce-greenhouse-gas-emissions-by-u-s-hospitals-and-health-systems/

[2] U.S. EPA. U.S. Transportation Sector Greenhouse Gas Emissions 1990-2022. 2024 May. https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101AKR0.pdf

6

associated with health care, such as the anesthetic gases nitrous oxide and desflurane, are themselves greenhouse gases 100's or 1000's times more potent than carbon dioxide. This means that reducing the unnecessary wastage of those anesthetic gases through measures like substituting other equivalent gases for desflurane and replacing leaky centralized piping systems for nitrous oxide not only saves money for healthcare organizations that can then be put to patient care, it also helps reduce the severity of climate change thereby further protecting the health of children and future generations.

11. Because the work being done by the Office of Climate Change and Health Equity has been shut down and is not being done by others within the federal government at this time, my observations and personal experience lead me to believe it will make it much harder and unlikely for the health sector to achieve GHG emission reductions. This has immediate implications for operational costs and efficiency of health care organizations, and longer-term implications for the health of all people in the United States because of the increased severity of climate change impacts.

12. Prior to starting the Office of Climate Change and Health Equity, as stated above, I spent twelve years at the National Institutes of Health, where I led activities related to the nexus of climate change and health, including co-chairing the NIH working group on climate change and human health and representing NIH

7

and HHS on the oversight committee of the Global Change Research Program. Based on my personal experience and observations while at NIH, the responses of the NIH to these executive orders will severely impair the ability of the nation's health systems to protect the health of people in the United States from climate change-related threats as well as to adequately prepare health care providers for the increasingly severe climate change-related challenges to their operations and facilities. The arbitrary termination of the Congressionally-funded Climate Change and Health Initiative not only halts the generation of critical knowledge at a time when that program was just focusing on implementation science and evaluating which interventions were most effective at protecting human health from climate change-related threats; by cutting off funding for this work, the administration is also ending the training and creation of new, young experts in the field, so that the country will be left without a pipeline to help people develop the skills and knowledge needed to protect health from climate change.

**The Defendants' Actions that "Unleash" Fossil Fuels and Block Renewable Energy Disrupt Continuity of Healthcare**

13. The decarbonization of the health sector is not just about reducing waste and pollution; it's also about assuring continuity of access to care during the course of natural disasters, which are becoming more frequent and severe due to climate change. A community health center operated by Crescent Care in New Orleans was part of a city-wide coalition of resilience hubs powered by solar microgrids that was

8

able to continue to operate in 2024 though Hurricane Francine, assuring care and safe medical supplies to vulnerable residents. In 2012, Superstorm Sandy knocked out power to the Greenwich Hospital in Connecticut for 7 days, far longer than the required operation for a diesel generator. But Greenwich had installed a more sustainable combined heat and power system to supply its energy in 2008, so it was only without power for 7 seconds when power was lost.  Where Sandy forced closure and evacuation of dozens of health care providers, Greenwich maintained continuous operations, saving money and lives.[3]

14.     Diesel generators that are used by many healthcare facilities, on the other hand, routinely fail, making it impossible for many places to continue to provide healthcare when it is most needed during times of crisis. One study that I am aware of has documented that unless well maintained, diesel generators fail up to 50% of the time within 48 hours, and even well-maintained generators have a 20% fail rate within two weeks.[4]  Based on my observations and personal experience, it is quite clear that when hospitals rely solely on fossil fuels for their energy, they are less secure.

---

[3] U.S. Climate Resilience Toolkit. Hospital Plans Ahead for Power, Serves Community Through Hurricane Sandy. 2015. https://toolkit.climate.gov/case-study/hospital-plans-ahead-power-serves-community-through-hurricane-sandy
[4] Marqusee J, Don II DJ. Reliability of emergency and standby diesel generators: Impact on energy resiliency solutions. Applied energy. 2020 Jun 15;268:114918. https://www.sciencedirect.com/science/article/abs/pii/S030626192030430X

9

15.    Cost savings are very important to health systems, and thus any savings that can be accomplished by having access to renewable sources of energy as opposed to fossil fuels should be encouraged, not hindered.  The first medical center microgrid in California, installed at the Kaiser Permanente Medical Center in Richmond, is providing annual savings of $394,000.[5] The University of Nebraska Medical Center has achieved 45% energy savings through a combination of solar panels and efficiency measures at its Maurer Center for Public Health.[6] At a time when health systems are facing severe financial stresses, energy cost savings measures can translate into lives saved and should be encouraged, not blocked.

16.    Solar energy installations are also being used by health care organizations to directly benefit energy insecure patients. For example, the Boston Medical Center is using its 356 kilowatt solar array to generate energy credits that it then passes on to reduce the bills of patients in need, through its "Clean Power Prescription".[7] The Children's National Medical Center's Research and Innovation Campus, built on the historic Walter Reed Army Medical Center's campus in Washington, D.C., houses the largest solar canopy in the District of Columbia.  The

---

[5] Department of Energy. Better Buildings. Healthcare. https://betterbuildingssolutioncenter.energy.gov/sectors/healthcare

[6] Department of Energy. Better Buildings. UNMC: Maurer Cener for Public Health. https://betterbuildingssolutioncenter.energy.gov/showcase-projects/unmc-maurer-center-public-health

[7] Boston Medical Center. BMC launches innovative Clean Power Prescription program. https://www.bmc.org/clean-power-prescription-program

campus provides low-cost energy to low-income residents in the surrounding community.[8] Limiting the ability of vulnerable people to access more affordable, clean energy will lead to increased illness and death.

**Conclusion**

17.    I am seeing that the Defendants' actions to "unleash" fossil fuels, block renewable energy development, and suppress climate science represent a direct threat to the health and safety of all Americans, particularly children and vulnerable populations. By dismantling the HHS Office of Climate Change and Health Equity and removing critical resources that healthcare providers relied upon to protect their patients and communities, the Defendants have undermined the nation's ability to prepare for and respond to climate-related health emergencies, at a time when they are only increasing.

18.    I have personally observed that healthcare facilities with microgrids powered by renewable energy sources maintain operations during natural disasters when fossil fuel-dependent systems often fail. The health sector's transition to clean energy not only reduces greenhouse gas emissions that contribute to climate change, but also provides immediate benefits through cost savings, enhanced resilience, and

---

[8] Children's National. The District's largest community solar canopy unveiled at the Children's National Research & Innovation Campus. 2021 Apr 28. https://www.childrensnational.org/about-us/newsroom/2021/dc-officials-and-leaders-celebrate-largest-community-solar-canopy-in-the-district-at-the-cnri-campus

11

Case 2:25-cv-00054-DLC    Document 25-10    Filed 06/13/25    Page 13 of 13

improved community health outcomes. The work the federal government was doing to support this transition was saving lives and money—objectives that should transcend political boundaries.

19.     By blocking these efforts and suppressing the scientific information that guides them, the Defendants are placing politics, not based in scientific evidence, over the lives of the Plaintiffs and all children and public health, and short-term industry interests over the long-term wellbeing of these Plaintiffs as they grow and of the families they will form. Based on my observations and personal experience, I am seeing that the Executive Orders and their implementation are harming American families and health. The consequences will be measured not just in increased healthcare costs and system failures, but in preventable illness, suffering, and loss of life—particularly among the children whose futures depend on the climate and health policies we implement today.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 10, 2025 at Bethesda, Maryland.

John Balbus, MD, MPH
Digitally signed by John Balbus, MD, MPH
Date: 2025.06.11 16:40:35 -04'00'

John Balbus

12

# ATTACHMENT 22

Roger Sullivan
McGARVEY LAW
345 1st Avenue East
Kalispell, MT 59901
(406) 752-5566
rsullivan@mcgarveylaw.com

Philip L. Gregory*
GREGORY LAW GROUP
1250 Godetia Drive
Redwood City, CA 94062
(650) 278-2957
pgregory@gregorylawgroup.com

Julia A. Olson*
Andrea K. Rodgers*
Nathan Bellinger*
OUR CHILDREN'S TRUST
1216 Lincoln St.
Eugene, OR 97401
(415) 786-4825
julia@ourchildrenstrust.org
andrea@ourchildrenstrust.org
nate@ourchildrenstrust.org

Daniel C. Snyder*
Haley Nicholson*
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
dsnyder@publicjustice.net
hnicholson@publicjustice.net

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

| | |
|---|---|
| **EVA LIGHTHISER**; et al. <br> Plaintiffs, <br><br> v. <br><br> **DONALD J. TRUMP**, in his official capacity as President of the United States; et al. <br> Defendants. | Case No: CV-25-54-BU-DLC <br><br> **DECLARATION OF GARY A. JONESI IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 2 of 255

I, Gary A. Jonesi, hereby declare and if called upon would testify as follows:

1.      I am offering this testimony in my personal capacity as a fact witness, and I have personal knowledge of the facts stated herein.

2.      I have not been retained as an expert witness by any party or their counsel in connection with this case, and am not offering expert testimony to the Court. I am receiving no compensation in connection with this case or my declaration.

3.      I am submitting this Declaration in support of Plaintiffs' Motion for Preliminary Injunction, which is seeking to prevent Defendants from implementing several sections of Executive Orders Nos. 14154, 14156, and 14261, which are designed to "unleash" fossil fuels, block renewable energy, and suppress the development and publication of climate change science.

4.      I was employed at the United States Environmental Protection Agency ("EPA") Headquarters in Washington, D.C., from September 1985 until retiring on January 24, 2025. Among other things, I was the Office of Civil Enforcement's lead on climate change matters and the National Coordinator of the agency's Clean Renewable Energy Opportunities efforts to incorporate clean renewable energy projects in enforcement case resolutions. During a 2020 temporary fellowship in the U.S. Senate's Committee on Environment and Public Works I helped to draft the 2020 American Innovation and Manufacturing ("AIM") Act that phases down the

1

production and consumption of hydrofluorocarbon (HFC) greenhouse gases ("GHGs"). At EPA, I also worked on numerous fossil fuel and climate-related matters, including but not limited to cases involving AIM Act, methane, and other oil and gas pollution enforcement matters, and in key litigation roles in the Deepwater Horizon oil spill case. After leaving EPA in January 2025, I established and am the Executive Director of CREEDemocracy, a nonprofit organization dedicated to promoting clean renewable energy and helping to empower democracy.

5.      Since its creation, EPA's mission has always been to abate pollution to protect the lives, health, safety, and well-being of people, like the Plaintiffs in this case.[1] Throughout much of my career at EPA, the agency and its staff were aware that one of the greatest pollution sources of harm to human health and welfare is GHG pollution, primarily from burning fossil fuels. This was made clear by, among other things, all of the scientific work that led to the Endangerment Finding for GHGs that was made in 2009.

6.      I have observed and have personal experience with EPA working since 2009 to limit GHG emissions in order to address the significant harms caused by climate change. To "unleash" more fossil fuels requires the dismantling of the pollution control rules and regulations as well as permitting and programs that EPA manages and conducts.

---

[1] U.S. EPA, The Origins of EPA, https://www.epa.gov/history/origins-epa.

7.    I am aware that on March 12, 2025, EPA Administrator Lee Zeldin announced: *"Today is the greatest day of deregulation our nation has seen. We are driving a dagger straight into the heart of the climate change religion to drive down cost of living for American families, unleash American energy, bring auto jobs back to the U.S. and more."* *"Alongside President Trump, we are living up to our promises to unleash American energy, lower costs for Americans, revitalize the American auto industry, and work hand-in-hand with our state partners to advance our shared mission."*[2]

8.    Since January 20, 2025, I have observed Administrator Zeldin and EPA taking numerous actions, implementing executive orders ("EOs") 14154, 14156, and 14261, that work against controlling GHG emissions. Administrator Zeldin is implementing the EOs by directing the EPA to "unleash American energy" and establish "energy dominance" with respect to fossil fuels, which is contrary to the Congressionally-authorized mission of EPA to control and abate pollution to protect American lives and health.[3]

---

[2] U.S. EPA, EPA Launches Biggest Deregulatory Action in U.S. History (Mar. 12, 2025), https://www.epa.gov/newsreleases/epa-launches-biggest-deregulatory-action-us-history (Exhibit A).

[3] Testimony of Lee Zeldin Administrator U.S. Environmental Protection Agency before the United States House of Representatives Committee on Energy & Commerce Subcommittee on Environment (May 20, 2025), https://www.congress.gov/119/meeting/house/118283/witnesses/HHRG-119-IF18-Wstate-ZeldinL-20250520.pdf.2025.05.20 Zeldin Congressional testimony.pdf (Exhibit B).

9.    Administrator Zeldin's plans to close the EPA Office of Atmospheric Protection and the Office of Quality Planning and Standards, which are responsible for regulating GHG pollution, will make the work of limiting or preventing GHG pollution much more difficult.[4]

10.    Administrator Zeldin's efforts to repeal dozens of regulations and policies that limit GHG pollution and other hazardous air pollution will result in greater amounts of GHG pollution emitted to the air. Specifically, EPA Administrator Zeldin's March 12, 2025 list of agency actions being initiated to "unleash" American energy, will all result in substantial increases in GHG pollution for a variety of reasons[5]:

- **"Reconsideration of regulations on power plants (Clean Power Plan 2.0)."** This will slow down the transition to the clean renewable energy sources that are needed to combat climate change because it will enable fossil fuel powered plants to continue to operate while externalizing the costs of their pollution.
- **"Reconsideration of regulations throttling the oil and gas industry."** This will encourage greater use of fossil fuels and slow down the transition to the clean renewable energy sources that are needed to combat climate change.
- **"Reconsideration of mandatory Greenhouse Gas Reporting Program that imposed significant costs on the American energy supply (GHG Reporting Program)."** This publicly available data guides policy decisions at the federal, state, and local levels. Losing the data will deny the Plaintiffs, policy makers and industry access to how much climate-warming gas an economic sector or factory is emitting and to track GHG pollution over time.

---

[4] Jean Chemnick, *EPA Reorganization Signals End to Climate Work*, E&E News (May 5, 2025), https://www.eenews.net/articles/epa-reorganization-signals-end-to-climate-work/ (Exhibit C).

[5] *See* Exhibit A.

4

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 6 of 255

- **"Reconsideration of limitations, guidelines and standards (ELG) for the Steam Electric Power Generating Industry to ensure low-cost electricity while protecting water resources (Steam Electric ELG)."** This will encourage greater use of fossil fuels and slow down the transition to the clean renewable energy sources that are needed to combat climate change.
- **"Reconsideration of wastewater regulations for oil and gas development to help unleash American energy (Oil and Gas ELG)."** This action will make it more likely that oil and gas will be increasingly used as an energy source.
- **"Reconsideration of the 2009 Endangerment Finding and regulations and actions that rely on that Finding (Endangerment Finding)."** This is the science-based foundation for numerous climate-related regulations and will at a minimum create massive uncertainty for the regulated community and, if successful, undermine the legal basis for numerous climate-related legal requirements.

11.     The following additional actions on Administrator Zeldin's March 12, 2025 list will also result in more fossil fuel pollution, because they are all EPA regulations whose purpose is to abate pollution from those sources in order to protect the health and lives of people:[6]

- "Reconsideration of Mercury and Air Toxics Standards that improperly targeted coal-fired power plants (MATS)."
- "Reconsideration of Biden-Harris Administration Risk Management Program rule that made America's oil and natural gas refineries and chemical facilities less safe (Risk Management Program Rule)."
- "Reconsideration of light-duty, medium-duty, and heavy-duty vehicle regulations that provided the foundation for the Biden-Harris electric vehicle mandate (Car GHG Rules)."
- "Reconsideration of technology transition rule that forces companies to use certain technologies that increased costs on food at grocery stores and semiconductor manufacturing (Technology Transition Rule)."

---

[6] *See* Exhibit A.

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 7 of 255

- "Reconsideration of Particulate Matter National Ambient Air Quality Standards that shut down opportunities for American manufacturing and small businesses (PM 2.5 NAAQS)."
- "Reconsideration of multiple National Emission Standards for Hazardous Air Pollutants for American energy and manufacturing sectors (NESHAPs)."
- "Restructuring the Regional Haze Program that threatened the supply of affordable energy for American families (Regional Haze)."
- "Overhauling Biden-Harris Administration's 'Social Cost of Carbon'."
- "Redirecting enforcement resources to EPA's core mission to relieve the economy of unnecessary bureaucratic burdens that drive up costs for American consumers (Enforcement Discretion)."
- "Terminating Biden's Environmental Justice and DEI arms of the agency (EJ/DEI)."
- "Ending so-called "Good Neighbor Plan" which the Biden-Harris Administration used to expand federal rules to more states and sectors beyond the program's traditional focus and led to the rejection of nearly all State Implementation Plans."
- "Working with states and tribes to resolve massive backlog with State Implementation Plans and Tribal Implementation Plans that the Biden-Harris Administration refused to resolve (SIPs/TIPs)."
- "Reconstituting Science Advisory Board and Clean Air Scientific Advisory Committee (SAB/CASAC)."
- "Prioritizing the coal ash program to expedite state permit reviews and update coal ash regulations (CCR Rule)."

12. Administrator Zeldin's March 12, 2025 directive that EPA reconsider its 2009 Endangerment Finding that the current and projected concentrations of GHG emissions threaten the public health and welfare of current and future generations, which serves as the legal prerequisite for EPA to exercise its statutory authority to regulate GHG pollution, has no basis in any new scientific information

6

that I observed during my tenure at EPA.[7,8] In my personal experience at EPA, an endangerment finding regulatory process would typically take between two and five years, and be grounded in the best available scientific research and peer-reviewed publications on the harms of the pollution to human health and welfare. In my years at EPA, I did not encounter a single scientist inside the federal government who disagreed with the Endangerment Finding for GHGs.

13.    I am also aware that the potential loss of over 1,000 probationary EPA employees working on climate change, air pollution, and environmental enforcement, who were put on leave or could be fired at any time. This would be a crippling loss for the agency's ability to carry out its GHG pollution control work.[9]

14.    EPA's Office of Research, reportedly slated for closure,[10] is the scientific arm of EPA with over 1,000 chemists, biologists, toxicologists, physicians,

---

[7] U.S. EPA, Trump EPA Kicks Off Formal Reconsideration of Endangerment Finding with Agency Partners (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-epa-kicks-formal-reconsideration-endangerment-finding-agency-partners. (Exhibit D).

[8] U.S. EPA, Endangerment Finding One Pager, https://www.epa.gov/system/files/documents/2025-03/final-pager-endangerment.pdf (Exhibit E).

[9] See Lisa Friedman, E.P.A. Tells More Than 1,000 They Could Be Fired 'Immediately', NY Times (Feb. 2, 2025), https://www.nytimes.com/2025/02/03/climate/trump-epa-workers-zeldin.html. (Exhibit F).

[10] See Letter from the House Committee on Science, Space, and Technology to Lee Zeldin (March 26, 2025), https://democrats-science.house.gov/download/2025-03-26-epa-letter&download=1. (Exhibit G).

7

and other scientists who provide the scientific backbone for EPA's pollution-control policies. Based on my observations and personal experience, eliminating the experts and dissolving EPA's independent research office will undermine the agency's scientific integrity, limit its ability to abate GHG pollution, and leave the federal government and states ill-equipped to deal with public health risks from GHG pollution and climate change.[11, 12] Without this office, EPA's mission is severely compromised. There is no conceivable reason to eliminate this office unless the goal is to "unleash" more pollution and eliminate the scientific basis of the work EPA does to protect public health and wellbeing, including to prevent and limit GHG pollution.

15. I have reviewed a directive from EPA's Office of Enforcement and Compliance Assurance directing that EPA's "enforcement and compliance will no longer focus on methane emissions from oil and gas facilities,"[13] and requiring the

---

[11] *See* Valerie Volcovici & Tim McLaughlin, US EPA research in limbo as scientists brace for massive job cuts, Reuters (May 1, 2025), https://www.reuters.com/sustainability/climate-energy/us-epa-research-limbo-scientists-brace-massive-job-cuts-2025-05-01/. (Exhibit H).

[12] *See* Valerie Volcovici, US EPA plans to cut staff to 1980s levels, dissolve research office (May 2, 2025), https://www.reuters.com/business/world-at-work/us-epa-plans-reduce-staff-1980s-levels-cut-budget-by-300-million-2025-05-02/. (Exhibit I).

[13] *See* Memorandum from Jeffrey A. Hall re Implementing National Enforcement and Compliance Initiatives Consistently with Executive Orders and Agency Priorities (Mar. 12, 2025), https://www.epa.gov/system/files/documents/2025-03/necimemo- 20250312.pdf. (Exhibit J).

Assistant Administrator for the Office of Enforcement and Compliance Assurance to pre-approve "[a]ny proposed order or other enforcement action that would unduly burden or significantly disrupt energy production or power generation, shut down any facility engaged in energy production or power generation, or severely restrict capacity for energy production or power generation." This action will deter career staff from proposing enforcement actions against fossil fuel energy facilities not only because a new cumbersome process for political level approval is required but also because I know that EPA career staff are frightened that they will be fired or reassigned to undesirable work or locations for enforcement actions against fossil fuel facilities. These disincentives weaken EPA's ability to regulate air pollutants and protect Plaintiffs' health and lives.

16.     I know EPA has a longstanding policy against giving regulated entities definitive assurances (written or oral) that EPA will refrain from enforcing a specific environmental protection statute, regulation, or other legal requirement against that entity outside of the context of formal enforcement proceedings. That policy is called EPA's Policy Against "No Action" Assurances.[14] As the policy states, the problem with those kinds of promises is they "*erode the credibility of EPA's enforcement program by creating real or perceived inequalities in the Agency's treatment of the*

---

[14] Memorandum from Courtney Price to EPA Assistant Administrators, (Nov. 16, 1984), https://www.epa.gov/sites/default/files/2013-10/documents/noactionass-mem.pdf (Exhibit K).

*regulated community. This credibility is vital as a continuing incentive for regulated*

*parties to comply with environmental protection requirements.*" EPA's Policy

Against "No Action" Assurances has been in place for over four decades, since 1984.

17.     On March 24, 2025, EPA invited regulated facilities, including fossil

fuel facilities that emit hazardous air pollutants and are subject to 89 Fed. Reg. 38508

or eight other hazardous air pollutant rules, to request presidential exemptions under

42 U.S.C § 7412(i)(4) by email.[15] The President's April 8 Proclamation on

*Regulatory Relief for Certain Stationary Sources to Promote American Energy,*[16]

awards exemptions to numerous coal-fired electricity generation facilities without

any facility-specific determination, analysis or public input, which is what EPA staff

would typically require and review in advance of granting any kind of exemption.

In my personal experience at EPA, these types of exemptions will lead to increases

in fossil fuel pollution and will erode the public's confidence in the agency's

credibility.

18.     I am aware that EPA is currently working to increase the ability of coal

and gas-fired power plants in the U.S. to continue and increase their GHG pollution;

to increase the amount of mercury that may be emitted by coal- and gas-fired power

---

[15] EPA, Clean Air Act Section 112 Presidential Exemption Information, https://www.epa.gov/stationary-sources-air-pollution/clean-air-act-section-112-presidential-exemption-information (Exhibit L).
[16] Proclamation No. 10914 of April 8, 2025, 90 Fed. Reg. 16777 (Apr. 21, 2025) (Exhibit M).

10

plants; and to allow all coal- and gas-fired power plants to operate without continuously monitoring the exhaust from their smokestacks.[17] According to the EPA from when I was working there, coal-fired power plants are the largest source of anthropogenic mercury emissions in the United States, and exposure to mercury emissions harms human health.[18] I have seen pre-publication versions of two proposed EPA rules to repeal all GHG emissions standards for fossil fuel-fired power plants, and another to modify the mercury and air toxic standards for coal- and oil-fired power plants, both dated June 11, 2025.[19, 20] The proposed rule says these changes were "directed by Executive Order 14154 . . . and Executive Order 14261."[21] EPA is the primary entity responsible for controlling air pollution, and the limits EPA establishes by rule are the limits EPA can enforce. The above-listed

---

[17] *See* Lisa Friedman, Document Shows E.P.A. Plans to Loosen Limits on Mercury From Power Plants, NY Times (June 10, 2025),
https://www.nytimes.com/2025/06/10/climate/epa-mercury-power-plants-greenhouse-gases.html. (Exhibit N).

[18] *See* EPA, Basic Information About Mercury, (2024, last visited June 11, 2025), https://www.epa.gov/mercury/basic-information-about-mercury. (Exhibit O).

[19] *See* Repeal of Greenhouse Gas Emissions Standards for Fossil Fuel-Fired Electric Generating Units, internet pre-publication version (signed June 11, 2025) (to be codified at 40 CFR Part 60),
https://www.epa.gov/system/files/documents/2025-06/12674-01-oar_carbon-pollution-standards-repeal-nrpm_proposal_20250611_clean_v3_0.pdf. (Exhibit P).

[20] *See* Repeal of Amendments to National Emission Standards for Hazardous Air Pollutants: Coal- and Oil-Fired Electric Utility Steam Generating Units (signed June 11, 2025) (to be codified at 40 CFR Part 63),
https://www.epa.gov/system/files/documents/2025-06/6716.4-01-oar_2060-aw68_matsrtrrepeal_proposal_fr_20250610_signature-review-1.pdf. (Exhibit Q).

[21] *See* Exhibit P at 14; *see also* Exhibit Q at 11.

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 13 of 255

changes do not appear to be based on any scientific information that I was aware of while at EPA and will weaken EPA's ability to regulate fossil fuel pollution and protect Plaintiffs' health and lifespans. EPA is taking these actions to increase the use of fossil fuels while also taking actions to limit the growth of renewable energy. For example, in response to President Trump's executive orders, EPA Region 2 withdrew a Clean Air Act permit that had already been issued for an offshore wind project.[22]

19.     EPA and Administrator Zeldin are utilizing EPA resources and a self-imposed vastly reduced workforce to eliminate the regulatory programs that exist to study and limit the effects of fossil fuel pollution. Based on my decades of my personal experience working at EPA and my understanding of its limited resources, EPA's time spent "unleashing" pollution will undoubtedly result in more fossil fuel pollution and delay critical efforts to implement regulatory actions consistent with EPA's mission to abate pollution to protect Plaintiffs' lives, health, safety, and well-being.

20.     All told, collectively these actions that EPA is currently taking to "unleash" fossil fuels are undoing safeguards originally implemented by the agency

---

[22] Order Granting Motion for Voluntary Remand, OCS Appeal No. 24-01 (EPA App. Bd. Mar. 14, 2025), https://yosemite.epa.gov/oa/eab_web_docket.nsf/9C7B7CF33923032185258C4D0058F4A7/$File/Atlantic%20Shores%20Order%20Granting%20Motion%20for%20Voluntary%20Remand,%20FINAL.pdf. (Exhibit R).

12

after significant work and scientific research. Those safeguards were designed to reduce GHG emissions because the EPA's mission is to abate pollution, not give industries a free pass to pollute the air. EPA's implementation of the EOs is cumulatively resulting in additional—and avoidable—fossil fuel pollution in the United States.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 12, 2025 at Reston, Virginia.

_____

Gary A. Jonesi

13

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 15 of 255

# EXHIBIT A

USCA Case #26-1037      Document #2183632       Filed: 07/16/2026      Page 152 of 164

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 16 of 255



# EPA Launches Biggest Deregulatory Action in U.S. History

## Administrator Zeldin Announces 31 Historic Actions to Power the Great American Comeback

March 12, 2025

**Contact Information**
EPA Press Office (press@epa.gov)

**WASHINGTON** – U.S. Environmental Protection Agency (EPA) Administrator Lee Zeldin announced the agency will undertake 31 historic actions in the greatest and most consequential day of deregulation in U.S. history, to advance President Trump's Day One executive orders and Power the Great American Comeback. Combined, these announcements represent the most momentous day in the history of the EPA. While accomplishing EPA's core mission of protecting the environment, the agency is committed to fulfilling President Trump's promise to unleash American energy, lower cost of living for Americans, revitalize the American auto industry, restore the rule of law, and give power back to states to make their own decisions.

*"Today is the greatest day of deregulation our nation has seen. We are driving a dagger straight into the heart of the climate change religion to drive down cost of living for American families, unleash American energy, bring auto jobs back to the U.S. and more,"* **said EPA Administrator Zeldin.**

*"Alongside President Trump, we are living up to our promises to unleash American energy, lower costs for Americans, revitalize the American auto industry, and work hand-in-hand with our state partners to advance our shared mission,"* **added EPA Administrator Zeldin.**

These historic actions will roll back trillions in regulatory costs and hidden "taxes" on U.S. families. As a result of these announcements, the cost of living for American families will decrease. It will be more affordable to purchase a car, heat homes, and operate a business. It will be more affordable to bring manufacturing into local communities while individuals widely benefit from the tangible economic impacts.

These actions will create American jobs, including incredible progress to bring back American auto jobs. The Biden and Obama era regulations being reconsidered have suffocated nearly every single sector of the American economy.

Today, EPA Administrator Zeldin announced the following actions:

**UNLEASHING AMERICAN ENERGY**

- Reconsideration of regulations on power plants (Clean Power Plan 2.0)

- Reconsideration of regulations throttling the oil and gas industry (OOOO b/c)

- Reconsideration of Mercury and Air Toxics Standards that improperly targeted coal-fired power plants (MATS)

- Reconsideration of mandatory Greenhouse Gas Reporting Program that imposed significant costs on the American energy supply (GHG Reporting Program)

- Reconsideration of limitations, guidelines and standards (ELG) for the Steam Electric Power Generating Industry to ensure low-cost electricity while protecting water resources (Steam Electric ELG)

- Reconsideration of wastewater regulations for oil and gas development to help unleash American energy (Oil and Gas ELG)

- Reconsideration of Biden-Harris Administration Risk Management Program rule that made America's oil and natural gas refineries and chemical facilities less safe (Risk Management Program Rule)

USCA Case #26-1037     Document #2183632      Filed: 07/16/2026      Page 154 of 164

## LOWERING THE COST OF LIVING FOR AMERICAN FAMILIES

- Reconsideration of light-duty, medium-duty, and heavy-duty vehicle regulations that provided the foundation for the Biden-Harris electric vehicle mandate (Car GHG Rules)

- Reconsideration of the 2009 Endangerment Finding and regulations and actions that rely on that Finding (Endangerment Finding)

- Reconsideration of technology transition rule that forces companies to use certain technologies that increased costs on food at grocery stores and semiconductor manufacturing (Technology Transition Rule)

- Reconsideration of Particulate Matter National Ambient Air Quality Standards that shut down opportunities for American manufacturing and small businesses (PM 2.5 NAAQS)

- Reconsideration of multiple National Emission Standards for Hazardous Air Pollutants for American energy and manufacturing sectors (NESHAPs)

- Restructuring the Regional Haze Program that threatened the supply of affordable energy for American families (Regional Haze)

- Overhauling Biden-Harris Administration's "Social Cost of Carbon"

- Redirecting enforcement resources to EPA's core mission to relieve the economy of unnecessary bureaucratic burdens that drive up costs for American consumers (Enforcement Discretion)

- Terminating Biden's Environmental Justice and DEI arms of the agency (EJ/DEI)

## ADVANCING COOPERATIVE FEDERALISM

- Ending so-called "Good Neighbor Plan" which the Biden-Harris Administration used to expand federal rules to more states and sectors beyond the program's traditional focus and led to the rejection of nearly all State Implementation Plans

USCA Case #26-1037     Document #2183632        Filed: 07/16/2026        Page 155 of 164

Case 2:25-cv-00054-DLC    Document 25-22    Filed 06/13/25    Page 19 of 255

- Working with states and tribes to resolve massive backlog with State Implementation Plans and Tribal Implementation Plans that the Biden-Harris Administration refused to resolve (SIPs/TIPs)

- Reconsideration of exceptional events rulemaking to work with states to prioritize the allowance of prescribed fires within State and Tribal Implementation Plans (Exceptional Events)

- Reconstituting Science Advisory Board and Clean Air Scientific Advisory Committee (SAB/CASAC)

- Prioritizing coal ash program to expedite state permit reviews and update coal ash regulations (CCR Rule)

- Utilizing enforcement discretion to further North Carolina's recovery from Hurricane Helene

Last updated on March 14, 2025

# EXHIBIT 6

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| ELENA VENNER, *et al.*,<br>                    *Petitioners*,<br><br>        v.<br><br>UNITED STATES<br>ENVIRONMENTAL PROTECTION<br>AGENCY, *et al.*,<br>                    *Respondents*. | Case No. 26-1038<br>Lead Case No. 26-1037<br>(and consolidated cases) |

## SUPPLEMENTAL DECLARATION OF DANIEL SPERLING, PhD, IN SUPPORT OF PETITIONERS' MOTION TO STAY THE FINAL RULE PENDING REVIEW

I, Daniel Sperling, hereby declare and if called upon would testify as follows:

1.    I am submitting this Supplemental Declaration in support of Petitioners' Motion to Stay the Repeal Rule pending review. I am offering this testimony in my personal capacity, and I have personal knowledge of the facts stated herein.

2.    I have reviewed the declarations of Brandis (of Volvo Group North America), Noonan (of International Motors), and Potter (Daimler Truck North America) and submit this supplemental declaration to respond to some of their

1

statements that I believe don't accurately reflect the current state of the transportation market and technology. (ECF 2181086, Exhibits D-F).

3. **Intervenors claims of harm from "whiplash" supports a stay of the Repeal Rule, not the reverse.** EPA is causing the whiplash that hurts all companies. Any whiplash caused by EPA's reversal of its regulatory framework (or now the need for a stay) hurts the global competitiveness of all manufacturers, given the global shift to electric cars and trucks. It also hurts smaller American auto companies like Rivian. The global market tells a clear story that the intervenor declarants are sidestepping.

4. The global market, including the truck markets served by Volvo (Swedish), Daimler (German), and International Motors (owned through a subsidiary of Volkswagen Group, a German multinational conglomerate), is transitioning toward electric propulsion. Large international truck manufacturers must produce and sell electric trucks to meet this increased demand globally or they will shrink as others provide the electric trucks.

5. Sales of electric trucks are growing rapidly in countries like China, which had 28% market share of electric heavy freight trucks in 2025. In 2025, 18% of heavy duty trucks sold in Sweden were electric while 16% were electric in Norway. The U.S. is an outlier on transportation electrification, largely because of the actions of the current administration.

2

6.    This administration is trying to reduce sales of electric vehicles (EVs) in the U.S., and the Repeal Rule is a major contributor to that. To be competitive in the international truck market, Volvo, Daimler, and International know they need to compete in China and Europe and elsewhere to do that, they need to produce and sell electric Medium- and Heavy-Duty trucks. Depressing U.S. sales and production of EVs, which the Repeal Rule attempts to do, is worse for all vehicle manufacturers competing globally, rendering them less competitive in the medium and long-term future. And it creates whiplash for companies more focused on the US market.

7.    **There is a Demand for Electric Medium Duty Trucks in the U.S. (Class 4, 5, 6),** such as those used by Amazon, UPS and others to deliver goods from warehouses to retail businesses and homes.  For example, Amazon is already buying and deploying Medium-Duty electric delivery trucks. Amazon already employs 40,000 electric delivery trucks supplied by Rivian with a commitment to reach 100,000 vehicles.[1] FedEx also uses electric delivery trucks. The total cost of ownership of electric trucks varies greatly depending on the size and use of the trucks. Delivery trucks are known to often have lower costs because they travel relatively certain distances each day, enabling fleets to buy trucks with relatively smaller (and less expensive) batteries, while still accumulating very high total

---

[1] https://www.aboutamazon.com/news/transportation/everything-you-need-to-know-about-amazons-electric-delivery-vans-from-rivian

3

mileage. Because the battery and truck costs are limited when used for deliveries, and electricity and maintenance costs are much lower than with gasoline and diesel engines, the total cost of owning and operating electric delivery trucks tends to be less than for internal combustion engine trucks.   There are many other applications and situations where electric trucks are already economically attractive.  Because large transportation companies have large fleets, they also generally charge their trucks in their own depots at their warehouses, thus easing the transition to a public charging network. Indeed, Amazon alone has installed 50,000 EV chargers across the United States.

8.      **Electric Class 8 trucks are already being sold in the U.S. by Tesla and globally by International, Volvo, and Daimler.** The Tesla electric Class 8 Semi has been selling in the U.S. at a lower price than International, Volvo, or Daimler with positive reviews. It travels 500 miles on a single charge. There is demand for these Tesla electric Class 8 trucks and they are now rolling out of the Tesla factory in Reno. New Class 8 long-haul trucks are often purchased by large corporations like UPS, Amazon, and Walmart, who have terminals and warehouses that span the United States. PepsiCo subsidiary FritoLay was the first to partner with Tesla to use the new electric Semi in 2022, installing charging facilities on their

warehouse property.[2] The declarants do not address this.

9.      While the cost of owning and operating certain large electric Class 8 trucks is currently greater than diesel trucks in certain applications in the U.S., the reality is that the technology exists and performs well, and the costs are coming down. As indicated, the Tesla Class 8 Semi is priced much lower than the trucks from the legacy truck makers, while similar trucks in China are being sold for even much less. There is also substantial experience with Class 8 electric trucks in the US. For instance, the Volvo subsidiary Peterbilt 520EV garbage truck[3] has been picking up refuse in Portland, Oregon for nearly three years.[4] The waste management company Republic Services[5], which operates in 41 states and Puerto Rico, has been incorporating electric Class 8 trucks into their fleet since 2023.[6]

10.      The truck manufacturers could scale at the rate needed to comply with EPA's rules that were repealed for their upcoming model years. There is plenty of evidence that demand and economics in the U.S. are sufficient to support the electric

---

[2] https://www.pepsico.com/newsroom/stories/2023/go-behind-the-wheel-with-pepsicos-first-tesla-semi-driver
[3] https://www.peterbilt.com/trucks/electric/520EV
[4] https://www.oregonlive.com/environment/2023/11/oregons-first-electric-garbage-truck-hits-portland-streets.html
[5] https://www.republicservices.com/sustainability/climate-leadership/electrification
[6] https://www.weforum.org/stories/2023/02/electric-garbage-truck-energy-mobility/

5

truck market (aided by large incentives being provided by California and perhaps other states), even as the global market moves ahead.

11.    For the Hawai'i Youth Petitioners, Class 8 trucks are largely not what is needed on the Islands. But the Repeal Rule harms their ability to electrify the other classes of vehicles they do need. Hawai'i is especially in need of Medium-Duty electric trucks and has had some difficulty securing orders, undercutting declarants' arguments about lack of U.S. demand. Indeed, Hawai'i is legally required to transition its ground transportation fleets to zero-emission vehicles.

12.    **More charging infrastructure is needed, but it is not a barrier.** The technology for charging Light-, Medium-, and Heavy-Duty vehicles at high speed exists, and is built out more than the intervenor declarants state. For Light-Duty infrastructure, there is an extensive network. Almost all new Light- and Medium-Duty EVs today have access to Tesla's network, doubling the number of chargers available. Car companies are continuing to invest in and build out the network of chargers. The major corporations purchasing Medium- and Heavy-Duty vehicles have hundreds to thousands of warehouses and facilities in the U.S. that can host charging infrastructure for Class 8 EVs. Indeed, and as noted above, Amazon has already proven this possible by installing 50,000 charging stations at its facilities in the United States.

6

13. Even where further infrastructure is needed, companies like Volvo, Daimler, and International could collaborate in installing and financing their own charging networks like Tesla and Rivian have done and as other car manufacturers are doing. Notably, eight car companies (BMW, GM, Honda, Hyundai, Kia, Mercedes-Benz, Stellantis, and Toyota) founded IONNA[7], which is dedicated to building out EV charging across the United States. IONNA is on pace to build 30,000 high-speed EV chargers by 2030.[8] Clearly, the challenge of expanding the charging network is not a prohibitive barrier.

14. The declarants' assertions about market demand and the need to shift infrastructure are easily remedied by a stay and vehicle manufacturers deploying the electrification technology they are already deploying globally.

15. There was a time when automakers claimed that tetraethyl lead was needed in gasoline. EPA's rules to eliminate leaded gasoline, to protect human health and children, forced the technological and market conditions that protected people from that pollutant.[9] Here the technology, electric trucks, already exists—that U.S. innovators made possible—and it is being deployed globally and suppressed here at home. That suppression is best shown by the Repeal Rule.

---

[7] https://www.ionna.com/
[8] https://www.axios.com/2026/07/08/ionna-accelerates-us-ev-charging-buildout
[9] https://nonprofitnewsfeed.com/resource/the-rise-and-fall-of-leaded-gasoline-an-absurd-true-timeline/

7

16.     Finally, Respondents argue that it is futile to stay the Repeal Rule because model year 2027 vehicles are locked in. That point is precisely why a stay is needed. There are more model years being planned right now. A stay keeps vehicle manufacturers moving in the direction EPA set them on since the Endangerment Finding was made, and it keeps the U.S. competitive with the rest of the world.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 16, 2026 in Davis, California.

_____
Daniel Sperling

8